UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

NEW YORK CITY COUNCIL MEMBER YDANIS
RODRIGUEZ, NEW YORK CITY COUNCIL MEMBER
JUMAANE WILLIAMS, JOHN KNEFEL, NEW YORK
CITY COUNCIL MEMBER  LETITIA JAMES, JUSTIN
SULLIVAN, JEFFERY MCCLAIN, NEW YORK CITY
COUNCIL MEMBER MELISSA MARK-VIVERITO,
STEPHANIE KEITH, DEMOCRATIC DISTRICT
LEADER PAUL NEWELL, JUSTIN WEDES, PETER
DUTRO, TIMOTHY FITZGERALD, PAUL SULLIVAN,
MICHAEL RIVAS and YONATAN MILLER.

|  | Index No. 12 CV 3389 (NRB)(RLE) |
|  | ECF CASE |
|  | **COMPLAINT AND JURY DEMAND** |

                                        Plaintiffs,

                         -against-

DEPUTY INSPECTOR EDWARD WINSKI, THE CITY
OF NEW YORK, THE METROPOLITAN TRANSIT
AUTHORITY, J.P. MORGAN CHASE & CO.,
BROOKFIELD OFFICE PROPERTIES, MITSUI
FUDUSAN AMERICA, INC., MAYOR OF THE CITY
OF NEW YORK MICHAEL BLOOMBERG, NEW
YORK POLICE DEPARTMENT COMMISSIONER
RAYMOND KELLY,  METROPOLITAN TRANSIT
AUTHORITY POLICE COMMISSIONER MICHAEL
COAN,  MTA POLICE OFFICER LAKERAM, , POLICE
OFFICER ROBERT MATRISCIANI, SERGEANT
STEVEN CARO, POLICE OFFICER MARGARET
MONROE, POLICE OFFICER FERNANDO TRINIDAD,
JOHN AND JANE DOE NYPD OFFICERS ##1-100,
JOHN AND JANE DOE MTA POLICE OFFICERS ##1-
8, JOHN DOE EMPLOYEES OF J.P. MORGAN CHASE
& CO. ##1-10, JOHN DOE EMPLOYEES OF
BROOKFIELD OFFICE PROPERTIES ##1-10, JOHN
DOE EMPLOYEES OF MITSUI FUDUSAN AMERICA,
INC. ##1-10,

                                        Defendants.

-------------------------------------------------------------------- x

TABLE OF CONTENTS                                    Page

I.   ABRIDGING FREEDOM OF THE PRESS: ELECTED OFFICIALS
     AND MEMBERS OF THE PRESS HAVE BEEN DENIED A RIGHT
     OF ACCESS TO OBSERVE AND RECORD POLICE ACTIONS
     AGAINST OCCUPY WALL STREET                                11

     a.  Elected Officials Prevented From Observing Police
         Actions By Improper Arrests And Uses Of Force          11

     b.  Suppression Of "Mainstream" Media Journalists          16

     c.  Suppression Of Citizen Journalists                     19

     d.  The Police Forces Of Defendant City And Defendant MTA  23
         Have Vested Interests In Chilling Press And Governmental
         Access To Their Enforcement Activities

II.  ABRIDGING FREEDOM TO PEACEABLY ASSEMBLE: FROM THE
     INCEPTION OF THE OCCUPY WALL STREET MOVEMENT,
     DEFENDANTS HAVE ACTED TO UNCONSTITUTIONALLY AND
     ARBITRARILY PREVENT PERSONS FROM ASSEMBLING IN
     TRADITIONAL PUBLIC FORA TO DISCUSS MATTERS OF PUBLIC
     CONCERN, WHILE ALLOWING PERSONS TO ENGAGE IN NON-
     POLITICAL ACTIVITIES IN THOSE SAME SPACES                  29

     a.  Prevention Of Entry Into And Forcible Removal Of Citizens
         From Public Spaces Engaging In Peaceful Assembly
         And Public Issue Speech                                29

         1.  Public Space                                       29

         2.  Public Issue Speech and Assembly                   32

         3.  Factual Allegations Relating to Public Space Issues 37

             FKA Liberty Park                                   44

             100 Williams Street                                48

             Winter Garden                                      49

             Union Square Park                                  52

III. DEFENDANTS CITY, MAYOR BLOOMBERG, COMMISSIONER KELLY
     HAVE CONSPIRED WITH PRIVATE CORPORATIONS AND OTHER
     GOVERNMENTAL ENTITIES TO SUPPRESS THE CONSTITUTIONAL
     RIGHTS OF PLAINTIFFS AND OTHER OWS PARTICIPANTS TO
     PETITION THEIR GOVERNMENT FOR REDRESS OF GRIEVANCES        53

IV. FREEDOM OF SPEECH: DEFENDANTS HAVE ENGAGED IN
SYSTEMATIC VIOLATIONS OF LAW AND CONSTITUTIONAL
GUARANTEES INTENDED TO CHILL THE FIRST AMENDMENT
RIGHTS OF OCCUPY WALL STREET PARTICIPANTS TO EXPRESS
OPINIONS ON MATTERS OF PUBLIC CONCERN                          56

    a. NYPD Often Overcharges Peaceful Protesters With
    Resisting Arrest In Order To Hold Them Overnight
    Rather Than Release Them With DAT's                        56

    b. NYPD Photographs Arrestees And, Upon
    Dismissals, Does Not Return The Photographs To
    The Innocent Arrestee In Violation Of State Privacy Law    58

V. THE LACK OF RESPECT THE NYPD HAS FOR THE COMMUNITIES
IT POLICES, AND FOR THE CONSTITUTION AND LAWS IT IS
SUPPOSED TO UPHOLD ALSO LEADS TO WIDESPREAD NYPD
CORRUPTION AND CRIMINAL CONDUCT                                 61

VI. NYPD MISCONDUCT CAN BE EXAMINED IN  MICROCOSM BY
VIEWING THE NYPD'S TREATMENT OF THE OCCUPY MOVEMENT            64

EQUITABLE RELIEF                                                 72

CAUSES OF ACTION 1 – 34                                          74

APPENDIX I                                                      114

I. A CONTINUING PATTERN OF MISCONDUCT AND REFORM:
NYPD HISTORY, PAST AND CURRENT, SUPPORTS THE PLAINTIFFS'
DEMAND FOR THE APPOINTMENT OF INDEPENDENT AUDITOR             114

II. LACK OF ACCOUNTABILITY PLUS  LACK OF TRANSPARENCY EQUAL
LACK OF TRUST BETWEEN THE NYPD AND THE NYC COMMUNITIES
THEY POLICE                                                    120

    A.    UNCONSTITUTIONAL ARREST QUOTAS                        120

    B.    "CONTEMPT OF COP" ARRESTS                             124

    C.    STOP AND FRISK                                        128

    D.    FLAKING/ TESTILYING                                   129

III. FAILURES OF NYPD OVERSIGHT AND  SELF- POLICING LEAD TO
LACK OF ACCOUNTABILITY FOR POLICE MISCONDUCT CREATING
LACK OF TRUST OF THE COMMUNITY IN THE NYPD                    133

A.    INTERNAL AFFAIRS BUREAU                                      133

B.    CIVILIAN COMPLAINT REVIEW BOARD                             135

C.    COMMISSION TO COMBAT POLICE CORRUPTION                      137

IV.  THE FINANCIAL COST OF THIS UNCHECKED  NYPD MALFEASANCE
     AND WRONGDOING HAS HAD NO EFFECT ON THE NYPD CONDUCT         140

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiffs seek relief for the violation of their rights secured by 42 USC §1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York and rules and regulations of the City of New York.

2.     The claims arise from a series of incidents in connection with Occupy Wall Street protests beginning in and around September 17, 2011 and continuing to the present day in which the City of New York in concert with various private and public entities have employed Officers of the New York City Police Department ("NYPD") and others acting under color of state law, to intentionally and willfully subject Plaintiffs and the public to, among other things, violations of rights to free speech, assembly, freedom of the press, false arrest, excessive force, false imprisonment, and malicious prosecution and, furthermore, purposefully obstructing Plaintiffs carrying out their duties as elected officials and members of the press, including oversight of the New York City Police Department.

3.     This unlawful conduct has been undertaken with the intention of obstructing, chilling, deterring and retaliating against Plaintiffs for engaging in Constitutionally-protected protest activities.

4.     Plaintiffs seek injunctive relief as well as special, compensatory and punitive monetary damages against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

5.     This action is brought pursuant to 28 USC §1331, 42 USC §1983, and the First,

Fourth and Fourteenth Amendments to the United States Constitution.  Pendent party jurisdiction and supplementary jurisdiction over Plaintiffs' state law claims are asserted.

6.      Venue is laid within the United States District Court for the Southern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claims occurred within the boundaries of the Southern District of New York.

## INTRODUCTION

7.      The First Amendment to the United States Constitution states: "Congress shall make no law [I.]  respecting an establishment of religion, or prohibiting the free exercise thereof; [II.] or abridging the freedom of speech, [III.] or of the press; [IV.] or the right of the people peaceably to assemble, [V.] and to petition the Government for a redress of grievances.

8.      During the early life of the Occupy Wall Street ("OWS") movement, Defendants including but not limited to Defendant City of New York and its police force, the New York City Police Department ("NYPD"), have acted to systematically curtail four of the five freedoms guaranteed by the First Amendment with respect to Occupy Wall Street participants: Freedom of Speech, Freedom of the Press, Freedom to Peaceably Assemble, and Freedom to Petition the Government for Redress of Grievances.

9.      Furthermore, in the course of their undertakings intended to suppress Plaintiffs' First Amendment rights, Defendants have systematically employed means that violate Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

10.      Private corporations named as Defendants and others have conspired and acted in concert with the government actors named as Defendants and others to suppress the First

Amendment rights of citizens speaking out against the perceived interests of such corporations. This lawsuit seeks redress for these violations, including but not limited to ensuring that Defendant City of New York ("City") and its agents follow the law as it relates to political protest and First Amendment protected expression.

11.      Plaintiffs bring this action primarily to address following unlawful actions taken by the defendants:

   a.   The arbitrary prevention of citizens from entering public spaces for the purpose of lawfully and peaceably assembling, and the forcible removal of citizens from public spaces who are present for the purpose of lawfully and peaceably assembling;

   b.   Violating the rights of members of the press and elected officials who seek to lawfully observe and document actions taken by police officers in and around demonstrations and other Constitutionally protected activities;

   c.   Violating the privacy of protesters who have been arrested but whose charges were dismissed by retaining the photographs of said protesters;

   d.   Violating the rights to Free Speech and public assembly by improper police conduct during the arrest and processing of peaceful protesters that seek to chill the continued and future expressive conduct of said peaceful protesters;

   e.   Detaining persons in arrest and non-arrest postures for extended periods of time for participating in peaceful protests, without charges;

   f.   Photographing said non-prosecuted detainees in direct violation of applicable statutes and administrative enactments setting forth offenses which justify police taking and retaining photographs of arrestees;

4

g.   Charging persons arrested for participating in peaceful protests with crimes and violations not actually committed;

h.   Overcharging persons arrested for participating in peaceful protests with crimes and violations not supported by probable cause in order to remove officers' discretion to release said persons from custody with summonses or Desk Appearance Tickets;

i.   Charging persons arrested for participating in peaceful protests with crimes and violations in the absence of probable cause; and

j.   Using excessive force against persons participating in peaceful protests with the intention and purpose of denying, dissuading and/or discouraging said protesters from exercising their First Amendment rights to free expression, peaceable assembly, and to petition their government for a redress of grievances.

k.   Creating and disseminating disinformation, such as false alerts of threats to officer safety[1], in order to unneccesarily escalate police responses to peaceful protest activities, and in efforts to instigate escalated responses from said peaceful protesters to justify police uses of force.

12.   Plaintiffs now bring this action to assure that present and future First Amendment protected activities undertaken by Plaintiffs and others will not be violently suppressed by Defendants in the absence of probable cause and in violation of

---

[1] See, e.g., Youtube, "M22 NYPD tries to incite riot at ows union square" uploaded March 22, 2012, and available online at
http://www.youtube.com/watch?feature=player_embedded&v=Z1kMs93nM_M [video of junior officer participating in enforcement against OWS protesters at Union Square repeatedly shouting "They're throwing glass bottles! They want to hurt us, guys!" when no such activity was taking place.]

Constitutional guarantees.

