402.     At least one lawsuit has been filed complaining of these January 1, 2012 unlawful arrests. *See* <u>Treffs v. The City of New York et al.</u>, SDNY 12-cv-3030 (HB)(KNF).

403.     On or about January 10, 2012, Plaintiff Justin Sullivan was arrested and charged with multiple counts of assault while observing the arrest of another OWS participant in a public place, Grand Central Station.

404.     The video exhibit clearly shows that Plaintiff Sullivan did not commit either assault, but that inconsistent police actions led to officers knocking themselves down, knocking down Plaintiff Sullivan, and even allowing a dog to bite an OWS participant that was in police custody.

405.     On March 17, 2012, a large group of OWS participants gathered in FKA Liberty Park for cultural classes, music and socializing.

406.     Defendant Deputy Inspector Edward Winski told OWS participant Dallas Pesola that he would be arrested that day, though Defendant Winski did not indicate why.

407.     Within a few hours, OWS participant Dallas Pesola was arrested at the behest of Defendant Deputy Inspector Edward Winski, charged with two counts of disorderly conduct and one count of resisting arrest, held for forty-eight hours before being arraigned and released.

408.     Later on March 17, 2012, without cause or legal right, high ranking members of the NYPD announced that this public space was now closed and anybody who remained would be arrested.

409.    Thereafter, high ranking members of the NYPD, including Lieutenants and Deputy Inspectors began to violently harm the OWS participants.

410.    More than seventy OWS participants were arrested that evening.

411.    Upon information and belief, every one of the arrested individuals were processed as overnight arrests and not issued Desk Appearance Tickets.

412.    Video of the violence brought to the peaceful protest by the NYPD can be seen here:

http://www.youtube.com/watch?v=_1AiNMAv2KI&feature=BFa&list=UUhwwoeOZ3E JPobW83dgQfAg&lf=plcp, last accessed 4/29/12.

413.    During the same series of arrests, a female OWS participant went into seizure while being arrested, yet she was not provided any medical attention and was literally left on a cold street of NYC for length fo time before the NYPD finally carried her to a sidewalk.  One on the sidewalk, they did not seek to locate a medic or anyone to provide medical attention.  Video of this incident can be seen here

http://www.youtube.com/watch?v=An8OCm-Gl2U&feature=related.

## EQUITABLE RELIEF

414.    Injunctive relief is appropriate in this case because firstly, the Plaintiffs have shown that their Constitutional rights have been violated.  Lewis v. Casey, 518 U.S. 343 (1996).

415.    Secondly, Plaintiffs have shown that, in light of the continuous and ongoing

nature of the Constitutional violations at issue, said violations are highly likely to

recur.

416.    Where a plaintiff's right to free speech has been infringed in the past, the chilling

effect of future speech is a sufficient continuing injury to obtain injunctive relief.

Secretary of State of MD. V. Joseph H. Munson Co., Inc., 467 U.S. 947 at 956-957

(1984).

417.    Where an individual officers' misconduct is officially authorized it is likely to

recur, and therefore injunctive relief is appropriate.  City of Los Angeles v. Lyons,

461 U.S. 95 at 106.  *See also* Illinois Migrant Council v. Pilliod, 540 F.2d 1062, 1067

(7th Cir. 1976).

418.    Plaintiffs have standing, and injunctive relief is granted where they "allege a

pattern of localized, intentional misconduct aimed at a particular set of identifiable

individuals, those individuals satisfied the requirement that they show an imminent

threat of injury."   Nat'l Council of La Raza v. Gonzales, 468 F. Supp. 2d 429, 442

(E.D.N.Y. 2007).

419.    For example, the court upheld standing and the availability of injunctive relief

where Plaintiffs who had been falsely arrested in high drug areas feared further future

injury because of the pattern of conduct exhibited by police and because the arrests

took place in targeted geographical zones, i.e. high drug areas.  Roe v. City of New

York, 151 F.Supp. 2d 495 (S.D.N.Y. 2001).  *See also* Zepeda v. U.S.I.N.S., 753 F.2d

719 (9th Cir. 1983); Illinois Migrant Council v. Pilliod, 540 F.2d 1062 (7th Cir. 1976);

National Congress of Puerto Rican Rights v. City of New York 191 F.R.D. 52
(S.D.N.Y. 1999).

420.   Plaintiffs here have demonstrated that their Constitutional rights have been
violated repeatedly.  That the violations are ongoing, and have taken place in recent
days.

421.   Plaintiffs here have demonstrated that they have been targeted as members of a
group, namely, OWS.  Therefore, each and every participant in OWS named here as a
plaintiff is entitled to relief and has standing to participate in this lawsuit.  Each
plaintiff is chilled from engaging in future public speech and peaceful assembly in
connection with OWS.  Finally, the conduct by police has been almost certainly
authorized by the City.

422.   Each of these factors, along with past injury, demonstrate the high likelihood that
injury to Plaintiffs and other OWS participants are likely to recur; and further, that
Plaintiffs exercise of their First Amendment rights have been chilled by the likelihood
that the injury will recur.

423.   Therefore, Plaintiffs are entitled to injunctive relief.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CONSTITUTIONAL RIGHTS OF PLAINTIFFS**
(UNITED STATES CONSTITUTION AND 42 USC §1983)

424.   The above paragraphs and Appendix I below are here incorporated by reference.

425.   The above-referred acts by Defendants were undertaken under color of law.

426.   The above-referred acts by Defendants were undertaken in the exercise of

Defendants' official duties.

427.    The above-referred acts by Defendants violated the Constitutional rights of

Plaintiffs.

428.    Plaintiffs were injured as a result of Defendants' acts.


## SECOND CAUSE OF ACTION
## VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH BY PREVENTING ELECTED OFFICIALS FROM OBSERVING AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
### (FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA AND 42 USC § 1983)

429.    The above paragraphs and Appendix I below are here incorporated by reference.

430.    On November 15, 2011, elected officials, including Plaintiffs Council members

Rodriguez and Williams and Democratic District Leader Newell were prevented by

NYPD officers from observing, recording and reporting on the clearance of FKA

Liberty Park for no lawful purpose.

431.    Plaintiffs Rodriguez and Newell were arrested for exercising their personal and

institutional roles to report on a major police mobilization.

432.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and

statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under 42 USC §1983.

433.    As a result, the aforementioned Plaintiffs have been injured.

### THIRD CAUSE OF ACTION
### VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH
### BY PREVENTING ELECTED OFFICIALS FROM OBSERVING AND
### RECORDING POLICE ACTIONS AGAINST PROTESTERS
(ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW YORK,
STATE CONSTITUTIONAL TORT)

434.    The above paragraphs and Appendix I below are here incorporated by reference.

435.    On November 15, 2011, elected officials, including Plaintiffs Council members
Rodriguez and Williams and Democratic District Leader Newell were prevented by
NYPD officers from observing, recording and reporting on the clearance of FKA
Liberty Park for no lawful purpose.

436.    Plaintiff Rodriguez and Newell were arrested for exercising their personal and
institutional roles to report on a major police mobilization.

437.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and
statutory rights and have conspired to deprive them of such rights and are liable to
Plaintiffs under the New York State Constitution.

438.    As a result, the aforementioned Plaintiffs have been injured.

### FOURTH CAUSE OF ACTION
### ABUSE OF EXECUTIVE POWER BY PREVENTING MEMBERS OF THE
### LEGISLATIVE BRANCH FROM OBTAINING INFORMATION ABOUT
### THE CONDUCT OF A CITY AGENCY IN ORDER TO REVIEW ITS
### ACTIONS AND TO MAKE LAW FOR THE GOOD RULE AND
### GOVERNMENT OF THE CITY
(THE CHARTER OF THE CITY OF NEW YORK, §§ 28 AND 29)

439.    The above paragraphs and Appendix I below are here incorporated by reference.

440.    Members of NYPD, a Mayoral City agency, prevented Plaintiffs Rodriguez and
Williams from observing the mass police action against OWS on November 15, 2011.

441.    In doing so, the executive branch of City government prevented them from

performing an official function, to wit, to gather information in furtherance of the role of the City Council to review government activities and make law for the good rule of the City.

442.     Such action prevented Plaintiff Council members James and Mark-Viverito, as well as Rodriguez and Williams, from effectively conducting Charter mandated investigations and lawmaking responsibility.

## FIFTH CAUSE OF ACTION
### VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM OBSERVING AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
(FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA AND 42 USC § 1983)

443.     The above paragraphs and Appendix I below are here incorporated by reference.

444.     Members of the press, including Plaintiffs Justin Wedes and John Knefel have been routinely prevented by NYPD officers from observing, recording and reporting on OWS activities and police response to said activities.

445.     Reporters, including the above referenced Plaintiffs, were forcibly removed and sometimes arrested by NYPD officers from the scene of police actions against protesters for no lawful purpose.

446.     In addition, members of the press are targeted by police officers for arrest and harassment to deter them from recording and observing police activity.

447.     Furthermore, the deliberate and unlawful interference with and prevention of reporting about police activities in connection with the OWS movement violates the rights of all citizens, including all Plaintiffs in this suit, from being free of unlawful and unnecessary infringement of their free speech rights.

448.   Defendants have deprived the above Plaintiffs of their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to Plaintiffs under 42 USC §1983.

449.   As a result, the aforementioned Plaintiffs have been injured.

### SIXTH CAUSE OF ACTION
### VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM OBSERVING AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
(ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW YORK, STATE CONSTITUTIONAL TORT)

450.   The above paragraphs and Appendix I below are here incorporated by reference.

451.   Members of the press, including Plaintiffs Justin Wedes and John Knefel have been routinely prevented by NYPD officers from observing, recording and reporting on OWS activities and police response to said actibities.

452.   Reporters, including the above referenced Plaintiffs, were forcibly removed and sometimes arrested by NYPD officers from the scene of police actions against protesters for no lawful purpose.

453.   In addition, members of the press are targeted by police officers for arrest and harassment to deter them from recording and observing police activity.

454.   Furthermore, the deliberate and unlawful interference with and prevention of reporting about police activities in connection with the OWS movement violates the rights of all citizens, including all Plaintiffs in this suit, from being free of unlawful and unnecessary infringement of their free speech rights.

455.   Defendants have deprived the above Plaintiffs of their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under the State Constitution.

456.    As a result, the aforementioned Plaintiffs have been injured.


### SEVENTH CAUSE OF ACTION
### VIOLATION OF RIGHT TO FREE SPEECH AND FREE ASSEMBLY IN PUBLIC SPACES
(FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND, 42 U.S.C. § 1983)

457.    The above paragraphs and Appendix I below are here incorporated by reference.

458.    Plaintiffs John Knefel, Paul Sullivan, Timothy Fitzgerald, Michael Rivas and

Justin Wedes, attempted to enter and/or remain in publicly accessible open areas in

accordance with each area's published rules.

459.    They were prevented from entering and/or forced to leave and/or arrested for

being in a publicly accessible open area by officers of NYPD and MTA Police.

460.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and

statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under 42 USC §1983, New York State common law, and the New York

State Constitution.