## PARTIES

13.     Plaintiff Ydanis Rodriguez is a member of the New York City Council, representing the people of the 10th Council District in Manhattan, New York.  As such, he represents many constituents who have participated in the OWS and other protest actions in the City of New York.  Council member Rodriguez is also an active participant in OWS and has participated in other protest actions in the City of New York.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

14.     Plaintiff Jumaane Williams is a member of the New York City Council, representing the people of the 45th Council District in Brooklyn, New York.  As such, he represents many constituents who have participated in the OWS and other protest actions in the City of New York.  Council member Williams is also an active participant in OWS and has participated in other protest actions in the City of New York.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

15.     Plaintiff John Knefel is a participant in OWS and a citizen journalist.  NYPD has not issued him a "press pass."   He intends to participate in Constitutionally protected protest activities in New York City in the future.

16.     Plaintiff Letitia James is a member of the New York City Council, representing the people of the 35th Council District in Brooklyn, New York.  As such, she represents many constituents who have participated in OWS and other protest actions in the City of New York.  Council member James is also an active participant in OWS and has participated in other protest actions in the City of New York.  She intends to participate in Constitutionally protected protest activities in New York City in the future.

6

17.     Plaintiff Justin Sullivan is a participant in OWS and a citizen journalist.  NYPD has not issued him a "press pass."  He intends to participate in Constitutionally protected protest activities in New York City in the future.

18.     Plaintiff Timothy Fitzgerald is a participant in OWS and a citizen journalist. NYPD has not issued him a "press pass."   He intends to participate in Constitutionally protected protest activities in New York City in the future.

19.     Plaintiff Paul Sullivan is a participant in OWS and a citizen journalist.  NYPD has not issued him a "press pass."  He intends to participate in Constitutionally protected protest activities in New York City in the future.

20.     Plaintiff Michael Rivas is a participant in OWS.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

21.     Plaintiff Jeffery McClain is a participant in OWS and a member of the organization Iraq War Veterans for Peace.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

22.     Plaintiff Melissa Mark-Viverito is a member of the New York City Council, representing the people of the 8th Council District in Manhattan and the Bronx, New York.  As such, she represents many constituents who have participated in the Occupy Wall Street and other protest actions in the City of New York.  Council member Mark-Viverito is also an active participant in OWS and has participated in other protest actions in the City of New York.  She intends to participate in Constitutionally protected protest activities in New York City in the future.

23.     Plaintiff Stephanie Keith is a photographic journalist.  Her photographs have been printed in various media outlets including the New York Times and Wall Street Journal.

On October 1, 2011, she was covering the OWS Brooklyn Bridge protest.  At least two prior times, and one time subsequent to her October 1, 2011 arrest, the NYPD has issued her a "press pass."  Her images of the October 1, 2011 march on or near the Brooklyn Bridge were utilized by the Associated Press and appeared on national news outlets including ABC News.  She intends to continue to earn a living by photographing protest activities, including those associated with the Occupy Wall Street movement.

24.     Plaintiff Paul Newell is the Democratic District Leader for the 64th Assembly District, Part C, Manhattan, a district encompassing areas where many Occupy Wall Street activities have been conducted, notably including Zuccotti Park, F/K/A Liberty Plaza Park[2] ("FKA Liberty Park[3]").  He is also a participant in OWS and has participated in other large scale community actions, demonstrations and protests prior to Occupy Wall Street.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

25.     Plaintiff Jason Wedes is a participant in OWS and a citizen journalist.  NYPD has not issued him a "press pass."  He intends to participate in constitutionally protected protest activities in New York City in the future.  He is one of several persons who posts updates about OWS to the twitter account "OccupyWallStNYC," and also posts as an administrator to the Occupy Wall Street Facebook page.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

26.     Plaintiff Peter Dutro is an active participant in OWS. He is a member of various

---

[2] Following Brookfield Properties' purchase of One Liberty Plaza, Liberty Plaza Park was renamed Zuccotti Park, in honor of Brookfield Properties Chairman John Zuccotti.
[3] By the appellation "FKA Liberty Park" used herein, Plaintiffs note the ironic fact that the OWS movement, criticizing corporate capture of our nation's political discourse at the expense of individual rights and liberties, grew to prominence in a privately-owned public space that was formerly named to invoke the American ideal of liberty, and now for a corporate chairman.

working groups, including one that interacts with Amalgamated Bank, the bank that holds much of the donated funds received on behalf of the Occupy Wall Street movement. He intends to participate in Constitutionally protected protest activities in New York City in the future.

27.     Plaintiff Yonatan Miller is an active participant in OWS. He is a member of various working groups. He intends to participate in Constitutionally protected protest activities in New York City in the future.

28.     Defendant The City of New York is a municipal corporation organized under the laws of the State of New York. NYPD is an agency of the City of New York and its Commissioner and officers are employees and agents of the City of New York.

29.     Defendant Metropolitan Transit Authority ("MTA") is a public transportation corporation organized under the laws of the State of New York. Its Police Department, Commissioner and officers are employees and agents of the MTA.

30.     Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a business entity registered to do business and in fact doing business in the State of New York. J.P. Morgan is the property owner of One Chase Manhattan Plaza, and is the successor in interest to the original entity that bargained with the City of New York to provide a publicly accessible open area in return for bonus floor to area ratio in its building on the One Chase Manhattan Plaza site.

31.     Defendant Brookfield Office Properties ("Brookfield") is a business entity registered to do business and in fact doing business in the State of New York. Brookfield is the property owner of FKA Liberty Park, the Winter Garden in the World Financial Center, and other properties in the City of New York. FKA Liberty Park, and the Winter

Garden and other properties owned by Brookfield are publicly accessible open areas, which it or a predecessor in ownership were required to build in return for bonus floor to area ratio in its buildings near the sites.

32.     Defendant Mitsui Fudusan America, Inc. ("Mitsui") is a business entity registered to do business and in fact doing business in the State of New York.  Mitsui is the property owner of 100 William Street which includes a publicly accessible open area, which it or a predecessor in ownership was required to build in return for bonus floor to area ratio in its building on the site.

33.     Defendant Mayor Michael Bloomberg ("Mayor Bloomberg") was at all times here relevant the Mayor of the City of New York.  As such, Mayor Bloomberg was a policy maker with respect to the strategic deployment of police officers against OWS and their orders about how to handle OWS participants and members of the press covering OWS. Mayor Bloomberg is sued in his individual and official capacities.

34.     Defendant New York Police Commissioner Raymond Kelly ("the Commissioner") was at all times here relevant the Commissioner of the New York City Police Department, and, as such, was a policy maker with respect to training, supervision, discipline and the strategic deployment of and orders to NYPD officers engaged in the suppression of OWS participants and its press coverage.  The Commissioner is sued in his individual and official capacities.

35.     Defendant MTA Police Commissioner Michael Coan ("the MTA Commissioner") was at all times here relevant the Commissioner of the MTA Police Department, and, as such, was a policy maker with respect to training, supervision, discipline and the strategic deployment of and orders to MTA police officers engaged in the suppression of OWS

participants and its press coverage.  The MTA Commissioner is sued in his individual and official capacities.

36.     All other individual state actor defendants ( collectively, "officers" or "the officers") are employees of the NYPD or the MTA, and are sued in their individual and official capacities.

## I.   ABRIDGING FREEDOM OF THE PRESS: ELECTED OFFICIALS AND MEMBERS OF THE PRESS HAVE BEEN DENIED A RIGHT OF ACCESS TO OBSERVE AND RECORD POLICE ACTIONS AGAINST OCCUPY WALL STREET

### a.   ELECTED OFFICIALS PREVENTED FROM OBSERVING POLICE ACTIONS BY IMPROPER ARRESTS AND USES OF FORCE.

37.     The right of access to governmental administration and processes is enshrined in the First Amendment's guarantees of free speech and a free press.  It protects the public against the arbitrary interference of access to important governmental information.  New York Civil Liberties Union v. NY City Transit Auth., 2012 WL 10972 (2d Cir. 2012) citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580.

38.     "'[A] major purpose of [the First] Amendment [is] to protect the free discussion of governmental affairs'.... By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government."  New York Civil Liberties Union v. NY City Transit Auth., at 431; quoting Globe Newspaper v. Superior Court, 457 U.S. 596 at 604 (1982).

39.     Implicit in the First Amendment is the notion that, in order to have free discussion of governmental affairs, the press and public must have access to government affairs.  Id.

40.     The First Amendment protects the rights to gather information about what public officials do and to record matters of public interest.  Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir.1995).

41.     Citizens have a "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct." Smith v. City of Cumming, at 1333 (11th Cir. 2000). "There can be no doubt that the free speech clause of the Constitution protects ... videotap[ing]" police officers.  Robinson v. Fetterman, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005).

42.     Reasonable time, place and manner restrictions, however, cannot be used to justify Constitutionally overly broad police restrictions.  In City of Houston, Tx. v. Hill, 482 U.S. 451 (1987), the court struck down a city ordinance that prevented speech that would "interfere" with a police officer. Id. at 462.

43.     The court further explained:  "[W]e are mindful that the preservation of liberty depends in part upon the maintenance of social order.  But the First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." Hill at 471-472.

44.     Yet, on November 15, 2011, when FKA Liberty Park was cleared, NYPD barred the public, the press, and elected officials from observing their activities.  In fact, they were kept at least two blocks away from the police activities.

45.     Indeed, in a show of force and intimidation, NYPD arrested and assaulted reporters and elected officials, including some of the Plaintiffs herein, to prevent them from covering or even observing the police action.  Still others were merely prevented

from observing in furtherance of their institutional roles in a democracy.

46.    The New York City Council has a duty to monitor and review the conduct and performance of agencies on a regular and continuous basis on behalf of the people of the City of New York.  New York City Charter §29(2).

47.    The New York City Council cannot perform its Charter-mandated role unless individual members of the Council are permitted to observe city agencies perform their duties.

48.    Individual Council members were prevented from observing the activities of NYPD in their actions to clear FKA Liberty Park.

49.    On November 15, 2011, at approximately 2:00 a.m., plaintiff Ydanis Rodriguez, a Member of the New York City Council and Chair of the Higher Education Committee went to observe the events at the eviction of FKA Liberty Park.  He understood that residents of his district, as well as City University students, were in FKA Liberty Park at the time.

50.    As Plaintiff Ydanis Rodriguez approached a line of police officers and barricades, he informed the officers that he was a City Council member.  The police told him he could not go any further and he complied.  Plaintiff Ydanis Rodriguez nevertheless was attacked and arrested by police officers in the absence of probable cause.

51.    In the prosecution against Council member Rodriguez, Defendant City claimed that he refused an order to not approach the barricades.  By this construction, Defendant City in effect asserted that in addition to the arbitrary physical barriers that were erected by agents of Defendant City to keep observers out, said agents of Defendant City also established an arbitrary invisible line before the physical barricades through which no one

could pass, on pain of arrest.

52.    Council member Rodriguez was therefore unable to report on the police actions taken at FKA Liberty Park to the City Council or to his constituents, preventing him and the Council from performing their charter mandated roles as monitors of City agencies.

53.    The incident was covered on Time Magazine's web site.

54.    The story was initially accompanied with a photograph of Rodriguez on the ground being forcefully held down by police officers, and is attached hereto with said original photograph as **Exhibit A**.  The original photograph is no longer on the site but the caption from the saved snapshot of the page is "Riot gear police tackle New York City Council Member Ydanis Rodriguez near Zuccotti Park."

55.    Some hours later, the photograph was removed and replaced with an unrelated photograph of Council member Rodriguez, attached hereto with replacement photograph as **Exhibit B**.  The associated text with the photograph is "New York City Council Member Ydanis Rodriguez, left, speaks with Assistant Chief William Morris, center, and Captain Andrew Lombardo, right, on Nov. 7, 2011, in New York."

56.    Upon information and belief, the photograph was removed due to the request and intervention of City officials.

57.    Plaintiff Democratic District Leader Paul Newell also went to FKA Liberty Park when the eviction started.

58.    As an elected representative, Plaintiff Newell also went to monitor the situation and the police actions being taken against OWS participants.  Plaintiff Newell's district includes FKA Liberty Park.

59.    It was and remains a personal and institutional responsibility for Plaintiff Newell

to observe momentous governmental actions in his district, such as the eviction of OWS protesters from FKA Liberty Park.