461.    As a result, Plaintiffs have been injured.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF RIGHT TO FREE SPEECH AND FREE ASSEMBLY IN PUBLIC SPACES
(ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW YORK, STATE CONSTITUTIONAL TORT)

462.    The above paragraphs and Appendix I below are here incorporated by reference.

463.    Plaintiffs John Knefel, Paul Sullivan, Timothy Fitzgerald, Michael Rivas and

Justin Wedes, attempted to enter and/or remain in publicly accessible open areas in

accordance with each area's published rules.

464.    They were prevented from entering and/or forced to leave and/or arrested for being in a publicly accessible open area by officers of NYPD and MTA Police.

465.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to Plaintiffs under 42 USC §1983, New York State common law, and the New York State Constitution.

466.    As a result, Plaintiffs have been injured.


## NINTH CAUSE OF ACTION
### CONSPIRACY TO VIOLATE PLAINTIFFS FIRST AMENDMENT RIGHTS OF FREEDOM OF SPEECH, ASSEMBLY, AND PRESS

467.    The above paragraphs and Appendix I below are here incorporated by reference.

468.    An agreement was formed between and among state actor/defendants City of New York, MTA, and its agents, Mayor Bloomberg and Commissioner Kelly and private actors/defendants J.P. Morgan, Brookfield Properties, and Matsui to violate the Constitutional rights of Plaintiffs and other participants in OWS.

469.    Specifically, an agreement was formed to bar OWS participants from entering and/or remaining in publicly accessible open area on each of the private actor defendants' properties, as described above.

470.    In each case, the conspiring entities or individuals acted in concert and committed overt acts to cause violations of the Constitutional rights of Plaintiffs and many other OWS participants.

471.    The conspiracy has caused Plaintiffs to suffer injury.

## TENTH CAUSE OF ACTION
## VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA AND SECTION 160.50 OF THE CRIMINAL PROCEDURE LAW OF THE STATE OF NEW YORK

472.     The above paragraphs and Appendix I below are here incorporated by reference.

473.     Defendant NYPD took photographs of OWS arrestees, including substantially all Plaintiffs.

474.     The criminal charges against substantially all Plaintiffs and numerous other OWS arrestees have been terminated in their favor.

475.     With deliberate indifference and gross negligence, defendants did not return or destroy photographs taken of arrestees who received favorable terminations in their criminal court case.

476.     Defendants have deprived Plaintiffs of their civil, Constitutional and statutory rights, and have conspired to deprive them of such rights in violation of 42 USC §§1983, 1985 New York State law, and the New York State Constitution.

477.     Plaintiffs were damaged as a result of defendants' unlawful conduct.

## ELEVENTH CAUSE OF ACTION
## MUNICIPAL AND SUPERVISORY LIABILITY
(THE CITY OF NEW YORK, MAYOR BLOOMBERG AND COMMISSIONER KELLY UNDER 42 USC § 1983 AND MONELL V. CITY OF NEW YORK DEPARTMENT OF SOCIAL SERVICES, 436 U.S. 658(1978))

478.     The above paragraphs and Appendix I below are here incorporated by reference.

479.     The City and the Commissioner are liable for the damages suffered by Plaintiffs as a result of the conduct of their employees, agents, and servants.

480.     The City, and the Commissioner knew or should have known of their employees',

agents', or servants' propensity to engage in the illegal and wrongful acts detailed above.

481.    The aforesaid events have been carefully planned by the City and the Police Commissioner.  For example, The Commissioner and the Mayor of the City of New York, Michael Bloomberg, have both said that each aspect of the Zuccotti Park operation went according to the City's plan.

482.    The aforementioned actions are occurring in an open and notorious manner. Furthermore, much of the aforementioned activities have been carried out by police supervisors and presumably at the direction of the City and the Commissioner.  If the City and Commissioner are not directing such actions, they clearly are tacitly accepting and encouraging such conduct.

483.    Similarly, the forcible removing of protesters from public spaces and the prevention of members of the press to observe and record police activities has been widely reported on and happens in the presence of and at the direction of supervising officers.  The New York Press Club was loudly critical of the actions taken against members of the press, and they were acknowledged publicly by Commissioner Kelly. The City and Commissioner clearly has notice of such actions and yet, the City, Commissioner and their supervisors either direct such actions or tacitly accept and encourage them by not preventing officers from engaging in such conduct and disciplining them.   The aforesaid events were not isolated incidents.

484.    The City and the Commissioner have been aware for some time (from lawsuits, notices of claim and complaints filed with the Civilian Complaint Review Board) that many of their police officers are insufficiently trained on the observations necessary

to support arrests and prosecutions.  The City and the Commissioner are further aware, from the same sources, that NYPD officers routinely assault citizens without fear of reprisal.  The City and the Commissioner fail to discipline officers for not reporting fellow officers' misconduct that they have observed, and they fail to discipline officers for making false statements to disciplinary agencies.  Further, there is no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct.  Without this notification, improper force is practiced and incredible testimony goes uncorrected.  Additionally, the City and the Inspector have isolated their law department from the discipline of police officers, so that civil suits against police officers for actions taken in their capacity as police officers have no impact on the officers' careers, regardless of the outcome of the civil actions. Furthermore, the Public Information Division routinely makes false statements about the circumstances incident to arrests to protect police officers. The City is aware that all of the aforementioned has resulted in violations of citizens' Constitutional rights. Despite such notice, the City and the Commissioner, have failed to take corrective action.  This failure and these policies caused the officers in the present case to violate plaintiff's civil rights, without fear of reprisal.

485.    The City and the Commissioner knew or should have known that the officers who caused Plaintiffs' injury had a propensity for the type of conduct that took place in this case.  Nevertheless, the City and the Commissioner failed to take corrective action.

486.    The City and the Commissioner knew or should have known that the officers who caused Plaintiffs' injury had a propensity for the type of conduct that took place in

this case. Nevertheless, the City and Commissioner failed to take corrective action.

487.    The City and the Inspector have failed to take the steps to discipline, train, supervise or otherwise correct the improper, illegal conduct of the individual defendants in this and in similar cases involving misconduct.

488.    The above described policies and customs demonstrated a deliberate indifference on the part of policymakers of the City, and the Commissioner to the Constitutional rights of persons within New York City, and were the cause of the violations of plaintiff's rights here alleged.

489.    Defendants, the City and the Commissioner have damaged Plaintiffs by their failure to properly train, supervise, discipline, review, remove, or correct the illegal and improper acts of their employees, agents or servants in this and in similar cases involving police misconduct.

490.    Plaintiff has been damaged as a result of the wrongful, grossly negligent and illegal acts of the City and the Commissioner.

### TWELFTH CAUSE OF ACTION
### VIOLATION OF YDANIS RODRIGUEZ'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

491.    The above paragraphs and Appendix I below are here incorporated by reference.

492.    Defendant police officer Robert Matrisciani and Sergeant Steven Caro and John Doe officers subjected Plaintiff Council member Ydanis Rodriguez to false arrest and false imprisonment and deprivation of liberty without probable cause.

493. On November 15, 2011, at approximately 2:00 a.m., plaintiff Rodriguez went to observe the police action being taken against the OWS participants.

494. Approximately 2 blocks away from FKA Liberty Park on Broadway, plaintiff encountered police barricades and police officers. He was told that he could not go past the barricades, and he complied.

495. As he backed away from the barricades in compliance with police orders, police officers attacked him and falsely arrested him without any probable cause he was committing any crime or otherwise not obeying police orders, lawful or otherwise.

496. He was held in custody for approximately 18 hours.

497. Defendant police officers have no reasonable expectation of successfully prosecuting Plaintiff.

498. Plaintiff was aware of his confinement, and did not consent to it.

499. These defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC §1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

500. Plaintiff was damaged as a result of defendants' unlawful conduct.

**THIRTEENTH CAUSE OF ACTION**
**VIOLATION OF <u>YDANIS RODRIGUEZ'S</u> FOURTH AMENDMENT RIGHT
TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES–
MALICIOUS PROSECUTION**
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§ 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

501. The above paragraphs and Appendix I below are here incorporated by reference.

502.    Defendants police officer Robert Matrisciani and Sergeant Steven Caro, acting

with malice, initiated a false prosecution against Plaintiff Ydanis Rodriguez and

caused him to be prosecuted.

503.    The criminal proceedings were terminated favorably to Plaintiff.

504.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure,

due process of law, pursuant to the Fourth and Fourteenth Amendments to the United

States Constitution and are liable to plaintiff under 42 U.S.C. §§1983 and the New

York State Constitution and tort law.

505.    Plaintiff was damaged as a result of defendants' unlawful conduct.


### FOURTEENTH CAUSE OF ACTION
### VIOLATION OF YDANIS RODRIGUEZ'S FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)

506.    The above paragraphs and Appendix I below are here incorporated by reference.

507.        By aggressively approaching plaintiff as if to attack him, defendants

Police Officer Matrisciani and Sergeant Caro made plaintiff fear for his physical well-

being and safety and placed him in apprehension of immediate harmful and/or

offensive touching.

508.        Defendants engaged in and subjected plaintiff to immediate harmful

and/or offensive touching and battered him by tackling him to the ground and striking

him, causing plaintiff to suffer injuries.

509.   Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

510.   Defendants used excessive and unnecessary force with plaintiff.

511.   Defendants have deprived plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and New York State laws and Constitution.

512.   Plaintiff was damaged by defendants' assault, battery and use of excessive force.

## FIFTEENTH CAUSE OF ACTION
## VIOLATION OF JEFFERY MCCLAIN'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

513.   The preceding paragraphs are here incorporated by reference.

514.   Defendant John Doe NYPD officers subjected Plaintiff Jeffery McClain to false arrest and false imprisonment and deprivation of liberty without probable cause.

515.   On November 15, 2011, at approximately 2:00 a.m., Plaintiff McClain went to Lower Manhattan in support of the OWS participants who were being removed from FKA Liberty Park.

516.   Plaintiff joined a demonstration in the early morning hours protesting the eviction of the park at Foley Square.  Police officer took action against the demonstrators forcing them out of the Square.

517.   Plaintiff joined a march uptown, but when it seemed that police were going to take action against the march, he broke off the march with approximately 20 other

protesters and turned down a lower Manhattan street going West.  He followed all traffic and pedestrian regulations and violated no law.

518.   Police surrounded this smaller group of protesters, and some police officers attacked another of the protesters.

519.   Upon seeing this protester being badly beaten on the ground without having provoked or resisted police arrest, plaintiff tried to move the protester away from the police by pulling on his back pack.  Plaintiff did not touch any police officers while taking this action.

520.   Plaintiff was then attacked by police officers, and badly beaten as he lay on the ground.  Plaintiff was in no way resisting or fighting back against the officers.

521.   In the course of being beaten, plaintiff was verbally abused by the officers, who called him a traitor for being both a war veteran and OWS participant.