60.     The Democratic Party of the State of New York is recognized and certified as an official political party under the laws of the State of New York. It is also the largest political party in the State of New York.

61.     The rules of the Democratic Party mandate that as District Leader, Plaintiff Newell must inform and communicate with his constituents and the members of the greater district community about conditions in his district and affairs of government generally.

62.     Plaintiff Newell was also prevented from observing police actions on November 15, 2011 at FKA Liberty Park and thereby fulfilling his personal and institutional obligations.  He was arbitrarily arrested without probable cause.  All charges were dismissed against Plaintiff Newell.

63.     On November 15, 2011, Plaintiff Council member Williams also attempted to get to the site of the eviction to monitor the police action against protesters.  He too was prevented from engaging in his personal and institutional role as a monitor and overseer of the NYPD by agents of Defendant City including members of the NYPD.

64.     Council member Williams was therefore unable to report on the police actions taken at FKA Liberty Park to the City Council, preventing him and the Council from performing their Charter mandated roles as monitors of City agencies including the NYPD.

65.     Plaintiff Council members Mark-Viverito, James, Rodriguez and Williams, among other Council members, have been denied the right to receive information about

the police actions against OWS, depriving them of their First Amendment Free Speech rights and further preventing them from performing their Charter mandated roles as monitors of City agencies including the NYPD.

66.     Furthermore, plaintiff Council members and other Council members were prevented from gathering information in furtherance of their duty to enact laws for the "good rule and government of the city; for the order, protection and government of persons and property for the preservation of the public health, comfort, peace and prosperity of the city and its inhabitants[.]" Charter § 28.

## b. SUPPRESSION OF "MAINSTREAM" MEDIA JOURNALISTS

67.     Some 26 journalists who tried to reach FKA Liberty Park on the night of the eviction, November 15, 2011 ("the night of the eviction") to report on the police action against OWS were similarly prevented from reaching FKA Liberty Park during the eviction. *See* spreadsheet of Joshua Stearns, tracking journalist arrests at nationwide Occupy events, accessed on April 25, 2012 from http://storify.com/jcstearns/tracking-journalist-arrests-during-the-occupy-prot attached hereto as **Exhibit C.**

68.     Many journalists from well-known mainstream media outlets complained of their treatment by NYPD on the night of the eviction, claiming that they were being prevented from performing their duties as journalists. *See* November 21, 2011 Letter of New York Times Vice President and Assistant General Counsel George Freeman and twelve (12) others to NYPD Deputy Commissioner Paul J. Browne, attached hereto as **Exhbit D.**

69.     Reporters could not get "anywhere near" FKA Liberty Park on the night of the

eviction, said journalist Andrew Katz. *See* Brian Stelter and Al Baker, "Reporters Say Police Denied Access to Protest Site," New York Times Media Decoder Blog, November 15, 2011, incorporated by reference herein and available online at http://mediadecoder.blogs.nytimes.com/2011/11/15/reporters-say-police-denied-access-to-protest-site/, last accessed 4/25/12.

70.    NY1 reporter Lindsey Christ said that the aggressiveness with which the police handled reporters on the night of the eviction made it "the scariest 20 minutes" of her life. Id.

71.    NY1 reporter Lindsey Christ reported that a New York Post reporter was put in a choke hold by police officers on the night of the eviction.  Id.

72.    Despite the widely reported-upon and observed rough behavior employed by agents of Defendant City on the night of the eviction, NYPD Spokesperson Paul J. Browne carefully stated that "he saw 'nobody' who was manhandled." Id.

73.    In response to police treatment of press on November 15, 2011, United States Congressman Jerrold Nadler, Ranking Member of the House Judiciary Subcommittee on the Constitution, and the representative of Lower Manhattan, wrote a letter, dated December 6, 2011, to United States Attorney General Eric Holder, requesting that the Attorney General initiate an investigation into law enforcement activities surrounding the Occupy movement generally, and OWS particularly.  See December 6, 2011 letter of Congressman Jerrold Nadler, attached hereto as **Exhibit E.**

74.    In that December 6, 2011 letter, Congressman Nadler described Defendant Mayor Bloomberg's claim that reporters were prevented from approaching FKA Liberty Park for their own protection as "hav[ing] little merit."  Congressman Nadler went on to point out

that "[j]ournalists enter war zones to inform the American people about the status of those conflicts. I think they can be trusted to assume the risks associated with covering a non-violent protest. The actions of the NYPD to prevent the press from covering the protests and the [November 15, 2011] eviction [of OWS participants from FKA Liberty Park] affect core First Amendment values, not just of the right of the press to report, but also the public's right to be informed on matters of great civic importance." Id. at 3.

75.    Gabe Pressman, president of the The New York Press Club, which represents many of the most established media outlets and reporters in the City of New York, wrote a letter to Defendant New York City Police Commissioner Kelly, stating in part: "the brash manner in which officers ordered reporters off the streets [on the night of the eviction] and then made them back off until the actions of the police were almost invisible is outrageous." See Gabe Pressman, "Open Letter to Mayor Bloomberg and Commissioner Kelly," November 15, 2011, incorporated by reference herein and available online at http://www.newyorkpressclub.org/coalition.php, sub-tab "11/15/2011 – Open Letter to Mayor Bloomberg and Commissioner Kelly," last accessed 4/26/12.

76.    Mayor Michael Bloomberg paradoxically claimed that the actions taken against journalists on the night of the eviction were undertaken "to protect" said journalists. See YouTube, "Bloomberg Defends Blocking Media from Zuccotti Park (via @capitalnewyork)", incorporated by reference herein and available online at http://www.youtube.com/watch?v=cOsujgv8Ueo, last accessed 4/25/12.

77.    In response to the Press Club letter, Defendant Commissioner Kelly issued a well-publicized "directive" instructing NYPD officers to not unreasonably interfere with press coverage.

78.     Nevertheless, the suppression of reporters and the right to freedom of the press and speech persisted thereafter, and continues to date.  *See, e.g.,* February 1, 2012 Letter of New York Times Vice President and Asssant General Counsel George Freeman and ten (10) others to NYPD Deputy Commissioner Paul J. Browne, incorporated herein by reference and attached hereto as **Exhbit F**.

79.     Upon information and belief, many reporters working for established media outlets are afraid to enforce their rights in court because of the threat it poses to their careers.

c.     **SUPPRESSION OF CITIZEN JOURNALISTS**

80.     Citizen reporters, photographers and videographers have been critical in providing unfiltered and contemporaneous information to the public about OWS and police responses to OWS.

81.     As citizen reporters, they have no institutions or corporations to answer to for their reporting.

82.     On information and belief, citizen reporters who are not credentialed by NYPD have been targeted by police officers for suppression, harassment and arrest, in violation of their First Amendment rights.

83.     On information and belief, citizen reporters who are not credentialed by NYPD continue to be targeted by police officers for suppression, harassment and arrest, in violation of their First Amendment rights.

84.     On information and belief, the NYPD's acts in suppressing, harassing and arresting citizen reporters are motivated, in whole or in part, by an unconstitutional distinction between "official" reporters, who are credentialed by NYPD, and other

reporters.

85.    However, as pled above, the NYPD has also acted to suppress, harass and arrest "official" reporters as well.

86.    Reporters have a First Amendment right to gather and record governmental processes, including police actions, regardless of whether they are "official" or "unofficial". Smith, 212 F.3d at 1333 (11th Cir. 2000) *citing* Iacobucci v. Boulter, 1997 WL 258494 (D.Mass, 1997).

87.    On or about November 15, 2011, in FKA Liberty Park, a publicly accessible open space, Plaintiff Timothy Fitzgerald, a citizen reporter who was documenting protest activities and police response to same in that publicly accessible open place, was grabbed, pulled to the ground and arrested.

88.    On December 12, 2011, Plaintiff Jonathan Knefel was covering a police action against OWS participants at Winter Garden.

89.    When asked whether he had (NYPD issued) press credentials, he replied he did not.

90.    Since he was not a member of the press credentialed by NYPD, he was prevented from continuing to record the activity and arrested without probable cause. **See Exhibit G**, at timestamps 14:42-15:00.

91.    On December 12, 2011, at the Winter Garden, a publicly accessible open space, Plaintiff Justin Wedes, a citizen reporter who was documenting protest activities and police response to same in that publicly accessible open place, was grabbed, pulled to the ground and arrested without warning or probable cause as he stood recording police interactions from a reasonable distance. *See* **Exhibit G**, at timestamps 12:13-12:55.

92.     Plaintiff Justin Wedes was held for forty (40) hours before being arraigned with respect to the above-described arrest.

93.     Furthermore, Mr. Wedes was targeted for arrest again by Defendant Deputy Inspector Winski.  On March 15, 2012, Defendant Winski focused on Mr. Wedes, as the video attached shows, Defendant Winski called out  "HEY JUSTIN" to Plaintiff Wedes via megaphone, and then made gestures and mouthed words indicating that Defendant Winski intended to arrest Mr. Wedes, stating in sum and substance, "You're coming with me."  This conduct so frightened and chilled Mr. Wedes' right to observe and document police action that he fled the area in order to avoid yet another illegal arrest.

94.      On or about December 12, 2011, at the Winter Garden, a publicly accessible open space, Plaintiff Paul Sullivan, a citizen reporter who was documenting protest activities and police response to same in that publicly accessible open place, was grabbed, pulled to the ground and arrested without warning or probable cause.

95.     Plaintiff Paul Sullivan sustained nerve damage in his left hand as a result of the above-described arrest.

96.     Photographer Plaintiff Stephanie Keith was covering the Brooklyn Bridge march on October 1, 2011 for the Associated Press.

97.     Plaintiff Mrs. Keith was carrying sophisticated photography equipment with her on October 1, 2011 for the purpose of taking photographs for licensing and sale to major news outlets.

98.     Plaintiff Mrs. Keith's photographs taken prior to her arrest appeared in major press outlets.

99.     Plaintiff Mrs. Keith's photographs taken prior to her arrest prove that the police

had not notified many OWS participants that they could not go on the roadway.

100.    Plaintiff Mrs. Keith did not have NYPD granted press credentials.

101.    Plaintiff Mrs. Keith violated no police order, but was nevertheless arrested while covering the news story.

102.    On or about January 10, 2012, Plaintiff Justin Sullivan was filming an OWS activity at Grand Central Station.

103.    Because Plaintiff Justin Sullivan was filming the activity, he was falsely arrested by MTA police and subjected to excessive force.

104.    Plaintiff Justin Sullivan was photographed and fingerprinted.

105.    Defendant MTA Police Officer Lakeram specifically ordered other officers present to get Plaintiff Justin Sullivan's camera.

106.    Plaintiff Justin Sullivan was initially released from custody at the precinct with multiple summonses.

107.    When Plaintiff Justin Sullivan went back to the MTA Police Precinct located at Grand Central Station to ask for his missing video camera, he was re-arrested and held for approximately 24 more hours.

108.    Additional charges were issued as against Plaintiff Justin Sullivan at that time.

109.    Plaintiff Justin Sullivan's still camera was returned.

110.    Plaintiff Justin Sullivan's video camera was not returned.

111.    Plaintiff Justin Sullivan's data chips were not returned.

112.    A witness reported that she observed an officer who fits the physical description of Officer Lakeram instructing another officer to break the camera.

### d.   THE POLICE FORCES OF DEFENDANT CITY AND DEFENDANT MTA HAVE VESTED INTERESTS IN CHILLING PRESS AND GOVERNMENTAL ACCESS TO THEIR ENFORCEMENT ACTIVITIES

113.   On information and belief, while Defendant MTA is a separate municipal organization from Defendant City of New York, MTA Police communicates about policies and strategies with NYPD.

114.   The MTA Police Commissioner is Defendant Chief Michael Coan.

115.   Defendant Chief Coan became Chief of MTA Police after a 26 year career in the NYPD, rising to the level of Deputy Chief of the NYPD.

116.   Notably, Defendant Chief Coan was the Commanding officer of NYPD's Public Information Division for four years.

117.   On September 19, 2011, a peaceful march from FKA Liberty Park through Wall Street resulted in Defendant Deputy Inspector Winski arresting an orange-hatted OWS participant for alleged disorderly conduct and resisting arrest.