522.   He was held in custody for approximately 7 hours.

523.   Defendant police officers have no reasonable expectation of successfully prosecuting Plaintiff.

524.   Plaintiff was aware of his confinement, and did not consent to it.

525.   These defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC §1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

526.   Plaintiffs were damaged as a result of defendants' unlawful conduct.

## SIXTEENTH CAUSE OF ACTION
### VIOLATION OF JEFFERY MCCLAIN'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES– MALICIOUS PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

527.    The preceding paragraphs are here incorporated by reference.

528.    Defendant John Doe, acting with malice, initiated a false prosecution against

Plaintiff Jeffery McClain and caused him to be prosecuted.

529.    The criminal proceedings were terminated favorably to Plaintiff.

530.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure,

due process of law, pursuant to the Fourth and Fourteenth Amendments to the United

States Constitution and are liable to plaintiff under 42 U.S.C. §§1983 and the New

York State Constitution and tort law.

531.    Plaintiff was damaged as a result of defendants' unlawful conduct.

## SEVENTEENTH CAUSE OF ACTION
### VIOLATION OF JEFFERY MCCLAIN'S FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)

532.    The above paragraphs and Appendix I below are here incorporated by reference.

533.    By aggressively approaching plaintiff McClain as if to attack him, defendant John

Doe NYPD officers made plaintiff fear for his physical well-being and safety and

placed him in apprehension of immediate harmful and/or offensive touching.

534.     Defendants engaged in and subjected plaintiff to immediate harmful and/or offensive touching and battered him by tackling him to the ground and striking him repeatedly, causing plaintiff to suffer blunt chest trauma including fractured ribs, lacerations and bruises to his face, and other injuries.

535.     Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

536.     Defendants used excessive and unnecessary force with Plaintiff in the course of an unlawful arrest.

537.     Defendants have deprived plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and New York State laws and Constitution.

538.     Plaintiff was damaged by defendants' assault, battery and use of excessive force.

### EIGHTEENTH CAUSE OF ACTION
### VIOLATION OF JUSTIN WEDE'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

539.     The above paragraphs and Appendix I below are here incorporated by reference.

540.     Defendant Deputy Inspector Edward Winski and other John Doe NYPD officers subjected Plaintiff Justin Wedes to false arrest and false imprisonment and deprivation of liberty without probable cause.

541.   On January 17, 2012, Plaintiff Justin Wedes was present at the Winter Garden.

542.   Plaintiff was holding a laptop to record and stream video content of the activities and interactions between OWS participants and the NYPD.

543.   Plaintiff was holding a cell phone that was being used to live tweet the activities and interactions between OWS participants and the NYPD.

544.   Plaintiff was grabbed without cause by Defendant Deputy Inspector Edward Winski and taken to the ground.

545.   Plaintiff did not resist in any manner.

546.   Plaintiff was arrested and charged with Criminal Trespass in the Third Degree and Resisting Arrest.

547.   He was held in custody for approximately 40 hours.

548.   Defendant Police Officers had no reasonable expectation of successfully prosecuting Plaintiff.

549.   Plaintiff was aware of his confinement, and did not consent to it.

550.   These defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC §1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

551.   Plaintiffs were damaged as a result of defendants' unlawful conduct.

## NINETEENTH CAUSE OF ACTION
## VIOLATION OF <u>JUSTIN WEDE'S</u> FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)

552.   The above paragraphs and Appendix I below are here incorporated by reference.

553.   By aggressively grabbing Plaintiff Wedes,  defendant Deputy Inspector Ed Winski and John Doe NYPD officers made plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

554.       Defendants engaged in and subjected plaintiff to immediate harmful and/or offensive touching and battered him by tackling him to the ground and placing extremely tight flexi cuffs on his wrists for a lengthy period of time.

555.   Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

556.   Defendants used excessive and unnecessary force with plaintiff in the course of an unlawful arrest.

557.   Defendants have deprived plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and New York State laws and Constitution.

558.   Plaintiff was damaged by defendants' assault, battery and use of excessive force.

## TWENTIETH CAUSE OF ACTION
## VIOLATION OF PETER DUTRO'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST

(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

559.     The above paragraphs and Appendix I below are here incorporated by reference.

560.     Defendant Police Officer Margaret Monroe and other John Doe NYPD officers subjected Plaintiff Peter Dutro to false arrest and false imprisonment and deprivation of liberty without probable cause.

561.     On November 17, 2011, Plaintiff Peter Dutro was present at 52 Broadway branch of the Amalgamated Bank when a march associated with Occupy Wall Street passed that location.

562.     Accompanied by several employees of Amalgamated Bank, Plaintiff Peter Dutro went to the ATM vestibule of the Amalgamated Bank to observe the march.

563.     Shortly thereafter, Plaintiff Peter Dutro observed an individual being taken to the ground and arrested by one or more uniformed NYPD officers.

564.     Plaintiff Peter Dutro opened the front door of the Amalgamated Bank and asked the individual being arrested for his name.

565.     Immediately, some of the NYPD officers arresting the individual outside of the Amalgamated Bank began running towards Plaintiff Peter Dutro, joined on the way by other officers.

566.     In all, approximately six (6) members of the NYPD entered the Amalgamated Bank vestibule and arrested Plaintiff Peter Dutro, against the protests of several Amalgamated Bank employees who identified Plaintiff Peter Dutro as an

Amalgamated Bank customer who had done nothing wrong.

567.    Plaintiff Peter Dutro was present at the bank as a customer and representative of the OWS movement, that had a bank account at the Amalgamated Bank.

568.    Plaintiff Peter Dutro was taking photos through the front glass window of the Amalgamated Bank at 51 Broadway of various police interactions with citizens on the street, including members of the OWS movement.

569.    Nonetheless, the defendant John Doe officers and Defendant NYPD Officer Margaret Monroe unlawfully arrested Plaintiff.

570.    Plaintiff was held for approximately ten hours before being released with a Desk Appearance Ticket.

571.    On January 25, 2012, the Plaintiff appeared in court and was arraigned on the sole charge of disorderly conduct, PL 240.20(5).

572.    The criminal complaint, sworn to by PO Margaret Monroe, states that defendant PO Margaret Monroe observed the plaintiff standing in a group of approximately 50 individuals, standing on the sidewalk and blocking the sidewalk at the above location.

573.    These false allegations are contradicted by surveillance video from the Amalgamated Bank vestibule, but Plaintiff Peter Dutro was nevertheless arrested, detained, and subjected to prosecution on the basis of said false allegations.

574.    The Amalgamated Bank provided security camera video footage of the Plaintiff's conduct that morning prior to his arrest.

575.    The security video shows that Plaintiff never left the bank prior to his arrest, and therefore, was not on the corner of Exchange Place and Broadway at approximately 9:15am.

576.   On January 25, 2011, the Plaintiff pled not guilty and stated ready for trial.

577.   On February 23, 2012, the Manhattan District Attorney's Office filed a certificate of readiness.

578.   On or about March 1, 2012, counsel for the Plaintiff met with the District Attorney and provided a copy of the security video.

579.   On March 12, 2012, the criminal charges against the Plaintiff were dismissed upon motion of the District Attorney's Office.

580.   Defendant police officers had no reasonable expectation of successfully prosecuting Plaintiff.

581.   Plaintiff was aware of his confinement, and did not consent to it.

582.   These defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC §1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

583.   Plaintiffs were damaged as a result of defendants' unlawful conduct.

## TWENTY-FIRST CAUSE OF ACTION
## VIOLATION OF <u>PETER DUTRO'S</u> FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)

584.   The above paragraphs and Appendix I below are here incorporated by reference.

585.   By aggressively grabbing Plaintiff Dutro, the John Doe NYPD officers made

plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

586.    Defendants engaged in and subjected plaintiff to immediate harmful and/or offensive touching and battered him by tackling him to the ground and placing extremely tight flexi cuffs on his wrists for a lengthy period of time.

587.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

588.    Defendants used excessive and unnecessary force with plaintiff in the course of an unlawful arrest.

589.    Defendants have deprived plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and New York State laws and Constitution.

590.    Plaintiff was damaged by defendants' assault, battery and use of excessive force.

### TWENTY-SECOND CAUSE OF ACTION
### VIOLATION OF PETER DUTRO'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

591.    The above paragraphs and Appendix I below are here incorporated by reference.

592.    Defendant PO Margaret Monroe and other Defendants John Doe Officers, acting with malice, initiated a false prosecution against Plaintiff Peter Dutro and caused him to be prosecuted.

593.    The criminal proceedings were terminated favorably to Plaintiff.

594.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil, Constitutional and statutory rights to be free from unreasonable search and seizure, due process of law, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and are liable to plaintiff under 42 U.S.C. §§1983 and the New York State Constitution and tort law.

595.    Plaintiff was damaged as a result of defendants' unlawful conduct.

### TWENTY-THIRD CAUSE OF ACTION
### VIOLATION OF STEPHANIE KEITH'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

596.    The above paragraphs and Appendix I below are here incorporated by reference.

597.    Defendant John Doe NYPD officers subjected Plaintiff Stephanie Keith to false arrest and false imprisonment and deprivation of liberty without probable cause.

598.    On October 1, 2011, Plaintiff Stephanie Keith was lawfully present and engaged in her professional capacity as a photojournalist covering the Occupy Wall Street march on the Brooklyn Bridge.

599.    Plaintiff Stephanie Keith was observing, not participating, in the above-referred march in her professional capacity as a photojournalist.

600.    Plaintiff Stephanie Keith only proceeded insofar as police proceeded ahead of her, and complied with all instructions tendered to her by police officers, but was nevertheless arrested.

601.    Nonetheless, the defendant John Doe officers unlawfully arrested Plaintiff.

602.   Plaintiff was held for approximately ten (10) hours before being released with a
Desk Appearance Ticket.

603.   On December 15, 2011, the Plaintiff appeared in court.

604.   Information was provided to the District Attorney's office proving that plaintiff
was a member of the working press who was working in her vocation at the time of
her arrest.

605.   Upon motion of the District Attorney's office, all charges were dismissed against
the Plaintiff.

606.   Defendant police officers had no reasonable expectation of successfully
prosecuting Plaintiff.

607.   Plaintiff was aware of her confinement, and did not consent to it.

608.   These defendants have deprived Plaintiff of her civil, Constitutional and statutory
rights, and have conspired to deprive him of such rights in violation of 42 USC
§1983, The U.S. Constitution, New York State common law, and the New York State
Constitution.

609.   Plaintiff was damaged as a result of defendants' unlawful conduct.

## TWENTY-FOURTH CAUSE OF ACTION
## VIOLATION OF <u>STEPHANIE KEITH'S</u> FOURTH AMENDMENT RIGHT
## TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE –
## EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

610.   The above paragraphs and Appendix I below are here incorporated by reference.

611.   By aggressively arresting Plaintiff Keith while she was performing her chosen

occupation, the John Doe NYPD officers made plaintiff fear for her physical well-being and safety and placed her in apprehension of immediate harmful and/or offensive touching.

612.    Defendants engaged in and subjected plaintiff to immediate harmful and/or offensive touching and battered her by tackling her to the ground and placing extremely tight flexi cuffs on her wrists for a lengthy period of time.