118.   NYPD spokesperson Paul Browne alleged in an e-mailed statement that this individual was arrested "for jumping a police barrier and resisting arrest." *See* Laura Marcinek, "Wall Street Areas Blocked as Police Arrest Seven in Protest," Bloomberg News, September 19, 2011, incorporated by reference herein and available online at http://www.bloomberg.com/news/2011-09-18/wall-street-occupied-by-a-few-hundred-people-as-protesters-ranks-dwindle.html, last accessed 4/25/12.

119.   However, a NY Times City Room Blog with photographs showed precisely the opposite – Defendant Deputy Inspector Winski tried to pull a protestor over a barrier, and then Defendant Deputy Inspector Winski jumped over the barrier to grab the OWS participant.  See Colin Moynihan, "Wall Street Protests Continue, With at Least 6

23

Arrested", New York Times City Room Blog, September 19, 2011, incorporated by reference herein and available online at

http://cityroom.blogs.nytimes.com/2011/09/19/wall-street-protests-continue-with-at-least-5-arrested/, last accessed 4/25/12.

120.    Subsequently, Spokesperson Paul Browne stated that 'he had gotten his facts scrambled." Dwyer, J. "*A Spray Like A Punch in the Face*" N.Y. Times, 9/27/2011, available online at http://www.nytimes.com/2011/09/28/nyregion/a-burst-of-pepper-spray-like-a-punch-in-the-face.html and incorporated by reference herein.

121.    Similarly, members of the NYPD lied about the conditions of Plaintiff Council member Rodriguez's arrest, stating, among other false claims, that the Council member was not injured in the course of the arrest.

122.    On information and belief, the above-referred incidents of misstatements, lies and cover-ups perpetrated by members of the NYPD and related to officer misconduct stem from the NYPD's insular culture, which prioritizes fraternal loyalty over objective integrity.

123.    The widespread phenomenon and practice of police officers covering up for one another's bad acts is known colloquially as "the blue wall of silence."

124.    On information and belief, the insular culture of the NYPD, in conjunction with "the blue wall of silence" phenomenon that has been found to exist among police officers generally, have combined to make internal police oversight by NYPD oversight divisions such as the Internal Affairs Bureau ("IAB") and Performance Monitoring Unit ("PMU") largely ineffective at curbing all but the most egregious acts of individual officer corruption.

Case 1:12-cv-03389-NRB   Document 1   Filed 04/30/12   Page 28 of 73

125.    On information and belief, the NYPD's continuing practice of combating meaningful efforts towards internal police oversight is demonstrated by the custom and practice of NYPD officers harassing, hazing and otherwise making life difficult for officers who diligently apply themselves to IAB assignments.

126.    On information and belief, the NYPD's continuing practice of combating meaningful efforts towards internal police oversight is demonstrated by the custom and practice of NYPD officers harassing, hazing and otherwise making life difficult for officers who come forward and speak out about police misconduct, such as Adrian Schoolcraft.

127.    On information and belief, NYPD supervisory complicity or acquiessence to the NYPD's continuing practice of combating meaningful efforts towards internal police oversight is demonstrated by the limited manpower and resources of PMU.

128.    As of the last report on PMU released by Defendant City's Commission to Combat Police Corruption ("CCPC") in 2006, incorporated by reference herein, fourteen (14) officers comprised the totality of the PMU, and were nominally tasked with monitoring the performance of any of the approximately forty thousand (40,000) members of the NYPD who may be set down for performance monitoring.

129.    On information and belief, the insular culture of the NYPD, in conjunction with "the blue wall of silence" phenomenon that has been found to exist among police officers generally, have led to a continuing practice of NYPD officers and leadership working to systematically undermine external municipal oversight efforts undertaken by Defendant City's CCPC and Defendant City's Civilian Complaint Review Board ("CCRB").

130.    On information and belief, the NYPD's continuing custom or practice of covering

25

up police misconduct rather than meaningfully addressing same is a "top-down" phenomenon, wherein senior NYPD officials including but not limited to Defendant Commissioner Kelly actively foster a work environment and culture in which misconduct is obfuscated and attempts at meaningful monitoring and oversight are systematically opposed.

131.   On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same also enables police officers to lie in accusatory instruments and under oath.

132.   On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same, in conjunction with the NYPD's policy of quantitative enforcement "performance goals," actually encourages police officers to lie in accusatory instruments and under oath.

133.   On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same, in conjunction with the NYPD's policy of quantitative enforcement "performance goals," actually encourages police officers to lie in accusatory instruments and under oath because officers are forced to operate in a system which penalizes an absence of enforcement activity, even when no cause for enforcement activity exists, while at the same time enabling officers to lie and commit acts of misconduct against civilians without employment consequences.

134.   On information and belief, taken together these practices, policies and customs engender perverse incentives for officers to commit acts of misconduct against civilians without consequences.

135.   Defendant Commissioner Kelly demonstrated the reach of these pernicious

practices when he claimed that he was not aware of any claim of injury made by Plaintiff

Council member Ydanis Rodriguez, even though Plaintiff Council member Rodriguez

had open and obvious wounds on his head, sustained during his arrest, observed by

bystanders to Council member Rodriguez' arrest.  See "NYC Councilman Ydanis

Rodriguez Arrested During Zuccotti Park Raid," CBS/AP, November 15, 2011, available

online at  http://newyork.cbslocal.com/2011/11/15/nyc-councilman-ydanis-rodriguez-

arrested-during-zuccotti-park-raid/ and incorporated by reference herein.

136.     Under NYPD Interim Order 53(03), desk officers processing arrests are required

to observe the physical and mental condition of incoming prisoners and make note of said

condtions in the Command Log.

137.     Therefore, Council member Rodriguez's injuries should have been recorded in a

Command Log that was or should have been available to Defendant Commissioner Kelly

at the time of his statement noted above.

138.     Whether this information was not made available to Defendant Commissioner

Kelly or Defendant Commissioner Kelly willfully disregarded this information, the

NYPD's customs, policies and practices that promote police misconduct and discourage

meaningful police oversight were to blame.

139.     The willful failure of Defendant City to accurately take note of injuries inflicted

by members of the NYPD on a City Council member for Defendant City while said City

Council member was being arrested for observing a police action shocks the conscience.

140.     The willful failure of Defendant City to acknowledge injuries inflicted by

members of the NYPD on a City Council member for Defendant City while said City

Council member was being arrested for observing a police action shocks the conscience.

141.    The battery and false arrest inflicted by members of the NYPD on a City Council member for Defendant City while said City Council member was observing a police action shocks the conscience.

142.    By employing the NYPD in its present condition to police protests while failing to provide meaningful avenues of police accountability, Defendant City chills each plaintiff, and indeed each citizen, from engaging in Constitutionally protected speech.

143.    The above-described issues and phenomena are not new developments, and are not unique or unprecedented in the history of policing in New York City.

144.    Instead, the treatment of OWS participants by Defendants represents a continuation, if not a culmination, of general trends of official misconduct among the agents of Defendant City of New York that has persisted in varying forms for over a century.

145.    These trends of official misconduct and further support of the above-pled unconstitutional NYPD policies, practices and customs are set forth in detail in Appendix I, which is appended hereto.

146.    The facts, allegations and sources set forth in Appendix I are incorporated by reference in the body of the Complaint.

II.     **ABRIDGING FREEDOM TO PEACEABLY ASSEMBLE: FROM THE INCEPTION OF THE OCCUPY WALL STREET MOVEMENT, DEFENDANTS HAVE ACTED TO UNCONSTITUTIONALLY AND ARBITRARILY PREVENT PERSONS FROM ASSEMBLING IN TRADITIONAL PUBLIC FORA TO DISCUSS MATTERS OF PUBLIC CONCERN, WHILE ALLOWING PERSONS TO ENGAGE IN NON-POLITICAL ACTIVITIES IN THOSE SAME SPACES**

a.     **PREVENTION OF ENTRY INTO AND FORCIBLE REMOVAL OF CITIZENS FROM PUBLIC SPACES ENGAGING IN PEACEFUL ASSEMBLY AND PUBLIC ISSUE SPEECH**

**1. Public Space**

147.    Through unlawful exercises of police power and misapplication of law, the NYPD has sought to prevent and has prevented Plaintiffs and other citizens from exercising certain Constitutional Rights, including the right to public assembly and expressive speech.

148.    Plaintiffs and other residents of this great city are being prevented from assembling and speaking on public issues in public spaces around Manhattan.

149.    Specifically, Plaintiffs and other citizens have been prevented from lawfully entering and/or remaining at public spaces located at FKA Liberty Park, 100 Williams Street, the Winter Garden, and One Chase Manhattan Plaza in Lower Manhattan, among others.

150.    On information and belief, each of the above-listed areas is designated as "publicly accessible open space" by the City of New York.

151.    The City of New York negotiated with the private developers who own(ed) the aforementioned properties to create these public spaces, in exchange for zoning variances allowing the developers to, among other things, exceed floor area ratio restrictions, creating more office space than was generally possible under law.

152.    In 1961, New York City passed a comprehensive Zoning Resolution, setting the City's zoning ordinances and formalizing and codifying the trade-off that developers are able to seek between developing the site beyond the property's zoned floor to area ratio in exchange for creating public space on the property.

153.    As it applies to the aforementioned properties, the 1961 Zoning Resolution requires that property owners build "plazas" in exchange for bonus floor-to-area ratio building rights.

154.    A "plaza" is defined in Art. 1, Ch. 3 §33-11 of the Zoning Resolution as an "open area accessible to the public at all times".  See attached **exhibit H**.

155.    In 2007, the City Council approved Resolution 1103, making certain amendments to the 1961 Zoning Resolution.  Tellingly, it changed the name "plaza" and other similar designations to the more emphatic "publicly accessible open area".  Art. 1, Ch. 2 §12-10.

156.    Resolution 1103 was enacted by decision of the City of New York's City Planning Commission without amendment.  It reiterates that no change in the terms of public access to publicly accessible open areas may be made without application to the City Planning Commission, and further, upon application the minimum hours of access to said publicly accessible open areas must reach at least to 10:00 PM from April 14 to October 31, and to 8:00 pm from November 1 to April 14.

157.    Further, it clarifies that no barriers above five feet can ever be deployed around a publicly accessible open area, and that they must be fully removed during opening hours. See **exhibit I**.

158.    Though publicly accessible open areas are privately owned, it only exists as a creation of City law and policy, and represents the fruit of a consummated bargain between a private actor and government, to wit, for the private actor to provide public space in return for "bonus" floor area from the government.

159.    Moreover, the owners of publicly accessible open areas formally transfer responsibility for said areas to the City in order for the City to administer them as they see fit.  This was done prior to the eviction of OWS participants at FKA Liberty Park on November 15, 2011.

160.    This was no mere enforcement of the private property rights of Brookfield Properties, the owner.  To support the criminal charge of trespass against Ronnie Nunez and others who remained in FKA Liberty Park on November 15, Manhattan District attorney Cyrus Vance explained, "Brookfield Properties had transferred authority to the New York City Police Department to revoke that license [to remain in FKA Liberty Park], by ordering the dispersal and evacuation of all individuals in the park."  See **exhibit J** page 4.

161.    Indeed, Brookfield Properties gave NYPD "permission" to evacuate Zuccotti Park.  See **exhibit K.  In other words, the evacuation order was at the discretion of the City, not Brookfield Properties.**

162.    Under federal and state Constitutional law, whether a space is considered public is not determined by a formalistic approach to the law of real property.  Rather, the court must look to a variety of factors:  "[T]he source of authority for the private action; whether the State is so entwined with the regulation of the private conduct as to constitute

State activity; whether there is meaningful State participation in the activity; and whether there has been a delegation of what has traditionally been a State function to a private person." Shad Alliance v. Smith Haven Mall, 66 N.Y.2d 496, 505 (1985).

163.    Streets, sidewalks, parks and other public spaces adjacent to sidewalks and streets have long been considered traditional public fora for speech and assembly. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." Hague v. CIO, 307 U.S. 496, 515 (1939). Speech finds its greatest protection in public fora. Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006).

164.    Under these well-settled precedents, these publicly accessible open areas are "public fora" for Constitutional law purposes, and activities within them are entitled to the highest Constitutional protections.

## 2.    Public Issue Speech and Assembly

165.    [S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.' " Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758-759 (1985) (opinion of Powell, J.); *quoting* First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 776 (1978). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). That is

because "speech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145, (1983). *See also* Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011).