613.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

614.    Defendants used excessive and unnecessary force with plaintiff in the course of an unlawful arrest.

615.    Defendants have deprived plaintiff of her civil, Constitutional and statutory rights and have conspired to deprive her of such rights and are liable to plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and New York State laws and Constitution.

616.    Plaintiff was damaged by defendants' assault, battery and use of excessive force.

### TWENTY-FIFTH CAUSE OF ACTION
### VIOLATION OF STEPHANIE KEITH'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES– MALICIOUS PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

617.    The above paragraphs and Appendix I below are here incorporated by reference.

618.    Defendants John Doe Officers, acting with malice, initiated a false prosecution against Plaintiff Mrs. Keith and caused her to be prosecuted.

619.   The criminal proceedings were terminated favorably to Plaintiff.

620.   Defendants acted under color of law and conspired to deprive Plaintiff of her

civil, Constitutional and statutory rights to be free from unreasonable search and

seizure, due process of law, pursuant to the Fourth and Fourteenth Amendments to

the United States Constitution and are liable to plaintiff under 42 U.S.C. §§1983 and

the New York State Constitution and tort law.

621.   Plaintiff was damaged as a result of defendants' unlawful conduct.

**TWENTY-SIXTH CAUSE OF ACTION**
**VIOLATION OF PAUL SULLIVAN'S FOURTH AMENDMENT RIGHT TO**
**BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE**
**ARREST**
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

622.   The above paragraphs and Appendix I below are here incorporated by reference.

623.   Defendant Officer Peter Volaric and other John Doe NYPD officers subjected

Plaintiff Paul Sullivan to false arrest and false imprisonment and deprivation of

liberty without probable cause.

624.   On or about December 12, 2011, Plaintiff Paul Sullivan, a citizen journalist, was

present at the Winter Garden.

625.   Plaintiff was holding a video camera to record the activities and interactions

between OWS participants and the NYPD.

626.   Plaintiff was grabbed without cause by Defendant Officer Peter Volaric and then

was pushed to the ground by Defendant Volaric and several other John Doe NYPD

officers.

627.   Plaintiff did not resist in any manner.

628.   Plaintiff was arrested and charged with resisting arrest and criminal trespass.

629.   He was held in custody for approximately thirty-seven hours.

630.   These defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC

§1983, The U.S. Constitution, New York State common law, and the New York State

Constitution.

631.   Plaintiff was damaged as a result of defendants' unlawful conduct.

### TWENTY-SEVENTH CAUSE OF ACTION
### VIOLATION OF PAUL SULLIVAN'S FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)

632.   The above paragraphs and Appendix I below are here incorporated by reference.

633.   By aggressively grabbing Plaintiff Sullivan, Defendant Officer Peter Volaric and

John Doe NYPD officers made plaintiff fear for his physical well-being and safety

and placed him in apprehension of immediate harmful and/or offensive touching.

634.         Defendants engaged in and subjected plaintiff to immediate harmful

and/or offensive touching and battered him by slamming him against a wall and

pushing him to the ground.

635.   Defendants used excessive and unnecessary force with plaintiff in the course of an

unlawful arrest.

636.   Defendants have deprived plaintiff of his civil, constitutional and statutory rights

and have conspired to deprive him of such rights and are liable to plaintiff under

common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and

New York State laws and Constitution.

637.    Plaintiff was damaged by defendants' assault, battery and use of excessive force.

### TWENTY-EIGHTH CAUSE OF ACTION
### VIOLATION OF TIMOTHY FITZGERALD'S FOURTH AMENDMENT
### RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE --
### FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

638.    The above paragraphs and Appendix I below are here incorporated by reference.

639.    Defendant John Doe NYPD officers subjected Plaintiff Timothy Fitzgerald to

false arrest and false imprisonment and deprivation of liberty without probable cause.

640.    On November 15, 2011, Plaintiff Timothy Fitzgerald, a citizen journalist, was

present at the FKA Liberty Park.

641.    Plaintiff was using an iPhone to record and live-stream the activities and

interactions between OWS participants and the NYPD.

642.    Plaintiff was grabbed without cause by Defendant John Doe NYPD officer and

was pushed to the ground.

643.    Plaintiff did not resist in any manner.

644.    Plaintiff was arrested and charged with crimes.

645.    Plaintiff was arrested and charges with violations.

646.    The charges against the Plaintiff arising from said incident have been dismissed.

647.    These defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC

§1983, The U.S. Constitution, New York State common law, and the New York State

Constitution.

648.    Plaintiff was damaged as a result of defendants' unlawful conduct.

## TWENTY-NINTH CAUSE OF ACTION
### VIOLATION OF TIMOTHY FITZGERALD'S FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)

649.    The above paragraphs and Appendix I below are here incorporated by reference.

650.    By aggressively grabbing Plaintiff Fitzgerald, Defendant John Doe NYPD officers made plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

651.    Defendants engaged in and subjected plaintiff to immediate harmful and/or offensive touching and battered him by grabbing his arms, pushing him to the ground and placing extremely tight flexi cuffs on his wrists for a lengthy period of time

652.    Defendants used excessive and unnecessary force with plaintiff in the course of an unlawful arrest.

653.    Defendants have deprived plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and New York State laws and Constitution.

654.    Plaintiff was damaged by defendants' assault, battery and use of excessive force.

## THIRTIETH CAUSE OF ACTION
## VIOLATION OF <u>MICHAEL RIVAS'</u> FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
### (FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

655.    The above paragraphs and Appendix I below are here incorporated by reference.

656.    Defendant John Doe NYPD officers subjected Plaintiff Michael Rivas to false arrest and false imprisonment and deprivation of liberty without probable cause.

657.    On March 17, 2012, Plaintiff Michael Rivas was present at FKA Liberty Park.

658.    As Plaintiff attempted to enter the park, he physically assaulted and pepper sprayed without cause by Defendant John Doe NYPD officers.

659.    Plaintiff did not resist in any manner.

660.    Plaintiff was arrested and charged with crimes.

661.    Plaintiff was arrested and charged with violations.

662.    The charges from Plaintiff Michael Rivas' March 17, 2012 arrest have been dismissed.

663.    These defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC §1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

664.    Plaintiff was damaged as a result of defendants' unlawful conduct.

### THIRTY-FIRST CAUSE OF ACTION
### VIOLATION OF <u>MICHAEL RIVAS'</u> FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)

665.    The above paragraphs and Appendix I below are here incorporated by reference.

666.    By aggressively pushing and punching Plaintiff Rivas, Defendant John Doe NYPD officers made plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

667.    Defendants engaged in and subjected plaintiff to immediate harmful and/or offensive touching and battered him by pushing him repeatedly, punching him in the face, slamming a car door on his foot five times, and, after hand-cuffing him, spraying him with pepper spray and hitting him with a nightstick.

668.    Defendants used excessive and unnecessary force with plaintiff in the course of an unlawful arrest.

669.    Defendants have deprived plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC §1983 and New York State laws and Constitution.

670.    Plaintiff was damaged by defendants' assault, battery and use of excessive force.

## THIRTY-SECOND CAUSE OF ACTION
## VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM OBSERVING AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
(FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW YORK, 42 USC § 1983 AND STATE CONSTITUTIONAL TORT)

671.    The above paragraphs and Appendix I below are here incorporated by reference.

672.    On March 15, 2012, Plaintiff Justin Wedes was present at an OWS activity involving the Bank of America.

673.    Defendant Deputy Inspector Edward Winski was also present, and recognized plaintiff Justin Wedes.

674.    While utilizing a voice amplification bullhorn, Defendant Deputy Inspector Edward Winski called out to Justin, by name and threatened to arrest him for being present along with over one-hundred other individuals.

675.    Defendant Deputy Inspector Edward Winski focused on Plaintiff Wedes in an effort to chill the Plaintiff's First Amendment rights to publicly assemble.

676.    Defendant Deputy Inspector Edward Winski focused on Plaintiff Wedes in an effort to chill the Plaintiff's First Amendment rights to act as a citizen journalist.

677.    Defendant Deputy Inspector Edward Winski focused on Plaintiff Wedes in an effort to chill the Plaintiff's First Amendment rights was successful, as video shows soon after the Defendant focused on Plaintiff Wedes and called out to him, threatening to arrest him, Plaintiff exited the area in order to avoid another unlawful arrest.

678.    Plaintiff was damaged as a result of defendants' unlawful conduct.

## THIRTY-THIRD CAUSE OF ACTION
### RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION/EXPRESSIVE ASSOCIATION AGAINST INDIVIDUALS OBSERVING, RECORDING AND COMMENTING UPON POLICE ACTIONS
(FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, ARTICLE 1 § 12 OF THE CONSTITUTION OF THE STATE OF NEW YORK, 42 USC § 1983 AND STATE CONSTITUTIONAL TORT)

679.    The above paragraphs and Appendix I below are here incorporated by reference.

680.    In many of the incidents detailed above and throughout the course of Occupy Wall Street, numerous individuals have been subjected to adverse actions including but not limited to arrest, assault, battery and malicious prosecution for observing, recording, and/or commenting upon police conduct with respect to Occupy Wall Street.

681.    To wit, Plaintiff Stephanie Keith was lawfully present as a member of the press when she was arrested while photographing police-protester interactions on October 1, 2011 on the Brooklyn Bridge.

682.    To wit, Plaintiff Justin Wedes was lawfully present as an observer, social media correspondent and livestream correspondent when he was thrown to the ground and arrested by Deputy Inspector Winski on December 12, 2011 at 225 Liberty Street.

683.    To wit, Plaintiff Peter Dutro was lawfully present as a bank customer at Amalgamated Bank when he was seized and arrested on patently false charges after asking the name of a person being arrested on November 17, 2011 in the vestibule of 52 Broadway.

684.    The aforesaid actions and other like actions were undertaken by the NYPD for no proper purpose.

685.    The aforesaid actions and other like actions undertaken by the NYPD against the

aforesaid Plaintiffs were causally connected to the First Amendment protected activities of the aforesaid Plaintiffss.

686.   The aforesaid actions and other like actions were undertaken by the NYPD in flagrant violation of the terms of the consent decree entered in <u>Black et al. v. Codd et al.</u>, United States District Court, Southern District of New York, 73 Civ. 5283 ("Consent Decree").

687.   The Consent Decree states at 2 that: "[n]one of the following constitutes probable cause for the arrest or detention of an onlooker [to a police action] unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated: (a) Speech alone, even though crude and vulgar; (b) Requesting and making notes of shield numbers and names of officers; (c) Taking photographs; (d) Remaining in the vicinity of the stop or arrest."

688.   This understanding memorialized in the Consent Decree is codified in the NYPD Patrol Guide at PG §298-03, subsection "Observers At The Scene of Police Incidents."

689.   Despite due and repeated notice of the First Amendment rights of citizens in the vicinity of police actions, those same rights have been disregarded flagrantly and repeatedly throughout the course of Occupy Wall Street by members and ranking officers of the NYPD alike.