166.   Clearly, the OWS protests are, and were always planned to be speech about matters of public concern.  Attached as **exhibit L** are pages from Adbusters Magazine, which helped initiate the OWS movement.   As the pages indicate, the OWS actions were planned well in advance, and were intended as speech to dramatize the inequities and social injustice in American society. Clearly, speech in connection with Occupy Wall Street is entitled to the highest protection.

167.   Numerous Courts across the country have now recognized the First Amendment right to Occupy space, including tents and tarps, as it *"is an expression of hope for a more just, economically egalitarian society and that it functions as a model community demonstrating their vision of such a society."* Occupy Augusta v. Maine Commissioner of Public Safety (USDC Maine 11CV00452(NT) slip op. at 3, 12/7/2011) http://www.med.uscourts.gov/Opinions/Torresen/2011/NT_12072011_1-11cv_452_James_Freeman_v_John_Morris.pdf.  *"The setting up of tents, sleeping, and governance on Dewey Square is expressive conduct and symbolic."* Occupy Boston v. City of Boston (11-4152-G, Superior Court Civil Action, Commonwealth of Massachusetts, 2011, slip p at 2, 12/7/2011)(available online http://aclum.org/sites/all/files/legal/occupy_boston/Memorandum_and_Decision.pdf. ["*The Plaintiffs will likely prevail on their claim that their tent city is expressive conduct.*

*With their occupation of Capitol Park across from the Capitol, the Plaintiffs intend to convey a particularized message on behalf of those who have been unfairly excluded from participation in government. The Plaintiffs also intend to model an ideal form of governance.... In this case, the October 2008 stock market crisis, subsequent bank bailouts, high unemployment, deflation of the housing market, rise in foreclosures, and increasing disparity between the incomes of the highest wage-earners and the low and middle- income earners are all well-known and have set the stage for the Occupy movement. Groups associated with Occupy Wall Street have coalesced in cities around the nation and their protests have received wide coverage in the press. Those who view the tent cities erected by the Occupy movement in general and by Occupy Augusta in particular are likely to understand that these tent cities in parks and squares near centers of government and finance symbolize a message about the unequal distribution of wealth and power in this country."*]

168.    At least two other district court judges have held that the Occupy movement's tent cities and overnight camping are protected speech under the First Amendment. Occupy Minneapolis v. County of Hennepin, ___ F.Supp.2d ___, 2011 WL 5878359 at *4 (D. Minn., Nov. 23, 2011); Occupy Ft. Myers v. City of Ft. Myers, ___ F.Supp.2d ___, 2011 WL 5554034 at *5 (M.D. Fla., Nov. 15, 2011) (collecting cases).  Occupy Augusta v. Maine Commissioner of Public Safety (USDC Maine 11CV00452(NT) slip op. at 10-12, 12/7/2011), available online at http://www.med.uscourts.gov/Opinions/Torresen/2011/NT_12072011_1-11cv_452_James_Freeman_v_John_Morris.pdf; *see also*, Occupy Minneapolis v. County of Hennepin, ___ F.Supp.2d ___, 2011 WL 5878359 at *4 (D. Minn., Nov. 23, 2011);

Occupy Ft. Myers v. City of Ft. Myers, ___ F.Supp.2d ___, 2011 WL 5554034 at *5

(M.D. Fla., Nov. 15, 2011), Occupy Oklahoma (Isbell) v. Oklahoma City,

(11CV01423)(12/2/11)); Occupy Nashville v. Governor Haslam, (11CV01037 10/31/11),

Occupy Denver v. City of Denver, (11CV03048, 12/7/1).

169.    To withstand constitutional scrutiny, government restrictions of public issue

speech in a public forum must be (1) content neutral, in that they target some quality

other than substantive expression; (2) narrowly tailored to serve a significant

governmental interest; and (3) permit alternative channels for expression. Deegan v. City

of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006).

170.    The restrictions on speech at issue here are not content neutral, since the police

are allowing some people to assemble and speak in these public spaces, while the

Plaintiffs as OWS participants have been barred and/or removed.

171.    Content based restrictions on speech by government must be subjected to "the

most exacting scrutiny".  The regulation must be necessary to serve a compelling state

interest that it is narrowly drawn to achieve that end. Boos v. Barry, 485 U.S. 312, 321

(1988).

172.    In public debate, even insulting and outrageous speech (a level not reached by

OWS protesters) must be tolerated by citizens in its public fora in order to provide

"adequate breathing space" for the freedoms protected by the First Amendment. In

Snyder v. Phelps, 131 S.Ct. 1207 (2011), the court denied the claim of a father who sued

for intentional infliction of emotional distress when his son's funeral was picketed by the

Westboro Baptist Church.  The picketers displayed signs stating, for example, "Thank

God for Dead Soldiers," "God Hates You", "Fags Doom Nations," "America is Doomed," "Priests Rape Boys," and "You're Going to Hell". Id. At 1216-1217. Even this speech and this protest, because it was about public issues, and took place in a public space adjacent to a public street, was held to be protected by the First Amendment. *See also* Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 56 (1988) and Boos at 381.

173.    By allowing individuals to remain and assemble in public spaces unmolested for days and weeks in pursuit of commercial and non-political purposes[4] that Defendant City deems more desirable, while conducting mass arrests and employing excessive force against individuals assembling and remaining in public places for discussion of public issues involving the effects of income inequality on society, Defendant City is engaging in impermissible content-based restrictions in its policing of public fora.

174.    However, even assuming *arguendo* that NYPD's restriction on OWS speech is somehow content neutral, the restriction is in no way a reasonable time, place and manner restriction.

175.    Content neutral time, place and manner restrictions on speech must be narrowly tailored to serve a significant governmental interest, and ample alternative channels for

---

[4] *See, e.g.,* "Final Installment Of 'Harry Potter' Series Holds U.S. Premiere At Lincoln Center[;] Some Fans Camp Out For Week For Chance To Glimpse Hogwarts Crew" CBS New York, July 11, 2011, incorporated by reference herein and available online at http://newyork.cbslocal.com/2011/07/11/harry-potter-fans-camp-out-at-lincoln-center-for-u-s-premiere/; *see also* Lucadamo, Kathleen, "Lady Gaga fans camp outside 'SaturdayNight Live' for days in hopes to score Tickets," New York Daily News, May 20, 2011, incorporated herein by reference and available online at http://articles.nydailynews.com/2011-05-20/entertainment/29583913_1_lady-gaga-fans-tickets-season-finale; *see also* Bilton, Nick, "iPad Resellers Now Camp Overnight at Apple Stores," New York Times, April 15, 2011, incorporated by reference herein and available online at http://bits.blogs.nytimes.com/2011/04/15/ipad-resellers-now-camp-overnight-at-apple-stores/.

speech must be available. Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 648 (1981).

176.    As will be shown in the factual allegations below, numerous police actions against OWS participants that were intended to prevent OWS participants from entering or remaining in nominally publicly accessible open areas are not content neutral, and in any case, do not and would not amount to reasonable time, place and manner restrictions.

### 3. Factual Allegations Relating to Public Space Issues

177.    The City of New York has engaged in a pattern and practice of barring OWS participants from engaging in public speech and peaceful assembly since on or around September 17, 2011, the day OWS began.

178.    Defendant City of New York has continued this pattern and practice of barring OWS participants from engaging in public speech and peaceful assembly to date.

179.    Defendant City of New York has continued this pattern and practice of barring OWS participants from engaging in public speech and peaceful assembly and has conspired with other public and private entities to do so unlawfully.

180.    On September 17, 2011, peaceful OWS participants gathered at Bowling Green in Manhattan and marched to Wall Street, but were prevented from entering Wall Street on a Saturday by police officers and barricades.

181.    On information and belief, most of the businesses and offices surrounding the area of Wall Street that was closed by NYPD officers on Saturday, September 17, 2011 were already closed or in limited operation on Saturday, September 17, 2011.

182.    On information and belief, the area of Wall Street that was closed by NYPD officers on Saturday, September 17, 2011 has relatively few residences, as compared to most other blocks in New York City.

183.    On information and belief, no reasonable time, place or manner restriction existed to justify the acts of agents of Defendant City in closing the area of Wall Street that was closed by NYPD officers on Saturday, September 17, 2011.

184.    On information and belief, these police officers and barricades were present for the sole purpose of preventing a group of individuals from undertaking their intended shared act of peaceful expressive assembly, to wit, occupying Wall Street.

185.    From Wall Street, the OWS participants marched to One Chase Manhattan Plaza, a publicly accessible open space, to hold a General Assembly meeting, but were met there as well with police barricades and NYPD officers.

186.    On information and belief, the police barricades and NYPD officers present at One Chase Manhattan Plaza on Saturday September 17, 2011, were present for the sole purpose of preventing OWS participants from entering said open, outdoor plaza.

187.    On information and belief, the businesses and offices located in the buildings around One Chase Manhattan Plaza are either closed or in limited operation on Saturdays and Sundays.

188.    On information and belief, the area encompassing One Chase Manhattan Plaza that was closed by NYPD officers on Saturday, September 17, 2011 has relatively few residences, as compared to most other blocks in New York City.

189.    On information and belief, no reasonable time, place or manner restriction existed

to justify the acts of agents of Defendant City in closing the area encompassing One

Chase Manhattan Plaza that was closed by NYPD officers on Saturday, September 17,

2011.

190.    On information and belief, the NYPD's closure of One Chase Manhattan Plaza on

Saturday, September 17, 2011, was undertaken for the express purpose of preventing a

group of individuals from peaceably assembling to discuss issues of public concern,

including but not limited to social issues arising from income inequality.

191.    Police Spokesman Paul J. Browne explained that prior to September 17, the plans

for the meeting and protest were "well known publicly." *See* **exhibit M**.

192.    One Chase Manhattan Plaza is a product of bargaining undertaken by Defendant

City of New York's City Planning Commission, on behalf of the citizens of the City of

New York with the private developers who developed One Chase Manhattan Plaza.

193.    In return for said developers creating a plaza designated for public use and

enjoyment, Defendant City allowed a zoning variance to build the One Chase Manhattan

Plaza building beyond the generally-applicable floor to area ratio limit.  See **exhibit N**,

from New York Times, December 7, 1955.

194.    One Chase Manhattan Plaza was the first plaza to be built under the seminal New

York City 1961 Zoning resolution. Manhattan Skyscrapers, Nash, Eric P. Princeton

Architectural Press, 2005, page 113.

195.    In building One Chase Manhattan Plaza, authorization was sought and granted to de-map a portion of Cedar Street to join two parcels of land upon which One Chase Manhattan Plaza was built.  *See* New York City Landmarks Preservation Commission, One Chase Manhattan Plaza Landmark Designation Report, February 10, 2009, Designation List 410, LP-2294.

196.    In the generations since its construction, One Chase Manhattan Plaza has traditionally been used as a public space for public speech.  For example, in 2009, it was the site of a group demonstrating against home disclosures – NACA – that was undisturbed by police or by private security.

197.    From September 17, 2011 to at least October 12, 2011, New York City police officers and police department barricades prevented OWS participants from entering One Chase Manhattan Plaza for the purpose of engaging in public issue speech and peaceful assembly.

198.    One Chase Manhattan Plaza is a public space that is open 24 hours a day, 7 days a week.

199.    On information and belief, members of the NYPD, including but not limited to Defendants, willfully and intentionally prevented the entry of OWS participants to One Chase Manhattan Plaza to deter individuals from engaging in peaceable assembly and speech regarding particular matters of public concern.

200.    After September 17, 2011, police barricades and police presence remained around One Chase Manhattan Plaza, preventing the entry of OWS participants.

201.    On October 12, 2011, OWS participants walked to One Chase Manhattan Plaza to protest the unfairness of the New York State Tax Code and to present J.P. Morgan CEO Jamie Dimon with a large symbolic check, representing the tax breaks he would receive under said tax code. *See* Michael Herzenberg,  "Four Arrested As "Occupy Wall Street" Protesters Rally At JPMorgan Chase HQ," New York 1, October 12, 2011, incorporated by reference herein and available online at http://www.ny1.com/content/news_beats/politics/148841/four-arrested-as--occupy-wall-street--protesters-rally-at-jpmorgan-chase-hq.

202.    Police barricades and officers prevented OWS participants from entering One Chase Manhattan Plaza.

203.    The October 12, 2011 OWS participants were not employing amplified sound on the walk to One Chase Manhattan Plaza or at One Chase Manhattan Plaza.

204.    The October 12, 2011 OWS participants were not sufficiently numerous to fill the entirety of the public plaza at One Chase Manhattan Plaza.