690.   Officers of the NYPD took adverse action against the aforesaid Plaintiffss and other persons similarly situated in deliberate efforts to chill the First Amendment protected expression of persons observing, recording, and/or commenting upon police actions undertaken in the course of Occupy Wall Street.

691.   Upon information and belief, officers of the NYPD have gone to particular pains to retaliate against credentialed and citizen journalists in order to deter those individuals from recording and disseminating instances of police brutality and abuses of authority.

692.   Upon information and belief, officers and ranking officers of the NYPD are aware of the First Amendment rights of participants in Occupy Wall Street.

693.   Upon information and belief, officers and ranking officers of the NYPD are aware of the First Amendment rights of credentialed and citizen journalists observing Occupy Wall Street.

694.   Upon information and belief, officers and ranking officers of the NYPD have willfully acted to deter individuals from documenting police actions in order to increase their capacities to use improper force, false arrests and malicious prosecutions to deter participation in Occupy Wall Street overall.

## THIRTY-FOURTH CAUSE OF ACTION
### (RESPONDEAT SUPERIOR)

695.   The above paragraphs and Appendix I below are here incorporated by reference.

696.   The defendants' intentional tortious acts were undertaken within the scope of their employment by defendant City of New York and the MTA in furtherance of the defendant City of New York's interest.

697.   As a result of defendants' tortious conduct in the course of their employment and in furtherance of the business of defendant City of New York and MTA, Plaintiffs were damaged.

WHEREFORE, the Plaintiffs will likely succeed on the merits and;

WHEREFORE, unlawful interference with Constitutional rights is *per se* irreparable harm; and

WHEREFORE, these causes of action are not moot as they are continuing to occur and they are "capable of repetition, yet evading review" Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975), Williams v. Ward, 845 F.2d 374, 380 n.6 (2d Cir. 1988) People ex rel. Maxian on Behalf of Roundtree v. Brown, 164 A.D.2d 56, 58, (2d Dep't. 1990) aff'd. 77 N.Y.2d 422 (1991);

WHEREFORE, the NYPD history set forth in the attached appendix and incorporated herein indicate that appropriate oversight and monitoring is not in place at the present time;

WHEREFORE, other large municipalities, including Oakland[5] and Detroit[6], currently have an Independent Police Monitor authorized by a Federal Court that began by (i) initially auditing then present police practices and thereafter, (ii) working with members of the police force and the the Department of Justice (Detroit) or Plaintiffs (Oakland) to create and/or ensure compliance with substantive and procedural requirements entered in a consent decree that would increase best police practices in those police departments; and (iii) on a quarterly basis report back to the Federal Court on compliance by the police department with the 201 substantive and procedural requirements (Detroit) or 51 tasks (Oakland)[7].

---

[5] Oakland Police Department, (http://policeperformancesolutions.com/oakland.htm )
[6] Detroit Police Department (http://policeperformancesolutions.com/detroit.htm)
[7] Additionally, after an extensive investigation by the Department of Justice, the Puerto Rico police department - the second largest police department in the United States - was found to have a systematic pattern and practice of (i) excessive force in violation of the Fourth Amendment;

Plaintiffs respectfully request that the court:

    (a) Issue a permanent injunction enjoining Defendants from forcibly preventing lawful entry into public spaces, and from forcibly removing citizens lawfully remaining in public spaces;

    (b) Issue a permanent injunction enjoining Defendants from preventing press access to policing activities in connection with public speech and assembly;

    (c) Issue a permanent injunction enjoining Defendants from retaining photographs and fingerprints (and all copies thereof) of arrestees who have received favorable dispositions in their criminal cases, and returning the photographs to the arrestees;

    (d) Issue an Accountability and Transparency Order that the NYPD appoint an agreed upon independent monitor[8] to:

        i.    Review all OWS arrests to determine:

            a.  What percentage of OWS arrestees processed as overnight arrests were eligible for Desk Appearance Tickets/Summons;

            b.  What percentage of OWS arrestees processed as overnight arrests were dismissed or resolved with an Adjournment in Contemplation of Dismissal;

---

(ii) unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and (iv) unlawful searches and seizures in violation of the Fourth Amendment.
http://www.justice.gov/crt/about/spl/documents/prpd_exec_summ.pdf
[8] Currently there are at least two major American Cities, that have independent monitors auditing and oversight of their Police Department, appointed and pursuant to federal litigation. Oakland Police Department, (SEE _ http://policeperformancesolutions.com/oakland.htm ) Detroit Police Department (http://policeperformancesolutions.com/detroit.htm)., See also Cincinnati Police Department (2001) http://www.cincinnati-oh.gov/police/downloads/police_pdf5114.pdf.

    c.   What percentage of OWS arrestees were charged with one or all of the contempt of cop charges - 1 (disorderly conduct), 2 (obstruction of governmental administration) and/or 3 (resisting arrest);

ii.   Undertake an investigation into how a decision can be made by the NYPD to close public spaces, and how they occurred at:

    a.   100 William Street on 1/11/12;

    b.   FKA Liberty Park on 3/17/12;

    c.   Union Square on 3/21/12;

    d.   One Chase Manhattan Plaza, from 9/17/11 to present in varying forms;

iii.   Review all complaints filed with the IAB and audit such response by the IAB;

iv   Review all complaints forwarded by the CCRB and audit such responses by the NYPD to report on the findings.

v.   Review all stop and frisks and audit such documentation of the stop and frisks, and report on the findings;

vi.   Review all quota documentation and audit such documentation of the arrest quotas existence in the NYPD, and report on the findings;

(e) Issue an accountability and transparency order that the NYPD report on its hierarchial structure for all at Captain level or higher, and the structure for who the Commissioner reports to.

(f) Issue a Declaratory judgment declaring that the complained of conduct is

unlawful;

(g) Award money damages to Plaintiffs who have been damaged by the unlawful

and/or unconstitutional actions of defendants;

(h) award attorney's fees pursuant to 42 USC §§ 1983 and 1988.

Dated:  April 29, 2012

Stoll, Glickman & Bellina, LLP            Stecklow Cohen & Thompson

Leo Glickman, Esq.                        Wylie M. Stecklow, Esq.
475 Atlantic Avenue, 3rd Floor            The Liberty & Justice For All Building
Brooklyn, NY 11217                        10 Spring Street – Suite 1
(718)852-3710                             New York, NY  10012
Fax: (718)852-3586                        (212) 566 8000
lglickman@stollglickman.com               Fax (212) 202 4952
                                          wylie@wylielaw.com

The Kurland Group

Yetta Kurland, Esq.
350 Broadway, Suite 701
New York, N.Y.  10013
(212) 253 8911
Fax (212) 614 2532
kurland@kurlandassociates.com

113

APPENDIX I

### I.   A CONTINUING PATTERN OF MISCONDUCT AND REFORM: NYPD HISTORY, PAST AND CURRENT, SUPPORTS THE PLAINTIFFS' DEMAND FOR THE APPOINTMENT OF INDEPENDENT AUDITOR

1.   Since the days of Tammany Hall, the New York Police Department has been widely-recognized as direly needing major reform approximately every twenty years.

2.   Five score and 18 years ago, in 1894, the Lexow Committee was established under State Senator Clarence Lexow to investigate corruption and graft within the NYPD.  The resulting reforms, presided over by Theodore Roosevelt himself as President of the NYPD's Board of Commissioners, led to the ouster of corrupt and violent NYPD officers such as:

   A. Alexander "Clubber" Williams, who was known at the time as "the Czar of the Tenderloin."

   B. Chief William "Big Bill" Devery, who once famously commented to officers under his command that "[i]f there's any grafting to be done, I'll do it. Leave it to me."

   C. Thomas Byrnes, whose brutal questioning tactics, which he referred to as "the Third Degree," became the trademark for physical and psychological torture of criminal suspects by police.

3.   Eighteen years later, in 1912, allegations of police graft led to the establishment of the Curran Committee to investigate police corruption.  While the Curran Committee's investigation centered on police corruption, it also delivered a scathing indictment of police accountability practices, finding that well over ninety percent (90%) of police misconduct complaints were assigned to the accused officer or their immediate superior

for investigation, calling into question the consistent findings of no fault produced by these internal investigations. "Lies! Mayor Cries at Curran Report."  New York Times, June 4, 1913, *citing* Curran Committee Report, 4265.

4.      Eighteen years later, in 1930, the Seabury Commission explored the grip organized crime had on police officers, judges and politicians through the use of corrupt vice officers.  Among its foremost findings was that of a pervasive practice of false arrests of economically and socially disadvantaged persons, setting the stage for shakedowns by corrupt police and magistrates.  These economically and socially disadvantaged persons were threatened with convictions and imprisonments on the basis of false testimony from police and paid "witnesses" if they did not pay bribes to police and court officials.  Among other findings, the Seabury Commission found 51 women at one correctional institution who had all been convicted and imprisoned on entirely false charges and testimony. *See* New York Supreme Court First Appellate Division Website at http://www.courts.state.ny.us/courts/ad1/centennial/1930_1939.shtml, last accessed 2/28/12.

5.      In the late 1940's and early 1950's, Brooklyn District Attorney Miles F. McDonald led his Office in a special inquiry that uncovered a scandal involving a Brooklyn bookmaker named Harry Gross, who had enlisted NYPD officers as muscle for his $20-million-a-year criminal operation. The inquiry led to the resignation of Mayor William O'Dwyer, his police commissioner William P. O'Brien, Chief Inspector August Flath, and three-hundred other police and officials.  The inquiry produced twenty-two indictments and ten convictions.  McDonald later recalled that when Gross went temporarily broke, "the police went and got him. They staked him to $50,000 to run his

operation again. They weren't making any money without him. With him, it was a fortune."

6.      In the early 1970's, a series of New York Times articles, including a front-page New York Times article about NYPD Detective Frank Serpico, led to the establishment of the Knapp Commission under Judge Whitman Knapp.  The Knapp Commission found systematic corruption throughout the NYPD and recommended the establishment of a central internal affairs division, among other reforms.  In 1973, Mayor John Lindsay and Police Commissioner Patrick Murphy embraced the Knapp Commission report and adopted many of their recommendations while replacing over ninety (90%) percent of the top officers in the NYPD.  However, the Knapp Commission's most important recommendation, the institution of a permanent civilian police oversight body, would remain unfulfilled for nearly 20 years.

7.      The Knapp Commission brought attention to a persistent difficulty in effecting meaningful police reform:  the fraternal understanding among police officers known at the time as the "Blue Code of Silence."  As described to the Knapp Commission by Detective Frank Serpico and others, the Blue Code of Silence is a tacit understanding among police officers that it is unacceptable to cooperate in investigations as to fellow officers' misconduct, be it unlawful force, false arrests, or out-and-out bribe taking.

8.      Detective Serpico himself was a victim of persecution for his violation of the Blue Code of Silence; after speaking out regarding police corruption in the NYPD, in early 1971 Serpico was shot in the face in the course of a buy-bust operation, and none of his fellow officers assisted him or called in the officer-involved shooting.  Instead, Serpico was tended-to by an elderly neighbor of the suspect who shot him, and recovered to

testify despite continuing police harassment over the course of his hospitalization for his injuries.