205.    On information and belief, even if allowed into said public plaza, the October 12, 2011 OWS participants would not have precluded others from use and enjoyment of said public plaza by their presence or expressive activities.

206.    On information and belief, even if allowed into said public plaza, the October 12, 2011 OWS participants would not have precluded others from access to buildings adjacent to the public plaza by their presence or expressive activities.

207.    It can hardly be said that prevention of a gathering of people in a very large plaza without sound amplification, without blocking doorways or ordinary pedestrian traffic, without any inconvenience to the public whatsoever, save the inconvenience to those who are not receptive to the content of their speech and purpose of their assembly, is a compelling or even significant government interest.

208.    Indeed, allowing OWS participants into the public plaza would very likely have caused less public inconvenience than forcing them to stay on the sidewalk.

209.    Moreover, particularly as it relates to the October 12, 2011 protest, there was no suitable alternative channel for the protest.  It was meant as a message to the CEO Jamie Dimon of J.P. Morgan Chase, whose headquarters is at One Chase Manhattan Plaza.

210.    On information and belief, the NYPD has repeatedly undertaken arbitrary closures of various public spaces on a number of occassions to stop OWS public speech and assembly, cutting off forums for speech as OWS participants attempt to use them.

211.    Upon information and belief, between September 17, 2011 and October 12, 2011, people who were not OWS participants were not prevented by NYPD from entering and remaining on the One Chase Manhattan Plaza to engage in speech and assembly activities.

212.    At some point after October 12, 2011, the police barricades were removed and were replaced by a high fence surrounding the entire publicly accessible open area.  The fence has been there 24 hours a day, seven (7) days a week since it was put up.

213.    On information and belief, the fence now surrounding One Chase Manhattan Plaza is owned by the private property owners of One Chase Manhattan Plaza.

214.    On information and belief, the erection of this fence around the publicly accessible open space at One Chase Manhattan Plaza is nothing more than a continuation of the policies, customs and/or practices of Defendant City and NYPD to prevent OWS participants from entering public spaces to peaceably assemble and engage in expressive activities and speech on matters of public concern.

215.    The fence at One Chase Manhattan Plaza could not have been erected without coordination with Defendant City, including but not limited to permitting for said fence and coordination with the NYPD to take down NYPD barriers.

216.    On information and belief, the NYPD is intertwined with the continuing practice of content-based restrictions on Constitutionally protected activities, and is a participant in implementing and enforcing said content-based restrictions.

217.    On information and belief, the property owner of One Chase Manhattan Plaza has not only participated in the violation of public space rules, they are doing so as a delegate of NYPD, and the NYPD or another like state entity can only be the source of such authority. Security guards allow certain people to enter, while others are barred.

218.    OWS participants are prohibited from entering the public space at One Chase Manhattan Plaza.

219.    There is no construction occurring at the public space at One Chase Manhattan Plaza.

220.    There are no apparent safety concerns that would reasonably preclude the presence of OWS participants from the public space at One Chase Manhattan Plaza.

221.    On information and belief, the gate and security around the public space at One Chase Manhattan Plaza is nothing  more than another manifestation of the City policy, custom and/or practice of keeping OWS participants out of One Chase Manhattan Plaza and other public spaces closely related to the target audiences of OWS expressive activities, to wit, financial institutions that have played significant roles in the current economic crisis and that have lobbied heavily to reduce government oversight of financial markets.

222.    On information and belief, Defendant City of New York's policy, custom or practice of keeping OWS participants out of One Chase Manhattan Plaza and oher public spaces closely related to the target audiences of OWS expressive activities is an impermissible content-based restriction on First Amendment protected expressive activities.

### FKA Liberty Park

223.    FKA Liberty Park (Zuccotti Park) is a publicly accessible open area under the 2007 Zoning Resolution.

224. The NYPD and Defendant Brookfield Properties, the property owners of FKA Liberty Park, have acknowledged in court proceedings that responsibility for FKA Liberty Parkwas transferred to the City on November 15, 2011. **Exhibit J.**

225.     At about 1:00 a.m. on November 15, 2011, the NYPD forcibly removed OWS participants from the park.

226.     Many of those arrested on November 15, 2011 at FKA Liberty Park were not provided with a realistic opportunity to leave FKA Liberty Park.

227.     However, on November 15, 2011, at approximately 8:30 a.m., Justice Billings of the Supreme Court of the County and State of New York issued a Temporary Restraining Order, enjoining the City and NYPD from forcibly removing OWS participants from the park and permitting their re-entry into the park, with their equipment and personal effects, during the pendency of the litigation.  Attached as **Exhibit O**.

228.     City attorneys were present in the courtroom when the ruling was made.

229.     Defendant City had immediate notice of this ruling.

230.     Nevertheless, the NYPD violated Justice Billings' order, refusing entry of OWS participants in a flagrant and blatant violation of the rule of law.  *See* Video of man showing cops the order and the punched woman, attached hereto as **Exhibit G,** at timestamps 8:07-8:59.

231.     Clearly, it was the City's decision to continue its policy of restricting the Constitutional rights of OWS participants to blatantly flout a judicial order ordering that OWS participants be allowed to re-enter FKA Liberty Park.

232.     Later on November 15, 2011, Justice Stallman of the Supreme Court of the State and County of New York, denied a Temporary Restraining Order application brought by a participant in Occupy Wall Street, and permitted the City and Brookfield Properties to

enforce laws and rules at FKA Liberty Park to prohibit "the erection of structures, the use of gas or other combustible materials, and the accumulation of garbage and human waste..." A copy of the Order is attached as **Exhibit P.**

233.     Ironically, the City then immediately erected structures, to wit, barriers and barricades, at FKA Liberty Park to prevent citizens from engaging in peaceful assembly and free speech that have nothing to do with the health or safety concerns of the public.

234.     In addition to the two layers of metal barricades placed around FKA Liberty Park, the NYPD had officers stationed around the perimeter of FKA Liberty Park, and arbitrarily barred some persons from entry into the park, while allowing others to enter unmolested.

235.     For several months after November 15, 2011, NYPD officers, in concert with private security entities, conduct arbitrary searches of bags and other personal containers of certain people entering FKA Liberty Park, but not others, in violation of the Fourth Amendment.  *See* <u>MacWade v. Kelly</u>, 460 F.3d 260, 267 (2d Cir. 2006).

236.     On information and belief, for several months after November 15, 2011, the NYPD was barring entry to FKA Liberty Park and conducting searches of persons who, in individual officers' perceptions and stereotypes, appeared to be OWS participants.

237.     On information and belief, police were engaging in content specific regulation of OWS speech.

238.     Over this time, the NYPD would not allow a OWS participant to enter FKA Liberty Park if a determination was made that the entry could be denied.

239.    On information and belief, NYPD Officers' reasons for barring OWS participants entry to FKA Liberty Park include, but are not limited to (a) carrying too large of a bag; (b) carrying a musical instrument; (c) carrying food for more than one person such as a pizza pie or box of cupcakes; (d) carrying books; or (e) carrying a chair.

240.    This practice of conditioning entry to a public space on submission to warrantless searches --without probable cause-- chilled the ability of many individuals to engage in Constitutionally protected speech.

241.    This practice of allowing NYPD Officers to arbitrarily deny individuals access to a public space, putatively for carrying food, books, or bags into a public space where those items are allowed, chilled the ability of many individuals to engage in Constitutionally protected speech.

242.    At some point after November 15, 2011, the barricades were taken down from the perimeter of the FKA Liberty Park.

243.    Even then, the barricades remained in and near FKA Liberty Park.

244.    On information and belief, the barricades were and are being kept close to FKA Liberty Park after being removed to facilitate Defendant City of New York and its agents' future use of said barricades at FKA Liberty Park to chill and curtail future expressive activities.

245.    On information and belief, the barricades were and are being kept close to FKA Liberty Park as a tacit threat of future use of said barricades at FKA Liberty Park to chill and curtail future OWS-related expressive activities.

246.    On March 17, 2012, the six month anniversary of day one of Occupy Wall Street, the NYPD unlawfully 'closed' the park, violently arrested more than seven peaceful OWS participants and erected the barricades once again.

247.    Regardless of the ownership of the barricades that remain at the site, clearly the City is very involved and intertwined with the property owner in asserting responsibility for the publicly accessible open space and therefore, the City is and will be held responsible if the barricades are deployed to block entry.

### 100 William Street

248.    On January 1, 2012, at approximately 7 p.m., OWS participants gathered to hold a General Assembly meeting at 100 William Street.

249.    The area where they were going to hold the meeting is a publicly accessible open area.

250.    Plaintiff Yonatan Miller was among the OWS participants gathered at 100 Williams Street on January 1, 2012.

251.    As Plaintiff Miller and others gathered, police officers and Supervisors arrived.

252.    Defendant Deputy Inspector Edward Winski, backed up by numerous officers, demanded that the OWS participants leave the area.

253.    Defendant Deputy Inspector Winski was told by various OWS participants present that the plaza at 100 William Street was public space.

254.    Defendant Deputy Inspector Winski responded that the owners believed this to be private space.

255.    The OWS participants pointed out to Defendant Deputy Inspector Winski that they were entitled to be there under the publicly accessible open area's rules, and pointed to legally required signage in the public plaza that stated in large letters, "REQUIRED TO BE OPEN TO THE PUBLIC FROM 7AM TO MIDNIGHT."

256.    Defendant Winski and the other officers allowed other citizens to enter the public area, only barring the OWS participants.

257.    Plaintiff Miller and other OWS participants were threatened with arrest if they did not comply with the forcible removal instigated by Defendant Winski.

258.    There was no legal or Constitutional basis for Defendant Winski to forcibly remove the OWS participants.

259.    Defendant Winski responded to the OWS participants claim that they had the right to be in this public space by threatening to arrest them and process them overnight, telling them they can leave or he will arrest them and they will be incarcerated until the morning when they could explain his illegal actions "to the judge." *See* **Exhibit G** at timestamp 18:30.

260.    **Exhibit G**, at timestamps 17:43-20:53 is a video of this incident.

## Winter Garden

261.    On December 12, 2011, OWS participants gathered at the Winter Garden to engage in Constitutionally protected speech and assembly activities.

262.     Police came to the scene to remove the OWS participants.  Many people involved in the activities, but who were not engaged in any type of disorderly conduct, were charged criminally with trespass.

263.     The Winter Garden is a publicly accessible open area, and is owned by Brookfield Properties.

264.     In order to be charged with criminal trespass, it must be shown that a <u>lawful</u> order was given to leave the premises.

265.     Under the rules of the Winter Garden, the OWS participants were in the open space within the permissible time of use.

266.     Plaintiff John Knefel was at the Winter Garden recording the activities of the OWS participants on December 12, 2011.

267.     Plaintiff John Knefel was not engaged in any activity that could be construed as unlawful.

268.     Plaintiff John Knefel was nevertheless stopped from recording the arrests of OWS participants

269.     Plaintiff John Knefel was arrested.

270.     Plaintiff Paul Sullivan was at the Winter Garden recording the activities of the OWS participants on or about December 12, 2011.

271.     Plaintiff Paul Sullivan was not engaged in any activity that could be construed as unlawful.

272.   Plaintiff Paul Sullivan was nevertheless stopped from recording the arrests of OWS participants

273.   Plaintiff Paul Sullivan was arrested.

274.   A New York Times photographer, Robert Stolarick, was present that day at the Winter Garden.

275.   Robert Stolarick did have current NYPD press credentials.

276.   While he was photographing the arrests that are referenced in this complaint, he was physically blocked by members of the NYPD from doing his job as a member of the press.

277.   Mr. Stolarick continued to try to do his job, and members of the NYPD continued to try to block him from photographing these arrests. *See* video attached as **Exhibit G**, at timestamps 13:00-14:41.

278.   The carte blanche given to members of the NYPD to suppress First Amendment expression and press coverage of same over the course of the Winter Garden incident is reflected in the video of Plaintiff Paul Sullivan, who was arrested by a Defendant "John Doe" Police Officer for chuckling at said Defendant when said Defendant comically slipped on the Winter Garden's marble floor while pursuing an OWS participant.

279.   The City had no lawful purpose to prohibit all OWS participants from entering and remaining in the Winter Garden to engage in Constitutionally protected activity.