9.      The Blue Code of Silence continues to date, though it is now better known under the new moniker "The Blue Wall of Silence."

10.     Thereafter, in 1986, new legislation allowed the formation of the Civilian Complaints Investigative Bureau ("CCIB"), a body administered by mayoral appointees that provided civilian investigations of complaints of police misconduct.  However, the CCIB's efficacy was questionable at best; all of its investigations were undertaken under police supervision, and the civilian investigators reported to police investigators and employees.

11.     That same 1986 legislation allowed the Civilian Complaint Review Board ("CCRB") to eventually achieve the status of a genuine civilian police oversight agency. The CCRB had been initially formed in the 1950's, but the board itself was comprised of NYPD deputy commissioners and its investigations were undertaken solely by NYPD personnel.  Following public calls for civilian oversight of policing in the 1960's, opponents of police accountability successfully introduced a ballot measure forbidding civilian investigations of police conduct that remained law until revoked in 1986.

12.     Soon thereafter, the CCRB was commissioned to investigate the 1988 Tompkins Square Park riots, and roundly condemned police misuse of force in that incident.  The CCRB's report noted that "there is no evidence that any effort was made to limit the use of force... Force was used for its own sake."

13.     Thereafter, in 1992, approximately 20 years after the Knapp Commission, and following the arrests of six NYPD officers in Suffolk County, New York for cocaine

trafficking, Mayor David Dinkins appointed an independent commission under Judge Milton Mollen to investigate Police Corruption and review the anti-corruption procedures established in the NYPD.

14.     In 1993, before the end of his term, Mayor David Dinkins and the City Council empowered the modern CCRB with subpoena power and the ability to recommend disciplinary charges for police.

15.     The Mollen Commission's 1993 interim report found the NYPD to possess "a deep-rooted institutional reluctance to uncover corruption in the department." The interim report went on to state that the NYPD had "abandoned its responsibility to insure integrity" and had not recognized "that fighting corruption must be one of the department's highest priorities."

16.     The Mollen Commission's final report, issued in 1994 under the title "ANATOMY OF FAILURE: A PATH FOR SUCCESS," found that modern police corruption was widespread throughout the NYPD and "characterized by brutality, theft, abuse of authority and active police criminality."

17.     "In its report, the Mollen Commission advised the adoption of a 'dual track' approach to the problem of combating police corruption, an approach which would combine the 'two necessary' principles of lasting reform -- independent oversight and command accountability...' While the report stressed that the 'primary responsibility for combating police corruption should and must remain in the Department', creation of an Independent Polcie Commission was urged, which would 'serve as a management tool for the Mayor and Police Commissioner and a watchdog for the public.'" Mayor of the City of New York v. The Council of the City of New York, 1995 WL 478872 *1(N.Y.

Sup. 1995.)

18.     These findings, and concurrent recommendations for independent civilian police oversight, were scorned by then-Mayor-elect Rudy Giuliani, and then-NYPD Commissioner Raymond Kelly, with Giuliani favoring the installation of a special prosecutor over the proposed civilian oversight, and Kelly stating that the Mollen Commisssion's report "besmirches the reputation of the department with a rather broad brush that I don't think is appropriate or warranted."

19.     Giuliani, in his capacity as mayor, repeatedly vetoed City Council attempts to enact Mollen Commission recommendations, and instead created the Commission to Combat Police Corruption (CCPC) in 1995, a six-member board with no subpoena powers that can only conduct investigations with the permission of the Mayor and the NYPD Commissioner of Investigations.

20.     An ensuing State Court litigation between the City Council and Mayor Giuliani over the City Council's creation of the Independent Police Investigation and Audit Board ruled that the City Council's attempt to appoint two of the five members of this board was an impediment of the Mayor's executive power. Mayor of the City of New York v. The Council of the City of New York, 1995 WL 478872 (N.Y. Sup. 1995), aff'd, 235 A.D.2d 230, 651 N.Y.S.2d 531 (App Div1st Dept 1997).

21.     In 2005, Mark F. Pomerantz resigned from his position as chairman of CCPC, stating "Doing the job in the right way, in the absence of subpoena power, requires ongoing discussion with the Police Department about the commission's jurisdiction and access to information." Pomerantz went on to note that his attempts to investigate various forms of police misconduct were rendered futile because the police could (and

did) simply refuse to provide information necessary to investigate.  As of that time, the
CCPC had a budget of only $500,000.00 per year for its four employees, and the six
members of the board served without pay.

22.     For the past twenty years, the reforms of police accountability in New York City
specifically called for by the Mollen Commission have been neutered and stunted by lack
of support from the Executive branch and lack of funding from the municipality.

23.     Police misconduct, on the other hand, has flourished over the last twenty years in
New York City, and is once again reaching critical mass.

## II. LACK OF ACCOUNTABILITY PLUS  LACK OF TRANSPARENCY EQUAL  LACK OF TRUST BETWEEN THE NYPD AND THE NYC COMMUNITIES THEY POLICE

### A.  UNCONSTITUTIONAL ARREST QUOTAS

24.     Instead of taking steps to curb officers' tendencies to wrongfully arrest persons in
the absence of probable cause, Respondent City of New York has, if anything,
incentivized this behavior among NYPD officers through the introduction of quantitative
enforcement "productivity goals," which may be fairly referred to as arrest and summons
quotas.

25.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy
may be inferred as a finding of fact when, on June 24, 2010, the Honorable Judge Shira
A. Scheindlin in Floyd v. City of New York, United States District Court, Southern
District of New York, 08 CV 1034, ordered the release of documentation in the
possession of the Defendant New York City Police Department's Internal Affairs Bureau,
which investigates claims of serious misconduct and corruption of members of the
NYPD, with respect to any and all quota allegations investigated by same.  The court

held that the Plaintiff in that case had overcome the law enforcement privilege due the strong public interest in uncovering the civil rights violations alleged in the Complaint, and by demonstrating a compelling need to review such documentation.  The court noted that the law enforcement privilege is a qualified privilege which may be overcome by establishing: 1) that the suit is non-frivolous and brought in good faith; 2) that the information sought is not available through other discovery or from other sources; and 3) that the party has a compelling need for the privileged information.

26.     In addition, in May 2004, the Patrolmen's Benevolent Association filed a labor grievance on behalf of six officers and one sergeant who were transferred out of the 75th precinct for allegedly failing to meet a ten summons per-month quota. In January 2006, a labor arbitrator found that the 75th precinct had imposed summons quotas on its officers in violation of New York State labor laws.

27.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in Bryant v. City of New York, Kings County Supreme Court Docket #022011/2007, found that Plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests officers were to make that violated Plaintiff's Constitutional rights and contributed to her arrest" imposed by Defendant City of New York.

28.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported by the media on November 8, 2010, that commanders are permitted to set

"productivity goals."[9]

29.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy

may further be inferred from the posting of lists of quantitative targets for various forms

of summonses at the 77th Precinct in Brooklyn.  See fn8.

30.     Attached hereto as **Exhibit X** are copies of the quantitative target sheets obtained

from the 77th Precinct by or on behalf of the New York Daily News, as referenced in the

aforesaid November 8, 2010 New York Daily News article.

31.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy

may further be inferred from the tapes recordings acquired by WABC-TV/DT, including,

among other admissions, a 41st precinct sergeant explaining that each of his officers is

held to a twenty summons per month and one arrest per month enforcement quota, as

reported by the media on March 3, 2010.[10]

32.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy

may further be inferred from the tape recordings acquired by the Village Voice,

including, among other admissions, an 81st precinct sergeant telling his officers to make

"special" arrests as directed by their superiors even if they must void the arrests at the end

of their shifts, as reported by the media on May 11, 2010.[11]

---

[9] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77[th] Precinct Told To Meet Quotas For
Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article
incorporated by reference herein and available online at
http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.
[10] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010.
Article incorporated by reference herein and available online at
http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.
[11] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place
Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and
available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

33.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the testimony of above-referred former NYPD Officer Steve Anderson, who stated that he gave the drugs that he had obtained in a nightclub in Queens to former NYPD Officer Henry Tavarez because Officer Tavarez had been having trouble meeting his quotas and was consequently in danger of losing his assignment.  See fn5.

34.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the recently filed lawsuit by the New York Civil Liberties Union, Matthews v. City of New York, Raymond Kelly, et al.,  (12CV1254) (Jones, J), brought by and on behalf of an NYPD officer alleging harm from retaliatory conduct against him following his criticism of the arrest quota system in his precinct.

35.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the Month to Date Officer Activity Report from Sunday January 1, 2012 to Sunday January 15, 2012, attached hereto as **"Exhibit Y,"**

36.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy, and the NYPD's knowledge that is exists and is improper can be inferred from the conduct towards NYPD Office Adrian Schoolcraft when he reported to NYPD investigators the use and abuse of quota systems in the NYPD.  This confidential report was leaked to his precinct commanding officer who ordered PO Schoolcraft to be taken from his home and committed to a mental psychiatric unit at Jamaica Hospital. See http://www.villagevoice.com/2012-03-07/news/the-nypd-tapes-confirmed/

123

## B. "CONTEMPT OF COP" ARRESTS

37.     The findings of widespread police brutality and police abuse of authority in the Mollen Commission report were not unique to New York City; however, Respondent City of New York has remained uniquely intransigent in its refusal to meaningfully address these issues.

38.     On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight times as often as Caucasians.[12]

39.     The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008.  See fn6.

40.     In response to Seattle Police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings about obstruction arrests in... his top twelve (12) tips to officers for 'avoiding civil liability lawsuits.'  'Don't arrest for 'contempt' of cop,' he wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'"  See fn6.

---

[12] Nalder, Kamb and Lathrop, "Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate," Seattle Post-Intelligencer, February 28, 2008.  Article incorporated herein by reference and available online at http://www.seattlepi.com/local/353020_obstructmain28.asp

41.     In a review of San Jose criminal cases published on October 31, 2009, the San

Jose Mercury News reported that the Santa Clara County Prosecutor declined to

prosecute over one-third (33.33...%) of resisting arrest cases brought by San Jose police,

a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general

twenty percent (20%) decline-to-prosecute rate.[13]

42.     The San Jose Mercury News investigation cited above also found that the San

Jose Police Department did not sustain or substantiate civilian complaints with respect to

any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the

San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of

those 99 cases. See fn7.

43.     In response to the San Jose Mercury News investigation cited above, the San Jose

Police Department instituted a new policy of tracking arrests where it appears that

resisting arrest is being used as a cover charge to justify unnecessary and excessive police

uses of force on civilians. See fn7.

44.     A November 19, 1997 New York Times special report on police brutality

predicated on perceived or actual disrespect of New York City Police Officers noted that

at that time, Defendant City of New York did not monitor or track police use or levying

of charges such as disorderly conduct or resisting arrest.[14]

---

[13] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases,"  San Jose Mercury News, October 31, 2009.  Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1

[14] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A961958260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all

45.     November 19, 1997 New York Times special report on police brutality predicated

on perceived or actual disrespect of New York City Police Officers noted that at that

time, Defendant City of New York did not monitor or track police use or levying of

charges such as disorderly conduct or resisting arrest, despite considerable anecdotal

evidence that New York City Police Officers were arresting individuals on those and

other like charges to justify use of force and/or to punish those individuals for "contempt

of cop." See fn8.