## Union Square Park

280.    OWS participants, who have effectively been prevented from entering and remaining in One Chase Manhattan Plaza, FKA Liberty Park, 100 William Street and the Winter Garden, among others, have been holding general assembly meetings and conducting other expressive activities at Union Square Park.

281.    Union Square Park has for centuries been a meeting place for citizens to come together: to celebrate Union victories in the Civil War, to mourn together, as after 9/11, and to rally and protest.

282.    Indeed, Union Square Park was the site of the first Labor Day parade in 1882.

283.    Union Square Park, as a matter of practice, has long been open to the public 24 hours a day, although as a City park, regulations state that it is open to the public from 6:00 a.m. to 1:00 a.m.  The South entrance to Union Square Park is a public sidewalk and has always been open to the public 24 hours a day.

284.    Nevertheless, just before midnight on March 21, 2012, police began barricading the South entrance of the park, dispersing OWS participants, and arresting those who they allege were not complying with their order.

285.    Plainly, the order to leave the South plaza of the park was arbitrary and illegal.

### III.    DEFENDANTS CITY, MAYOR BLOOMBERG, COMMISSIONER KELLY HAVE CONSPIRED WITH PRIVATE CORPORATIONS AND OTHER GOVERNMENTAL ENTITIES TO SUPPRESS THE CONSTITUTIONAL RIGHTS OF PLAINTIFFS AND OTHER OWS PARTICIPANTS TO PETITION THEIR GOVERNMENT FOR REDRESS OF GRIEVANCES

286.    The examples noted above show a policy established by the Defendants City of New York, Mayor Bloomberg, and Commissioner Kelly of specifically targeting Occupy Wall Street participants and preventing them from engaging in Constitutionally protected activities in publicly accessible open spaces.  These actions were not the mere activities of private actors on private property, nor the mere enforcement of property laws by public officials.  Rather, Plaintiffs' allegations demonstrate that they were the acts of public actors acting in concert with private corporations to bar access to publicly accessible open areas in furtherance of the governmental interests of the Mayor and the private interests of corporations.

287.    As demonstrated by its supporting deposition in the Ronnie Nunez criminal trespass case, Brookfield management has worked with police to have OWS participants removed from its public spaces, actually transferring discretion and authority to NYPD to order OWS participants off of publicly accessible open areas and forcibly removing them.  *See* **Exhibit K,** attached.

288.    Police barricades were erected at One Chase Manhattan Plaza in advance of the beginning of OWS in order to bar OWS participants from entering.  At some point after October 12, 2011 police barricades were removed and, upon information and belief, a private fence owned by Defendant J.P. Morgan was erected to keep OWS protesters out of the Plaza.

289.    On information and belief, the close temporal proximity between the removal of the initial barriers and their replacement with the subsequent private fence shows that Defendant J.P. Morgan and state actors conferred and conspired to continue the violation of Constitutional rights of individuals seeking to gather and exercise their rights in said publicly accessible open area.

290.    On October 3, 2011, Defendant J.P. Morgan made the largest contribution ever to the New York Police Foundation, to wit, goods, services and cash totaling Four point Six Million Dollars ($4,600,000.00).

291.    The New York Police Foundation is closely associated with the NYPD.  A photo and a statement from Commissioner Ray Kelly appears on the home page of the New York Police Foundation's web site. http://www.nycpolicefoundation.org/netcommunity// *See* **Exhibit Q**.

292.    Defendant Mitsui officials conferred with Defendant NYPD Deputy Inspector Winski to violate the Constitutional rights of OWS participants when Defendant Mitsui, according to the words of Defendant Winski, told him that they were to be removed in violation of their rights.

293.    An agreement was formed between the state actors MTA and its police commissioner, and the state actors City of New York and its Mayor and Police Commissioner to violate the Constitutional rights of OWS participants in their jurisdictions.

294.    The MTA Commissioner was a high-ranking 26 year veteran of the NYPD when he left to become MTA Commissioner.  The MTA Commissioner served for approximately five years with NYPD's Public Information Division as its highest ranking

officer.  The Public Information Division has responsibility for handling the press.  Given this history, the MTA Commissioner would have had every opportunity to coordinate with NYPD in its response to OWS generally and handling the press specifically in connection with OWS.

295.     In each case, the conspiring entities or individuals acted in concert and committed overt acts to cause violations of the Constitutional rights of Plaintiffs and many other OWS participants.

296.     Just two years ago, the United States Supreme Court, in upholding the right of corporations to spend unlimited amounts of money on political campaigns, stated "[t]here is no basis for the proposition that, in the political speech context, the Government may impose restrictions on certain disfavored speakers.  Both history and logic lead to this conclusion." Citizens United v. Federal Elections Commission, 130 S.Ct. 876 at 883 (2010).

297.     Yet, Defendant City of New York, through its police department, in apparent deference to and in conjunction with large corporations, has restricted actual live people from speaking in the political speech context by ferreting out OWS participants and barring them from speaking in public spaces where others are allowed to assemble and speak freely.

298.     In light of the Citizens United decision, and the spectacle of corporate money crowding out other speakers from the political process, it is more important than ever that the public square be available to all people, especially those with fewer resources, to freely express opinions.

299.    The City, the Mayor and the  police force, have conspired with the defendant private corporations and other governmental entities to effectively impose a corporate monopoly on political speech by barring OWS from traditional public squares and by targeting press to suppress reporting on the crackdowns on the movement.

## IV. FREEDOM OF SPEECH: DEFENDANTS HAVE ENGAGED IN SYSTEMATIC VIOLATIONS OF LAW AND CONSTITUTIONAL GUARANTEES INTENDED TO CHILL THE FIRST AMENDMENT RIGHTS OF OCCUPY WALL STREET PARTICIPANTS TO EXPRESS OPINIONS ON MATTERS OF PUBLIC CONCERN

### A.    NYPD OFTEN OVERCHARGES PEACEFUL PROTESTERS WITH  RESISTING ARREST IN ORDER TO HOLD THEM OVERNIGHT RATHER THAN RELEASE THEM WITH DAT'S

300.    According to NYPD Patrol Guide section ("PG") 208-27, various arrestable offenses should result in the issuance of a Desk Appearance Ticket.

301.    One of the disqualifications of eligibility for receiving a Desk Appearance Ticket is the charge of resisiting arrest.  PG 208-27(4)(s).

302.    A defendant that is otherwise eligible to receive a Desk Appearance Ticket will lose such eligibility, and will subsequently be held overnight and be processed through the system, if one of the charges filed against such an individual is resisting arrest.

303.    Often times, this charge will be added to a docket regardless of whether factual conduct existed that would sustain a prima facie charge of resisting arrest.

304.    It is well recognized in New York's First Appellate Department's jurisprudence, which controls in Manhattan, that affirmative conduct intended to prevent an an arrest is

required to support a charge of resisting arrest under PL §205.30. People v. Arbeiter 169 Misc.2d 771, 774 (1996).

305.    Often times during peaceful OWS protests, individuals will be charged with resisting arrest as a punitive charge so that they would become ineligible to receive a Desk Appearance Ticket.

306.    Often times, when a defendant is wrongfully charged with resisting arrest, the charge itself is dropped by the District Attorney's office.

307.    Distinctly, the charge of Obstruction of Governmental Administration, triggers a discretionary decision to be made by a member of the NYPD whether to issue a Desk Appearance Ticket or not. PG 208-27(4)(t*) "A person arrested for Obstruction Governmental Administration 2nd Degree may be issued a DAT if he/she engaged in uncooperative actions and is otherwise qualified."

308.    The charge of resisting arrest does not trigger any discretionary decision. Upon information and belief, the charge of resisting arrest is often added to an array of charges by the NYPD against OWS participants as an unconstitutional chill on an individual's right to peacefully assemble and engage in expressive speech by punishing such conduct with an overnight incarceration rather than the issuance of a Desk Appearance Ticket.

309.    Further information regarding the NYPD's continuing pattern and practice of charging individuals with Disorderly Conduct, Resisting Arrest, and Obstruction of Governmental Administration in retaliation for perceived "Contempt of Cop" is contained in Appendix I, incorporated by reference herein.

### B.   NYPD PHOTOGRAPHS ARRESTEES AND, UPON DISMISSALS, DOES NOT RETURN THE PHOTOTGRAPHS TO THE INNOCENT ARRESTEE IN VIOLATION OF STATE PRIVACY LAW

310.   Plaintiffs and other OWS participants have been arrested and taken to One Police Plaza and police precincts under police custody.

311.   While at One Police Plaza and other precincts, police personnel take photographs of the individual arrestees, in contradiction to customary police practice.

312.   The NYPD Patrol Guide at PG 208-07 provides a list of "photographable offenses." (Attached as **Exhibit R**).  It includes all felonies and a list of misdemeanors as photographable offenses.

313.   PG 208-07 does not designate disorderly conduct as a photographable offense.

314.   PG 208-07 does not designate resisting arrest as a photographable offense.

315.   PG 208-07 does not designate obstruction of governmental administration in the second degree as a photographable offense.

316.   PG 208-07 does not designate any degree of misdemeanor or violation trespass as a photographable offense.

317.   The Plaintiffs, and indeed nearly all OWS arrestees, have not been arrested for photographable offenses.

318.   Nevertheless, NYPD officers have photographed substantially all OWS arrestees.

319.   On information and belief, one purpose of this practice of improper photographing of arrestees is to facilitate prosecutions in mass arrests by providing deponent officers and testifying officers with a reference as to which particular arrestee they will allege undertook particular conduct.

320.   On information and belief, the allegations against these mass arrestees are

58

generally fabricated to support arrests undertaken in the absence of probable cause to chill Constitutionally protected expression.

321.   On information and belief, deponent officers and testifying officers setting forth allegations regarding mass arrestees need photographic references and other materials to consistently set forth their allegations because the allegations against the mass arrestees are generally not based on validly criminal conduct observed by any officer.

322.   In the aftermath of the unlawful closure of FKA Liberty Park on or about March 17, 2012, a number of individuals were detained by the NYPD for more than ten hours, photographed and then released without charges.

323.   NYPD photographs OWS arrestees and does not return the photographs to the arrestee, nor, upon information and belief, destroy them when they are found not guilty by a competent court.

324.   The failure to return or destroy the photographs violates New York State's guarantees of privacy set forth in its Criminal Procedure Law.

325.   Crim. Pro. L. § 160.50 provides that fingerprints and photographs of defendants whose charges are terminated favorably must be returned to the person or destroyed "forthwith."

326.   Nevertheless, the NYPD often flouts the law by retaining photographs, sometimes using them for photo arrays and other investigation techniques, in direct contravention of the letter and spirit of the law.

327.   Upon information and belief, NYPD has not returned or destroyed photographs of innocent arrestees in the OWS movement and Plaintiff.

328.   On November 15, 2012, Plaintiff Jeffery McClain was arrested, and on January

11, 2012, the charges against him were dismissed.

329.   A photograph was taken of him at 1 Police Plaza.

330.   On January 27, 2012, he wrote the police department to ask for the photograph or proof that it was destroyed.  Attached as **Exhibit S**.

331.   On February 15, 2012, the Department wrote back explaining that it would consider his request for 20 business days under the provisions of the Freedom of Information Law (FOIL).  Attached as **Exhibit T**.

332.   FOIL does not apply to this matter, and it is nothing more than an attempt at obstruction.

333.   On March 15, 2012, the Department wrote in further reply to Plaintiff McClain's lawful and proper request for the destruction of his photograph in police possession, stating that "numerous records must be reviewed in order to determine whether disclosure is required."  Attached as **Exhibit U**.

334.   The March 15, 2012 letter from the NYPD to Plaintiff McClain went on to state that Plaintiff McClain would receive a response by July 15, 2012.  Id.

335.   "[T]he purpose of CPL 160.50 is to protect accused individuals from the unauthorized use of their records."  Green v. Montgomery, 95 N.Y.2d 693, 701, 746 N.E.2d 1036, 1041 (2001).

336.   Crim. Pro. L. § 160.50 creates a liberty interest which cannot be deprived without due process of law under the Fourteenth Amendment to the United States Constitution. Anderson v. City of New York, 611 F. Supp. 481 at 489 (S.D.N.Y. 1985).

337.   The pattern of prior conduct of not returning or destroying photographs and fingerprints with deliberate indifference of the rights of innocent citizens makes the failure to follow the statute a violation of state law and Constitutional law.