46.     The above-cited New York Times special report noted that Los Angeles had

already instituted a system for tracking the initiation and dispositions of "contempt of

cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the

time of that article's publication in 1997.  See fn3.Upon information and belief, the

"contempt of cop" and "cover charge" charges levied most regularly by New York City

Police Officers are disorderly conduct, resisting arrest, and obstruction of governmental

administration.

47.     Upon information and belief, "contempt of cop" and "cover charge" charges such

as disorderly conduct, resisting arrest, and obstruction of governmental administration are

relatively easy for police to levy in the absence of actual probable cause because they

may arise out of nearly any police-civilian interactions.

48.     Upon information and belief, "contempt of cop" and "cover charge" charges such

as disorderly conduct, resisting arrest, and obstruction of governmental administration are

relatively easy for police to levy in the absence of actual probable cause because they can

be levied solely upon the allegations of the arresting officer(s) without reference to

physical evidence or witness observation of criminal acts.

49.     Upon information and belief, to date, Respondent City of New York has not implemented any particular, training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

50.     Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing decades-old custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, to date, Respondent City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

51.     Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Respondent City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

52.     Upon information and belief, and despite due and repeated notice that New York City Police Officers such as the Defendant Police Officers have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Respondent City of New York has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

## C.     STOP AND FRISK

53.     A 2007 NYPD report revealed that over a half-million pedestrians in New York City were stopped by the NYPD during the calendar year 2006.

54.     Nearly ninety (90%) percent of the persons stopped, according to this NYPD report, were minorities.

55.     In 2008, the Center for Constitutional Rights brought a Federal Lawsuit against the NYPD related to this Stop and Frisk conduct.

56.     This case is captioned, Floyd v. City of New York, United States District Court, Southern District of New York, 08 CV 1034.

57.     This lawsuit alleged that the NYPD engaged in unconstitutional pattern and practice of using race and/or national origin rather than reasonable suspicion as the determinative factor in deciding whether to stop and frisk individuals, in violation of the Fourth Amendment.

58.     The Plaintiffs in <u>Floyd</u> allege that these Constitutional violations are "the result

of, and are directly and proximately caused by, policies, practices and/or customs

devised, implemented and enforced by the City, Commissioner Kelly and Mayor

Bloomberg."

59.     The Court in Floyd, in ruling against the Defendants' motion for summary

judgment accepted that almost twenty-five (25%) percent of the recorded stops between

2004 and 2009 lacked 'sufficiently detailed documentation to assess their legality."

<u>Floyd</u>, (decision of 8/31/11, page 62/86).

60.     In this same opinion, the Court found sufficient material facts in dispute to allow

the claim to go forward that the stop and frisk policy was so manifest, that it implied "the

constructive acquiescence of senior policy-making officials."

61.     In February 2012, Plaintiff City Councilmember Rodriguez and  Plaintiff City

Councilmember Williams sought to introduce legislation into the City Council of the City

of New York that would create additional burdens upon NYPD who stopped individuals,

including, handing out their business card identifying the officers by name, and handing

out a document that sets forth the rights of those stopped to consent or decline to the

search they were about to undergo.

### D.     FLAKING/ TESTILYING

62.     The July 7, 1994 Mollen Commission Report ("The Report") was prepared for

and at the request of the Respondent City of New York, and therefore knowledge of its

contents may be imputed to Respondent City of New York.

63.     Among the species of police corruption explored in The Report, particular note

was made of the practice of "testilying," or false testimony and falsification of records in connection with arrests.  The Report at 36.

64.     The Mollen Commission found "testilying" to be "probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns."  Id.

65.     The Mollen Commission explained that officers are particularly prone to engage in "testilying" with respect to said charges because "[t]he vast majority of charges for narcotics or weapons possession crimes result in pleas without the necessity of grand jury or trial testimony, thus obviating officers' concerns about the risk of detection and possible exposure to criminal charges of perjury."  The Report at 37.

66.     The Mollen Commission made particular note of "testilying" in an undisclosed unit of the NYPD's narcotics division, "where... [The Mollen Commission's] analysis of police records and intelligence sources indicated that the incidence of falsifications might run high."  The Report at 38-39.

67.     The Report continues: "While we cannot disclose the details of our investigation because we have referred the evidence to a prosecutor, the evidence suggests that certain officers in this unit falsified documents and may have committed testimonial perjury to conceal Constitutional violations.  Even more troubling, the evidence suggests that the unit's commanding officer not only tolerated, but encouraged, this unlawful practice."  The Report at 39 (emphasis added).

68.     Upon information and belief, in response to these findings, the NYPD adopted a policy, that absent exceptional circumstances, any Police Officer found to have lied would be terminated from the NYPD.

69.     Upon information and belief, this policy is not being followed.

70.     In 2004, then Lieutenant Carolyn Fanale, swore in a criminal complaint that she was hit in the head by the defendant, thereby providing sufficient information for the accusatory instrument to be converted to an actual complaint.

71.     During an interview with the Civilian Complaint Review Board, Lieutenant Fanale stated that she was never hit in the head by the defendant, but that it must have been some other female officer.

72.     Lietuenant Fanale was not terminated from the NYPD for lieing, quite the contrary, she was promoted and is presently a Captain in the intelligence division at One Police Plaza.

73.     In 2007, Sergeant Timothy Horohoe was interviewed by the Civilian Complaint Review Board in relation to this conduct in Times Square in knocking bicyclist Richard Vazquez from his bicycle and arresting Vazquez.

74.     The CCRB substantiated an excessive force claim against Sgt. Horohoe and also brought *sua sponte*, a separate claim that Sgt Horohoe had lied to the CCRB during its investigation.

75.     Sgt. Horohoe's employment with NYPD was not terminated, in fact, he continued in a position of training hundreds of recent NYPD Academy graduates who policed Times Square as part of "Operation Impact," a foot patrol program which is one of the most common postings for rookie officers upon academy graduation.

76.     The practice of officers "testilying" with respect to narcotics charges continues in the NYPD to date.

77.     Upon information and belief, the practice of officers "testilying" with respect to

narcotics charges continues to be employed with particular frequency by narcotics officers in Brooklyn and Queens.

78.    In 2008, now-former NYPD undercover officer Steve Anderson was caught on video purchasing three bags of cocaine from an employee of a nightclub in Queens.[15]

79.    Anderson did not arrest the person who sold the drugs to him. Id.

80.    Instead, Anderson provided the drugs to then-fellow NYPD undercover officer Henry Tavarez. Id.

81.    Tavarez then used the drugs to support the false arrests of four people. Id.

82.    As a result of this and like incidents, prosecutors in Brooklyn and Queens have dismissed charges against approximately four hundred (400) individuals whose arrests were believed to have been tainted by the corrupt acts of NYPD officers. Id.

83.    Another detective from the same unit, Jason Arbeeny, was recently convicted of various crimes in relation to his own 2007 conduct of planting a bag of crack cocaine in the car of a Coney Island couple to support narcotics charges against said couple.[16]

84.    In that case, on November 1, 2011, "[b]efore announcing the verdict, Justice Reichbach scolded the department for what he described as a widespread culture of corruption endemic in its drug units. 'I thought I was not naïve,' he said. 'But even this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed.'" Id.

---

[15] Jim Dwyer, "The Drugs? They Came From The Police," New York Times, October 13, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/10/14/nyregion/those-drugs-they-came-from-the-police.html?ref=nyregion
[16] Tim Stellow, "Detective is Found Guilty of Planting Drugs," New York Times, November 1, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/11/02/nyregion/brooklyn-detective-convicted-of-planting-drugs-on-innocent-people.html?_r=2&partner=rss&emc=rss

85.     Justice Reichbach continued: "Anything goes in the never-ending war on drugs…
and a refusal to go along with questionable practices raise the specter of blacklisting and
isolation." Id.

86.     The practice of false drug arrests is colloquially referred to as "flaking."[17]

III.    **FAILURES OF NYPD OVERSIGHT AND  SELF- POLICING LEAD TO LACK
OF ACCOUNTABILITY FOR POLICE MISCONDUCT CREATING LACK OF
TRUST OF THE COMMUNITY IN THE NYPD**

    **A. IAB**

87. The Internal Affairs Bureau has as its mission, in part, to investigate incidents of
    individual police misconduct and corruption, but not department-wide problems.

88. Between 1994 and 2006, the number of complaints IAB received  about suspected
    police corruption and misconduct more than tripled, rising from 14,789 to 44,994.

89. However, during this same time period, the number of serious misconduct IAB
    investigations dropped from 2,258 to 1,057.

90. In 1994, the IAB was investigating about fifteen percent (15%) of the complaints
    (tips) it received.

91. By 2006, that number fell to just Two point Three percent (2.3%).

92. Excessive force used in an arrest has risen in the IAB from 1994 to 2006, and had
    become one of the most common type of IAB cases.

---

[17] Parascandola, Kappstatter, Doyle and Schapiro, "Cop Morale Low After String of NYPD
Scandals Puts Department Under Fire," New York Daily News, October 23, 2011, incorporated
by reference herein and available online at http://articles.nydailynews.com/2011-10-
23/local/30329895_1_bronx-cop-internal-affairs-bureau-captains-endowment-association

93. In 1993, excessive force only accounted for less than one percent (1%) of all IAB serious misconduct investigations, by 2007, this figure rose so that almost 20 percent of all IAB investigations were over use of excessive force.

94. Command Discipline procedures are to be used by supervising NYPD officers to self-police low levels of misconduct.

95. Command Discipline is split into two levels of dscipline with the less serious level being controlled at the supervising officer level, and normally resulting in penalties form verbal instructions to loss of vacation days.

96. Often times, more serious command discipline charges are mischaracterized as less serious to protect an NYPD officer form more serious penalties.

97. Upon information and belief, when an individual officer seeks to take a vacation day, a certain paperwork is to be filed.

98. Failure to file such paperwork would serve to give the officer a paid day off without a concurrent deduction in their vacation days, in effect, defrauding the tax payers of New York City of one day's pay.

99. When an officer is caught failing to file such paperwork, this misconduct is covered up as a less serious command discipline, such as failure to file correct paperwork, rather than a more serious charge involving improper payment.

100.   In order for self-policing to work within the NYPD, confidentiality must be guaranteed.

101.    Upon information and belief, within the NYPD, confidentiality does not exist and

cannot be relied upon by either rank and file members of the force or supervisors.

102.    As an example, the information provided to investigators by NYPD PO Adrian

Schoolcraft was to be confidential information.

103.    However, within a few weeks. PO Schoolcraft's commanding officer had the

knowledge that he had filed such a report with NYPD investigators.