## V.   THE LACK OF RESPECT THE NYPD HAS FOR THE COMMUNITIES IT POLICES, AND FOR THE CONSTITUTION AND LAWS IT IS SUPPOSED TO UPHOLD, ALSO LEADS TO WIDESPREAD NYPD CORRUPTION AND CRIMINAL CONDUCT

338.   A simple review of police misconduct that was caught and led to arrests, indictments and/or police trials, since the beginning of the OWS movement just six months ago, overwhelmingly indicates that the Mollen Commission's recommendation for Command Control and Oversight is needed now, even more than it was twenty years ago.

339.   Individually, these particular acts may indicate a bad apple in an otherwise finely tuned administration of police security in New York City.

340.   Collectively, these individual acts indicate a systematic pattern of police conduct that strains the accountability that these officers owe the citizens and residents of New York City.

341.   On October 23, 2011, five current and three former members of the NYPD were arrested and charged federally with Conspiracy to Transport Fire Arms Interstate, Conspiracy to Transport Defaced Firearms Interstate, Conspiracy to Sell a Firearm to an

Out Of State Resident, Conspiracy to Transport and Receive Stolen Merchandise.  United States of America v. Masso, et al, 11MAG2730.

342.    Just five days later, on October 28, 2011, a ticket fixing scandal broke with the arrest of thirteen NYPD officers, two Sergeants and one Internal Affairs Lieutenant, who was charged with leaking information to union officials about the investigation that led to these arrests.

343.    The charges also included misconduct, grand larceny, records tampering and obstruction of governmental administration.

344.    The investigation began with the uncovering of an officer from the 40th precinct who was selling narcotics from a barbershop he owned in the Bronx.

345.    On January 17, 2012, NYPD Officer Jason Arbeeny, a 14 year veteran, was convicted of planting drug on two individuals.

346.    Testimony at the trial of Officer Arbeeny indicated that the planting of drugs was widespread in the Brooklyn South Narcotics Taskforce.  An individual named Melanie Perez testified at the Arbeeny trial that she was provided with narcotics by NYPD officers and then forced to perform sex acts.

347.    On January 29, 2012, NYPD Officer Monty Green was put through an NYPD departmental trial for acting as a pimp.

348.    On February 3, 2012, a retired NYPD Officer was found guilty of conspiracy to distribute cocaine and using, carrying, and possessing a firearm in connection with that

conspiracy. *See* Jim Kouri, "Retired NYPD Officer Convicted In Bronx Drug

Trafficking Conspiracy," examiner.com, February 4, 2012, incorporated by reference

herein and available online at http://www.examiner.com/public-safety-in-

national/retired-nypd-officer-convicted-bronx-drug-trafficking-conspiracy.

349.    On February 25, 2012, an investigation was disclosed into NYPD Detectives from

the 33rd Precinct for drinking on the job and either paying a waitress for sex or sexually

assaulting her on February 16, 2012. *See* Al Baker, "4 Detectives Suspected of Drinking

on the Job," New York Times, February 24, 2012, incorporated herein by reference and

available online at http://www.nytimes.com/2012/02/25/nyregion/4-detectives-

suspected-of-drinking-on-duty.html?_r=2.

350.    On March 7, 2012, the Village Voice reported on a 95 page NYPD report

concerning the unlawful hospitalization of NYPD Officer Adrian Schoolcraft in

retaliation for reporting *confidentially* to NYPD investigators that crime statistics were

being manipulated by orders of precinct Commanding Officers to arrest citizens for doing

little more than standing on the street corner while making it difficult for real victims of

crimes to report such crimes.  Said NYPD report substantially confirmed Schoolcraft's

claims. *See* Graham Rayman, "The NYPD Tapes Confirmed," Village Voice, March 7,

2012, incorporated by reference herein and available online at

http://www.villagevoice.com/2012-03-07/news/the-nypd-tapes-confirmed/.

### VI.   NYPD MISCONDUCT CAN BE EXAMINED IN MICROCOSM BY VIEWING THE NYPD'S TREATMENT OF THE OCCUPY MOVEMENT

351.   On September 18, 2011, an arrest made by Defendant Deputy Inspector Winski was one of the first made at Occupy Wall Street of an OWS participant.

352.   On this date, a peaceful march was taking place from FKA Liberty Park to Wall Street.

353.   As an individual in an orange hat passed Defendant Deputy Inspector Winski.

354.   This individual in the orange hat was arrested and charged with resisting arrest and disorderly conduct.

355.   NYPD Spokesperson Paul Browne stated in an email to the media that this individual was arrested as he tried to jump a barricade and resisted arrest.

356.   A NY Times article appeared that contradicted this statement, and seemed to prove that the opposite was true, specifically, that Defendant Deputy Inspector Winski was the individual who jumped a barricade to make this arrest.

357.   Photographs were posted on line that show the statement made by the NYPD was inaccurate.  See **Exhibit V**, five photographs taken by NY Times photographer Robert Stolarick.

358.   In a follow-up interview, NYPD Spokesperson Paul Browne stated to the NY Times that he must have had his notes mixed up.

359.    Since that date, the NYPD has engaged in an intentional pattern to badger and bother both citizen and media press.

360.    On September 24, 2011, a senior officer of the NYPD, Deputy Inspector Anthony Bologna, was present in the vicinity of Union Square when a peaceful protest was taking place.

361.    Deputy Inspector Anthony Bologna approached a group of defenseless young women who were being held against their will by the NYPD in orange netting and sprayed them with NYPD issued pepper spray, without apparent cause or provocation.

362.    At or about the same time, Deputy Inspector Anthony Bologna was walking on the sidewalk in and around Union Square when he again released a few various sprays of NYPD issued pepper spray.

363.    Both moments of improper conduct were caught on video camera and subsequently posted on the internet.

364.    Recordings of these two serial incidents of misconduct by Deputy Inspector Bologna are available online at http://www.youtube.com/watch?v=bRc7t6gRkhE and http://www.youtube.com/watch?v=gcl9mQPC-Xo, both last accessed 4/29/12.

365.    Upon information and belief, the NYPD initially sought to justify the use of pepper spray, and discount the posted videos.  However, after multiple videos were posted and received significant viewership, the NYPD conducted a *pro forma* investigation into the improper use of pepper spray by Deputy Inspector Anthony Bologna.

366.    On information and belief, Deputy Inspector Bologna was docked vacation days for his misconduct, but suffered no criminal sanction.

367.    Further acts of violence committed by the NYPD on September 24, 2011, were caught on video and published on the MSNBC program "The Last Word with Lawrence O'Donnell."

368.    On October 1, 2011, a peaceful march left FKA Liberty Park and eventually made its way to the Brooklyn Bridge.

369.    There is conflicting evidence of whether the NYPD led people onto the bridge, then trapped and arrested them.

370.    There is a lawsuit that was filed a few days later in the Southern District of New York challenging the conduct of the NYPD.  Garcia et al v. NYC et al, 11CV6957 (JSR).

371.    As set out above, Plaintiff Stephanie Keith was working that day as a news photographer when she was arrested on the Brooklyn Bridge.

372.    The Manhattan District Attorney's Office dismissed all charges against Mrs. Keith in the interest of justice, due to her status as a working professional news photographer.

373.    On November 15, 2011, the NYPD at the behest of private property owners and the defendant Michael Bloomberg, physically evicted peaceful protesters from FKA Liberty Park.

374.    Plaintiff Councilmember Ydanis Rodriguez was assaulted as he tried to observe the police interaction at FKA Liberty Park on November 15, 2011, in his capacity as a democratically elected member of the New York City Council.

375.    Plaintiff Democratic District Leader Paul Newell was assaulted as he tried to observe the police interaction at FKA Liberty Park on November 15, 2011, in his capacity as a democratically elected District Leader for the 64th Assembly District, Part C, Manhattan.

376.    On November 15, 2011, Plaintiff Michael Rivas was badly beaten by police officers as he tried to enter FKA Liberty Park.  He was arrested without warning or probable cause, and suffers permanent injuries as a result of the encounter.

377.    On November 15, 2011, Plaintiff Jeffery MCClain  went to lower Manhattan while FKA Liberty Park was being evicted.  He is a veteran of the Army and member of the Iraq War Veterans for Peace.  He was dressed in uniform and with a t-shirt showing his affiliation.

378.    When Plaintiff McClain was prevented from going to the park by members of the NYPD, he joined a march with other OWS particpants to Foley Square.

379.    OWS participants were being harrassed and intimidated by police at Foley Square.

380.    Due to this mistreatment, Plaitniff McClain, and many other OWS participants, began to march North.  When it appeared that all the marchers would be arrested, he broke off with about 20 others and marched down a side street.

381.    Plaintiff McClain and the twenty other OWS participants he was with, were quickly surrounded by police, even though they were breaking no laws.  Upon seeing one participant being brutalized by police officers while he was on the ground and not resisting, he tried to assist the person by pulling him away from the out of control police gang assault.

382.    Plaintiff McClain was immediately arrested and badly beaten by police officers, who repeatedly called him a traitor to his country and unfit for his uniform. *See* **exhibit W**, photograph of Jeffery McClain.

383.    On November 15, 2011, a citizen of this great city was punched in the face by a member of the NYPD simply because she was presenting to this officer the Court Order authorizing the OWS participants back into Liberty Plaza. *See* Video, **Exhibit G**.

384.    On November 15, 2011 and thereafter, members of the NYPD and other Defendants authorized the mass destruction of the property of the OWS participants and others.

385.    Notices of claim have been filed concerning this destruction of property by and on behalf of Occupy Wall Street, members of the Library of Occupy Wall Street and Global Revolution TV.

386.    On November 15, 2011, Plaintiff Timothy Fitzgerald, a citizen reporter, documented the destruction of property belonging to OWS participants by the NYPD, and was subsequently grabbed, pulled to the ground and arrested by NYPD officers.

387.    On November 17, 2011, during a peaceful protest in response to the eviction of FKA Liberty Park, NYPD entered Amalgamated Bank at 52 Broadway and arrested Plaintiff Peter Dutro.

388.    The criminal complaint filed against Plaintiff Peter Dutro set out that he was at the corner of Broadway and Exchange Place with approximately 50 other individuals.

389.    This was false, as Plaintiff Peter Dutro was in the confines of the Amalgamated Bank, and falsely arrested solely because Plaintiff Dutro had asked a peaceful protester who was being arrested, "What's your name?"

390.    The Manhattan District Attorney's Office dismissed the case against Plaintiff Peter Dutro after reviewing the security video from Amalgamated Bank.

391.    On December 17, 2011 at the Winter Garden, Plaintiff Justin Wedes was targeted by Defendant Deputy Inspector Ed Winski because of his status as citizen press.

392.    Although the video of Plaintiff Justin Wedes' arrest clearly shows he complied with the arresting officers and did not resist in any manner, he was charged with resisting arrest and held for more than forty (40) hours.

393.    On December 17, 2011 at the Winter Garden, Plaintiff John Knefel was arrested as a recognized citizen journalist because he did not have NYPD issued press credentials. *See* video, **Exhibit G**, at timestamps 14:42-15:00.

394.    On or about December 17, 2011, at the Winter Garden, Plaintiff Paul Sullivan, a citizen journalist, was grabbed, pulled to the ground and arrested without warning or

probable cause.

395.    On December 17, 2011 at the Winter Garden, NY Times photographer Robert

Stolarick was harassed and physically blocked from doing his job as a professional press

photographer by members of the NYPD. *See* Video, **exhibit G**, at timestamps 13:00-

14:41.

396.    On or about January 1, 2012, at approximately 2:30 a.m., a group of people were

marching on the sidewalk on Second Avenue heading north.

397.    As the group approached 13th Street, they were stopped by the NYPD and

surrounded by officers of the NYPD on foot and on motor scooter.

398.    The individuals surrounded, began to chant, "why are we being detained, why are

we being detained."

399.    Some individuals sought to leave the area and the officers standing in their path

pushed these individuals back.  At the same time, the officers on motor scooters,

maneuvered their scooters in a way to intimidate individuals with the fear that they would

be physically harmed by these officers on motor scooters if they tried to leave the area.

400.    More than twenty individuals were detained and arrested at 13th Street an Second

Avenue at approximately 2:50 a.m. on January 1, 2012 and subsequently issued Desk

Appearance Tickets.

401.    On the date that they were to appear in Court, the Manhattan District Attorney's

Office declined to prosecute substantially every one of these arrests.