104.    As a further example of the lack of confidentiality within the NYPD, the

investigation into the ticket fixing scandal led to the arrest of an IAB Lieutenant

whose sole culpability involved leaking information about the investigation to union

representatives.

### B. CCRB

105.    The New York Civil Liberties Union report on the CCRB's activities from the

time of the Mollen Commission Report until twelve years later, 1994 through  2006.

106.    The NYCLU report  entitled "Mission Failure: Civilian Review of Policing in

New York City 1994-2006" ("NYCLU Report". )[18], reviewed, collated and

summarized information from the CCRB's Annual Reports and other sources,

resulting in the following findings:

a.    CCRB complaint data indicates that serious police misconduct, including
improper threats and use of force, occurs with significant frequency, with
allegations of excessive force in half of all complaints filed with the CCRB.
NYCLU Report at  4.

b.    The NYPD takes no disciplinary action whatsoever against nearly 30% of
officers named in substantiated CCRB complaints, and gave only

---

[18] Available online at http://www.nyclu.org/files/ccrb_failing_report_090507.pdf

"instructions" to nearly a third of officers who were disciplined following substantiated CCRB complaints between 2000 and 2005. Id. at 5.

c. "In recent years it appears that the NYPD has adopted a radically more lenient disciplinary standard as regards acts of police misconduct directed at civilians. In 2004 the police department ordered instructions in approximately 30 percent of all disciplinary actions related to a substantiated CCRB complaint. In 2005 instructions represented nearly 60 percent of such disciplinary actions; and in 2006 instructions rose to 72 percent of all disciplinary actions related to police misconduct directed at civilians. Suspension of a police officer has become an extraordinarily rare occurrence, even when egregious acts of misconduct are involved." Id. at 6.

107.    Defendant City of New York's knowledge of its continuing failure to abate the

above-referred practices and customs can be shown with reference to the following

facts reported to the City in the *2006 Annual Report* of the CCRB:[19]

a. Only 12,059 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 received full investigations. *CCRB 2006 Annual Report*, 93.

b. Only 1,441 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 resulted in a finding of even one substantiated allegation. *Id.*

c. The NYPD either took no disciplinary action whatsoever or merely issued instructions in 1,062 of the 1,918 cases of CCRB-substantiated police misconduct closed by the department between 2002 and 2006. Some of these cases had been forwarded to the NYPD by the CCRB before 2002. *Id.* at 101.

d. In the five years between 2002 and 2006 only one (1) NYPD officer was subject to employment termination as a result of allegations of misconduct substantiated by the CCRB. *Id.* at 100.

e. The CCRB substantiated only 3.5% of the excessive force allegations reported between 2002 and 2006. *Id.* at 95.

108.    The failure of the CCRB to be a trusted avenue for community members to

challenge unlawful police conduct help to ensure that there is a lack of accountability

for misconduct by NYPD officers, and directly lead to distrust between the

---

[19] 2001-2010 CCRB Reports available online at http://www.nyc.gov/html/ccrb/html/reports.html

community and the NYPD.

### C. CCPC

109.   The CCPC lacks subpoena power and funding to effectively monitor the NYPD
and act as the dual approach independent police commission urged by the Mollen
Commission.

110.   Evidence of the inability of the CCPC to assist in combating corruption and
ensuring command accountability can be seen by the CCPC head, Mark Pomerantz,
resigning from his position as chairman of CCPC, stating, "[d]oing the job in the right
way, in the absence of subpoena power, requires ongoing discussion with the Police
Department about the commission's jurisdiction and access to information."
Pomerantz went on to note that his attempts to investigate various forms of police
misconduct were rendered futile because the police could (and did) simply refuse to
provide information necessary to investigate.

111.   Further evidence of the inability of the CCPC to assist in combating NYPD
corruption and ensuring command accountability can be seen by the CCPC head,
Richard Davis, stating on or about March 20, 2012, that no new special commission
like the Mollen Commission is currently needed, what is needed is more effective
ongoing oversight over the NYPD.  *See*
http://nyls.mediasite.com/mediasite/SilverlightPlayer/Default.aspx?peid=85a87d7123
8d47a1b4c0d423bb67ffb71d at 54 minutes.

112.    Discipline within the NYPD is to begin when an officer is identified as having committed an act of wrongdoing.

113.    According to the NYPD Patrol Guide, 206-01, a Supervisor is to file a specific NYPD report (PD 468-123) if they have heard or viewed an act of police misconduct.

114.    Once the PD 468-123 is filed, it should be entered within a Command Discipline Log according to NYPD PG 206-02.

115.    At that point, policy states that an evaluation is to take place to determine whether the charge is a serious charge that would require referral to the Internal Affairs Buraeu ("IAB") or to the Deputy Commissioner of Trials ("DCT"), or if it is a less serious charge and can be handled at the Command Discipline level.

116.    According to NYPD OG 206-05, If the charge is deemed serious, it is filed as charges and specifications and forwarded to referred to the Department Advocate Office ("DAO).

117.    Upon information and belief, the Command Discipline is misused by NYPD members and Supervisors in order to reduce the penalties suffered by members of the service ("MOS") who commit acts of misconduct.

118.    One specific manner in which the Command Discipline regulations are misused is the misclassification of serious charges that would require the filing of Charges and Specifications, as less serious charges that allow for a penalty such as the loss of vacation days, or the lesser penalty of verbal instructions.

119.   An independent oversight body could both audit the NYPD's past use of the Command Discipline rules and guidelines, and monitor its current application of these guidelines.

120.   An independent oversight body could work with the NYPD to develop rules that would facilitate best practices for police management that are clearly lacking today.

121.   Currently, MOS who have been found guilty of misconduct by the DCT or who suffer from persistently poor performance are monitored by the Department's Performance Monitoring Unit ("PMU").

122.   Commanders must make periodic reports on monitored officers to PMU, which PMU members may use to confer with or make recommendations to those commanders or supervised officers.

123.   These interventions are purely disciplinary in character, and performance improvement in and of itself will not necessarily remove officers from increased scrutiny.

124.   The Commission to Combat Police Corruption ("CCPC") monitors PMU performance as well, and has found that PMU fails to follow up on approximately half of the negative performance information reported to them by commanders of officers under monitoring. CCPC, A FOLLOW-UP REVIEW OF THE NEW YORK CITY POLICE DEPARTMENT'S PERFORMANCE MONITORING UNIT, April 2006. ("CCPC Report")  Available online at

http://www.nyc.gov/html/ccpc/downloads/pdf/performance_monitoring_april_2006.p
df and incorporated herein by reference.

125.   The CCPC faults PMU's poor performance in updating the background

paperwork of officers under monitoring.  This paperwork is nominally updated every

six months, but the CCPC found that less than half of the files on officers under PMU

monitoring were in fact updated on the mandated semi-annual basis. CCPC Report at

12-13.

126.   The Department's current record retention policy mandates the removal of records

of low and intermediate level PMU monitoring from officers' Central Personnel

Index files ("CPI") after differing periods of time. CCPC Report at 4.

127.   This policy is facially counterproductive; the removal of low level disciplinary

actions from CPIs actively prevents monitored officers' future supervisors from

identifying and meaningfully addressing patterns of negative behavior.

## IV.   THE FINANCIAL COST OF THIS UNCHECKED NYPD MALFEASANCE AND WRONGDOING HAS HAD NO EFFECT ON THE NYPD CONDUCT

128.   The City Comptroller's most recently issued claims report (issued June 11, 2011)

and available online at

http://comptroller.nyc.gov/bureaus/bla/pdf/2011_Claims_Report.pdf reviews claims

from 2006 through 2010.

129.   The City Comptroller's report shows that in the years 2006 to 2010, tort claims

against the NYPD for negligence, excessive force, false arrests, and other civil rights

violations have cost the city over Five Hundred Million Dollars ($500,000,000.00).

130.   Moreover, this report indicates that the claims have increased in number and cost throughout the reporting period.  (See Comptroller's report at 50-51).

131.   Despite this remarkable and unprecedented outlay of City funds to compensate victims of alleged NYPD negligence and misfeasance, the NYPD has made no changes in respect to its current enforcement policies and practices.

132.   Virtually zero dollars ($0.00) of this Half a Billion dollars ($500,000,000.00) paid due to NYPD malfeasance, comes from the NYPD budget, or pension program, or the privately funded NYPD Foundation.

133.   Therefore, the NYPD sustains no cognizable financial damage due to their bad conduct.

134.   During this same time period, the City of New York has had to make drastic changes and reductions to the budgets of many of the social programs relied upon by the citizenry of this great city.

135.   As an example, in 2010 budget custs  the Department of Education's budget was cut by Three Hundred Fifty Million dollars ($350,000,000.00), while the NYPD was asked to cut Three Hundred Fifty (350) civilian positions, and to extend the fleet lifecycle of their motor fleet.  See "List Of NYC Agency Cuts, Layoffs," November 10, 2010, CBS 2 New York, available online at http://newyork.cbslocal.com/2010/11/18/list-of-nyc-agency-cuts-layoffs/ and incorporated herein by reference.

136.   In the following round of budget cuts,  the the Department of Education's budget was cut by an additional Nine Hundred Twenty Six Million Dollars ($926,000,000.00).  In the same round of budget cuts, proposed cuts of Two Hundred

Fifty Three Million Dollars to the NYPD budget were reduced by One Hundred Sixty

Million Dollars ($160,000,000.00) through negotiations between the Mayor and the

City Council, so that the NYPD's budget was only cut by Ninety Three Million

Dollars ($93,000,000.00) approximately ten percent (10%) of the burden borne by

the Department of Education.. *See* Citizens' Budget Commission, "The New York

City Budget Since the Recession: Seven Rounds of Cuts and the Deepest Still to

Come," February 7, 2011, available online at http://www.cbcny.org/cbc-

blogs/blogs/new-york-city-budget-recession-seven-rounds-cuts-and-deepest-still-

come and incorporated herein by reference.

137.    As a further example, on or about Friday, April 30, 2010, St. Vincent's Hospital

was closed due to budget cuts.  See Jonathan D. Rockoff, "St. Vincent's Closes

Doors," May 1, 2010, Wall Street Journal, available online at

http://online.wsj.com/article/SB10001424052748703871904575216531731237488.ht

ml and incorporated by reference herein.

138.    This list could go on, but it indicates that the failure of the City to hold the NYPD

accountable for their bad acts not only destroys the trust between the NYPD and the

citizens who give them their authority, but also costs these same citizens education

dollars, art dollars, medicare dollars, hospital dollars.

139.    According Walter Mack, NYPD Deputy Commissioner at the Internal Affairs

Bureau from 1993-1995, in 1993 Defendant Commissioner Raymond Kelly agreed to

implement a computer system to assimilate all data that came in via 1983 litigation,

and provide this data to the IAB.

http://nyls.mediasite.com/mediasite/SilverlightPlayer/Default.aspx?peid=85a87d7123

<u>8d47a1b4c0d423bb67ffb71d</u> at 53 minutes.

140.   Upon information and belief, and another showing that effective oversight of the

NYPD does not currently exist, this promised implementation was never effected.