UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x
NEW YORK CITY COUNCIL MEMBER YDANIS
RODRIGUEZ, NEW YORK CITY COUNCIL MEMBER
JUMAANE WILLIAMS, JOHN KNEFEL, NEW YORK       Index No. 12CV3389 (NRB)
CITY COUNCIL MEMBER  LETITIA JAMES, JUSTIN
SULLIVAN, JEFFERY MCCLAIN, NEW YORK CITY
COUNCIL MEMBER MELISSA MARK-VIVERITO,          FIRST AMENDED
STEPHANIE KEITH, DEMOCRATIC DISTRICT           COMPLAINT
LEADER PAUL NEWELL, JUSTIN WEDES, PETER        JURY TRIAL DEMANDED
DUTRO, TIMOTHY FITZGERALD, PAUL SULLIVAN,
MICHAEL RIVAS, YONATAN MILLER, CHARLES
MEACHAM, and THE NATIONAL PRESS
PHOTOGRPAHERS' ASSOCIATION.

                        Plaintiffs,

            -against-

DEPUTY INSPECTOR EDWARD WINSKI, THE CITY
OF NEW YORK, THE METROPOLITAN TRANSIT
AUTHORITY, J.P. MORGAN CHASE & CO.,
BROOKFIELD OFFICE PROPERTIES, MITSUI
FUDUSAN AMERICA, INC., MAYOR OF THE CITY
OF NEW YORK MICHAEL BLOOMBERG, NEW
YORK POLICE DEPARTMENT COMMISSIONER
RAYMOND KELLY,  METROPOLITAN TRANSIT
AUTHORITY POLICE COMMISSIONER MICHAEL
COAN,  MTA POLICE OFFICER LAKERAM, , POLICE
OFFICER ROBERT MATRISCIANI, SERGEANT
STEVEN CARO, POLICE OFFICER MARGARET
MONROE, POLICE OFFICER FERNANDO TRINIDAD,
DEPUTY INSPECTOR TLOCZKOWSKI, LIEUTENANT
DANIEL ALBANO, JAMES MORRISSEY, JOHN AND
JANE DOE NYPD OFFICERS ##1-100, JOHN AND
JANE DOE MTA POLICE OFFICERS ##1-8, JOHN DOE
EMPLOYEES OF J.P. MORGAN CHASE & CO. ##1-10,
JOHN DOE EMPLOYEES OF  BROOKFIELD OFFICE
PROPERTIES ##1-10, JOHN DOE EMPLOYEES OF
MITSUI FUDUSAN AMERICA, INC. ##1-10,

                        Defendants.

------------------------------------------------------------------------- x

TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................4

JURISDICTION ............................................................................................4

INTRODUCTION ...........................................................................................5

PARTIES ......................................................................................................8

I. ABRIDGING FREEDOM OF THE PRESS: ELECTED OFFICIALS AND MEMBERS OF THE PRESS HAVE BEEN DENIED A RIGHT OF ACCESS TO OBSERVE AND RECORD POLICE ACTIONS AGAINST OCCUPY WALL STREET .........................14

    a.    ELECTED OFFICIALS PREVENTED FROM OBSERVING POLICE ACTIONS BY IMPROPER ARRESTS AND USES OF FORCE. ...............................14

    b.  SUPPRESSION OF "MAINSTREAM" MEDIA JOURNALISTS .........................19

    c.    SUPPRESSION OF CITIZEN JOURNALISTS ...................................................30

    d.    THE POLICE FORCES OF DEFENDANT CITY AND DEFENDANT MTA HAVE VESTED INTERESTS IN CHILLING PRESS AND GOVERNMENTAL ACCESS TO THEIR ENFORCEMENT ACTIVITIES ................................................34

II.    ABRIDGING FREEDOM TO PEACEABLY ASSEMBLE: FROM THE INCEPTION OF THE OCCUPY WALL STREET MOVEMENT, DEFENDANTS HAVE ACTED TO UNCONSTITUTIONALLY AND ARBITRARILY PREVENT PERSONS FROM ASSEMBLING IN TRADITIONAL PUBLIC FORA TO DISCUSS MATTERS OF PUBLIC CONCERN, WHILE ALLOWING PERSONS TO ENGAGE IN NON-POLITICAL ACTIVITIES IN THOSE SAME SPACES ................................40

    a.    PREVENTION OF ENTRY INTO AND FORCIBLE REMOVAL OF CITIZENS FROM PUBLIC SPACES ENGAGING IN PEACEFUL ASSEMBLY AND PUBLIC ISSUE SPEECH .......................................................................................40
      1. Public Space .......................................................................................40
      2.   Public Issue Speech and Assembly .................................................47
      3. Factual Allegations Relating to Public Space Issues ............................51

III.    DEFENDANTS CITY, MAYOR BLOOMBERG, COMMISSIONER KELLY HAVE CONSPIRED WITH PRIVATE CORPORATIONS AND OTHER GOVERNMENTAL ENTITIES TO SUPPRESS THE CONSTITUTIONAL RIGHTS OF PLAINTIFFS AND OTHER OWS PARTICIPANTS TO PETITION THEIR GOVERNMENT FOR REDRESS OF GRIEVANCES ...................................................73

IV. FREEDOM OF SPEECH: DEFENDANTS HAVE ENGAGED IN SYSTEMATIC VIOLATIONS OF LAW AND CONSTITUTIONAL GUARANTEES INTENDED TO CHILL THE FIRST AMENDMENT RIGHTS OF OCCUPY WALL STREET PARTICIPANTS TO EXPRESS OPINIONS ON MATTERS OF PUBLIC CONCERN ...................................................................................................76

    a.    NYPD OFTEN OVERCHARGES PEACEFUL PROTESTERS WITH RESISTING ARREST IN ORDER TO HOLD THEM OVERNIGHT RATHER THAN RELEASE THEM WITH DAT'S ...................................................................76

  b.   NYPD PHOTOGRAPHS ARRESTEES AND, UPON DISMISSALS, DOES NOT RETURN THE PHOTOTGRAPHS TO THE INNOCENT ARRESTEE IN VIOLATION OF STATE PRIVACY LAW .................................................................. 78

V.   THE LACK OF RESPECT THE NYPD HAS FOR THE COMMUNITIES IT POLICES, AND FOR THE CONSTITUTION AND LAWS IT IS SUPPOSED TO UPHOLD, ALSO LEADS TO WIDESPREAD NYPD CORRUPTION AND CRIMINAL CONDUCT ................................................................................................. 81

VI.   NYPD MISCONDUCT CAN BE EXAMINED IN MICROCOSM BY VIEWING THE NYPD'S TREATMENT OF THE OCCUPY MOVEMENT ............... 84

EQUITABLE RELIEF ........................................................................................................ 92

APPENDIX I ...................................................................................................................... 151

  I.   A CONTINUING PATTERN OF MISCONDUCT AND REFORM:  NYPD HISTORY, PAST AND CURRENT, SUPPORTS THE PLAINTIFFS' DEMAND FOR THE APPOINTMENT OF INDEPENDENT AUDITOR ................................. 151

  II.   LACK OF ACCOUNTABILITY PLUS  LACK OF TRANSPARENCY EQUAL LACK OF TRUST BETWEEN THE NYPD AND THE NYC COMMUNITIES THEY POLICE .......................................................................................................................... 157
      A.   UNCONSTITUTIONAL ARREST QUOTAS ............................................... 157
      B.   "CONTEMPT OF COP" ARRESTS ............................................................. 161
      C.   STOP AND FRISK ........................................................................................ 165
      D.   FLAKING/ TESTILYING ............................................................................. 166

  IV   FAILURES OF NYPD OVERSIGHT AND   SELF- POLICING LEAD TO LACK OF ACCOUNTABILITY FOR POLICE MISCONDUCT CREATING LACK OF TRUST OF THE COMMUNITY IN THE NYPD ................................................ 170
      A. IAB .................................................................................................................. 170
      B. CCRB ............................................................................................................... 172
      C. CCPC .............................................................................................................. 174

  V.   THE FINANCIAL COST OF THIS UNCHECKED  NYPD MALFEASANCE AND WRONGDOING HAS HAD NO EFFECT ON THE NYPD CONDUCT ....... 177

PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiffs seek relief for the violation of their rights secured by 42 USC § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York and rules and regulations of the City of New York.

2.      The claims arise from a series of incidents in connection with Occupy Wall Street protests beginning in and around September 17, 2011 and continuing to the present day in which the City of New York in concert with various private and public entities have employed Officers of the New York City Police Department ("NYPD") and others acting under color of state law, to intentionally and willfully subject Plaintiffs and the public to, among other things, violations of rights to free speech, assembly, freedom of the press, false arrest, excessive force, false imprisonment, and malicious prosecution and, furthermore, purposefully obstructing Plaintiffs carrying out their duties as elected officials and members of the press, including oversight of the New York City Police Department.

3.      This unlawful conduct has been undertaken with the intention of obstructing, chilling, deterring and retaliating against Plaintiffs for engaging in Constitutionally-protected protest activities.

4.      Plaintiffs seek injunctive relief as well as special, compensatory and punitive monetary damages against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

JURISDICTION

5.      This action is brought pursuant to 28 USC §1331, 42 USC § 1983, and the First,

Fourth and Fourteenth Amendments to the United States Constitution.  Pendent party jurisdiction and supplementary jurisdiction over Plaintiffs' state law claims are asserted.

6.      Venue is laid within the United States District Court for the Southern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claims occurred within the boundaries of the Southern District of New York.

INTRODUCTION

7.      The First Amendment to the United States Constitution states: "Congress shall make no law [I.]  respecting an establishment of religion, or prohibiting the free exercise thereof; [II.] or abridging the freedom of speech, [III.] or of the press; [IV.] or the right of the people peaceably to assemble, [V.] and to petition the Government for a redress of grievances.

8.      During the early life of the Occupy Wall Street ("OWS") movement, Defendants including but not limited to Defendant City of New York and its police force, the New York City Police Department ("NYPD"), have acted to systematically curtail four of the five freedoms guaranteed by the First Amendment with respect to Occupy Wall Street participants: Freedom of Speech, Freedom of the Press, Freedom to Peaceably Assemble, and Freedom to Petition the Government for Redress of Grievances.

9.      Furthermore, in the course of their undertakings intended to suppress Plaintiffs' First Amendment rights, Defendants have systematically employed means that violate Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

10.     Private corporations named as Defendants and others have conspired and acted in concert with the government actors named as Defendants and others to suppress the First

Amendment rights of citizens speaking out against the perceived interests of such corporations. This lawsuit seeks redress for these violations, including but not limited to ensuring that Defendant City of New York ("City") and its agents follow the law as it relates to political protest and First Amendment protected expression.

11.     Plaintiffs bring this action primarily to address following unlawful actions taken by the Defendants:

a.  The arbitrary prevention of citizens from entering public spaces for the purpose of lawfully and peaceably assembling, and the forcible removal of citizens from public spaces who are present for the purpose of lawfully and peaceably assembling;

b.  Violating the rights of members of the press and elected officials who seek to lawfully observe and document actions taken by police officers in and around demonstrations and other Constitutionally protected activities;

c.  Violating the privacy of protesters who have been arrested but whose charges were dismissed by retaining the photographs of said protesters;

d.  Violating the rights to Free Speech and public assembly by improper police conduct during the arrest and processing of peaceful protesters that seek to chill the continued and future expressive conduct of said peaceful protesters;

e.  Detaining persons in arrest and non-arrest postures for extended periods of time for participating in peaceful protests, without charges;

f.  Photographing said non-prosecuted detainees in direct violation of applicable statutes and administrative enactments setting forth offenses which justify police taking and retaining photographs of arrestees;

g.  Charging persons arrested for participating in peaceful protests with crimes and violations not actually committed;

h.  Overcharging persons arrested for participating in peaceful protests with crimes and violations not supported by probable cause in order to remove officers' discretion to release said persons from custody with summonses or Desk Appearance Tickets;

i.  Charging persons arrested for participating in peaceful protests with crimes and violations in the absence of probable cause; and

j.  Using excessive force against persons participating in peaceful protests with the intention and purpose of denying, dissuading and/or discouraging said protesters from exercising their First Amendment rights to free expression, peaceable assembly, and to petition their government for a redress of grievances.

k.  Creating and disseminating disinformation, such as false alerts of threats to officer safety[1], in order to unneccesarily escalate police responses to peaceful protest activities, and in efforts to instigate escalated responses from said peaceful protesters to justify police uses of force.

12.  Plaintiffs now bring this action to assure that present and future First Amendment protected activities undertaken by Plaintiffs and others will not be violently suppressed by Defendants in the absence of probable cause and in violation of

---

[1] See, e.g., Youtube, "M22 NYPD tries to incite riot at ows union square" uploaded March 22, http://www.youtube.com/watch?feature=player_embedded&v=Z1kMs93nM_M [video of junior officer participating in enforcement against OWS protesters at Union Square repeatedly shouting "They're throwing glass bottles! They want to hurt us, guys!" when no such activity was taking place.]

Constitutional guarantees.

PARTIES

13.     Plaintiff Ydanis Rodriguez is a member of the New York City Council,
representing the people of the 10th Council District in Manhattan, New York.  As such, he
represents many constituents who have participated in the OWS and other protest actions
in the City of New York.  Council member Rodriguez is also an active participant in
OWS and has participated in other protest actions in the City of New York.  He intends to
participate in Constitutionally protected protest activities in New York City in the future.

14.     Plaintiff Jumaane Williams is a member of the New York City Council,
representing the people of the 45th Council District in Brooklyn, New York.  As such, he
represents many constituents who have participated in the OWS and other protest actions
in the City of New York.  Council member Williams is also an active participant in OWS
and has participated in other protest actions in the City of New York.  He intends to
participate in Constitutionally protected protest activities in New York City in the future.

15.     Plaintiff John Knefel is a participant in OWS and a citizen journalist.  NYPD has
not issued him a "press pass."   He intends to participate in Constitutionally protected
protest activities in New York City in the future.

16.     Plaintiff Letitia James is a member of the New York City Council, representing
the people of the 35th Council District in Brooklyn, New York.  As such, she represents
many constituents who have participated in OWS and other protest actions in the City of
New York.  Council member James is also an active participant in OWS and has
participated in other protest actions in the City of New York.  She intends to participate
in Constitutionally protected protest activities in New York City in the future.

17.     Plaintiff Justin Sullivan is a participant in OWS and a citizen journalist.  NYPD has not issued him a "press pass."   He intends to participate in Constitutionally protected protest activities in New York City in the future.

18.     Plaintiff Timothy Fitzgerald is a participant in OWS and a citizen journalist. NYPD has not issued him a "press pass."   He intends to participate in Constitutionally protected protest activities in New York City in the future.

19.     Plaintiff Paul Sullivan is a participant in OWS and a citizen journalist.  NYPD has not issued him a "press pass."   He intends to participate in Constitutionally protected protest activities in New York City in the future.

20.     Plaintiff Michael Rivas is a participant in OWS.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

21.     Plaintiff Jeffery McClain is a participant in OWS and a member of the organization Iraq War Veterans for Peace.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

22.     Plaintiff Melissa Mark-Viverito is a member of the New York City Council, representing the people of the 8th Council District in Manhattan and the Bronx, New York.  As such, she represents many constituents who have participated in the Occupy Wall Street and other protest actions in the City of New York.  Council member Mark-Viverito is also an active participant in OWS and has participated in other protest actions in the City of New York.  She intends to participate in Constitutionally protected protest activities in New York City in the future.

23.     Plaintiff Stephanie Keith is a photographic journalist.  Her photographs have been printed in various media outlets including the New York Times and Wall Street Journal.

On October 1, 2011, she was covering the OWS Brooklyn Bridge protest.  At least two prior times, and one time subsequent to her October 1, 2011 arrest, the NYPD has issued her a "press pass."   Her images of the October 1, 2011 march on or near the Brooklyn Bridge were utilized by the Associated Press and appeared on national news outlets including ABC News.  On October 3, 2012, Plaintiff Stephanie Keith was named Newswoman of the Year by the Newswomens' Club of New York.  She intends to continue to earn a living by photographing protest activities, including those associated with the Occupy Wall Street movement.

24.     Plaintiff Charles Meacham is a photographic journalist.  His photographs have been featured in various media outlets in America, Europe, Australia and Asia, and have been featured in campaigns by Amnesty International and the Idaho Foundation, among others.  Mr. Meacham began covering OWS on or around October 15, 2011, and has continued to do so to date.  Mr. Meacham had received press accreditations from countries and municipalities around the world, including Lithuania and Sydney Australia, and most recently worked in Taipei, Taiwan before moving to New York City in 2011. He intends to continue to earn a living by photographing breaking news and protest activities, including those associated with the Occupy Wall Street movement.

25.     Plaintiff Paul Newell is the Democratic District Leader for the 64th Assembly District, Part C, Manhattan, a district encompassing areas where many Occupy Wall Street activities have been conducted, notably including Zuccotti Park, F/K/A Liberty Plaza Park[2] ("FKA Liberty Park[3]").  He is also a participant in OWS and has participated

---

[2] Following Brookfield Properties' purchase of One Liberty Plaza, Liberty Plaza Park was renamed Zuccotti Park, in honor of Brookfield Properties Chairman John Zuccotti.
[3] By the appellation "FKA Liberty Park" used herein, Plaintiffs note the ironic fact that the OWS movement, criticizing corporate capture of our nation's political discourse at the expense of

in other large scale community actions, demonstrations and protests prior to Occupy Wall Street.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

26.     Plaintiff Jason Wedes is a participant in OWS and a citizen journalist.  NYPD has not issued him a "press pass."   He intends to participate in constitutionally protected protest activities in New York City in the future.  He is one of several persons who posts updates about OWS to the twitter account "OccupyWallStNYC," and also posts as an administrator to the Occupy Wall Street Facebook page.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

27.     Plaintiff Peter Dutro is an active participant in OWS. He is or was a member of various working groups, including one that interacts with Amalgamated Bank, the bank that holds much of the donated funds received on behalf of the Occupy Wall Street movement.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

28.     Plaintiff Yonatan Miller is an active participant in OWS. He is a member of various working groups.  He intends to participate in Constitutionally protected protest activities in New York City in the future.

29.     Plaintiff National Press Photographers Association ("NPPA") is a New York Corporation that has been awarded 501(c)(6) tax exempt status by the United States Internal Revenue Service, with a principal place of business in the city of Durham, County of Wake, state of North Carolina. Plaintiff NPPA is dedicated to the advancement of visual journalism, its creation, practice, training, editing and distribution, in all news

---

individual rights and liberties, grew to prominence in a privately-owned public space that was formerly named to invoke the American ideal of liberty, and now for a corporate chairman.

media and works to promote its role as a vital public service.  Plaintiff NPPA joins on behalf of its approximately seven thousand (7,000) active press photographer members, including Plaintiff Stephanie Keith, on whose behalf NPPA has advocated with Defendant City of New York and agents of Defendant Mayor Michael Bloomberg and Defendant Police Commissioner Kelly throughout the course of the incidents described herein.

30.     Defendant The City of New York is a municipal corporation organized under the laws of the State of New York.  NYPD is an agency of the City of New York and its Commissioner and officers are employees and agents of the City of New York.

31.     Defendant Metropolitan Transit Authority ("MTA") is a public transportation corporation organized under the laws of the State of New York.  Its Police Department, Commissioner and officers are employees and agents of the MTA.

32.     Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a business entity registered to do business and in fact doing business in the State of New York.  J.P. Morgan is the property owner of One Chase Manhattan Plaza, and is the successor in interest to the original entity that bargained with the City of New York for various benefits and exemptions in the construction of same, including de-mapping and removing one block of public road in the process of building on the One Chase Manhattan Plaza site.

33.     Defendant Brookfield Office Properties ("Brookfield") is a business entity registered to do business and in fact doing business in the State of New York.  Brookfield is the property owner of FKA Liberty Park, the Winter Garden in the World Financial Center, and other properties in the City of New York. FKA Liberty Park, and the Winter

Garden and other properties owned by Brookfield are publicly accessible open areas, which it or a predecessor in ownership were required by Defendant City of New York to build and maintain for public use in return for bonus floor to area ratio in its buildings near the sites.

34.     Defendant James Morrissey is or holds himself out to be the manager of Defendant Brookfield's World Financial Center.  At all times relevant herein, he was an employee of Defendant Brookfield Properties, and was acting in his capacity as such.

35.     Defendant Mitsui Fudusan America, Inc. ("Mitsui") is a business entity registered to do business and in fact doing business in the State of New York.  Mitsui is the property owner of 100 William Street which includes a publicly accessible open area, which it or a predecessor in ownership was required by Defendant City of New York to build and maintain for public use in return for bonus floor to area ratio in its building on the site.

36.     Defendant Mayor Michael Bloomberg ("Mayor Bloomberg") was at all times here relevant the Mayor of the City of New York.  As such, Mayor Bloomberg was a policy maker with respect to the strategic deployment of police officers against OWS and their orders about how to handle OWS participants and members of the press covering OWS. Mayor Bloomberg is sued in his individual and official capacities.

37.     Defendant New York Police Commissioner Raymond Kelly ("the Commissioner") was at all times here relevant the Commissioner of the New York City Police Department, and, as such, was a policy maker with respect to training, supervision, discipline and the strategic deployment of and orders to NYPD officers engaged in the suppression of OWS participants and its press coverage.  The Commissioner is sued in his individual and official capacities.

38.     Defendant MTA Police Commissioner Michael Coan ("the MTA Commissioner")
was at all times here relevant the Commissioner of the MTA Police Department, and, as
such, was a policy maker with respect to training, supervision, discipline and the strategic
deployment of and orders to MTA police officers engaged in the suppression of OWS
participants and its press coverage.  The MTA Commissioner is sued in his individual
and official capacities.

39.     All other individual state actor Defendants ( collectively, "officers" or "the
officers") are employees of the NYPD or the MTA, and are sued in their individual and
official capacities.

  I.     ABRIDGING FREEDOM OF THE PRESS: ELECTED OFFICIALS AND
         MEMBERS OF THE PRESS HAVE BEEN DENIED A RIGHT OF
         ACCESS TO OBSERVE AND RECORD POLICE ACTIONS AGAINST
         OCCUPY WALL STREET

         a.   ELECTED OFFICIALS PREVENTED FROM OBSERVING POLICE
              ACTIONS BY IMPROPER ARRESTS AND USES OF FORCE.

40.     The right of access to governmental administration and processes is enshrined in
the First Amendment's guarantees of free speech and a free press.  It protects the public
against the arbitrary interference of access to important governmental information.  New
York Civil Liberties Union v. NY City Transit Auth., 2012 WL 10972 (2d Cir. 2012)
citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980).

41.      "'[A] major purpose of [the First] Amendment [is] to protect the free discussion
of governmental affairs'.... By offering such protection, the First Amendment serves to
ensure that the individual citizen can effectively participate in and contribute to our
republican system of self-government."  New York Civil Liberties Union v. NY City
Transit Auth., at 431; quoting Globe Newspaper v. Superior Court, 457 U.S. 596 at 604

(1982).

42.     Implicit in the First Amendment is the notion that, in order to have free discussion of governmental affairs, the press and public must have access to government affairs.  Id.

43.     The First Amendment protects the rights to gather information about what public officials do and to record matters of public interest.  Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000);  Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir.1995).

44.     Citizens have a "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct." Smith v. City of Cumming, at 1333 (11th Cir. 2000). "There can be no doubt that the free speech clause of the Constitution protects … videotap[ing]" police officers.  Robinson v. Fetterman, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005).

45.     Reasonable time, place and manner restrictions, however, cannot be used to justify Constitutionally overly broad police restrictions.  In City of Houston, Tx. v. Hill, 482 U.S. 451 (1987), the court struck down a city ordinance that proscribed speech that would "interfere" with a police officer. Id. at 462.

46.     The court further explained:  "[W]e are mindful that the preservation of liberty depends in part upon the maintenance of social order.  But the First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." Hill at 471-472.

47.     Yet, on November 15, 2011, when FKA Liberty Park was cleared, NYPD barred the public, the press, and elected officials from observing their activities.  In fact, they were kept at least two blocks away from the police activities.

48.     Indeed, in a show of force and intimidation, NYPD arrested and assaulted reporters and elected officials, including some of the Plaintiffs herein, to prevent them from covering or even observing the police action.  Still others were merely prevented from observing in furtherance and fulfillment of their institutional roles in a democracy.

49.     The New York City Council has a duty to monitor and review the conduct and performance of agencies on a regular and continuous basis on behalf of the people of the City of New York.  New York City Charter §29(2).

50.     The New York City Council cannot perform its Charter-mandated role unless individual members of the Council are permitted to observe city agencies perform their duties.

51.     Individual Council members were prevented from observing the activities of NYPD in their actions to clear FKA Liberty Park.

52.     On November 15, 2011, at approximately 2:00 a.m., Plaintiff Ydanis Rodriguez, a Member of the New York City Council and Chair of the Higher Education Committee went to observe the events at the eviction of FKA Liberty Park.  He understood that residents of his district, as well as City University students, were in FKA Liberty Park at the time.

53.     As Plaintiff Ydanis Rodriguez approached a line of police officers and barricades, he informed the officers that he was a City Council member.  The police told him he could not go any further and he complied.  Plaintiff Ydanis Rodriguez nevertheless was attacked and arrested by police officers in the absence of probable cause.

54.     In the prosecution against Council Member Rodriguez, Defendant City claimed that he refused an order to not approach the barricades.  By this construction, Defendant

City in effect asserted that in addition to the arbitrary physical barriers that were erected by agents of Defendant City to keep observers out, said agents of Defendant City also established an arbitrary invisible line before the physical barricades through which no one could pass, on pain of arrest.

55.     Council Member Rodriguez was therefore unable to report on the police actions taken at FKA Liberty Park to the City Council or to his constituents, preventing him and the Council from performing their charter mandated roles as monitors of City agencies.

56.     The incident was covered on Time Magazine's web site.

57.     The story was initially accompanied with a photograph of Rodriguez on the ground being forcefully held down by police officers, and is attached hereto with said original photograph as Exhibit A.  The original photograph is no longer on the site but the caption from the saved snapshot of the page is "Riot gear police tackle New York City Council Member Ydanis Rodriguez near Zuccotti Park."

58.     Some hours later, the photograph was removed and replaced with an unrelated photograph of Council Member Rodriguez, attached hereto with replacement photograph as Exhibit B.  The associated text with the photograph is "New York City Council Member Ydanis Rodriguez, left, speaks with Assistant Chief William Morris, center, and Captain Andrew Lombardo, right, on Nov. 7, 2011, in New York."

59.     Upon information and belief, the photograph was removed due to the request and intervention of City officials.

60.     Plaintiff Democratic District Leader Paul Newell also went to FKA Liberty Park when the eviction started.

61.     As an elected representative, Plaintiff Newell also went to monitor the situation

and the police actions being taken against OWS participants.  Plaintiff Newell's district includes FKA Liberty Park.

62.     It was and remains a personal and institutional responsibility for Plaintiff Newell to observe momentous governmental actions in his district, such as the eviction of OWS protesters from FKA Liberty Park.

63.     The Democratic Party of the State of New York is recognized and certified as an official political party under the laws of the State of New York. It is also the largest political party in the State of New York.

64.     The rules of the Democratic Party mandate that as District Leader, Plaintiff Newell must inform and communicate with his constituents and the members of the greater district community about conditions in his district and affairs of government generally.

65.     Plaintiff Newell was also prevented from observing police actions on November 15, 2011 at FKA Liberty Park and thereby fulfilling his personal and institutional obligations.  He was arbitrarily arrested without probable cause.  All charges were dismissed against Plaintiff Newell.

66.     On November 15, 2011, Plaintiff Council Member Williams also attempted to get to the site of the eviction to monitor the police action against protesters.  He too was prevented from engaging in his personal and institutional role as a monitor and overseer of the NYPD by agents of Defendant City including members of the NYPD.

67.     Council Member Williams was therefore unable to report on the police actions taken at FKA Liberty Park to the City Council, preventing him and the Council from performing their Charter mandated roles as monitors of City agencies including the

NYPD.

68.     Plaintiff Council Members Mark-Viverito, James, Rodriguez and Williams, among other Council members, have been denied the right to receive information about the police actions against OWS, depriving them of their First Amendment Free Speech rights and further preventing them from performing their Charter mandated roles as monitors of City agencies including the NYPD.

69.     Furthermore, Plaintiff Council members and other Council members were prevented from gathering information in furtherance of their duty to enact laws for the "good rule and government of the city; for the order, protection and government of persons and property for the preservation of the public health, comfort, peace and prosperity of the city and its inhabitants[.]" New York City Charter § 28.


        b. SUPPRESSION OF "MAINSTREAM" MEDIA JOURNALISTS


70.     Even prior to the inception of the OWS movement, Plaintiff NPPA has struggled with Defendant City of New York to assure full promulgation of media guidelines to New York City police officers as well as compliance therewith.

71.     This struggle is reflected in an October 17, 2011 letter to NYPD Deputy Commissioner Paul Browne by NPPA general counsel Mickey Osterreicher, additionally signed by representatives of the Associated Press, Dow Jones & Company, Thomas Reuters and the New York Times, among others, noting the NYPD's lack of follow-up and follow-through with resolutions from an August 2011 meeting regarding police-media interactions, attached hereto as Exhibit Z.

72.     Defendant City of New York issued no substantive response to NPPA's October 17, 2011 letter.

73.     Thereafter, NYPD conduct towards media journalists, including but not limited to NPPA members, continued to regularly diverge from stated NYPD policies for police-media interactions.

74.     Thereafter, NYPD conduct towards media journalists, including but not limited to NPPA members, continued to regularly diverge from constitutional norms for police-media interactions.

75.     These phenomena arguably climaxed on November 15, 2011, the date of the eviction of OWS from Zuccotti Park.

76.     Some 26 journalists who tried to reach FKA Liberty Park on the night of the eviction, November 15, 2011 ("the night of the eviction") to report on the police action against OWS were similarly prevented from reaching FKA Liberty Park during the eviction.  See "Appendix III: Index of Arrests of Journalists and Others Dcoumenting Occupy Wall Street" appendix to The Global Justice Clinic (NYU School of Law) and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice (Fordham Law School), Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street (2012) attached hereto as Exhibit AB. See also weblog of Joshua Stearns, tracking journalist arrests at nationwide Occupy events, accessed on April 25, 2012 from http://storify.com/jcstearns/tracking-journalist-arrests-during-the-occupy-prot attached hereto as Exhibit C.

77.     Many journalists from well-known mainstream media outlets complained of their treatment by NYPD on the night of the eviction, claiming that they were being prevented

from performing their duties as journalists.  <u>See</u> November 21, 2011 Letter of New York Times Vice President and Assistant General Counsel George Freeman and twelve (12) others to NYPD Deputy Commissioner Paul J. Browne, attached hereto as Exhbit D.

78.     On November 21, 2011, Plaintiff NPPA joined in the letter authored by George Freeman, which additionally noted that since the meeting of August of 2011 referenced therein, the NYPD had only increased its targeting and restriction of journalists, noting specific instances of police abuse of journalists from on and after November 15, 2011, and requesting an immediate meeting with Deputy Commissioner Browne and Defendant Commissioner Kelly to address same.  Id.

79.     Defendant City of New York issued no substantive response to the above-referred November 21, 2011 letter.

80.     Reporters could not get "anywhere near" FKA Liberty Park on the night of the eviction, said journalist Andrew Katz. <u>See</u> Brian Stelter and Al Baker, "Reporters Say Police Denied Access to Protest Site," New York Times Media Decoder Blog, November 15, 2011, incorporated by reference herein and available online at http://mediadecoder.blogs.nytimes.com/2011/11/15/reporters-say-police-denied-access-to-protest-site/, last accessed 4/25/12.

81.     NY1 reporter Lindsey Christ said that the aggressiveness with which the police handled reporters on the night of the eviction made it "the scariest 20 minutes" of her life. Id.

82.     NY1 reporter Lindsey Christ reported that a New York Post reporter was put in a choke hold by police officers on the night of the eviction.  Id.

83.     Despite the widely reported-upon and observed rough behavior employed by

agents of Defendant City on the night of the eviction, NYPD Spokesperson Paul J.

Browne carefully stated that "he saw 'nobody' who was manhandled."  Id.

*84.*    Indeed, the NYPD's use of force in general, and against journalists in particular is

on-going and well-documented. See e.g. "Appendix I: Table of Alleged Police Us of

Force Incidents" appendix to Suppressing Protest: Human Rights Violations in the U.S.

Response to Occupy Wall Street*, supra. Attached hereto as Exhibit AA.* See also *Exhibit*

*AB* [Appendix III]

85.    In response to police treatment of press on November 15, 2011, United States

Congressman Jerrold Nadler, Ranking Member of the House Judiciary Subcommittee on

the Constitution, and the representative of Lower Manhattan, wrote a letter, dated

December 6, 2011, to United States Attorney General Eric Holder, requesting that the

Attorney General initiate an investigation into law enforcement activities surrounding the

Occupy movement generally, and OWS particularly.  See December 6, 2011 letter of

Congressman Jerrold Nadler, attached hereto as Exhibit E.

86.    In that December 6, 2011 letter, Congressman Nadler described Defendant Mayor

Bloomberg's claim that reporters were prevented from approaching FKA Liberty Park for

their own protection as "hav[ing] little merit."  Congressman Nadler went on to point out

that "[j]ournalists enter war zones to inform the American people about the status of

those conflicts.  I think they can be trusted to assume the risks associated with covering a

non-violent protest.  The actions of the NYPD to prevent the press from covering the

protests and the [November 15, 2011] eviction [of OWS participants from FKA Liberty

Park] affect core First Amendment values, not just of the right of the press to report, but

also the public's right to be informed on matters of great civic importance."  Id. at 3.

87.     Gabe Pressman, president of the The New York Press Club, which represents many of the most established media outlets and reporters in the City of New York, wrote a letter to Defendant New York City Police Commissioner Kelly, stating in part: "the brash manner in which officers ordered reporters off the streets [on the night of the eviction] and then made them back off until the actions of the police were almost invisible is outrageous."  See Gabe Pressman, "Open Letter to Mayor Bloomberg and Commissioner Kelly," November 15, 2011, incorporated by reference herein and available online at http://www.newyorkpressclub.org/coalition.php, sub-tab "11/15/2011 – Open Letter to Mayor Bloomberg and Commissioner Kelly," last accessed 4/26/12.

88.     Mayor Michael Bloomberg paradoxically claimed that the actions taken against journalists on the night of the eviction were undertaken "to protect" said journalists.  See YouTube, "Bloomberg Defends Blocking Media from Zuccotti Park (via @capitalnewyork)", incorporated by reference herein and available online at http://www.youtube.com/watch?v=cOsujgv8Ueo, last accessed 4/25/12.

89.     In response to the Press Club letter, Defendant Commissioner Kelly issued a well-publicized "directive" instructing NYPD officers to not unreasonably interfere with press coverage.

90.     Nevertheless, the suppression of reporters and the right to freedom of the press and speech persisted thereafter, and continues to date.  See, e.g., February 1, 2012 Letter of New York Times Vice President and Assstant General Counsel George Freeman and ten (10) others to NYPD Deputy Commissioner Paul J. Browne, incorporated herein by reference and attached hereto as Exhbit F.

91.     Professional press photographer Plaintiff Stephanie Keith was covering the

Brooklyn Bridge march on October 1, 2011 for the Associated Press.

92.     Plaintiff Mrs. Keith was carrying sophisticated photography equipment with her on October 1, 2011 for the purpose of taking photographs for licensing and sale to major news outlets.

93.     Plaintiff Mrs. Keith's photographs taken prior to her arrest appeared in major press outlets.

94.     Plaintiff Mrs. Keith's photographs taken prior to her arrest prove that the police had not notified many OWS participants that they could not go on the roadway.

95.     Plaintiff Mrs. Keith did not have NYPD-granted press credentials.

96.     Plaintiff Mrs. Keith violated no police order, but the police arrested her nevertheless while she was covering the news story.

97.     Thereafter, on September 15, 2012, Plaintiff Mrs. Keith was covering a different news story, at a march related to OWS on Broadway near Houston Street, when she was approached without warning or apparent justification by Defendant Lieutenant Albano, who proceeded to grab Mrs. Keith by the arm, push her about her upper body, shove her and yell at her incoherently, causing her pain, discomfort, fear and distress.

98.     On information and belief, despite numerous complaints and lawsuits brought against him for acts of battery and wrongful arrests, Defendant Lieutenant Albano was and remains a member of the NYPD's legal bureau, which is, *inter alia*, responsible for providing legal guidance to the NYPD.

99.     On December 12, 2011, Plaintiff Charles Meacham was photographing police interactions at a demonstration in front of the headquarters of Goldman Sachs.

100.    Thereafter, Plaintiff Charles Meacham followed a mass of police officers to the

Winter Garden, a publicly accessible open space, where an OWS-related protest action was occurring.

101.    Plaintiff Charles Meacham remained behind the police during their procession to the Winter Garden, behavior that, on information and belief, can be fairly characterized as "following the story."

102.    Plaintiff Charles Meacham arrived at the Winter Garden and maintained a respectful distance from both police and demonstrators.

103.    After a time, police officers began arresting demonstrators then present on the main floor of the Winter Garden.

104.    Plaintiff Charles Meacham moved to the publicly accessible mezzanine level of the Winter Garden and continued photographing the events unfolding on the main level of the Winter Garden.

105.    After a time, Plaintiff Charles Meacham began to descend the steps to the main level of the Winter Garden and was headed towards the exit from same.

106.    As Plaintiff Charles Meacham was walking down the steps to the main level of the Winter Garden, he was approached by two Defendant "John Doe" Police Officers, who instructed him to leave the area.

107.    Plaintiff Charles Meacham readily agreed, and began moving towards the exit from the Winter Garden.

108.    One of these Defendant "John Doe" Police Officers was a heavy-set caucasian male who appeared to be in his forties, approximately six (6) feet tall, wearing an NYPD uniform and hat.

109.    The other of these Defendant "John Doe" Police Officers was a smaller, shorter

caucasian male who appeared to be in his mid thirties, wearing an NYPD uniform and hat.

110.    Before Plaintiff Charles Meacham could take more than a few steps, he was stopped by Defendant Deputy Inspector Tloczkowski.

111.    Defendant Deputy Inspector Tloczkowski asked Plaintiff Charles Meacham if he had NYPD-issued press credentials.

112.    Plaintiff Charles Meacham replied that he did not.

113.    Defendant Deputy Inspector Tloczkowski then responded, in sum and substance, "No?  Then you're coming with me."

114.    Defendant Deputy Inspector Tloczkowski then seized Plaintiff Charles Meacham.

115.    Defendant Deputy Inspector Tloczkowski then instructed the same two Defendant "John Doe" Police Officers who had just told Plaintiff Charles Meacham to leave to instead arrest Plaintiff Charles Meacham.

116.    On information and belief, Defendant Deputy Inspector Tloczkowski knew or should have known that Plaintiff Charles Meacham's ability to be lawfully present in a publicly accessible space as a professional photojournalist was not contingent on Plaintiff Charles Meacham's possessing NYPD-issued press credentials.

117.    On information and belief, the two Defendant "John Doe" Police Officers then present knew or should have known that Plaintiff Charles Meacham's ability to be lawfully present in a publicly accessible space as a professional photojournalist was not contingent on Plaintiff Charles Meacham's possessing NYPD-issued press credentials.

118.    On information and belief, the two Defendant "John Doe" Police Officers then present knew or should have known that it was improper to arrest a person who had just

been given instructions to disperse and who was complying with same.

119.    Nevertheless, the two Defendant "John Doe" Police Officers then present arrested Plaintiff Charles Meacham.

120.    One or more of the two Defendant "John Doe" Police Officers then present apologized to Plaintiff Charles Meacham as they were arresting him.

121.    On information and belief, this apology evinces that Defendant "John Doe" Police Officers' knowledge that he was being ordered to undertake a patently false arrest.

122.    Nevertheless, the two Defendant "John Doe" Police Officers then present arrested Plaintiff Charles Meacham, and took him to a precinct house for processing.

123.    Plaintiff Charles Meacham was held at that precinct for approximately fourteen (14) hours, before being transported to Manhattan Central Booking.

124.    Plaintiff Charles Meacham was held at Manhattan Central Booking for approximately twenty-two (22) hours before his arraignment.

125.    Plaintiff Charles Meacham was charged with Criminal Trespass in the Third Degree under PL §140.10(a), a class B Misdemeanor, and was released on his own recognizance.

126.    PL §140.10(a) sets forth the crime of Criminal Trespass in the Third Degree as occurring when "[a] person… knowingly enters or remains unlawfully in a  building or upon real property… which is fenced or otherwise enclosed in a manner designed to exclude intruders[.]"

127.    On information and belief, it was literally impossible for Plaintiff Charles Meacham to commit Criminal Trespass in the Third Degree under PL §140.10(a) in the Winter Garden on the day of December 12, 2011, as the Winter Garden was and is a

publicly accessible open space, which is not fenced or otherwise enclosed to exclude intruders.

128.    Below Criminal Trespass in the Third Degree under PL §140.10(a), the only lower trespass charge is violation Trespass, under PL §140.05, which is not a crime, but rather a mere violation.

129.    On information and belief, violation Trespass under PL §140.05 is summons or Desk Appearance Ticket eligible, meaning that a person accused of violation Trespass does not need to be processed through Central Booking, but can be released at officers' discretion.

130.    On information and belief, Plaintiff Charles Meacham was over-charged with Criminal Trespass in the Third Degree under PL §140.10(a) so as to make him ineligible for a summons or a Desk Appearance Ticket, and to force him to be processed through Central Booking.

131.    On information and belief, Plaintiff Charles Meacham was over-charged with Criminal Trespass in the Third Degree under PL §140.10(a) to deter him from covering future protests in New York as a photojournalist.

132.    The Winter Garden is a part of the World Financial Center, a suite of buildings that is owned by Defendant Brookfield Properties.

133.    The criminal complaint against Plaintiff Charles Meacham contained allegations by Defendant James Morrissey, General Manager of the World Financial Center.

134.    Defendant James Morrissey averred in the criminal complaint against Plaintiff Charles Meacham that he personally instructed Plaintiff Charles Meacham to leave the Winter Garden, and Plaintiff Charles Meacham refused to do so.

135.    These allegations are patently false.

136.    On information and belief, Defendant James Morrissey has never had a personal interaction of any sort with Plaintiff Charles Meacham.

137.    On information and belief, one or more Defendant Police Officers requested or demanded that Defendant James Morrissey act as complaining witness against Plaintiff Charles Meacham.

138.    On information and belief, Defendant James Morrissey signed his name to the allegations contained in the criminal complaint against Plaintiff Charles Meacham as part of an agreement between agents of Defendant City of New York and agents of Defendant Brookfield Properties, the purpose of which, inter alia, was to chill and deter the speech and expression of the OWS movement generally.

139.    On information and belief, Defendant James Morrissey signed his name to the allegations contained in the criminal complaint against Plaintiff Charles Meacham as part of an agreement between agents of Defendant City of New York and agents of Defendant Brookfield Properties, the purpose of which, inter alia, was to chill and deter the speech and expression of journalists covering the OWS movement.

140.    As a result of the foregoing, Plaintiff Charles Meacham was forced to return to Court on numerous occassions.

141.    On the motion of Plaintiff Charles Meacham's defense attorney, the charge of Criminal Trespass in the Third Degree under PL §140.10(a) was reduced to violation Trespass, under PL §140.05, which is not a crime, but a violation.

142.    On July 12, 2012, the Manhattan District Attorney's office dismissed the sole charge pending against Charles Meacham, with an Assistant District Attorney stating on

record in open court that the charge was being dismissed because Plaintiff Charles
Meacham had shown that he was a member of the press, working as such, at the time of
his arrest.

143.    Upon information and belief, many reporters working for established media
outlets are afraid to enforce their rights in court because of the threat it poses to their
careers.

144.    Plaintiff NPPA seeks injunctive and equitable relief to curtail the constitutionally
violative conduct, policies and practices of Defendant City of New York and its agents
described herein as they affect Plaintiff NPPA's membership and their ability to perform
their professional duties.

c.      SUPPRESSION OF CITIZEN JOURNALISTS

145.    Citizen reporters, photographers and videographers have been critical in providing
unfiltered and contemporaneous information to the public about OWS and police
responses to OWS.

146.    As citizen reporters, they have no institutions or corporations to answer to for
their reporting.

147.    On information and belief, citizen reporters who are not credentialed by NYPD
have been targeted by police officers for suppression, harassment and arrest, in violation
of their First Amendment rights.

148.    On information and belief, citizen reporters who are not credentialed by NYPD
continue to be targeted by police officers for suppression, harassment and arrest, in
violation of their First Amendment rights.

149.    On information and belief, the NYPD's acts in suppressing, harassing and

arresting citizen reporters are motivated, in whole or in part, by an unconstitutional distinction between "official" reporters, who are credentialed by NYPD, and other reporters.  See Exhibit AA & AB. [Appendix I & III]

150.    However, as pled above, the NYPD has also acted to suppress, harass and arrest "official" reporters as well.

151.    Reporters have a First Amendment right to gather and record governmental processes, including police actions, regardless of whether they are "officia" or "unofficial".  Smith, 212 F.3d at 1333 (11th Cir. 2000), *citing* Iacobucci v. Boulter, 1997 WL 258494 (D.Mass, 1997).

152.    On or about November 15, 2011, in FKA Liberty Park, a publicly accessible open space, several Defendant "John Doe" Police Officers grabbed Plaintiff Timothy Fitzgerald, a citizen reporter who was documenting protest activities and police response to same in that publicly accessible open place, and pulled Plaintiff Fitzgerald to the ground and arrested him.

153.    On December 12, 2011, Plaintiff Jonathan Knefel was covering a police action against OWS participants at Winter Garden.

154.    When asked whether he had (NYPD-issued) press credentials, Plaintiff Knefel replied he did not.

155.    Since he was not a member of the press credentialed by NYPD, he was prevented from continuing to record the activity and arrested without probable cause.  See Exhibit G, at timestamps 14:42-15:00.

156.    On December 12, 2011, at the Winter Garden, a publicly accessible open space, Defendant Deputy Inspector Winski and several Defendant "John Doe" Police Officers

seized Plaintiff Justin Wedes, a citizen reporter who was documenting protest activities and police response to same in that publicly accessible open place, pulled Plaintiff Wedes to the ground and arrested him without warning or probable cause as Plaintiff Wedes stood recording police interactions from a reasonable distance.  See Exhibit G, at timestamps 12:13-12:55.

157.    Plaintiff Justin Wedes was held for forty (40) hours before being arraigned with respect to the above-described arrest.

158.    Thereafter, Defendant Deputy Inspector Winski again targeted Mr. Wedes for arrest.  As the video attached shows, on March 15, 2012 Defendant Winski focused on Mr. Wedes and called out  "HEY JUSTIN" to Plaintiff Wedes via megaphone, and then made gestures and mouthed words indicating that Defendant Winski intended to arrest Mr. Wedes, stating in sum and substance, "You're coming with me."  Defendant Winski's conduct so frightened and chilled Mr. Wedes' right to observe and document police action that he fled the area in order to avoid yet another illegal arrest.

159.    On or about December 12, 2011, at the Winter Garden, a publicly accessible open space, Plaintiff Paul Sullivan, a citizen reporter who was documenting protest activities and police response to same in that publicly accessible open place, was grabbed, pulled to the ground and arrested without warning or probable cause.

160.    Plaintiff Paul Sullivan sustained nerve damage in his left hand as a result of the above-described arrest.

161.    On or about January 10, 2012, Plaintiff Justin Sullivan was filming an OWS activity at Grand Central Terminal.

162.    Because Plaintiff Justin Sullivan was filming the activity, he was falsely arrested

by MTA police and subjected to excessive force.

163.    Plaintiff Justin Sullivan was photographed and fingerprinted.

164.    Defendant MTA Police Officer Lakeram specifically ordered other officers present to get Plaintiff Justin Sullivan's camera.

165.    Plaintiff Justin Sullivan was initially released from custody at the precinct with multiple summonses.

166.    When Plaintiff Justin Sullivan went back to the MTA Police Precinct located at Grand Central Terminal to ask for his missing video camera, he was re-arrested by Defendant MTA Police Officer Lakeram and held for approximately 24 more hours.

167.    Additional charges were issued as against Plaintiff Justin Sullivan at that time.

168.    Plaintiff Justin Sullivan's still camera was returned.

169.    Plaintiff Justin Sullivan's video camera was not returned.

170.    Plaintiff Justin Sullivan's data chips were not returned.

171.    A witness reported that he observed an officer who fits the physical description of Defendant MTA Police Officer Lakeram smash an electronic device resembling Plaintiff Justin Sullivan's camera.

172.    On September 4, 2012, Justin Sullivan was issued an Adjournment in Contemplation of Dismissal ("A.C.D.") on the charges relating to his arrest. A condition of his A.C.D. was that he not be arrested again for six months or face a renewal of the charges against him.

173.    The A.C.D. is, essentially, a City-ordered gag order on Mr. Sullivan which requires him to either not participate in OWS activity or face continued egregious criminal sanctions.

> d.     THE POLICE FORCES OF DEFENDANT CITY AND
> DEFENDANT MTA HAVE VESTED INTERESTS IN CHILLING
> PRESS AND GOVERNMENTAL ACCESS TO THEIR
> ENFORCEMENT ACTIVITIES

174.    On information and belief, while Defendant MTA is a separate municipal

organization from Defendant City of New York, MTA Police communicates about

policies and strategies with NYPD.

175.    The MTA Police Commissioner is Defendant Chief Michael Coan.

176.    Defendant Chief Coan became Chief of MTA Police after a 26 year career in the

NYPD, rising to the level of Deputy Chief of the NYPD.

177.    Notably, Defendant Chief Coan was the Commanding officer of NYPD's Public

Information Division for four years.

178.    On September 19, 2011, a peaceful march from FKA Liberty Park through Wall

Street resulted in Defendant Deputy Inspector Winski arresting an orange-hatted OWS

participant for alleged disorderly conduct and resisting arrest.

179.    NYPD spokesperson Paul Browne alleged in an e-mailed statement that this

individual was arrested "for jumping a police barrier and resisting arrest."  See Laura

Marcinek, "Wall Street Areas Blocked as Police Arrest Seven in Protest," Bloomberg

News, September 19, 2011, incorporated by reference herein and available online at

http://www.bloomberg.com/news/2011-09-18/wall-street-occupied-by-a-few-hundred-

people-as-protesters-ranks-dwindle.html, last accessed 4/25/12.

180.    However, a NY Times City Room Blog with photographs showed precisely the

opposite – Defendant Deputy Inspector Winski tried to pull a protestor over a barrier, and

then Defendant Deputy Inspector Winski jumped over the barrier to grab the OWS

participant.  See Colin Moynihan, "Wall Street Protests Continue, With at Least 6

Arrested", New York Times City Room Blog, September 19, 2011, incorporated by reference herein and available online at http://cityroom.blogs.nytimes.com/2011/09/19/wall-street-protests-continue-with-at-least-5-arrested/, last accessed 4/25/12.

181.    Subsequently, Spokesperson Paul Browne stated that 'he had gotten his facts scrambled."  Dwyer, J. "*A Spray Like A  Punch in the Face"* N.Y. Times, 9/27/2011, available online at http://www.nytimes.com/2011/09/28/nyregion/a-burst-of-pepper-spray-like-a-punch-in-the-face.html and incorporated by reference herein.

182.    Similarly, members of the NYPD lied about the conditions of Plaintiff Council member Rodriguez's arrest, stating, among other false claims, that the Council member was not injured in the course of the arrest.

183.    On information and belief, the above-referred incidents of misstatements, lies and cover-ups perpetrated by members of the NYPD and related to officer misconduct stem from the NYPD's insular culture, which prioritizes fraternal loyalty over objective integrity.

184.    The widespread phenomenon and practice of police officers covering up for one another's bad acts is known colloquially as "the blue wall of silence."

185.    On information and belief, the insular culture of the NYPD, has combined with "the blue wall of silence" phenomenon that has been found to exist among police officers generally to make internal police oversight by NYPD oversight divisions such as the Internal Affairs Bureau ("IAB") and Performance Monitoring Unit ("PMU") largely ineffective at curbing all but the most egregious acts of individual officer corruption.

186.    On information and belief, the NYPD's continuing practice of combating

meaningful efforts towards internal police oversight is demonstrated by the custom and practice of NYPD officers harassing, hazing and otherwise making life difficult for officers who diligently apply themselves to IAB assignments.

187.    On information and belief, the NYPD's continuing practice of combating meaningful efforts towards internal police oversight is demonstrated by the custom and practice of NYPD officers harassing, hazing and otherwise making life difficult for officers who come forward and speak out about police misconduct, such as Adrian Schoolcraft.

188.    On information and belief, NYPD supervisory complicity or acquiescence to the NYPD's continuing practice of combating meaningful efforts towards internal police oversight is demonstrated by the limited manpower and resources of PMU.

189.    As of the last report on PMU released by Defendant City's Commission to Combat Police Corruption ("CCPC") in 2006, incorporated by reference herein, fourteen (14) officers comprised the totality of the PMU, and were nominally tasked with monitoring the performance of any of the approximately forty thousand (40,000) members of the NYPD who may be set down for performance monitoring.

190.    On information and belief, the insular culture of the NYPD, in conjunction with "the blue wall of silence" phenomenon that has been found to exist among police officers generally, have led to a continuing practice of NYPD officers and leadership working to systematically undermine external municipal oversight efforts undertaken by Defendant City's CCPC and Defendant City's Civilian Complaint Review Board ("CCRB").

191.    On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same is a "top-down"

phenomenon,  wherein senior NYPD officials including but not limited to Defendant Commissioner Kelly actively foster a work environment and culture in which misconduct is obfuscated and attempts at meaningful monitoring and oversight are systematically opposed.

192.    On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same also enables police officers to lie in accusatory instruments and under oath.

193.    On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same, in conjunction with the NYPD's policy of quantitative enforcement "performance goals," actually encourages police officers to lie in accusatory instruments and under oath.

194.    On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same, in conjunction with the NYPD's policy of quantitative enforcement "performance goals," actually encourages police officers to lie in accusatory instruments and under oath because officers are forced to operate in a system which penalizes an absence of enforcement activity, even when no cause for enforcement activity exists, while at the same time enabling officers to lie and commit acts of misconduct against civilians without employment consequences.

195.    On information and belief, taken together these practices, policies and customs engender perverse incentives for officers to commit acts of misconduct against civilians without consequences.

196.    Defendant Commissioner Kelly demonstrated the reach of these pernicious practices when he claimed that he was not aware of any claim of injury made by Plaintiff

Council Member Ydanis Rodriguez, even though Plaintiff Council Member Rodriguez

had open and obvious wounds on his head, sustained during his arrest, observed by

bystanders to Council member Rodriguez' arrest.  See "NYC Councilman Ydanis

Rodriguez Arrested During Zuccotti Park Raid," CBS/AP, November 15, 2011, available

online at  http://newyork.cbslocal.com/2011/11/15/nyc-councilman-ydanis-rodriguez-

arrested-during-zuccotti-park-raid/ and incorporated by reference herein.

197.    Under NYPD Interim Order 53(03), desk officers processing arrests are required

to observe the physical and mental condition of incoming prisoners and make note of said

condtions in the Command Log.

198.    Therefore, Council member Rodriguez's injuries should have been recorded in a

Command Log that was or should have been available to Defendant Commissioner Kelly

at the time of his statement noted above.

199.    Whether this information was not made available to Defendant Commissioner

Kelly or Defendant Commissioner Kelly willfully disregarded this information, the

NYPD's customs, policies and practices that promote police misconduct and discourage

meaningful police oversight were to blame.

200.    The willful failure of Defendant City to accurately take note of injuries inflicted

by members of the NYPD on a City Council member for Defendant City while said City

Council member was being arrested for observing a police action shocks the conscience.

201.    The willful failure of Defendant City to acknowledge injuries inflicted by

members of the NYPD on a City Council member for Defendant City while said City

Council member was being arrested for observing a police action shocks the conscience.

202.    The battery and false arrest inflicted by members of the NYPD on a City Council

member for Defendant City while said City Council member was observing a police action shocks the conscience.

203.    By employing the NYPD in its present condition to police protests while failing to provide meaningful avenues of police accountability, Defendant City chills each Plaintiff, and indeed each citizen, from engaging in Constitutionally protected speech by setting up the NYPD, in effect, as the arbiter of the content of speech in a democratic society.

204.    The above-described issues and phenomena are not new developments, and are not unique or unprecedented in the history of policing in New York City.

205.    Instead, the treatment of OWS participants by Defendants represents a continuation, if not a culmination, of general trends of official misconduct among the agents of Defendant City of New York that has persisted in varying forms for over a century.

206.    These trends of official misconduct and further support of the above-pled unconstitutional NYPD policies, practices and customs are set forth in detail in Appendix I, which is appended hereto.

207.    The facts, allegations and sources set forth in Appendix I are incorporated by reference in the body of the Complaint.

II.     ABRIDGING FREEDOM TO PEACEABLY ASSEMBLE: FROM THE
INCEPTION OF THE OCCUPY WALL STREET MOVEMENT, DEFENDANTS
HAVE ACTED TO UNCONSTITUTIONALLY AND ARBITRARILY PREVENT
PERSONS FROM ASSEMBLING IN TRADITIONAL PUBLIC FORA TO DISCUSS
MATTERS OF PUBLIC CONCERN, WHILE ALLOWING PERSONS TO ENGAGE
IN NON-POLITICAL ACTIVITIES IN THOSE SAME SPACES

a.     PREVENTION OF ENTRY INTO AND FORCIBLE REMOVAL
OF CITIZENS FROM PUBLIC SPACES ENGAGING IN PEACEFUL
ASSEMBLY AND PUBLIC ISSUE SPEECH

1. Public Space

208.    Through unlawful exercises of police power and misapplication of law, the NYPD

has sought to prevent and has prevented Plaintiffs and other citizens from exercising

certain Constitutional Rights, including the right to public assembly and expressive

speech.

209.    Plaintiffs and other residents of this great city are being prevented from

assembling and speaking on public issues in public spaces around Manhattan.

210.    Specifically, Plaintiffs and other citizens have been prevented from lawfully

entering and/or remaining at public spaces located at FKA Liberty Park, 100 William

Street, the Winter Garden, and One Chase Manhattan Plaza in Lower Manhattan, among

others.

211.    On information and belief, each of the above-listed areas other than One Chase

Manhattan Plaza is designated as "publicly accessible open space" by the City of New

York.

212.    The City of New York negotiated with the private developers who own(ed) the

aforementioned properties to create these public spaces, in exchange for zoning variances

40

allowing the developers to, among other things, exceed floor area ratio restrictions, creating more office space than was generally possible under law.

213.    In 1961, New York City passed a comprehensive Zoning Resolution, setting the City's zoning ordinances and formalizing and codifying the trade-off that enables developers to develop sites beyond property's nominal zoned floor to area ratio, in exchange for creating and maintaining public space on the property.

214.    As it applies to the aforementioned properties, the 1961 Zoning Resolution requires that property owners build "plazas" in exchange for bonus floor-to-area ratio building rights.

215.    A "plaza" is defined in Art. 1, Ch. 3 §33-11 of the Zoning Resolution as an "open area accessible to the public at all times".  <u>See</u> attached Exhibit H.

216.    In 2007, the City Council approved Resolution 1103, making certain amendments to the 1961 Zoning Resolution.  Tellingly, it changed the name "plaza" and other similar designations to the more emphatic "publicly accessible open area."   Art. 1, Ch. 2 §12-10.

217.    Resolution 1103 was enacted by decision of the City of New York's City Planning Commission without amendment.  It reiterates that no change in the terms of public access to publicly accessible open areas may be made without application to the City Planning Commission, and further, upon application the minimum hours of access to said publicly accessible open areas must reach at least to 10:00 PM from April 14 to October 31, and to 8:00 pm from November 1 to April 14.

218.    Further, it clarifies that no barriers above five feet can ever be deployed around a

publicly accessible open area, and that they must be fully removed during opening hours.

See Exhibit I.

219.    FKA Liberty Park, the Winter Garden and the atrium of 100 William Street are

"privately owned public spaces" and are considered "public plazas" within the rubric of

Defendant City of New York's Zoning Resolution. "In 2007, the New York City Council

adopted revised standards for all outdoor POPS, representing a significant update to and

consolidation of all previous plaza design regulations into one outdoor plaza designation-

the 'public plaza'." See New York City Department of City Planning, "Privately Owned

Public Space," online at http://www.nyc.gov/html/dcp/html/pops/pops.shtml

220.    A  "public plaza" is an open area for public use provided in accordance with the

requirements set forth in New York City Zoning Resolution 37-70, inclusive.

221.    The City of New York's Zoning Resolution goes on to state at § 37-727 that "[a]ll

#public plazas#[sic] shall be accessible to the public at all times, except where the City

Planning Commission has authorized a nighttime closing, pursuant to the provisions of

this Section."  Available online at http://www.nyc.gov/html/dcp/pdf/zone/art03c07.pdf

222.    Nothing in City of New York's Zoning Resolution's indicates that owners of

privately owned public spaces have standing to determine use of said privately owned

public spaces by any means but through the City of New York's City Planning

Commission.  See generally New York City Zoning Resolution §§37-70-37-78.

223.    The City of new York's Zoning Resolution states: "All #public plazas# shall be

accessible to the public at all times, except where the City Planning Commission has

authorized a nighttime closing, pursuant to the provisions of this Section."  City of New

York Zoning Resolution § 37-727.    Section 37-727 (f) further refers to Section 37-751

(c).  Section 37-751 (c) (2) states: " On each #street# frontage occupied by the #public

plaza# and where the City Planning Commission has authorized a limitation on the hours

of access for a #public plaza# pursuant to the provisions of Section 37-737, a minimum

of one hours of operation of access plaque shall be provided for every 40 linear feet of

approved barrier that limits public access.  The hours of access plaque shall be located on

the barrier that limits public access to the #public plaza# and shall consist of . . . (2) the

statement: "Open to the Public:" followed by the approved hours of operation."  Section

37-751 (c).

224.    The language cited in the preceding paragraph supports the proposition that

privately owned public spaces like FKA Liberty Park are open to the public twenty-four

hours a day, unless explicit signage to the contrary is posted following compliance with

the specific application procedure set forth in Defendant City of New York's Zoning

Resolution.

225.    Defendant City of New York's Zoning Resolution at § 37-737 states a very

specific application procedure for limiting the hours of operation for a privately owned

public space. The hours of operation may not be foreshortened according to the mere

whim of the privately owned public space's owner.

226.    Defendant City of New York's Zoning Resolution at § 37-737 also prescribes a

window of time necessary to achieve the approval of the Community Board and City

Council for limiting the hours of operation for a privately owned public spaces.

227.    The process set forth in Defendant City of New York's Zoning Resolution at §
37-737 is a time-consuming process involving multiple levels of review.  In short, a
unilateral and sudden decision by an owner is not sufficient to disburden the owner of its
delegated responsibilities pursuant Defendant City of New York's Zoning Resolution at §
37-737.

228.    The City of new York's Zoning Resolution states: "All #public plazas# shall be
accessible to the public at all times, except where the City Planning Commission has
authorized a nighttime closing, pursuant to the provisions of this Section."  City of New
York Zoning Resolution § 37-727.

229.    These regulations support the proposition that absent explicit Zoning Resolution-
compliant signage to the contrary, privately owned public spaces such as FKA Liberty
Park are open to the public twenty-four hours a day.

230.    Defendant City of New York's Zoning Resolution at § 37-727 also supports the
proposition that privately owned public spaces like FKA Liberty Park are not subject to
the City of New York's Parks Department rules, which state a default closing time for
City Parks of 1:00 AM unless otherwise posted.  See N.Y. City Dep't of Parks and
Recreation Rules § 1-03 (Gen. Provisions).

231.    In short, a unilateral and sudden decision by an owner is not sufficient to
disburden the owner of its responsibilities pursuant to Zoning Resolution Section 37-737.

232.    Additionally, the Zoning Resolution makes clear that a so-called "transfer of
authority" from the owner of a privately owned public space to Defendant City of New
York is a legal nullity, as owners of privately owned public spaces transfer authority for

said spaces to Defendant City of New York's City Planning Commission before said spaces are designated, as a necessary condition of the bargains producing privately owned public spaces.

233.     Though publicly accessible open areas are privately owned, they only exist as a creation of City law and policy, and represents the fruit of a consummated bargain between a private actor and government, i.e., for the private actor to provide public space in return for "bonus" floor area from the government.

234.     The actual transfers of authority related to the privately owned public spaces discussed herein were all undertaken before the inception of the OWS movement on September 17, 2011; no authority remained with Defendants Brookfield Properties or Mitsui Fudusan to be transferred.

235.     The transfer of authority from Defendant Brookfield Properties to Defendant City of New York for FKA Liberty Park was done prior to the eviction of OWS participants from FKA Liberty Park on November 15, 2011.

236.     In support of the criminal charge of trespass against Ronnie Nunez and others who remained in FKA Liberty Park on November 15, 2011, Manhattan District attorney Cyrus Vance explained, "Brookfield Properties had transferred authority to the New York City Police Department to revoke that license [to remain in FKA Liberty Park], by ordering the dispersal and evacuation of all individuals in the park." See Exhibit J page 4.

237.     Indeed, Brookfield Properties purportedly gave NYPD "permission" to evacuate Zuccotti Park. See Exhibit K.

238.    As Defendant Brookfield Properties had no actual authority over FKA Liberty Park to transfer to Defendant City of New York on November 15, 2011, the alleged "transfer of authority" from Defendant Brookfield Properties to Defendant City of New York only evidences joint action between Defendant Brookfield and Defendant City.

239.    Said joint action of Defendant Brookfield Properties and Defendant City of New York had the sole purpose of removing OWS participants from FKA Liberty Park without undertaking the officially prescribed steps set forth in the Zoning Resolution, or indeed for due process generally.

240.    Under federal and state Constitutional law, whether a space is considered public is not determined by a formalistic approach to the law of real property.  Rather, the court must look to a variety of factors:  "[T]he source of authority for the private action; whether the State is so entwined with the regulation of the private conduct as to constitute State activity; whether there is meaningful State participation in the activity; and whether there has been a delegation of what has traditionally been a State function to a private person." Shad Alliance v. Smith Haven Mall, 66 N.Y.2d 496, 505 (1985).

241.    Streets, sidewalks, parks and other public spaces adjacent to sidewalks and streets have long been considered traditional public fora for speech and assembly. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."  Hague v. CIO, 307 U.S. 496, 515 (1939).

Speech finds its greatest protection in public fora.  Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006).

242.    Under these well-settled precedents, these publicly accessible open areas, including One Chase Manhattan Plaza, are "public fora" for Constitutional law purposes, and activities within them are entitled to the highest Constitutional protections.

### 2.       Public Issue Speech and Assembly

243.    ""[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.' " Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758-759 (1985) (opinion of Powell, J.); *quoting* First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 776 (1978). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145, (1983). See also Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011).

244.    Clearly, the OWS protests are, and were always planned to be speech about matters of public concern.  Attached as Exhibit L are pages from Adbusters Magazine, which helped initiate the OWS movement.   As the pages indicate, the OWS actions were planned well in advance, and were intended as speech to dramatize the inequities and

social injustice in American society. Clearly, speech in connection with Occupy Wall Street is entitled to the highest protection.

245.    Numerous Courts across the country have now recognized the First Amendment right to Occupy space, including tents and tarps, as it "*is an expression of hope for a more just, economically egalitarian society and that it functions as a model community demonstrating their vision of such a society.*" <u>Occupy Augusta v. Maine Commissioner of Public Safety</u> (USDC Maine 11CV00452(NT) slip op. at 3, 12/7/2011) <u>http://www.med.uscourts.gov/Opinions/Torresen/2011/NT_12072011_1-11cv_452_James_Freeman_v_John_Morris.pdf</u>. "*The setting up of tents, sleeping, and governance on Dewey Square is expressive conduct and symbolic.*" <u>Occupy Boston v. City of Boston</u> (11-4152-G, Superior Court Civil Action, Commonwealth of Massachusetts, 2011, slip p at 2, 12/7/2011)(available online <u>http://aclum.org/sites/all/files/legal/occupy_boston/Memorandum_and_Decision.pdf</u>. ["*The Plaintiffs will likely prevail on their claim that their tent city is expressive conduct. With their occupation of Capitol Park across from the Capitol, the Plaintiffs intend to convey a particularized message on behalf of those who have been unfairly excluded from participation in government. The Plaintiffs also intend to model an ideal form of governance…. In this case, the October 2008 stock market crisis, subsequent bank bailouts, high unemployment, deflation of the housing market, rise in foreclosures, and increasing disparity between the incomes of the highest wage-earners and the low and middle- income earners are all well-known and have set the stage for the Occupy movement. Groups associated with Occupy Wall Street have coalesced in cities around the nation and their protests have received wide coverage in the press. Those who view*

*the tent cities erected by the Occupy movement in general and by Occupy Augusta in particular are likely to understand that these tent cities in parks and squares near centers of government and finance symbolize a message about the unequal distribution of wealth and power in this country.*"]

246.     At least two other district court judges have held that the Occupy movement's tent cities and overnight camping are protected speech under the First Amendment. Occupy Minneapolis v. County of Hennepin, ___ F.Supp.2d ___, 2011 WL 5878359 at *4 (D. Minn., Nov. 23, 2011); Occupy Ft. Myers v. City of Ft. Myers, ___ F.Supp.2d ___, 2011 WL 5554034 at *5 (M.D. Fla., Nov. 15, 2011) (collecting cases).  Occupy Augusta v. Maine Commissioner of Public Safety (USDC Maine 11CV00452(NT) slip op. at 10-12, 12/7/2011), available online at

http://www.med.uscourts.gov/Opinions/Torresen/2011/NT_12072011_1-11cv_452_James_Freeman_v_John_Morris.pdf; see also, Occupy Minneapolis v. County of Hennepin, ___ F.Supp.2d ___, 2011 WL 5878359 at *4 (D. Minn., Nov. 23, 2011); Occupy Ft. Myers v. City of Ft. Myers, ___ F.Supp.2d ___, 2011 WL 5554034 at *5 (M.D. Fla., Nov. 15, 2011), Occupy Oklahoma (Isbell) v. Oklahoma City, (11CV01423)(12/2/11)); Occupy Nashville v. Governor Haslam, (11CV01037 10/31/11), Occupy Denver v. City of Denver, (11CV03048, 12/7/1).

247.     To withstand constitutional scrutiny, government restrictions of public issue speech in a public forum must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression.  Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006).

248.    The restrictions on speech at issue here are not content neutral, since the police

are allowing some people to assemble and speak in these public spaces, while the

Plaintiffs as OWS participants have been barred and/or removed.

249.    Content based restrictions on speech by government must be subjected to "the

most exacting scrutiny".  The regulation must be necessary to serve a compelling state

interest that it is narrowly drawn to achieve that end.  Boos v. Barry, 485 U.S. 312, 321

(1988).

250.    In public debate, even insulting and outrageous speech (a level not reached by

OWS protesters) must be tolerated by citizens in its public fora in order to provide

"adequate breathing space" for the freedoms protected by the First Amendment.  For

example, in Snyder v. Phelps, 131 S.Ct. 1207 (2011), the Court denied the claim of a

father who sued for intentional infliction of emotional distress when his son's funeral was

picketed by the Westboro Baptist Church.  The picketers displayed signs stating, for

example, "Thank God for Dead Soldiers," "God Hates You", "Fags Doom Nations,"

"America is Doomed," "Priests Rape Boys," and "You're Going to Hell".  Id. At 1216-

1217.  Even this speech and this protest, because it was about public issues, and took

place in a public space adjacent to a public street, was held to be protected by the First

Amendment.  See also Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 56 (1988) and

Boos at 381.

251.    By allowing individuals to remain and assemble in public spaces unmolested for

days and weeks in pursuit of commercial and non-political purposes[4] that Defendant City

---

[4] See, e.g., "Final Installment Of 'Harry Potter' Series

deems more desirable, while conducting mass arrests and employing excessive force against individuals assembling and remaining in public places for discussion of public issues involving the effects of income inequality on society, Defendant City is engaging in impermissible content-based restrictions in its policing of public fora.

252.    However, even assuming *arguendo* that NYPD's restriction on OWS speech is somehow content neutral, the restriction is in no way a reasonable time, place and manner restriction.

253.    Content neutral time, place and manner restrictions on speech must be narrowly tailored to serve a significant governmental interest, and ample alternative channels for speech must be available.  Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 648 (1981).

254.    As will be shown in the factual allegations below, numerous police actions against OWS participants that were intended to prevent OWS participants from entering or remaining in nominally publicly accessible open areas are not content neutral, and in any case, do not and would not amount to reasonable time, place and manner restrictions.

3.  Factual Allegations Relating to Public Space Issues

---

Holds U.S. Premiere At Lincoln Center[;] Some Fans Camp Out For Week For Chance To Glimpse Hogwarts Crew" CBS New York, July 11, 2011, incorporated by reference herein and available online at http://newyork.cbslocal.com/2011/07/11/harry-potter-fans-camp-out-at-lincoln-center-for-u-s-premiere/; see also Lucadamo, Kathleen, "Lady Gaga fans camp outside 'SaturdayNight Live' for days in hopes to score
Tickets," New York Daily News, May 20, 2011, incorporated herein by reference and available online at http://articles.nydailynews.com/2011-05-20/entertainment/29583913_1_lady-gaga-fans-tickets-season-finale; see also Bilton, Nick, "iPad Resellers Now Camp Overnight at Apple Stores," New York Times, April 15, 2011, incorporated by reference herein and available online at http://bits.blogs.nytimes.com/2011/04/15/ipad-resellers-now-camp-overnight-at-apple-stores/.

255.    The City of New York has engaged in a pattern and practice of barring OWS participants from engaging in public speech and peaceful assembly since on or around September 17, 2011, the day OWS began.

256.    Defendant City of New York has continued this pattern and practice of barring OWS participants from engaging in public speech and peaceful assembly to date.

257.    Defendant City of New York has continued this pattern and practice of barring OWS participants from engaging in public speech and peaceful assembly and has conspired with other public and private entities to do so unlawfully.

258.    On September 17, 2011, peaceful OWS participants gathered at Bowling Green in Manhattan and marched to Wall Street, but were prevented from entering Wall Street on a Saturday by police officers and barricades.

259.    On information and belief, most of the businesses and offices surrounding the area of Wall Street that was closed by NYPD officers on Saturday, September 17, 2011 were already closed or in limited operation on Saturday, September 17, 2011.

260.    On information and belief, the area of Wall Street that was closed by NYPD officers on Saturday, September 17, 2011 has relatively few residences, as compared to most other blocks in New York City.

261.    On information and belief, no reasonable time, place or manner restriction existed to justify the acts of agents of Defendant City in closing the area of Wall Street that was closed by NYPD officers on Saturday, September 17, 2011.

262.    On information and belief, these police officers and barricades were present for the sole purpose of preventing a group of individuals from undertaking their intended shared act of peaceful expressive assembly, to wit, occupying Wall Street.

263.    From Wall Street, the OWS participants marched to the outdoor plaza space located at One Chase Manhattan Plaza ("One Chase Manhattan Plaza"), a publicly accessible open space, to hold a General Assembly meeting, but were met there as well with police barricades and NYPD officers.

264.    On information and belief, the police barricades and NYPD officers present at One Chase Manhattan Plaza on Saturday September 17, 2011, were present for the sole purpose of preventing OWS participants from entering said open, outdoor plaza.

265.    On information and belief, the businesses and offices located in the buildings around One Chase Manhattan Plaza are either closed or in limited operation on Saturdays and Sundays.

266.    On information and belief, the area encompassing One Chase Manhattan Plaza that was closed by NYPD officers on Saturday, September 17, 2011 has relatively few residences, as compared to most other blocks in New York City.

267.    On information and belief, no reasonable time, place or manner restriction existed to justify the acts of agents of Defendant City in closing the area encompassing One Chase Manhattan Plaza that was closed by NYPD officers on Saturday, September 17, 2011.

268.    On information and belief, the NYPD's closure of One Chase Manhattan Plaza on Saturday, September 17, 2011, was undertaken for the express purpose of preventing a group of individuals from peaceably assembling to discuss issues of public concern, including but not limited to social issues arising from income inequality.

269.    On information and belief, the NYPD's closure of One Chase Manhattan Plaza on Saturday, September 17, 2011, and subsequent actions undertaken preventing OWS participants from accessing same, were undertaken pursuant to an agreement between Defendant City of New York and Defendant J.P. Morgan Chase intended to impose non-content-neutral restrictions on individuals' rights to free speech and assembly as guaranteed by the New York State and Federal Constitutions.

270.    On information and belief, the NYPD's closure of One Chase Manhattan Plaza on Saturday, September 17, 2011, and subsequent actions undertaken preventing OWS participants from accessing same, constituted joint actions undertaken by Defendant City of New York and Defendant J.P. Morgan Chase intended to impose non-content-neutral restrictions on individuals' rights to free speech and assembly as guaranteed by the New York State and Federal Constitutions.

271.    Police Spokesman Paul J. Browne explained that prior to September 17, the plans for the meeting and protest were "well known publicly."  See Exhibit M.

272.    One Chase Manhattan Plaza is a product of bargaining undertaken by Defendant City of New York's City Planning Commission, on behalf of the citizens of the City of New York with the private developers who developed One Chase Manhattan Plaza.

273.    In return for said developers creating a plaza designated for public use and enjoyment, Defendant City allowed a zoning variance to build the One Chase Manhattan Plaza.  See Exhibit N, from New York Times, December 7, 1955.

274.    In building One Chase Manhattan Plaza, authorization was sought and granted to de-map a portion of Cedar Street to join two parcels of land upon which One Chase Manhattan Plaza was built.  See New York City Landmarks Preservation Commission, One Chase Manhattan Plaza Landmark Designation Report, February 10, 2009, Designation List 410, LP-2294.

275.    Though One Chase Manhattan Plaza is privately owned, it exists as a creation of a consummated bargain between a private actor and government.  Thus, it has its genesis in a combined effort between government and a private actor.

276.    In the generations since its construction, One Chase Manhattan Plaza has traditionally been used as a public space for public speech.  For example, in 2009, it was the site of a group demonstrating against home disclosures – NACA – that was undisturbed by police or by private security.

277.    Before September 17, 2011, persons would regularly gather and meet at One Chase Manhattan Plaza, to speak to one another, eat meals, and engage in substantially all of the activities that are commonly undertaken in public spaces.

278.    On September 17, 2011, Plaintiffs Justin Wedes and Peter Dutro were among the individuals who sought to enter One Chase Manhattan Plaza, and were prevented from doing so by Defendants.

279.     From September 17, 2011 to at least October 12, 2011, New York City police officers and police department barricades prevented OWS participants from entering One Chase Manhattan Plaza for the purpose of engaging in public issue speech and peaceful assembly.

280.     One Chase Manhattan Plaza is a public space that is open 24 hours a day, 7 days a week.

281.     On information and belief, members of the NYPD, including but not limited to Defendants, willfully and intentionally prevented the entry of OWS participants to One Chase Manhattan Plaza to deter individuals from engaging in peaceable assembly and speech regarding particular matters of public concern.

282.     After September 17, 2011, police barricades and police presence remained around One Chase Manhattan Plaza, preventing the entry of OWS participants.

283.     On October 12, 2011, OWS participants including Plaintiff Peter Dutro walked to One Chase Manhattan Plaza to protest the unfairness of the New York State Tax Code and to present J.P. Morgan CEO Jamie Dimon with a large symbolic check, representing the tax breaks he would receive under said tax code.  See Michael Herzenberg, "Four Arrested As "Occupy Wall Street" Protesters Rally At JPMorgan Chase HQ," New York 1, October 12, 2011, incorporated by reference herein and available online at http://www.ny1.com/content/148841/four-arrested-as--occupy-wall-street--protesters-rally-at-jpmorgan-chase-hq.

284.     Police barricades and officers prevented OWS participants from entering One Chase Manhattan Plaza.

285.    The October 12, 2011 OWS participants were not employing amplified sound on the walk to One Chase Manhattan Plaza or at One Chase Manhattan Plaza.

286.    The October 12, 2011 OWS participants were not sufficiently numerous to fill the entirety of the public plaza at One Chase Manhattan Plaza.

287.    On information and belief, even if allowed into said public plaza, the October 12, 2011 OWS participants would not have precluded others from use and enjoyment of said public plaza by their presence or expressive activities.

288.    On information and belief, even if allowed into said public plaza, the October 12, 2011 OWS participants would not have precluded others from access to buildings adjacent to the public plaza by their presence or expressive activities.

289.    It can hardly be said that prevention of a gathering of people in a very large plaza without sound amplification, without blocking doorways or ordinary pedestrian traffic, without any inconvenience to the public whatsoever, save the inconvenience to those who are not receptive to the content of their speech and purpose of their assembly, is a compelling or even significant government interest.

290.    Indeed, allowing OWS participants into the public plaza would very likely have caused less public inconvenience than forcing them to stay on the sidewalk.

291.    Moreover, particularly as it relates to the October 12, 2011 protest, there was no suitable alternative channel for the protest.  It was meant as a message to the CEO Jamie Dimon of J.P. Morgan Chase, whose headquarters is at One Chase Manhattan Plaza.

292.    On information and belief, the NYPD has repeatedly undertaken arbitrary closures of various public spaces on a number of occassions to stop OWS public speech and assembly, cutting off forums for speech as OWS participants attempt to use them.

293.    Upon information and belief, between September 17, 2011 and October 12, 2011, people who were not OWS participants were not prevented by NYPD from entering and remaining on the One Chase Manhattan Plaza to engage in speech and assembly activities.

294.    At some point after October 12, 2011, the police barricades were removed and were replaced by a high fence surrounding the entire publicly accessible open area.  The fence has been there 24 hours a day, seven (7) days a week since it was put up.

295.    On information and belief, the fence now surrounding One Chase Manhattan Plaza is owned by the private property owners of One Chase Manhattan Plaza.

296.    On information and belief, the erection of this fence around One Chase Manhattan Plaza is nothing more than a continuation of the policies, customs and/or practices of Defendant City and NYPD to prevent OWS participants from entering public spaces to peaceably assemble and engage in expressive activities and speech on matters of public concern.

297.    The fence at One Chase Manhattan Plaza could not have been erected without coordination with Defendant City, including but not limited to permitting for said fence and coordination with the NYPD to take down NYPD barriers.

298.    On information and belief, the NYPD is intertwined with the continuing practice of content-based restrictions on Constitutionally protected activities, and is a participant in implementing and enforcing said content-based restrictions.

299.    On information and belief, Defendant J.P. Morgan, the owner of One Chase Manhattan Plaza, has participated as a joint actor with the NYPD, and J.P. Morgan is intertwined with the NYPD in the continuing practice of content-based restrictions on speech and assembly.

300.    On information and belief J.P. Morgan Chase has engaged in joint action with Defendant City of New York in implementing and enforcing the content-based restrictions which occurred at one Chase Manhattan on September 17, 2011 and October 12, 2011, the space of time in between, and thereafter.

301.    These efforts at implementing and enforcing the content-based restrictions have precluded OWS activists, including Plaintiffs Peter Dutro and Yonatan Miller, from entering One Chase Manhattan Plaza to exercise their rights pursuant First and Fourteenth Amendment.

302.    On information and belief, since September 17, 2011, security guards at One Chase Manhattan Plaza allow certain people to enter while others are barred.

303.    OWS participants are prohibited from entering One Chase Manhattan Plaza.

304.    As of April 30, 2012, there was no construction occurring at the public space at One Chase Manhattan Plaza.

305.    There are no apparent safety concerns that would reasonably preclude the presence of OWS participants from One Chase Manhattan Plaza.

306.    On information and belief the fence at One Chase Manhattan Plaza could not have been erected without the coordination of Defendant J.P. Morgan Chase with Defendant City of New York, with such coordination including, but not limited to, permitting for said fence and coordination with the NYPD to take down NYPD barriers as new private barriers to access were emplaced.

307.    On information and belief, the NYPD is intertwined with J.P. Morgan in the continuing practice of content-based restrictions on Constitutionally protected activities, and they are both participants in implementing and enforcing said-content-based restrictions.

308.    This preclusion from One Chase Manhattan Plaza of OWS activists, including Plaintiffs Miller and Dutro, is a violation of their rights pursuant to the First and Fourteenth amendments to the Federal Constitution and is prohibited according to the principles enunciated in Marsh v. Alabama, 326 U.S. 501 (1946).  Accordingly, it was not lawful.

309.    As in Marsh, those citizens who are not precluded from entering the controverted space have been precluded from access to the message of those considered unsuitable to enter same.

310.    On information and belief, the gate and security around the public space at One Chase Manhattan Plaza is nothing  more than another manifestation of the City policy, custom and/or practice of keeping OWS participants out of One Chase Manhattan Plaza

and other public spaces closely related to the target audiences of OWS expressive activities, to wit, financial institutions that have played significant roles in the current economic crisis and that have lobbied heavily to reduce government oversight of financial markets.

311.    On information and belief, Defendant City of New York's policy, custom or practice of keeping OWS participants out of One Chase Manhattan Plaza and oher public spaces closely related to the target audiences of OWS expressive activities is an impermissible content-based restriction on First Amendment protected expressive activities.

FKA Liberty Park

312.    FKA Liberty Park (Zuccotti Park) is a publicly accessible open area under the 2007 Zoning Resolution.

313. The NYPD and Defendant Brookfield Properties, the property owners of FKA Liberty Park, have alleged in court proceedings that responsibility for FKA Liberty Park was transferred to the City on November 15, 2011.  Exhibit J.

314.    At about 1:00 a.m. on November 15, 2011, the NYPD forcibly removed OWS participants from the park.

315.    Many of those arrested on November 15, 2011 at FKA Liberty Park were not provided with a realistic opportunity to leave FKA Liberty Park.

316.    However, on November 15, 2011, at approximately 8:30 a.m., Justice Billings of the Supreme Court of the County and State of New York issued a Temporary Restraining

Order, enjoining the City and NYPD from forcibly removing OWS participants from the park and permitting their re-entry into the park, with their equipment and personal effects, during the pendency of the litigation.  Attached as Exhibit O.

317.    City attorneys were present in the courtroom when the ruling was made.

318.    Defendant City had immediate notice of this ruling.

319.    Nevertheless, the NYPD violated Justice Billings' order, refusing entry of OWS participants in a flagrant and blatant violation of the rule of law.   See Video of man showing cops the order and the punched woman, attached hereto as Exhibit G, at timestamps 8:07-8:59.

320.    Clearly, it was the City's decision to continue its policy of restricting the Constitutional rights of OWS participants to blatantly flout a judicial order ordering that OWS participants be allowed to re-enter FKA Liberty Park.

321.    Later on November 15, 2011, Justice Stallman of the Supreme Court of the State and County of New York, denied a Temporary Restraining Order application brought by a participant in Occupy Wall Street, and permitted the City and Brookfield Properties to enforce laws and rules at FKA Liberty Park to prohibit "the erection of structures, the use of gas or other combustible materials, and the accumulation of garbage and human waste…" Waller et al. v. City of New York et al., New York Supreme Index No, 112957/11, Motion Sequence No. 001, 11/15/11 Order of Justice Stallman. A copy of the Order is attached as Exhibit P.

322.     Ironically, the City then immediately erected structures, to wit, barriers and barricades, at FKA Liberty Park to prevent citizens from engaging in peaceful assembly and free speech that have nothing to do with the health or safety concerns of the public.

323.     In addition to the two layers of metal barricades placed around FKA Liberty Park, the NYPD had officers stationed around the perimeter of FKA Liberty Park, and arbitrarily barred some persons from entry into the park, while allowing others to enter unmolested.

324.     For several months after November 15, 2011, NYPD officers, in concert with private security entities, conduct arbitrary searches of bags and other personal containers of certain people entering FKA Liberty Park, but not others, in violation of the Fourth Amendment.  See MacWade v. Kelly, 460 F.3d 260, 267 (2d Cir. 2006).

325.     On information and belief, for several months after November 15, 2011, the NYPD was barring entry to FKA Liberty Park and conducting searches of persons who, in individual officers' perceptions and stereotypes, appeared to be OWS participants.

326.     On information and belief, police were engaging in content specific regulation of OWS speech.

327.     Over this time, the NYPD would not allow a OWS participant to enter FKA Liberty Park if a determination was made that the entry could be denied.

328.     On information and belief, NYPD Officers' reasons for barring OWS participants entry to FKA Liberty Park include, but are not limited to (a) carrying too large of a bag; (b) carrying a musical instrument; (c) carrying food for more than one person such as a pizza pie or box of cupcakes; (d) carrying books; or (e) carrying a chair.

329.    This practice of conditioning entry to a public space on submission to warrantless searches --without probable cause-- chilled the ability of many individuals to engage in Constitutionally protected speech.

330.    This practice of allowing NYPD Officers to arbitrarily deny individuals access to a public space, putatively for carrying food, books, or bags into a public space where those items are not proscribed, chilled the ability of many individuals to engage in Constitutionally protected speech.

331.    At some point after November 15, 2011, the barricades were taken down from the perimeter of the FKA Liberty Park.

332.    Even then, the barricades remained in and near FKA Liberty Park.

333.    On information and belief, the barricades were and are being kept close to FKA Liberty Park after being removed to facilitate Defendant City of New York and its agents' future use of said barricades at FKA Liberty Park to chill and curtail future expressive activities.

334.    On information and belief, the barricades were and are being kept close to FKA Liberty Park as a tacit threat of future use of said barricades at FKA Liberty Park to chill and curtail future OWS-related expressive activities.

335.    On March 17, 2012, the six month anniversary of day one of Occupy Wall Street, the  NYPD unlawfully 'closed' the park, violently arrested more than seven peaceful OWS participants and erected the barricades once again.

336.    Regardless of the ownership of the barricades that remain at the site, clearly the City is very involved and intertwined with the property owner in asserting responsibility

for the publicly accessible open space and therefore, the City is and will be held responsible if the barricades are deployed to block entry.

100 William Street

337.    On January 1, 2012, at approximately 7 p.m., OWS participants gathered to hold a General Assembly meeting in the atrium of 100 William Street.

338.    The atrium of 100 William Street is a "privately owned public space" and is considered a "public plaza" within the rubric of Defendant City of New York's Zoning Resolution.

339.    A "public plaza" is an open area for public use provided in accordance with the requirements set forth in New York City Zoning Resolution 37-70, inclusive.

340.    The City of New York's Zoning Resolution states at § 37-727 that "[a]ll #public plazas#[sic] shall be accessible to the public at all times, except where the City Planning Commission has authorized a nighttime closing, pursuant to the provisions of this Section."  Available online at http://www.nyc.gov/html/dcp/pdf/zone/art03c07.pdf

341.    The atrium at 100 William Street, owned by Defendant Mitsui, has a clearly visible sign stating: "REQUIRED TO BE OPEN TO THE PUBLIC FROM 7AM TO MIDNIGHT".  See Complaint, Ex. G at timestamps 19:00-19:27.

342.    Plaintiff Yonatan Miller was among the OWS participants gathered at 100 William Street on January 1, 2012.

343.    As Plaintiff Miller and others gathered, police officers and Supervisors arrived.

344.    Defendant Deputy Inspector Edward Winski, backed up by numerous officers, demanded that the OWS participants leave the area.

345.    Defendant Deputy Inspector Winski was told by various OWS participants present that the plaza at 100 William Street was public space.

346.    Defendant Deputy Inspector Winski responded that the owners of 100 William Street, i.e., Defendant Mitsui Fudusan, believed this to be private space.

347.    The OWS participants pointed out to Defendant Deputy Inspector Winski that they were entitled to be there under the publicly accessible open area's rules, and pointed to legally required signage in the public plaza that stated in large letters, "REQUIRED TO BE OPEN TO THE PUBLIC FROM 7AM TO MIDNIGHT."

348.    Defendant Winski and the other officers allowed other citizens to enter the public area, only barring the OWS participants.

349.    Plaintiff Miller and other OWS participants were threatened with arrest if they did not comply with the forcible removal instigated by Defendant Winski.

350.    There was no legal or Constitutional basis for Defendant Winski to forcibly remove the OWS participants.

351.    Defendant Winski responded to the OWS participants claim that they had the right to be in this public space by threatening to arrest them and process them overnight, telling them they can leave or he will arrest them and they will be incarcerated until the morning when they could explain his illegal actions "to the judge."  See Exhibit G at timestamp 18:30.

352.    Exhibit G, at timestamps 17:43-20:53 is a video of this incident.

353.    In entering and remaining within the atrium at 100 William Street during the listed open hours, Plaintiffs were not trespassing because posted sign indicates that the public is not precluded from entering the space.

354.    100 William Street is a "privately owned public space"; and, therefore, the parameters for its use are determined by the City of New York Zoning Resolution §§ 37-70 to 37-78.

355.    With respect to the atrium of 100 William Street, the duty to ensure access consistent with the Zoning Resolution was delegated to Defendant Mitsui.

356.    On information and belief, Mitsui and the NYPD precluded Plaintiff Yonatan Miller, and other OWS protesters, from exercising First Amendment rights inside the privately owned public space of 100 William Street.  The NYPD informed him and other OWS protesters that they would be arrested if they pursued entry into the space.  While Plaintiff and the OWS protesters were precluded from entering, other members of the public were allowed into the space.  See Exhibit G.

357.    Defendant Deputy Inspector Winski claims in Exhibit G that an employee of Mitsui invited and encouraged the police to take this action and/or did not prevent the NYPD from taking this action.

358.    The responsibility for keeping the space open to the public within the parameters of Section 37-327 had been delegated to the private owner Mitsui in consideration for a building variance permitted to Mitsui or its predecessor.

359.    Because Defendant Mitsui was delegated a duty to provide access to the public according to the parameters of Section 37-327 of the Zoning Resolution, and deliberately declined to do so with respect to certain persons and not others, in violation of the procedures set forth in the Zoning Resolution, Mitsui is liable for the violation of Plaintiff Yonatan Miller's first amendment rights.

360.    Therefore, Mitsui and the NYPD acted jointly to discourage and preclude Yonatan Miller and other OWS participants from exercising their first amendments rights.

361.    Nothing in City of New York's Zoning Resolution's indicates that Misui, the owner of 100 William Street, has standing to determine use of this privately owned public space by any means but through the City of New York's City Planning Commission.  See generally New York City Zoning Resolution §§37-70 -- 37-78.

362.    The New York City Zoning Resolution does not indicate in any way that Mitsui's self-determined, spontaneous wish as to usage of 100 William Street has any particular weight or bearing on the City of New York's City of New York's City Planning Commission's determinations as to usage of 100 William Street.

363.    A reading of the City of New York's Zoning Resolution § 37-737 indicates that there is a very specific application procedure for limiting hours the hours of operation for a privately owned public space and that the hours may not be foreshortened according to the mere whim of the owner.  See Zoning Resolution § 37-737.  This section also prescribes the window of time necessary to achieve the approval of the Community Board and City Council; and therefore, underscores the fact that the process of winning

approval for varying the hours from 24-open access to the public is a time-consuming process involving multiple levels of review.

364.    In short, a unilateral and sudden decision by Defendant Mitsui, even if ratified by Defendant City of New York's agent, Defendant Deputy Inspector Winski, is not sufficient to disburden Defendant Mitsui of its obligations to keep the space open to all members of the public during posted open hours.

Winter Garden

365.    On December 12, 2011, OWS participants gathered at the Winter Garden to engage in Constitutionally protected speech and assembly activities.

366.    A reading of the signage at Winter Garden evinces that the hours of operation are 6 AM to midnight, daily. The OWS participants and journalists present, including Plaintiffs John Knefel, Paul Sullivan, Justin Wedes and Charles Meacham were in Winter Garden within the posted permissible time for use.

367.    Police came to the scene to remove the OWS participants.  Many people involved in the activities or covering the activities as journalists, but who were not engaged in any type of disorderly conduct, were charged criminally with trespass.

368.    The Winter Garden is a publicly accessible open area, and is owned by Brookfield Properties.

369.    In order to be charged with criminal trespass, it must be shown that a lawful order was given to leave the premises.

370.    Under the rules of the Winter Garden, the OWS participants were in the open space within the permissible time of use.

371.    Plaintiff John Knefel was at the Winter Garden recording the activities of the OWS participants on December 12, 2011.

372.    Plaintiff John Knefel was not engaged in any activity that could be construed as unlawful.

373.    Plaintiff John Knefel was nevertheless stopped from recording the arrests of OWS participants

374.    Plaintiff John Knefel was arrested.

375.    On April 23, 2012, all criminal charges against Plaintiff John Knefel were dismissed.

376.    Plaintiff Paul Sullivan was at the Winter Garden recording the activities of the OWS participants on or about December 12, 2011.

377.    Plaintiff Paul Sullivan was not engaged in any activity that could be construed as unlawful.

378.    Plaintiff Paul Sullivan was nevertheless stopped from recording the arrests of OWS participants

379.    Plaintiff Paul Sullivan was arrested.

380.    A New York Times photographer, Robert Stolarick, was present that day at the Winter Garden.

381.    Robert Stolarick is a member of Plaintiff NPPA.

382.    Robert Stolarick did have current NYPD press credentials.

383.    While he was photographing the arrests that are referenced in this complaint, he was physically blocked by members of the NYPD from doing his job as a member of the press.

384.    Mr. Stolarick continued to try to do his job, and members of the NYPD continued to try to block him from photographing these arrests. See video attached as Exhibit G, at timestamps 13:00-14:41.

385.    As set forth above, Plaintiff Charles Meacham, a freelance photojournalist, was present that day at the Winter Garden.

386.    Plaintiff Charles Meacham does not have NYPD-issued press credentials.

387.    While Plaintiff Charles Meacham was complying with an order to leave the Winter Garden, Defendant Deputy Inspector Tloczkowski ordered that Plaintiff Charles Meacham instead be arrested because he did not posess NYPD-issued press credentials.

388.    The charges brought against Plaintiff Charles Meacham from this incident were later dismissed.

389.    The carte blanche given to members of the NYPD to suppress First Amendment expression and press coverage of same over the course of the Winter Garden incident is reflected in the video of Plaintiff Paul Sullivan, who was arrested by a Defendant "John Doe" Police Officer for chuckling at said Defendant when said Defendant comically slipped on the Winter Garden's marble floor while pursuing an OWS participant.

390.    The City had no lawful purpose to prohibit all OWS participants from entering and remaining in the Winter Garden to engage in Constitutionally protected activity.


Union Square Park

391.    OWS participants, who have effectively been prevented from entering and remaining in One Chase Manhattan Plaza, FKA Liberty Park, 100 William Street and the Winter Garden, among others, have been holding general assembly meetings and conducting other expressive activities at Union Square Park.

392.    Union Square Park has for centuries been a meeting place for citizens to come together: to celebrate Union victories in the Civil War, and to mourn together, as after 9/11, and to rally and protest.

393.    Indeed, Union Square Park was the site of the first Labor Day parade in 1882.

394.    Union Square Park, as a matter of practice, has long been open to the public 24 hours a day, although as a City park, regulations state that it is open to the public from 6:00 a.m. to 1:00 a.m.  The South entrance to Union Square Park is a public sidewalk and has always been open to the public 24 hours a day.

395.    Nevertheless, just before midnight on March 21, 2012, police began barricading the South entrance of the park, dispersing OWS participants, and arresting those who they allege were not complying with their order.

396.    Plainly, the order to leave the South plaza of the park was arbitrary and illegal.

III.    DEFENDANTS CITY, MAYOR BLOOMBERG, COMMISSIONER KELLY
HAVE CONSPIRED WITH PRIVATE CORPORATIONS AND OTHER
GOVERNMENTAL ENTITIES TO SUPPRESS THE CONSTITUTIONAL RIGHTS
OF PLAINTIFFS AND OTHER OWS PARTICIPANTS TO PETITION THEIR
GOVERNMENT FOR REDRESS OF GRIEVANCES

397.    The examples noted above show a policy established by the Defendants City of

New York, Mayor Bloomberg, and Commissioner Kelly of specifically targeting Occupy

Wall Street participants and preventing them from engaging in Constitutionally protected

activities in publicly accessible open spaces.  These actions were not the mere activities

of private actors on private property, nor the mere enforcement of property laws by

public officials.  Rather, Plaintiffs' allegations demonstrate that they were the acts of

public actors acting in concert with private corporations to bar access to publicly

accessible open areas in furtherance of the governmental interests of the Mayor and the

private interests of corporations.

398.    As demonstrated by its supporting deposition in the Ronnie Nunez criminal

trespass case, Brookfield management has worked with police to have OWS participants

removed from its public spaces, actually transferring discretion and authority to NYPD to

order OWS participants off of publicly accessible open areas and forcibly removing

them.  See Exhibit K, attached.

399.    Police barricades were erected at One Chase Manhattan Plaza in advance of the

beginning of OWS in order to bar OWS participants from entering.  At some point after

October 12, 2011 police barricades were removed and, upon information and belief, a

private fence owned by Defendant J.P. Morgan was erected to keep OWS protesters out

of the Plaza.

400.    On information and belief, the close temporal proximity between the removal of the initial barriers and their replacement with the subsequent private fence shows that Defendant J.P. Morgan and state actors conferred and conspired to continue the violation of Constitutional rights of individuals seeking to gather and exercise their rights in said publicly accessible open area.

401.    On October 3, 2011, Defendant J.P. Morgan made the largest contribution ever to the New York Police Foundation, to wit, goods, services and cash totaling Four point Six Million Dollars ($4,600,000.00).

402.    The New York Police Foundation is closely associated with the NYPD.  A photo and a statement from Commissioner Ray Kelly appears on the home page of the New York Police Foundation's web site. http://www.nycpolicefoundation.org/netcommunity// See Exhibit Q.

403.    Defendant Mitsui officials conferred with Defendant NYPD Deputy Inspector Winski to violate the Constitutional rights of OWS participants when Defendant Mitsui, according to the words of Defendant Winski, told him that they were to be removed in violation of their rights.

404.    An agreement was formed between the state actors MTA and its police commissioner, and the state actors City of New York and its Mayor and Police Commissioner to violate the Constitutional rights of OWS participants in their jurisdictions.

405.    The MTA Commissioner was a high-ranking 26-year veteran of the NYPD when he left to become MTA Commissioner.  The MTA Commissioner served for approximately five years with NYPD's Public Information Division as its highest ranking

officer.  The Public Information Division has responsibility for handling the press.  Given this history, the MTA Commissioner would have had every opportunity to coordinate with NYPD in its response to OWS generally and handling the press specifically in connection with OWS.

406.    In each case, the conspiring entities or individuals acted in concert and committed overt acts to cause violations of the Constitutional rights of Plaintiffs and many other OWS participants.

407.    Just two years ago, the United States Supreme Court, in upholding the right of corporations to spend unlimited amounts of money on political campaigns, stated "[t]here is no basis for the proposition that, in the political speech context, the Government may impose restrictions on certain disfavored speakers.  Both history and logic lead to this conclusion." Citizens United v. Federal Elections Commission, 130 S.Ct. 876 at 883 (2010).

408.    Yet, Defendant City of New York, through its police department, in apparent deference to and in conjunction with large corporations, has restricted actual live people from speaking in the political speech context by ferreting out OWS participants and barring them from speaking in public spaces where others are allowed to assemble and speak freely.

409.    In light of the Citizens United decision, and the spectacle of corporate money crowding out other speakers from the political process, it is more important than ever that the public square be available to all people, especially those with fewer resources, to freely express opinions.

410.    The City, the Mayor and the  police force, have conspired with the Defendant

private corporations and other governmental entities to effectively impose a corporate

monopoly on political speech by barring OWS from traditional public squares and by

targeting press to suppress reporting on the crackdowns on the movement.


IV. FREEDOM OF SPEECH: DEFENDANTS HAVE ENGAGED IN
SYSTEMATIC VIOLATIONS OF LAW AND CONSTITUTIONAL
GUARANTEES INTENDED TO CHILL THE FIRST AMENDMENT RIGHTS OF
OCCUPY WALL STREET PARTICIPANTS TO EXPRESS OPINIONS ON
MATTERS OF PUBLIC CONCERN

    a.    NYPD OFTEN OVERCHARGES PEACEFUL PROTESTERS WITH
    RESISTING ARREST IN ORDER TO HOLD THEM OVERNIGHT RATHER
    THAN RELEASE THEM WITH DAT'S

411.    According to NYPD Patrol Guide section ("PG") 208-27, various arrestable

offenses should result in the issuance of a Desk Appearance Ticket.

412.    One of the disqualifications of eligibility for receiving a Desk Appearance Ticket

is the charge of resisiting arrest.  PG 208-27(4)(s).

413.    A Defendant that is otherwise eligible to receive a Desk Appearance Ticket will

lose such eligibility, and will subsequently be held overnight and be processed through

the system, if one of the charges preferred against such an individual by police is resisting

arrest.

414.    Often times, this charge will be added to a docket regardless of whether factual

conduct existed that would sustain a prima facie charge of resisting arrest.

415.    It is well recognized in New York's First Appellate Department's jurisprudence,

which controls in Manhattan, that affirmative conduct intended to prevent an an arrest is required to support a charge of resisting arrest under PL §205.30.  People v. Arbeiter 169 Misc.2d 771, 774 (1996).

416.    Often times during peaceful OWS protests, individuals will be charged with resisting arrest as a punitive charge so that they would become ineligible to receive a Desk Appearance Ticket.

417.    Often times, when a Defendant is wrongfully charged with resisting arrest, the charge itself is dropped by the District Attorney's office.

418.    Distinctly, the charge of Obstruction of Governmental Administration, triggers a discretionary decision to be made by a member of the NYPD whether to issue a Desk Appearance Ticket or not. PG 208-27(4)(t*) "A person arrested for Obstruction Governmental Administration 2nd Degree may be issued a DAT if he/she engaged in uncooperative actions and is otherwise qualified."

419.    The charge of resisting arrest does not trigger any discretionary decision.  Upon information and belief, the charge of resisting arrest is often added to an array of charges by the NYPD against OWS participants as an unconstitutional chill on an individual's right to peacefully assemble and engage in expressive speech by punishing such conduct with an overnight incarceration rather than the issuance of a Desk Appearance Ticket.

420.    Further information regarding the NYPD's continuing pattern and practice of charging individuals with Disorderly Conduct, Resisting Arrest, and Obstruction of

Governmental Administration in retaliation for perceived "Contempt of Cop" is contained in Appendix I, incorporated by reference herein.

b.    NYPD PHOTOGRAPHS ARRESTEES AND, UPON DISMISSALS, DOES NOT RETURN THE PHOTOTGRAPHS TO THE INNOCENT ARRESTEE IN VIOLATION OF STATE PRIVACY LAW

421.   Plaintiffs and other OWS participants have been arrested and taken to One Police Plaza and police precincts under police custody.

422.   While at One Police Plaza and other precincts, police personnel take photographs of the individual arrestees, in contradiction to customary police practice.

423.   The NYPD Patrol Guide at PG 208-07 provides a list of "photographable offenses."  (Attached as Exhibit R).  It includes all felonies and a list of misdemeanors as photographable offenses.

424.   PG 208-07 does not designate disorderly conduct as a photographable offense.

425.   PG 208-07 does not designate resisting arrest as a photographable offense.

426.   PG 208-07 does not designate obstruction of governmental administration in the second degree as a photographable offense.

427.   PG 208-07 does not designate any degree of misdemeanor or violation trespass as a photographable offense.

428.   The Plaintiffs, and indeed nearly all OWS arrestees, have not been arrested for photographable offenses.

429.   Nevertheless, NYPD officers have photographed substantially all OWS arrestees.

430.   On information and belief, one purpose of this practice of improper photographing of arrestees is to facilitate prosecutions in mass arrests by providing deponent officers and testifying officers with a reference as to which particular arrestee

78

they will allege undertook particular conduct.

431.   On information and belief, the allegations against these mass arrestees are generally fabricated to support arrests undertaken in the absence of probable cause to chill Constitutionally protected expression.

432.   On information and belief, deponent officers and testifying officers setting forth allegations regarding mass arrestees need photographic references and other materials to consistently set forth their allegations because the allegations against the mass arrestees are generally not based on validly criminal conduct observed by any officer.

433.   In the aftermath of the unlawful closure of FKA Liberty Park on or about March 17, 2012, a number of individuals were detained by the NYPD for more than ten hours, photographed and then released without charges.

434.   NYPD photographs OWS arrestees and does not return the photographs to the arrestee, nor, upon information and belief, destroy them when they are found not guilty by a competent court.

435.   The failure to return or destroy the photographs violates New York State's guarantees of privacy set forth in its Criminal Procedure Law.

436.   Crim. Pro. L. § 160.50 provides that fingerprints and photographs of Defendants whose charges are terminated favorably must be returned to the person or destroyed "forthwith."

437.   Nevertheless, the NYPD often flouts the law by retaining photographs, sometimes using them for photo arrays and other investigation techniques, in direct contravention of the letter and spirit of the law.

438.   Upon information and belief, NYPD has not returned or destroyed photographs of

innocent arrestees in the OWS movement and Plaintiff.

439.   On November 15, 2012, Plaintiff Jeffery McClain was arrested, and on January 11, 2012, the charges against him were dismissed.

440.   A photograph was taken of him at 1 Police Plaza.

441.   On January 27, 2012, he wrote the police department to ask for the photograph or proof that it was destroyed.  Attached as Exhibit S.

442.   On February 15, 2012, the Department wrote back explaining that it would consider his request for 20 business days under the provisions of the Freedom of Information Law (FOIL).  Attached as Exhibit T.

443.   FOIL does not apply to this matter, and it is nothing more than an attempt at obstruction.

444.   On March 15, 2012, the Department wrote in further reply to Plaintiff McClain's lawful and proper request for the destruction of his photograph in police possession, stating that "numerous records must be reviewed in order to determine whether disclosure is required."  Attached as Exhibit U.

445.   The March 15, 2012 letter from the NYPD to Plaintiff McClain went on to state that Plaintiff McClain would receive a response by July 15, 2012.  Id.

446.   "[T]he purpose of CPL 160.50 is to protect accused individuals from the unauthorized use of their records."  Green v. Montgomery, 95 N.Y.2d 693, 701, 746 N.E.2d 1036, 1041 (2001).

447.   Crim. Pro. L. § 160.50 creates a liberty interest which cannot be deprived without due process of law under the Fourteenth Amendment to the United States Constitution. Anderson v. City of New York, 611 F. Supp. 481 at 489 (S.D.N.Y. 1985).

448.   The pattern of prior conduct of not returning or destroying photographs and fingerprints with deliberate indifference of the rights of innocent citizens makes the failure to follow the statute a violation of state law and Constitutional law.

V.        THE LACK OF RESPECT THE NYPD HAS FOR THE COMMUNITIES IT POLICES, AND FOR THE CONSTITUTION AND LAWS IT IS SUPPOSED TO UPHOLD, ALSO LEADS TO WIDESPREAD NYPD CORRUPTION AND CRIMINAL CONDUCT

449.   A simple review of police misconduct that was caught and led to arrests, indictments and/or police trials, since the beginning of the OWS movement just six months ago, overwhelmingly indicates that the Mollen Commission's recommendation for Command Control and Oversight is needed now, even more than it was twenty years ago.

450.   Individually, these particular acts may indicate a bad apple in an otherwise finely tuned administration of police security in New York City.

451.   Collectively, these individual acts indicate a systematic pattern of police conduct that strains the accountability that these officers owe the citizens and residents of New York City.

452.   On October 23, 2011, five current and three former members of the NYPD were arrested and charged federally with Conspiracy to Transport Fire Arms Interstate, Conspiracy to Transport Defaced Firearms Interstate, Conspiracy to Sell a Firearm to an

Out Of State Resident, Conspiracy to Transport and Receive Stolen Merchandise.  United States of America v. Masso, et al, 11MAG2730.

453.    Just five days later, on October 28, 2011, a ticket fixing scandal broke with the arrest of thirteen NYPD officers, two Sergeants and one Internal Affairs Lieutenant, who was charged with leaking information to union officials about the investigation that led to these arrests.

454.    The charges also included misconduct, grand larceny, records tampering and obstruction of governmental administration.

455.    The investigation began with the uncovering of an officer from the 40th precinct who was selling narcotics from a barbershop he owned in the Bronx.

456.    On January 17, 2012, NYPD Officer Jason Arbeeny, a 14 year veteran, was convicted of planting drug on two individuals.

457.    Testimony at the trial of Officer Arbeeny indicated that the planting of drugs was widespread in the Brooklyn South Narcotics Taskforce.  An individual named Melanie Perez testified at the Arbeeny trial that she was provided with narcotics by NYPD officers and then forced to perform sex acts.

458.    On January 29, 2012, NYPD Officer Monty Green was put through an NYPD departmental trial for acting as a pimp.

459.    On February 3, 2012, a retired NYPD Officer was found guilty of conspiracy to distribute cocaine and using, carrying, and possessing a firearm in connection with that

conspiracy.  See Jim Kouri, "Retired NYPD Officer Convicted In Bronx Drug Trafficking Conspiracy," examiner.com, February 4, 2012, incorporated by reference herein and available online at  http://www.examiner.com/public-safety-in-national/retired-nypd-officer-convicted-bronx-drug-trafficking-conspiracy.

460.    On February 25, 2012, an investigation was disclosed into NYPD Detectives from the 33rd Precinct for drinking on the job and either paying a waitress for sex or sexually assaulting her on February 16, 2012.  See Al Baker, "4 Detectives Suspected of Drinking on the Job," New York Times, February 24, 2012, incorporated herein by reference and available online at  http://www.nytimes.com/2012/02/25/nyregion/4-detectives-suspected-of-drinking-on-duty.html?_r=2.

461.    On March 7, 2012, the Village Voice reported on a 95 page NYPD report concerning the unlawful hospitalization of NYPD Officer Adrian Schoolcraft in retaliation for reporting *confidentially* to NYPD investigators that crime statistics were being manipulated by orders of precinct Commanding Officers to arrest citizens for doing little more than standing on the street corner while making it difficult for real victims of crimes to report such crimes.  Said NYPD report substantially confirmed Schoolcraft's claims.  See Graham Rayman, "The NYPD Tapes Confirmed," Village Voice, March 7, 2012, incorporated by reference herein and available online at

http://www.villagevoice.com/2012-03-07/news/the-nypd-tapes-confirmed/.

VI.    NYPD MISCONDUCT CAN BE EXAMINED IN  MICROCOSM BY
       VIEWING THE NYPD'S TREATMENT OF THE OCCUPY
       MOVEMENT

462.    On September 18, 2011, an arrest made by Defendant Deputy Inspector Winski

was one of the first made at Occupy Wall Street of an OWS participant.

463.    On this date, a peaceful march was taking place from FKA Liberty Park to Wall

Street.

464.    An individual in an orange hat passed Defendant Deputy Inspector Winski. This

individual in the orange hat was arrested and charged with resisting arrest and disorderly

conduct.

465.    NYPD Spokesperson Paul Browne stated in an e-mail to the media that this

individual was arrested as he tried to jump a barricade and resisted arrest.

466.    A NY Times article appeared that contradicted this statement, and seemed to

prove that the opposite was true, specifically, that Defendant Deputy Inspector Winski

was the individual who jumped a barricade to make this arrest.

467.    Photographs were posted on line that show the statement made by the NYPD was

inaccurate.  See Exhibit V, five photographs taken by NY Times photographer Robert

Stolarick.

468.    In a follow-up interview, NYPD Spokesperson Paul Browne stated to the NY

Times that he must have had his notes mixed up.

469.    Since that date, the NYPD has engaged in an intentional pattern to badger and bother both citizen and media press.

470.    On September 24, 2011, a senior officer of the NYPD, Deputy Inspector Anthony Bologna, was present in the vicinity of Union Square when a peaceful protest was taking place.

471.    Deputy Inspector Anthony Bologna approached a group of defenseless young women who were being held against their will by the NYPD in orange netting and sprayed them with NYPD-issued pepper spray, without apparent cause or provocation.

472.    At or about the same time, Deputy Inspector Anthony Bologna was walking on the sidewalk in and around Union Square when he again released a few various sprays of NYPD-issued pepper spray.

473.    Both moments of improper conduct were caught on video camera and subsequently posted on the internet.

474.    Recordings of these two serial incidents of misconduct by Deputy Inspector Bologna are available online at http://www.youtube.com/watch?v=TZ05rWx1pig and http://www.youtube.com/watch?v=gcl9mQPC-Xo, both last accessed 10/9/12.

475.    Upon information and belief, the NYPD initially sought to justify the use of pepper spray, and discount the posted videos.  However, after multiple videos were posted and received significant viewership, the NYPD conducted a *pro forma* investigation into the improper use of pepper spray by Deputy Inspector Anthony Bologna.

476.    On information and belief, Deputy Inspector Bologna was docked vacation days for his misconduct, but suffered no criminal sanction.

477.    Further acts of violence committed by the NYPD on September 24, 2011, were caught on video and published on the MSNBC program "The Last Word with Lawrence O'Donnell."

478.    On October 1, 2011, a peaceful march left FKA Liberty Park and eventually made its way to the Brooklyn Bridge.

479.    There is conflicting evidence of whether the NYPD led people onto the bridge, then trapped and arrested them.

480.    There is a lawsuit that was filed a few days later in the Southern District of New York challenging the conduct of the NYPD.  Garcia et al v. NYC et al, 11CV6957 (JSR).

481.    As set out above, Plaintiff Stephanie Keith was working that day as a news photographer when she was arrested on the Brooklyn Bridge.

482.    The Manhattan District Attorney's Office dismissed all charges against Mrs. Keith in the interest of justice, due to her status as a working professional news photographer.

483.    On November 15, 2011, the NYPD at the behest of private property owners and the Defendant Michael Bloomberg, physically evicted peaceful protesters from FKA Liberty Park.

484.   Plaintiff Councilmember Ydanis Rodriguez was assaulted as he tried to observe the police interaction at FKA Liberty Park on November 15, 2011, in his capacity as a democratically elected member of the New York City Council.

485.   Plaintiff Democratic District Leader Paul Newell was assaulted as he tried to observe the police interaction at FKA Liberty Park on November 15, 2011, in his capacity as a democratically elected District Leader for the 64th Assembly District, Part C, Manhattan.

486.   On November 15, 2011, Plaintiff Michael Rivas was badly beaten by police officers as he tried to enter FKA Liberty Park.  He was arrested without warning or probable cause, and suffers permanent injuries as a result of the encounter.

487.    On November 15, 2011, Plaintiff Jeffery MCClain  went to lower Manhattan while FKA Liberty Park was being evicted.  He is a veteran of the Army and member of the Iraq War Veterans for Peace.  He was dressed in uniform and with a t-shirt showing his affiliation.

488.   When Plaintiff McClain was prevented from going to the park by members of the NYPD, he joined a march with other OWS particpants to Foley Square.

489.   OWS participants were being harrassed and intimidated by police at Foley Square.

490.   Due to this mistreatment, Plaitniff McClain, and many other OWS participants, began to march North.  When it appeared that all the marchers would be arrested, he broke off with about 20 others and marched down a side street.

491.    Plaintiff McClain and the twenty other OWS participants he was with, were quickly surrounded by police, even though they were breaking no laws.  Upon seeing another participant being brutalized by police officers while he was on the ground and not resisting, he tried to assist the person by pulling him away from the out-of-control police gang assault.

492.    Plaintiff McClain was immediately arrested and badly beaten by police officers, who repeatedly called him a traitor to his country and unfit for his uniform. See Exhibit W, photograph of Jeffery McClain.

493.    On November 15, 2011, a citizen of this great city was punched in the face by a member of the NYPD simply because she was presenting to this officer the Court Order authorizing the OWS participants back into Liberty Plaza.  See Video, Exhibit G.

494.    On November 15, 2011 and thereafter, members of the NYPD and other Defendants authorized the mass destruction of the property of the OWS participants and others.

495.    Notices of claim have been filed concerning this destruction of property by and on behalf of Occupy Wall Street, members of the Library of Occupy Wall Street and Global Revolution TV.

496.    On November 15, 2011, Plaintiff Timothy Fitzgerald, a citizen reporter, documented the destruction of property belonging to OWS participants by the NYPD, and was subsequently grabbed, pulled to the ground and arrested by NYPD officers.

497.     On November 17, 2011, during a peaceful protest in response to the eviction of FKA Liberty Park, NYPD entered Amalgamated Bank at 52 Broadway and arrested Plaintiff Peter Dutro.

498.     The criminal complaint filed against Plaintiff Peter Dutro set out that he was at the corner of Broadway and Exchange Place with approximately 50 other individuals.

499.     This was false, as Plaintiff Peter Dutro was in the confines of the Amalgamated Bank, and falsely arrested solely because Plaintiff Dutro had asked a peaceful protester who was being arrested, "What's your name?"

500.     The Manhattan District Attorney's Office dismissed the case against Plaintiff Peter Dutro after reviewing the security video from Amalgamated Bank.

501.     On December 17, 2011 at the Winter Garden, Plaintiff Justin Wedes was targeted by Defendant Deputy Inspector Winski because of his status as citizen press.

502.     Although the video of Plaintiff Justin Wedes' arrest clearly shows he complied with the arresting officers and did not resist in any manner, he was charged with resisting arrest and held for more than forty (40) hours.

503.     On December 17, 2011 at the Winter Garden, Plaintiff John Knefel was arrested as a recognized citizen journalist because he did not have NYPD-issued press credentials. See video, Exhibit G, at timestamps 14:42-15:00.

504.     On or about December 17, 2011, at the Winter Garden, Plaintiff Paul Sullivan, a citizen journalist, was grabbed, pulled to the ground and arrested without warning or

probable cause.

505.    On December 17, 2011 at the Winter Garden, NY Times photographer Robert
Stolarick was harassed and physically blocked from doing his job as a professional press
photographer by members of the NYPD.  See Video, Exhibit G, at timestamps 13:00-
14:41.

506.    On or about January 1, 2012, at approximately 2:30 a.m., a group of people were
marching on the sidewalk on Second Avenue heading north.

507.    As the group approached 13th Street, they were stopped by the NYPD and
surrounded by officers of the NYPD on foot and on motor scooter.

508.    The individuals surrounded, began to chant, "why are we being detained, why are
we being detained."

509.    Some individuals sought to leave the area and the officers standing in their path
pushed these individuals back.  At the same time, the officers on motor scooters,
maneuvered their scooters in a way to intimidate individuals with the fear that they would
be physically harmed by these officers on motor scooters if they tried to leave the area.

510.    More than twenty individuals were detained and arrested at 13th Street an Second
Avenue at approximately 2:50 a.m. on January 1, 2012 and subsequently issued Desk
Appearance Tickets.

511.    On the date that they were to appear in Court, the Manhattan District Attorney's
Office declined to prosecute substantially every one of these arrests.

512.    At least one lawsuit has been filed complaining of these January 1, 2012 unlawful arrests.  See Treffs v. The City of New York et al., SDNY 12-cv-3030 (HB)(KNF).

513.    On or about January 10, 2012, Plaintiff  Justin Sullivan was arrested and charged with multiple counts of assault while observing the arrest of another OWS participant in a public place, Grand Central Terminal.

514.    The video Exhibit clearly shows that Plaintiff Sullivan did not commit either assault, but that inconsistent police actions led to officers knocking themselves down, knocking down Plaintiff Sullivan, and even allowing a dog to bite an OWS participant that was in police custody.

515.    On March 17, 2012, a large group of OWS participants gathered in FKA Liberty Park for cultural classes, music and socializing.

516.     Defendant Deputy Inspector Edward Winski told OWS participant Dallas Pesola that he would be arrested that day, though Defendant Winski did not indicate why.

517.    Within a few hours, OWS participant Dallas Pesola was arrested at the behest of Defendant Deputy Inspector Edward Winski, charged with two counts of disorderly conduct and one count of resisting arrest, held for forty-eight hours before being arraigned and released.

518.    Later on March 17, 2012, without cause or legal right, high ranking members of the NYPD announced that this public space was now closed and anybody who remained would be arrested.

519.    Thereafter, high ranking members of the NYPD, including Lieutenants and Deputy Inspectors began to violently harm the OWS participants.

520.    More than seventy OWS participants were arrested that evening.

521.    Upon information and belief, every one of the arrested individuals were processed as overnight arrests and not issued Desk Appearance Tickets.

522.    Video of the violence brought to the peaceful protest by the NYPD can be seen here:

http://www.youtube.com/watch?v=_1AiNMAv2KI&feature=BFa&list=UUhwwoeOZ3E JPobW83dgQfAg&lf=plcp, last accessed 10/09/12.

523.    During the same series of arrests, a female OWS participant went into seizure while being arrested, yet she was not provided any medical attention and was literally left on a cold street of NYC for length of time before the NYPD finally carried her to a sidewalk.  One on the sidewalk, they did not seek to locate a medic or anyone to provide medical attention.  Video of this incident can be seen here

http://www.youtube.com/watch?v=An8OCm-Gl2U&feature=related, last accessed 10/09/12.

EQUITABLE RELIEF

524.    Injunctive relief is appropriate in this case because firstly, the Plaintiffs have shown that their Constitutional rights have been violated.  Lewis v. Casey, 518 U.S. 343 (1996).

525.    Secondly, Plaintiffs have shown that, in light of the continuous and ongoing nature of the Constitutional violations at issue, said violations are highly likely to recur.

526.    Where a Plaintiff's right to free speech has been infringed in the past, the chilling effect of future speech is a sufficient continuing injury to obtain injunctive relief. Secretary of State of MD. V. Joseph H. Munson Co., Inc., 467 U.S. 947 at 956-957 (1984).

527.    Where an individual officers' misconduct is officially authorized it is likely to recur, and therefore injunctive relief is appropriate.  City of Los Angeles v. Lyons, 461 U.S. 95 at 106.  See also Illinois Migrant Council v. Pilliod, 540 F.2d 1062, 1067 (7th Cir. 1976).

528.    Plaintiffs have standing, and injunctive relief is granted where they "allege a pattern of localized, intentional misconduct aimed at a particular set of identifiable individuals, those individuals satisfied the requirement that they show an imminent threat of injury."   Nat'l Council of La Raza v. Gonzales, 468 F. Supp. 2d 429, 442 (E.D.N.Y. 2007).

529.    For example, the court upheld standing and the availability of injunctive relief where Plaintiffs who had been falsely arrested in high drug areas feared further future injury because of the pattern of conduct exhibited by police and because the arrests took place in targeted geographical zones, i.e. high drug areas.  Roe v. City of New York, 151 F.Supp. 2d 495 (S.D.N.Y. 2001).  See also Zepeda v. U.S.I.N.S., 753 F.2d 719 (9th Cir. 1983); Illinois Migrant Council v. Pilliod, 540 F.2d 1062 (7th Cir. 1976); National Congress of Puerto Rican Rights v. City of New York 191 F.R.D. 52 (S.D.N.Y. 1999).

530.    Plaintiffs here have demonstrated that their Constitutional rights have been violated repeatedly.  That the violations are ongoing, and have taken place in recent days.

531.    Plaintiffs here have demonstrated that they have been targeted as members of a group, namely, OWS.  Therefore, each and every participant in OWS named here as a Plaintiff is entitled to relief and has standing to participate in this lawsuit.  Each Plaintiff is chilled from engaging in future public speech and peaceful assembly in connection with OWS.  Finally, the conduct by police has been almost certainly authorized by the City.

532.    Each of these factors, along with past injury, demonstrate the high likelihood that injury to Plaintiffs and other OWS participants are likely to recur; and further, that Plaintiffs exercise of their First Amendment rights have been chilled by the likelihood that the injury will recur.

533.    Therefore, Plaintiffs are entitled to injunctive relief.

FIRST CAUSE OF ACTION
VIOLATION OF CONSTITUTIONAL RIGHTS OF PLAINTIFFS
(UNITED STATES CONSTITUTION AND 42 USC § 1983)

534.    The above paragraphs and Appendix I below are here incorporated by reference.

535.    The above-referred acts by Defendants were undertaken under color of law.

536.    The above-referred acts by Defendants were undertaken in the exercise of Defendants' official duties.

537.    The above-referred acts by Defendants violated the Constitutional rights of Plaintiffs.

538.    Plaintiffs were injured as a result of Defendants' acts.

SECOND CAUSE OF ACTION
VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH BY
PREVENTING ELECTED OFFICIALS FROM OBSERVING AND RECORDING
POLICE ACTIONS AGAINST PROTESTERS
(FIRST AMENDMENT OF THE CONSTITUTION OF THE
UNITED STATES OF AMERICA AND 42 USC § 1983)

539.    The above paragraphs and Appendix I below are here incorporated by reference.

540.    On November 15, 2011, elected officials, including Plaintiffs Council members

Rodriguez and Williams and Democratic District Leader Newell were prevented by

NYPD officers from observing, recording and reporting on the clearance of FKA Liberty

Park for no lawful purpose.

541.    Plaintiffs Rodriguez and Newell were arrested for exercising their personal and

institutional roles to report on a major police mobilization.

542.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and

statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under 42 USC § 1983.

543.    As a result, the aforementioned Plaintiffs have been injured.

THIRD CAUSE OF ACTION
VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH BY
PREVENTING ELECTED OFFICIALS FROM OBSERVING AND RECORDING
POLICE ACTIONS AGAINST PROTESTERS
(ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW YORK,
STATE CONSTITUTIONAL TORT)

544.   The above paragraphs and Appendix I below are here incorporated by reference.

545.   On November 15, 2011, elected officials, including Plaintiffs Council members

Rodriguez and Williams and Democratic District Leader Newell were prevented by

NYPD officers from observing, recording, and reporting on the clearance of FKA Liberty

Park for no lawful purpose.

546.   Plaintiff Rodriguez and Newell were arrested for exercising their personal and

institutional roles to report on a major police mobilization.

547.   Defendants have deprived the above Plaintiffs of their civil, Constitutional and

statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under the New York State Constitution.

548.   As a result, the aforementioned Plaintiffs have been injured.

FOURTH CAUSE OF ACTION
ABUSE OF EXECUTIVE POWER BY PREVENTING MEMBERS OF THE
LEGISLATIVE BRANCH FROM OBTAINING INFORMATION ABOUT THE
CONDUCT OF A CITY AGENCY IN ORDER TO REVIEW ITS ACTIONS AND
TO MAKE LAW FOR THE GOOD RULE AND GOVERNMENT OF THE CITY
(THE CHARTER OF THE CITY OF NEW YORK, §§ 28 AND 29)

549.   The above paragraphs and Appendix I below are here incorporated by reference.

550.   Members of NYPD, a Mayoral City agency, prevented Plaintiffs Rodriguez and

Williams from observing the mass police action against OWS on November 15, 2011.

551.   In doing so, the executive branch of City government prevented them from

performing an official function, to wit, to gather information in furtherance of the role of

the City Council to review government activities and make law for the good rule of the City.

552.    Such action prevented Plaintiff Council members James and Mark-Viverito, as well as Rodriguez and Williams, from effectively conducting Charter mandated investigations and lawmaking responsibility.

FIFTH CAUSE OF ACTION
VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS
PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM OBSERVING
AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
(FIRST AMENDMENT OF THE CONSTITUTION OF THE
UNITED STATES OF AMERICA AND 42 USC § 1983)

553.    The above paragraphs and Appendix I below are here incorporated by reference.

554.    Members of the press, including Plaintiffs Justin Wedes and John Knefel have been routinely prevented by NYPD officers from observing, recording and reporting on OWS activities and police response to said activities.

555.    Reporters, including the above referenced Plaintiffs, were forcibly removed and sometimes arrested by NYPD officers from the scene of police actions against protesters for no lawful purpose.

556.    In addition, members of the press are targeted by police officers for arrest and harassment to deter them from recording and observing police activity.

557.    Furthermore, the deliberate and unlawful interference with and prevention of reporting about police activities in connection with the OWS movement violates the rights of all citizens, including all Plaintiffs in this suit, from being free of unlawful and unnecessary infringement of their free speech rights.

558.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and

statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under 42 USC § 1983.

559.    As a result, the aforementioned Plaintiffs have been injured.

SIXTH CAUSE OF ACTION
VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS
PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM OBSERVING
AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
(ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW YORK,
STATE CONSTITUTIONAL TORT)

560.    The above paragraphs and Appendix I below are here incorporated by reference.

561.    Members of the press, including Plaintiffs Charles Meacham, Stephanie Keith,

Justin Wedes, John Knefel and members of Plaintiff NPPA have been routinely

prevented by NYPD officers from observing, recording and reporting on OWS activities

and police response to said actibities.

562.    Reporters, including the above referenced Plaintiffs, were forcibly removed and

sometimes arrested by NYPD officers from the scene of police actions against protesters

for no lawful purpose.

563.    In addition, members of the press are targeted by police officers for arrest and

harassment to deter them from recording and observing police activity.

564.    Furthermore, the deliberate and unlawful interference with and prevention of

reporting about police activities in connection with the OWS movement violates the

rights of all citizens, including all Plaintiffs in this suit, from being free of unlawful and

unnecessary infringement of their free speech rights.

565.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and

statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under the State Constitution.

566.    As a result, the aforementioned Plaintiffs have been injured.

SEVENTH CAUSE OF ACTION
VIOLATION OF RIGHT TO FREE SPEECH AND FREE ASSEMBLY IN PUBLIC
SPACES- ONE CHASE MANHATTAN PLAZA
(FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF
AMERICA, AND, 42 U.S.C. § 1983,)

567.    The above paragraphs and Appendix I below are here incorporated by reference.

568.    Prior to September 17, 2011, One Chase Manhattan Plaza was a public space that

is open 24 hours a day, 7 days a week.

569.    On September 17, 2011, OWS participants, including Plaintiff Justin Wedes,

travelled to One Chase Manhattan Plaza in order to hold a General Assembly meeting;

they were met there with police barricades and NYPD officers who prevented their entry

therein.

570.    On October 12, 2011, OWS participants, including Plaintiff Peter Dutro, travelled

to One Chase Manhattan Plaza to engage in location-specific first amendment protected

expression relating to matters of public concern, to wit, the impending lapse of New York

State's so-called "millionaires' tax," which generated approximately Four Billion Dollars

per year in tax revenue for the state of New York, and the benefits that would be enjoyed

by Defendant J.P. Morgan Chase CEO Jamie Dimon if the law lapsed.

571.    On information and belief, the police barricades and NYPD officers present at

Chase Manhattan Plaza on Saturday, September 17, 2011 were present for the sole

purpose of preventing OWS participants, including Plaintiff Justin Wedes, from entering

One Chase Manhattan Plaza.

572.    On information and belief, members of the NYPD, including but not limited to

the Defendants, willfully and intentionally prevented entry of OWS participants,

including Plaintiff Justin Wedes, to One Chase Manhattan Plaza to deter individuals from engaging in peaceable assembly and speech around matters of public concern relating to Defendant J.P. Morgan Chase and its executives.

573.    On information and belief, J.P. Morgan acted jointly with the NYPD and acquiesced in the closing of One Chase Manhattan Plaza to the OWS participants including Plaintiff Justin Wedes, on September 17, 2011.

574.    On information and belief, Defendant J.P. Morgan Chase, the owner of One Chase Manhattan Plaza, acted jointly with the NYPD and acquiesced in the closing of One Chase Manhattan Plaza to the OWS participants, including Plaintiff Peter Dutro, on October 12, 2011.

575.    On information and belief, Defendant J.P. Morgan Chase, the owner of One Chase Manhattan Plaza, has participated as a joint actor with the NYPD, and J.P. Morgan is intertwined with the NYPD in the continuing practice of content-based restrictions.

576.    On information and belief, Defendant J.P. Morgan Chase and the NYPD are joint actors in implementing and enforcing the content-based restrictions which prevented Plaintiffs' intended acts of First Amendment protected expression at One Chase Manhattan Plaza on September 17, 2011 and October 12, 2011, the space of time in between, and thereafter.

577.    These efforts at implementing and enforcing the content-based restrictions have precluded OWS participants and citizen journalists, including Plaintiffs Wedes and Dutro, from entering One Chase Manhattan Plaza to exercise their rights pursuant First and Fourteenth Amendment.

578.    On information and belief, security guards at One Chase Manhattan Plaza allow

certain people to enter while others are barred.

579.    OWS participants, including Plaintiffs Wedes and Dutro, are prohibited from entering the public space at One Chase Manhattan Plaza.

580.    On information and belief the fence at One Chase Manhattan Plaza could not have been erected without the coordination of the NYPD and J.P. Morgan, such coordination including, but not limited to, permitting for said fence and coordination with the NYPD to take down NYPD barriers.

581.    On information and belief, the NYPD is intertwined with J.P. Morgan in the continuing practice of content-based restrictions on Constitutionally protected activities, and they are both participants in implementing and enforcing said-content-based restrictions.

582.    This preclusion from One Chase Manhattan Plaza of OWS participants, including Plaintiffs Wedes and Dutro, is a violation of their rights pursuant to the First and Fourteenth amendments to the Federal Constitution and is prohibited according to the principles enunciated in Marsh v. Alabama, 326 U.S. 501 (1946).  Accordingly, it was not lawful.

583.    As in Marsh, those citizens who are not precluded from the controverted space have been precluded from access to the message of OWS activists, including that of Plaintiffs Wedes and Dutro.

584.    Defendant City of New York, Defendant J.P. Morgan Chase, and their respective agents have deprived the above Plaintiffs of their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to Plaintiffs under 42 USC § 1983, New York State common law, and the New York State Constitution.

585.    As a result, Plaintiffs have been injured.

EIGHTH CAUSE OF ACTION
VIOLATION OF RIGHT TO FREE SPEECH AND FREE ASSEMBLY IN PUBLIC
SPACES
(FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF
AMERICA, AND, 42 U.S.C. § 1983,)

586.    The above paragraphs and Appendix I below are here incorporated by reference.

587.    Plaintiffs including John Knefel, Paul Sullivan, Timothy Fitzgerald, Michael

Rivas and Justin Wedes, attempted to enter and/or remain in publicly accessible open

areas in accordance with each area's published rules.

588.    They were prevented from entering and/or forced to leave and/or arrested for

being in a publicly accessible open area by officers of NYPD and MTA Police.

589.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and

statutory rights and have conspired to deprive them of such rights and are liable to

Plaintiffs under 42 USC § 1983, New York State common law, and the New York State

Constitution.

590.    As a result, Plaintiffs have been injured.

NINTH CAUSE OF ACTION
VIOLATION OF RIGHT TO FREE SPEECH AND
FREE ASSEMBLY IN PUBLIC SPACES
(ARTICLE 1 § 8 OF THE CONSTITUTION OF THE
STATE OF NEW YORK, STATE CONSTITUTIONAL TORT)

591.    The above paragraphs and Appendix I below are here incorporated by reference.

592.    Plaintiffs including John Knefel, Paul Sullivan, Timothy Fitzgerald, Michael

Rivas and Justin Wedes, attempted to enter and/or remain in publicly accessible open

areas in accordance with each area's published rules.

593.    They were prevented from entering and/or forced to leave and/or arrested for

being in a publicly accessible open area by officers of NYPD and MTA Police.

594.    Defendants have deprived the above Plaintiffs of their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to Plaintiffs under 42 USC § 1983, New York State common law, and the New York State Constitution.

595.    As a result, Plaintiffs have been injured.

TENTH CAUSE OF ACTION
CONSPIRACY TO VIOLATE PLAINTIFFS FIRST AMENDMENT RIGHTS OF
FREEDOM OF SPEECH, ASSEMBLY, AND PRESS-
AS TO DEFENDANT JP MORGAN CHASE

596.    The above paragraphs and Appendix I below are here incorporated by reference.

597.    On information and belief, Defendant J.P. Morgan Chase and Defendant City of New York entered into an agreement to preclude OWS activists, including Plaintiffs Peter Dutro and Justin Wedes, from entering One Chase Manhattan Plaza from September 17-October 12, 2011, and thereafter.

598.    In support of this agreement, Defendant J.P. Morgan Chase and Defendant City of New York cooperated in acting to erect and maintain barriers around One Chase Manhattan Plaza as described above, and in the absence of any cognizable lawful purpose for same.

599.    In support of this agreement, Defendant J.P. Morgan Chase and Defendant City of New York cooperated in acting to erect and maintain fences around One Chase Manhattan Plaza as described above, and in the absence of any cognizable lawful purpose for same.

600.    The conspiracy has caused the violation of Plaintiffs Justin Wedes and Peter

Dutro's constitutional rights, and has caused Plaintiffs Justin Wedes and Peter Dutro's to suffer injury.


ELEVENTH CAUSE OF ACTION
CONSPIRACY TO VIOLATE PLAINTIFFS FIRST AMENDMENT RIGHTS OF
FREEDOM OF SPEECH, ASSEMBLY, AND PRESS-
AS TO DEFENDANT BROOKFIELD PROPERTIES

601.    The above paragraphs and Appendix I below are here incorporated by reference.

602.    On information and belief, Defendant Brookfield Properties and Defendant City of New York entered into an agreement to preclude OWS participants and observers, including Plaintiff Timothy Fitzgerald, from remaining in FKA Liberty Park, a privately owned public space, on and after November 15, 2011.

603.    In support of this agreement, Defendant Brookfield Properties and Defendant City of New York cooperated in creating an impression of legal authority sufficient to cause the closure of FKA Liberty Park without compliance with the regulations set forth in the Zoning Resolution for modifying the open hours of privately owned public spaces.

604.    In support of this agreement, Defendant Brookfield Properties and Defendant City of New York cooperated in an illusory "transfer of authority" from Defendant Brookfield to Defendant City for FKA Liberty Park on November 15, 2011, when Defendant Brookfield did not in fact possess sufficient authority to authorize the closure of FKA Liberty Park or delegate same to Defendant City of New York.

605.    On information and belief, Defendant Brookfield and Defendant City of New York agreed to preclude OWS Participants from entering FKA Liberty Park on and after November 15, 2011 with the intention of limiting the first amendment protected

expression of OWS participants.

606.    On information and belief, Defendant Brookfield and Defendant City of New York and their agents, including but not limited to Defendant James Morrisey and Defendant Deputy Inspector Tloczkowski, entered into an agreement to preclude OWS activists, citizen journalists and professional journalists, including Plaintiffs Wedes, Meacham, and members of Plaintiff NPPA, from remaining in the Winter Garden, a privately owned public space during its posted open hours on December 12, 2011.

607.    In support of this agreement, Defendant Brookfield Properties' agent, Defendant James Morrissey, while holding himself out as the manager of the Winter Garden for Defendant Brookfield Properties, falsely averred to having ordered Plaintiff Charles Meacham to leave the Winter Garden, and participated in the prosecution of said Plaintiff as such, which was terminated in said Plaintiff's favor.

608.    On information and belief, Defendant Brookfield and Defendant City of New York agreed to preclude OWS Participants and journalists documenting same from remaining within the Winter Garden on December 12, 2011 with the intention of limiting the first amendment protected expression of OWS participants, and that of journalists covering same.

609.    The conspiracy of Defendant Brookfield and Defendant City of New York have has caused the violation of Plaintiffs' constitutional rights, and has caused Plaintiffs to suffer injury.


TWELFTH CAUSE OF ACTION
CONSPIRACY TO VIOLATE PLAINTIFFS FIRST AMENDMENT RIGHTS OF
FREEDOM OF SPEECH, ASSEMBLY, AND PRESS
AS TO DEFENDANT MITSUI FUDUSAN

610.    The above paragraphs and Appendix I below are here incorporated by reference.

611.    An agreement was formed between and among state actor/Defendants City of New York, and its agents, including but not limited to Defendant Deputy Inspector Winski, and Defendant Mitsui Fudusan, to violate the Constitutional rights of Plaintiff Yonatan Miller and other participants in OWS.

612.    Specifically, an agreement was formed to bar OWS participants from entering and/or remaining in the privately owned public space at 100 William Street, as described above.

613.    In support of this agreement, agents of Defendant Mitsui and Defendant City of New York cooperated in creating an impression of legal authority sufficient to cause the ejection of OWS Participants including Plaintiff Yonatan Miller from the privately owned public space at 100 William Street on January 1, 2012, without compliance with the regulations set forth in the Zoning Resolution for modifying the open hours of privately owned public spaces.

614.    This false authority was then applied in a non-content neutral manner wherein non-OWS participants were allowed to remain in the space while Defendant Deputy Inspector Winski threatened OWS participants with arrest if they did not leave per the wishes of Defendant Mitsui.

615.    The conspiracy of Defendant Brookfield and Defendant City of New York have has caused the violation of Plaintiff Yonatan Miller's constitutional rights, and has caused Plaintiff Yonatan Miller to suffer injury.

THIRTEENTH CAUSE OF ACTION
VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA AND
SECTION 160.50 OF THE CRIMINAL PROCEDURE LAW OF THE STATE OF
NEW YORK

616.    The above paragraphs and Appendix I below are here incorporated by reference.

617.    Defendant NYPD took photographs of OWS arrestees, including substantially all

Plaintiffs.

618.    The criminal charges against substantially all Plaintiffs and numerous other OWS

arrestees have been terminated in their favor.

619.    With deliberate indifference and gross negligence, Defendants did not return or

destroy photographs taken of arrestees who received favorable terminations in their

criminal court case.

620.     Defendants have deprived Plaintiffs of their civil, Constitutional and statutory

rights, and have conspired to deprive them of such rights in violation of 42 USC §§ 1983,

1985 New York State law, and the New York State Constitution.

621.    Plaintiffs were damaged as a result of Defendants' unlawful conduct.


FOURTEENTH CAUSE OF ACTION
MUNICIPAL AND SUPERVISORY LIABILITY
(THE CITY OF NEW YORK, MAYOR BLOOMBERG
AND COMMISSIONER KELLY UNDER 42 USC § 1983 AND MONELL V.
CITY OF NEW YORK DEPARTMENT OF SOCIAL SERVICES, 436 U.S.
658(1978))

622.    The above paragraphs and Appendix I below are here incorporated by reference.

623.    The City and the Commissioner are liable for the damages suffered by Plaintiffs

as a result of the conduct of their employees, agents, and servants.

624.    The City, and the Commissioner knew or should have known of their employees',

agents', or servants' propensity to engage in the illegal and wrongful acts detailed above.

625.    The aforesaid events have been carefully planned by the City and the Police Commissioner.  For example, The Commissioner and the Mayor of the City of New York, Michael Bloomberg, have both said that each aspect of the Zuccotti Park operation went according to the City's plan.

626.    The aforementioned actions are occurring in an open and notorious manner. Furthermore, much of the aforementioned activities have been carried out by police supervisors and presumably at the direction of the City and the Commissioner.  If the City and Commissioner are not directing such actions, they clearly are tacitly accepting and encouraging such conduct.

627.    Similarly, the forcible removing of protesters from public spaces and the prevention of members of the press to observe and record police activities has been widely reported on and happens in the presence of and at the direction of supervising officers.  The New York Press Club was loudly critical of the actions taken against members of the press, and they were acknowledged publicly by Commissioner Kelly. The City and Commissioner clearly has notice of such actions and yet, the City, Commissioner and their supervisors either direct such actions or tacitly accept and encourage them by not preventing officers from engaging in such conduct and disciplining them.   The aforesaid events were not isolated incidents.

628.    The City and the Commissioner have been aware for some time (from lawsuits, notices of claim and complaints filed with the Civilian Complaint Review Board) that many of their police officers are insufficiently trained on the observations necessary to support arrests and prosecutions.  The City and the Commissioner are further aware, from the same sources, that NYPD officers routinely assault citizens without fear of reprisal.

The City and the Commissioner fail to discipline officers for not reporting fellow officers' misconduct that they have observed, and they fail to discipline officers for making false statements to disciplinary agencies.  Further, there is no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct. Without this notification, improper force is practiced and testimony which is not creditable goes uncorrected.  Additionally, the City and the Inspector have isolated their law department from the discipline of police officers, so that civil suits against police officers for actions taken in their capacity as police officers have no impact on the officers' careers, regardless of the outcome of the civil actions.  Furthermore, the Public Information Division routinely makes false statements about the circumstances incident to arrests to protect police officers. The City is aware that all of the aforementioned has resulted in violations of citizens' Constitutional rights.  Despite such notice, the City and the Commissioner, have failed to take corrective action.  This failure and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

629.    The City and the Commissioner knew or should have known that the officers who caused Plaintiffs' injury had a propensity for the type of conduct that took place in this case.  Nevertheless, the City and the Commissioner failed to take corrective action.

630.    The City and the Commissioner knew or should have known that the officers who caused Plaintiffs' injury had a propensity for the type of conduct that took place in this case.  Nevertheless, the City and Commissioner failed to take corrective action.

631.    The City and the Inspector have failed to take the steps to discipline, train, supervise or otherwise correct the improper, illegal conduct of the individual Defendants

in this and in similar cases involving misconduct.

632.    The above described policies and customs demonstrated a deliberate indifference

on the part of policymakers of the City, and the Commissioner to the Constitutional rights

of persons within New York City, and were the cause of the violations of Plaintiff's

rights here alleged.

633.    Defendants, the City and the Commissioner have damaged Plaintiffs by their

failure to properly train, supervise, discipline, review, remove, or correct the illegal and

improper acts of their employees, agents or servants in this and in similar cases involving

police misconduct.

634.    Plaintiff has been damaged as a result of the wrongful, grossly negligent and

illegal acts of the City and the Commissioner.


FIFTEENTH CAUSE OF ACTION
VIOLATION OF YDANIS RODRIGUEZ'S FOURTH AMENDMENT RIGHT TO
BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE
ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

635.    The above paragraphs and Appendix I below are here incorporated by reference.

636.    Defendant police officer Robert Matrisciani and Sergeant Steven Caro and John

Doe officers subjected Plaintiff Council member Ydanis Rodriguez to false arrest and

false imprisonment and deprivation of liberty without probable cause.

637.    On November 15, 2011, at approximately 2:00 a.m., Plaintiff Rodriguez went to

observe the police action being taken against the OWS participants.

638.    Approximately 2 blocks away from FKA Liberty Park on Broadway, Plaintiff

encountered police barricades and police officers.  He was told that he could not go past the barricades, and he complied.

639.    As he backed away from the barricades in compliance with police orders, police officers attacked him and falsely arrested him without any probable cause he was committing any crime or otherwise not obeying police orders, lawful or otherwise.

640.    He was held in custody for approximately 18 hours.

641.    Defendant police officers have no reasonable expectation of successfully prosecuting Plaintiff.

642.    Plaintiff was aware of his confinement, and did not consent to it.

643.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

644.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

SIXTEENTH CAUSE OF ACTION
VIOLATION OF <u>YDANIS RODRIGUEZ'S</u> FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW CLAIMS)

645.    The above paragraphs and Appendix I below are here incorporated by reference.

646.    Defendants police officer Robert Matrisciani and Sergeant Steven Caro, acting with malice, initiated a false prosecution against Plaintiff Ydanis Rodriguez and caused him to be prosecuted.

647.    The criminal proceedings were terminated favorably to Plaintiff.

648.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil, Constitutional and statutory rights to be free from unreasonable search and seizure, due process of law, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State Constitution and tort law.

649.    Plaintiff was damaged as a result of Defendants' unlawful conduct.


SEVENTEENTH CAUSE OF ACTION
VIOLATION OF YDANIS RODRIGUEZ'S FOURTH AMENDMENT RIGHT TO
BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE
FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

650.    The above paragraphs and Appendix I below are here incorporated by reference.

651.    By aggressively approaching Plaintiff as if to attack him, Defendants Police Officer Matrisciani and Sergeant Caro made Plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

652.    Defendants engaged in and subjected Plaintiff to immediate harmful and/or offensive touching and battered him by tackling him to the ground and striking him, causing Plaintiff to suffer injuries.

653.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

654.    Defendants used excessive and unnecessary force with Plaintiff.

655.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights

and have conspired to deprive him of such rights and are liable to Plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York State laws and Constitution.

656.     Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

EIGHTEENTH CAUSE OF ACTION
VIOLATION OF <u>JEFFERY MCCLAIN'S</u> FOURTH AMENDMENT RIGHT TO
BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE
ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

657.     The preceding paragraphs are here incorporated by reference.

658.     Defendant John Doe NYPD officers subjected Plaintiff Jeffery McClain to false arrest and false imprisonment and deprivation of liberty without probable cause.

659.     On November 15, 2011, at approximately 2:00 a.m., Plaintiff McClain went to Lower Manhattan in support of the OWS participants who were being removed from FKA Liberty Park.

660.     Plaintiff joined a demonstration in the early morning hours protesting the eviction of the park at Foley Square.  Police officer took action against the demonstrators forcing them out of the Square.

661.     Plaintiff joined a march uptown, but when it seemed that police were going to take action against the march, he broke off the march with approximately 20 other protesters and turned down a lower Manhattan street going West.  He followed all traffic and pedestrian regulations and violated no law.

662.     Police surrounded this smaller group of protesters, and some police officers attacked another of the protesters.

663.    Upon seeing this protester being badly beaten on the ground without having provoked or resisted police arrest, Plaintiff tried to move the protester away from the police by pulling on his back pack.  Plaintiff did not touch any police officers while taking this action.

664.    Plaintiff was then attacked by police officers, and badly beaten as he lay on the ground.  Plaintiff was in no way resisting or fighting back against the officers.

665.    In the course of being beaten, Plaintiff was verbally abused by the officers, who called him a traitor for being both a war veteran and OWS participant.

666.    He was held in custody for approximately 7 hours.

667.    Defendant police officers have no reasonable expectation of successfully prosecuting Plaintiff.

668.    Plaintiff was aware of his confinement, and did not consent to it.

669.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

670.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

NINETEENTH CAUSE OF ACTION
VIOLATION OF JEFFERY MCCLAIN'S FOURTH AMENDMENT RIGHT TO
BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS
PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

671.    The preceding paragraphs are here incorporated by reference.

672.    Defendant John Doe, acting with malice, initiated a false prosecution against

Plaintiff Jeffery McClain and caused him to be prosecuted.

673.    The criminal proceedings were terminated favorably to Plaintiff.

674.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure, due

process of law, pursuant to the Fourth and Fourteenth Amendments to the United States

Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State

Constitution and tort law.

675.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

TWENTIETH CAUSE OF ACTION
VIOLATION OF JEFFERY MCCLAIN'S FOURTH AMENDMENT RIGHT TO
BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE
FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

676.    The above paragraphs and Appendix I below are here incorporated by reference.

677.    By aggressively approaching Plaintiff McClain as if to attack him, Defendant

John Doe NYPD officers made Plaintiff fear for his physical well-being and safety and

placed him in apprehension of immediate harmful and/or offensive touching.

678.     Defendants engaged in and subjected Plaintiff to immediate harmful and/or offensive touching and battered him by tackling him to the ground and striking him repeatedly, causing Plaintiff to suffer blunt chest trauma including fractured ribs, lacerations and bruises to his face, and other injuries.

679.     Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

680.     Defendants used excessive and unnecessary force with Plaintiff in the course of an unlawful arrest.

681.     Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York State laws and Constitution.

682.     Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

TWENTY-FIRST CAUSE OF ACTION
VIOLATION OF JUSTIN WEDES' FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

683.     The above paragraphs and Appendix I below are here incorporated by reference.

684.     Defendant Deputy Inspector Edward Winski and other John Doe NYPD officers subjected Plaintiff Justin Wedes to false arrest and false imprisonment and deprivation of liberty without probable cause.

685.     On January 17, 2012, Plaintiff Justin Wedes was present at the Winter Garden.

686.     Plaintiff was holding a laptop to record and stream video content of the activities

and interactions between OWS participants and the NYPD.

687.    Plaintiff was holding a cell phone that was being used to live tweet the activities and interactions between OWS participants and the NYPD.

688.    Plaintiff was grabbed without cause by Defendant Deputy Inspetor Edward Winski and taken to the ground.

689.    Plaintiff did not resist in any manner.

690.    Plaintiff was arrested and charged with Criminal Trespass in the Third Degree and Resisting Arrest.

691.    He was held in custody for approximately 40 hours.

692.    Defendant Police Officers had no reasonable expectation of successfully prosecuting Plaintiff.

693.    Plaintiff was aware of his confinement, and did not consent to it.

694.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

695.    Plaintiffs were damaged as a result of Defendants' unlawful conduct.

TWENTY-SECOND CAUSE OF ACTION
VIOLATION OF JUSTIN WEDES' FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

696.    The above paragraphs and Appendix I below are here incorporated by reference.

697.    By aggressively grabbing Plaintiff Wedes, Defendant Deputy Inspector Ed

Winski and John Doe NYPD officers made Plaintiff fear for his physical well-being and

safety and placed him in apprehension of immediate harmful and/or offensive touching.

698.    Defendants engaged in and subjected Plaintiff to immediate harmful and/or

offensive touching and battered him by tackling him to the ground and placing extremely

tight flexi-cuffs on his wrists for a lengthy period of time.

699.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in

any way resist arrest.

700.    Defendants used excessive and unnecessary force with Plaintiff in the course of

an unlawful arrest.

701.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights

and have conspired to deprive him of such rights and are liable to Plaintiff under common

law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York

State laws and Constitution.

702.     Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

TWENTY-THIRD CAUSE OF ACTION
VIOLATION OF <u>PETER DUTRO'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

703.    The above paragraphs and Appendix I below are here incorporated by reference.

704.    Defendant Police Officer Margaret Monroe and other John Doe NYPD officers subjected Plaintiff Peter Dutro to false arrest and false imprisonment and deprivation of liberty without probable cause.

705.    On November 17, 2011, Plaintiff Peter Dutro was present at 52 Broadway branch of the Amalgamated Bank when a march associated with Occupy Wall Street passed that location.

706.    Accompanied by several employees of Amalgamated Bank, Plaintiff Peter Dutro went to the ATM vestibule of the Amalgamated Bank to observe the march.

707.    Shortly thereafter, Plaintiff Peter Dutro observed an individual being taken to the ground and arrested by one or more uniformed NYPD officers.

708.    Plaintiff Peter Dutro opened the front door of the Amalgamated Bank and asked the individual being arrested for his name.

709.    Immediately, some of the NYPD officers arresting the individual outside of the Amalgamated Bank began running towards Plaintiff Peter Dutro, joined on the way by other officers.

710.    In all, approximately six (6) members of the NYPD entered the Amalgamated Bank vestibule and arrested Plaintiff Peter Dutro, against the protests of several Amalgamated Bank employees who identified Plaintiff Peter Dutro as an Amalgamated

Bank customer who had done nothing wrong.

711.    Plaintiff Peter Dutro was present at the bank as a customer and representative of the OWS movement, that had a bank account at the Amalgamated Bank.

712.    Plaintiff Peter Dutro was taking photos through the front glass window of the Amalgamated Bank at 51 Broadway of various police interactions with citizens on the street, including members of the OWS movement.

713.    Nonetheless, the Defendant John Doe officers and Defendant NYPD Officer Margaret Monroe unlawfully arrested Plaintiff.

714.    Plaintiff was held for approximately ten hours before being released with a Desk Appearance Ticket.

715.    On January 25, 2012, the Plaintiff appeared in court and was arraigned on the sole charge of disorderly conduct, PL 240.20(5).

716.    The criminal complaint, sworn to by PO Margaret Monroe, states that Defendant PO Margaret Monroe observed the Plaintiff standing in a group of approximately 50 individuals, standing on the sidewalk and blocking the sidewalk at the above location.

717.    These false allegations are contradicted by surveillance video from the Amalgamated Bank vestibule, but Plaintiff Peter Dutro was nevertheless arrested, detained, and subjected to prosecution on the basis of said false allegations.

718.    The Amalgamated Bank provided security camera video footage of the Plaintiff's conduct that morning prior to his arrest.

719.    The security video shows that Plaintiff never left the bank prior to his arrest, and therefore, was not on the corner of Exchange Place and Broadway at approximately 9:15am.

720.     On January 25, 2011, the Plaintiff pled not guilty and stated ready for trial.

721.     On February 23, 2012, the Manhattan District Attorney's Office filed a certificate of readiness.

722.     On or about March 1, 2012, counsel for the Plaintiff met with the District Attorney and provided a copy of the security video.

723.     On March 12, 2012, the criminal charges against the Plaintiff were dismissed upon motion of the District Attorney's Office.

724.     Defendant police officers had no reasonable expectation of successfully prosecuting Plaintiff.

725.     Plaintiff was aware of his confinement, and did not consent to it.

726.     These Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

727.     Plaintiffs were damaged as a result of Defendants' unlawful conduct.


TWENTY-FOURTH CAUSE OF ACTION
VIOLATION OF PETER DUTRO'S FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

728.     The above paragraphs and Appendix I below are here incorporated by reference.

729.     By aggressively grabbing Plaintiff  Dutro, the John Doe NYPD officers made Plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

730.     Defendants engaged in and subjected Plaintiff to immediate harmful and/or offensive touching and battered him by tackling him to the ground and placing extremely tight flexi-cuffs on his wrists for a lengthy period of time.

731.     Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

732.     Defendants used excessive and unnecessary force with Plaintiff in the course of an unlawful arrest.

733.     Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York State laws and Constitution.

734.      Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

TWENTY-FIFTH CAUSE OF ACTION
VIOLATION OF <u>PETER DUTRO'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS
PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§ 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

735.     The above paragraphs and Appendix I below are here incorporated by reference.

736.     Defendant PO Margaret Monroe and other Defendants John Doe Officers, acting with malice, initiated a false prosecution against Plaintiff Peter Dutro and caused him to be prosecuted.

737.     The criminal proceedings were terminated favorably to Plaintiff.

738.     Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure, due process of law, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State Constitution and tort law.

739.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

TWENTY-SIXTH CAUSE OF ACTION
VIOLATION OF STEPHANIE KEITH'S FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

740.    The above paragraphs and Appendix I below are here incorporated by reference.

741.    Defendant John Doe NYPD officers subjected Plaintiff Stephanie Keith to false arrest and false imprisonment and deprivation of liberty without probable cause.

742.    On October 1, 2011, Plaintiff Stephanie Keith was lawfully present and engaged in her professional capacity as a photojournalist covering the Occupy Wall Street march on the Brooklyn Bridge.

743.    Plaintiff Stephanie Keith was observing, not participating, in the above-referred march in her professional capacity as a photojournalist.

744.     Plaintiff Stephanie Keith only proceeded insofar as police proceeded ahead of her, and complied with all instructions tendered to her by police officers, but was nevertheless arrested.

745.    Nonetheless, the Defendant John Doe officers unlawfully arrested Plaintiff.

746.    Plaintiff was held for approximately ten (10) hours before being released with a Desk Appearance Ticket.

747.    On December 15, 2011, the Plaintiff appeared in court.

748.    Information was provided to the District Attorney's office proving that Plaintiff was a member of the working press who was working in her vocation at the time of her arrest.

749.    Upon motion of the District Attorney's office, all charges were dismissed against the Plaintiff.

750.    Defendant police officers had no reasonable expectation of successfully prosecuting Plaintiff.

751.    Plaintiff was aware of her confinement, and did not consent to it.

752.    These Defendants have deprived Plaintiff of her civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

753.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

TWENTY-SEVENTH CAUSE OF ACTION
VIOLATION OF <u>STEPHANIE KEITH'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

754.    The above paragraphs and Appendix I below are here incorporated by reference.

755.    By aggressively arresting Plaintiff  Keith while she was performing her chosen occupation, the John Doe NYPD officers and Defendant Lieutenant Albano made Plaintiff fear for her physical well-being and safety and placed her in apprehension of immediate harmful and/or offensive touching.

756.     Defendants engaged in and subjected Plaintiff to immediate harmful and/or offensive touching and battered her by tackling her to the ground and placing extremely tight flexi-cuffs on her wrists for a lengthy period of time in one instance on October 1, 2011, and Defendant Lieutenant Albano additionally subjected Plaintiff Mrs. Keith to offensive touching and battering in another instance on September 15, 2012.

757.     In both instances, there was no objective need for any application of force against Mrs. Keith.

758.     Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

759.     Defendants used excessive and unnecessary force with Plaintiff in the course of an unlawful arrest.

760.     Defendants have deprived Plaintiff of her civil, Constitutional and statutory rights and have conspired to deprive her of such rights and are liable to Plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York State laws and Constitution.

761.     Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

TWENTY-EIGHTH CAUSE OF ACTION
VIOLATION OF STEPHANIE KEITH'S FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS
PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

762.     The above paragraphs and Appendix I below are here incorporated by reference.

763.     Defendants John Doe Officers, acting with malice, initiated a false prosecution against Plaintiff Mrs. Keith and caused her to be prosecuted.

764.    The criminal proceedings were terminated favorably to Plaintiff.

765.    Defendants acted under color of law and conspired to deprive Plaintiff of her civil, Constitutional and statutory rights to be free from unreasonable search and seizure, due process of law, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State Constitution and tort law.

766.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

TWENTY-NINTH CAUSE OF ACTION
VIOLATION OF PAUL SULLIVAN'S FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

767.    The above paragraphs and Appendix I below are here incorporated by reference.

768.    Defendant Officer Peter Volaric and other John Doe NYPD officers subjected Plaintiff Paul Sullivan to false arrest and false imprisonment and deprivation of liberty without probable cause.

769.    On or about December 12, 2011, Plaintiff Paul Sullivan, a citizen journalist, was present at the Winter Garden.

770.     Plaintiff was holding a video camera to record the activities and interactions between OWS participants and the NYPD.

771.    Plaintiff was grabbed without cause by Defendant Officer Peter Volaric and then was pushed to the ground by Defendant Volaric and several other John Doe NYPD officers.

772.    Plaintiff did not resist in any manner.

773.   Plaintiff was arrested and charged with resisting arrest and criminal trespass.

774.   He was held in custody for approximately thirty-seven hours.

775.   These Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983, The U.S. Constitution, New York State common law, and the New York State Constitution.

776.   Plaintiff was damaged as a result of Defendants' unlawful conduct.


THIRTIETH CAUSE OF ACTION
VIOLATION OF PAUL SULLIVAN'S FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)


777.   The above paragraphs and Appendix I below are here incorporated by reference.

778.   By aggressively grabbing Plaintiff Sullivan, Defendant Officer Peter Volaric and John Doe NYPD officers made Plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

779.   Defendants engaged in and subjected Plaintiff to immediate harmful and/or offensive touching and battered him by slamming him against a wall and pushing him to the ground.

780.   Defendants used excessive and unnecessary force with Plaintiff in the course of an unlawful arrest.

781.   Defendants have deprived Plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under common

law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York

State laws and Constitution.

782.    Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

THIRTY-FIRST CAUSE OF ACTION
VIOLATION OF TIMOTHY FITZGERALD'S FOURTH AMENDMENT RIGHT
TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE
ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

783.    The above paragraphs and Appendix I below are here incorporated by reference.

784.    Defendant John Doe NYPD officers subjected Plaintiff Timothy Fitzgerald to

false arrest and false imprisonment and deprivation of liberty without probable cause.

785.    On November 15, 2011, Plaintiff Timothy Fitzgerald, a citizen journalist, was

present at the FKA Liberty Park.

786.     Plaintiff was using an iPhone to record and live-stream the activities and

interactions between OWS participants and the NYPD.

787.    Plaintiff was grabbed without cause by Defendant John Doe NYPD officer and

was pushed to the ground.

788.    Plaintiff did not resist in any manner.

789.    Plaintiff was arrested and charged with crimes.

790.    Plaintiff was arrested and charges with violations.

791.    The charges against the Plaintiff arising from said incident have been dismissed.

792.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983,

The U.S. Constitution, New York State common law, and the New York State

Constitution.

793.    Plaintiff was damaged as a result of Defendants' unlawful conduct.


### THIRTY-SECOND CAUSE OF ACTION
VIOLATION OF <u>TIMOTHY FITZGERALD'S</u> FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 § 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND BATTERY CLAIMS)


794.    The above paragraphs and Appendix I below are here incorporated by reference.

795.    By aggressively grabbing Plaintiff Fitzgerald, Defendant John Doe NYPD officers made Plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

796.    Defendants engaged in and subjected Plaintiff to immediate harmful and/or offensive touching and battered him by grabbing his arms, pushing him to the ground and placing extremely tight flexi-cuffs on his wrists for a lengthy period of time

797.    Defendants used excessive and unnecessary force with Plaintiff in the course of an unlawful arrest.

798.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York State laws and Constitution.

799.    Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

### THIRTY-THIRD CAUSE OF ACTION
VIOLATION OF <u>MICHAEL RIVAS'</u> FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST

(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

800.    The above paragraphs and Appendix I below are here incorporated by reference.

801.    Defendant John Doe NYPD officers subjected Plaintiff Michael Rivas to false

arrest and false imprisonment and deprivation of liberty without probable cause.

802.    On March 17, 2012, Plaintiff Michael Rivas was present at FKA Liberty Park.

803.     As Plaintiff attempted to enter the park, he physically assaulted and pepper

sprayed without cause by Defendant John Doe NYPD officers.

804.    Plaintiff did not resist in any manner.

805.    Plaintiff was arrested and charged with crimes.

806.    Plaintiff was arrested and charged with violations.

807.    The charges from Plaintiff Michael Rivas' March 17, 2012 arrest have been

dismissed.

808.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983,

The U.S. Constitution, New York State common law, and the New York State

Constitution.

809.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

THIRTY-FOURTH CAUSE OF ACTION
VIOLATION OF <u>MICHAEL RIVAS'</u> FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

810.    The above paragraphs and Appendix I below are here incorporated by reference.

811.    By aggressively pushing and punching Plaintiff Rivas, Defendant John Doe
NYPD officers made Plaintiff fear for his physical well-being and safety and placed him
in apprehension of immediate harmful and/or offensive touching.

812.    Defendants engaged in and subjected Plaintiff to immediate harmful and/or
offensive touching and battered him by pushing him repeatedly, punching him in the
face, slamming a car door on his foot five times, and, after hand-cuffing him, spraying
him with pepper spray and hitting him with a nightstick.

813.    Defendants used excessive and unnecessary force with Plaintiff in the course of
an unlawful arrest.

814.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights
and have conspired to deprive him of such rights and are liable to Plaintiff under common
law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York
State laws and Constitution.

815.    Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

THIRTY-FIFTH CAUSE OF ACTION
VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS
PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM OBSERVING
AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
(FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF
AMERICA, ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW
YORK, 42 USC § 1983 AND STATE CONSTITUTIONAL TORT)

816.    The above paragraphs and Appendix I below are here incorporated by reference.

817.    On March 15, 2012, Plaintiff Justin Wedes was present at an OWS activity

involving the Bank of America.

818.    Defendant Deputy Inspector Edward Winski was also present, and recognized

Plaintiff Justin Wedes.

819.    While utilizing a voice amplification bullhorn, Defendant Deputy Inspector

Edward Winski called out to Justin, by name and threatened to arrest him for being

present along with over one-hundred other individuals.

820.    Defendant Deputy Inspector Edward Winski focused on Plaintiff Wedes in an

effort to chill the Plaintiff's First Amendment rights to publicly assemble.

821.     Defendant Deputy Inspector Edward Winski focused on Plaintiff Wedes in an

effort to chill the Plaintiff's First Amendment rights to act as a citizen journalist.

822.    Defendant Deputy Inspector Edward Winski focus on Plaintiff Wedes in an effort

to chill the Plaintiff's First Amendment rights was successful, as video shows soon after

the Defendant focused on Plaintiff Wedes and called out to him, threatening to arrest him,

Plaintiff exited the area in order to avoid another unlawful arrest.

823.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

THIRTY-SIXTH CAUSE OF ACTION
RETALIATION FOR FIRST AMENDMENT PROTECTED
EXPRESSION/EXPRESSIVE ASSOCIATION AGAINST INDIVIDUALS
OBSERVING, RECORDING AND COMMENTING UPON POLICE ACTIONS
(FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF
AMERICA, ARTICLE 1 § 12 OF THE CONSTITUTION OF THE STATE OF
NEW YORK, 42 USC § 1983 AND STATE CONSTITUTIONAL TORT)

824.    The above paragraphs and Appendix I below are here incorporated by reference.

825.    In many of the incidents detailed above and throughout the course of Occupy

Wall Street, numerous individuals have been subjected to adverse actions including but

not limited to arrest, assault, battery and malicious prosecution for observing, recording,

and/or commenting upon police conduct with respect to Occupy Wall Street.

826.    To wit, Plaintiff Stephanie Keith was lawfully present as a member of the press

when she was arrested while photographing police-protester interactions on October 1,

2011 on the Brooklyn Bridge.

827.    To wit, Plaintiff Justin Wedes was lawfully present as an observer, social media

correspondent and livestream correspondent when he was thrown to the ground and

arrested by Deputy Inspector Winski on December 12, 2011 at 225 Liberty Street.

828.    To wit, Plaintiff Peter Dutro was lawfully present as a bank customer at

Amalgamated Bank when he was seized and arrested on patently false charges after

asking the name of a person being arrested on November 17, 2011 in the vestibule of 52

Broadway.

829.    The aforesaid actions and other like actions were undertaken by the NYPD for no

proper purpose.

830.    The aforesaid actions and other like actions undertaken by the NYPD against the

aforesaid Plaintiffs were causally connected to the First Amendment protected activities

of the aforesaid Plaintiffss.

831.    The aforesaid actions and other like actions were undertaken by the NYPD in

flagrant violation of the terms of the consent decree entered in <u>Black et al. v. Codd et al.</u>,

United States District Court, Southern District of New York, 73 Civ. 5283 ("Consent

Decree").

832.    The Consent Decree states at 2 that: "[n]one of the following constitutes probable

cause for the arrest or detention of an onlooker [to a police action] unless the safety of

officers or other persons is directly endangered or the officer reasonably believes they are

endangered or the law is otherwise violated: (a) Speech alone, even though crude and

vulgar; (b) Requesting and making notes of shield numbers and names of officers; (c)

Taking photographs; (d) Remaining in the vicinity of the stop or arrest."

833.    This understanding memorialized in the Consent Decree is codified in the NYPD

Patrol Guide at PG §298-03, subsection "Observers At The Scene of Police Incidents."

834.    Despite due and repeated notice of the First Amendment rights of citizens in the

vicinity of police actions, those same rights have been disregarded flagrantly and

repeatedly throughout the course of Occupy Wall Street by members and ranking officers

of the NYPD alike.

835.    Officers of the NYPD took adverse action against the aforesaid Plaintiffss and

other persons similarly situated in deliberate efforts to chill the First Amendment

protected expression of persons observing, recording, and/or commenting upon police

actions undertaken in the course of Occupy Wall Street.

836.    Upon information and belief, officers of the NYPD have gone to particular pains

to retaliate against credentialed and citizen journalists in order to deter those individuals

from recording and disseminating instances of police brutality and abuses of authority.

837.   Upon information and belief, officers and ranking officers of the NYPD are aware of the First Amendment rights of participants in Occupy Wall Street.

838.   Upon information and belief, officers and ranking officers of the NYPD are aware of the First Amendment rights of credentialed and citizen journalists observing Occupy Wall Street.

839.   Upon information and belief, officers and ranking officers of the NYPD have willfully acted to deter individuals from documenting police actions in order to increase their capacities to use improper force, false arrests and malicious prosecutions to deter participation in Occupy Wall Street overall.

THIRTY-SEVENTH CAUSE OF ACTION
VIOLATION OF <u>JOHN KNEFEL'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

840.   The above paragraphs and Appendix I below are here incorporated by reference.

841.   Defendant John Doe NYPD officer subjected Plaintiff John Knefel to false arrest and false imprisonment and deprivation of liberty without probable cause.

842.   On December 12, 2011, Plaintiff John Knefel was present at the Winter Garden.

843.   Plaintiff was recording a video and live tweeting the activities and interactions between OWS participants and the NYPD.

844.   When asked whether he had (NYPD-issued) press credentials, he replied he did not.

845.   The officer then grabbed Plaintiff's arms and forced him to the ground.

846.    Plaintiff did not resist in any manner.

847.    Plaintiff was arrested and charged with criminal trespassing.

848.    He was held in custody for approximately 37 hours.

849.    Defendant Police Officer had no reasonable expectation of successfully

prosecuting Plaintiff.

850.    Plaintiff was aware of his confinement, and did not consent to it.

851.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983,

The U.S. Constitution, New York State common law, and the New York State

Constitution.

852.    Plaintiff was damaged as a result of Defendants' unlawful conduct.


THIRTY-EIGHTH CAUSE OF ACTION
VIOLATION OF <u>JOHN KNEFEL'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS
PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§ 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)


853.    The above paragraphs and Appendix I below are here incorporated by reference.

854.    Defendants John Doe Officers, acting with malice, initiated a false prosecution

against Plaintiff John Knefel and caused him to be prosecuted.

855.    The criminal proceedings were terminated favorably to Plaintiff.

856.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure, due

process of law, pursuant to the Fourth and Fourteenth Amendments to the United States

Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State

Constitution and tort law.

857.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

THIRTY-NINTH CAUSE OF ACTION
VIOLATION OF <u>JOHN KNEFEL'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

858.    The above paragraphs and Appendix I below are here incorporated by reference.

859.    By aggressively grabbing Plaintiff John Kenfel, Defendant John Doe NYPD

officer made Plaintiff fear for his physical well-being and safety and placed him in

apprehension of immediate harmful and/or offensive touching.

860.    Defendants engaged in and subjected Plaintiff to immediate harmful and/or

offensive touching and battered him by forcing him to the ground and placing extremely

tight flexi-cuffs on his wrists for a lengthy period of time.

861.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in

any way resist arrest.

862.    Defendants used excessive and unnecessary force with Plaintiff in the course of

an unlawful arrest.

863.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights

and have conspired to deprive him of such rights and are liable to Plaintiff under common

law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York

State laws and Constitution.

864.     Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

FORTIETH CAUSE OF ACTION
VIOLATION OF <u>JUSTIN SULLIVAN'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

865.     The above paragraphs and Appendix I below are here incorporated by reference.

866.     Defendant MTA Police Officer Lakeram and Defendants John Doe NYPD
officers subjected Plaintiff Justin Sullivan to false arrest and false imprisonment and
deprivation of liberty without probable cause.

867.     On January 3, 2012, Plaintiff Justin Sullivan was present at Grand Central
Terminal.

868.     Plaintiff was filming the activities and interactions between OWS participants and
the NYPD with a flip-style camera and a cell phone.

869.     Defendants John Doe officers ordered Plantiff to move behind the barricade, and
he complied.

870.     Once on the other side of the barricade, Defendant John Doe officer grabbed the
left side Plaintiff's chest, and threw Plaintiff over the barricade.  Multiple officers
grabbed Plaintiff and threw him up against a wall.

871.     Plaintiff did not resist in any manner.

872.     Plaintiff was arrested and charged with criminal trespassing.

873.     He was held in custody for approximately 18 hours.

874.     After his release, Plaintiff returned to the police station at Grand Central Terminal

to retrieve his confiscated flip-style camera.  At this time, he was arrested again by

Defendant Lieutenant Lakerman.

875.     Plaintiff was held in custody for approximately 24 hours, for a total detention time

of approximately 42 hours.

876.     Defendant Police Officer had no reasonable expectation of successfully

prosecuting Plaintiff.

877.     Plaintiff was aware of his confinement, and did not consent to it.

878.     These Defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983,

The U.S. Constitution, New York State common law, and the New York State

Constitution.

879.     Plaintiff was damaged as a result of Defendants' unlawful conduct.

FORTY-FIRST CAUSE OF ACTION
VIOLATION OF JUSTIN SULLIVAN'S FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS
PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§ 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

880.     The above paragraphs and Appendix I below are here incorporated by reference.

881.     Defendant MTA Police Officer Lakeram and Defendants John Doe NYPD

officers, acting with malice, initiated a false prosecution against Plaintiff Justin Sullivan

and caused him to be prosecuted.

882.     Plaintiff was arraigned on January 4, 2012 and has subsequently appeared in

court, ready to go to trial, on five occasions.

883.   The People served Plaintiff with a Certificate of Readiness dated March 15, 2012,

but were not ready for trial on the May 3, 2012 appearance date.

884.   The People served Plaintiff with a second Certificate of Readiness dated May 22,

2012, but were not ready for trial on the July 2, 2012 appearance date.

885.   The People have demonstrated a clear lack of intent to bring this case to trial.

886.   On Tuesday, September 4, 2012, Plaintiff was issued an A.C.D. in this matter.

887.   Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure, due

process of law, pursuant to the Fourth and Fourteenth Amendments to the United States

Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State

Constitution and tort law.

888.   Plaintiff was damaged as a result of Defendants' unlawful conduct.

FORTY-SECOND CAUSE OF ACTION
VIOLATION OF JUSTIN SULLIVAN'S FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

889.   The above paragraphs and Appendix I below are here incorporated by reference.

890.   By aggressively grabbing Plaintiff Justin Sullivan, Defendant John Doe NYPD

officer made Plaintiff fear for his physical well-being and safety and placed him in

apprehension of immediate harmful and/or offensive touching.

891.   Defendants engaged in and subjected Plaintiff to immediate harmful and/or

offensive touching and battered him by forcing him to the ground and wall multiple

times, placing extremely tight flexi-cuffs on his wrists for a lengthy period of time.

892.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in any way resist arrest.

893.    Defendants used excessive and unnecessary force with Plaintiff in the course of an unlawful arrest.

894.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under common law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York State laws and Constitution.

895.    Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

FORTY-THIRD CAUSE OF ACTION
VIOLATION OF <u>PAUL NEWELL'S</u> FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

896.    The above paragraphs and Appendix I below are here incorporated by reference.

897.    Defendant John Doe NYPD officer subjected Plaintiff Paul Newell to false arrest and false imprisonment and deprivation of liberty without probable cause.

898.    On November 15, 2011, at approximately 2:00 a.m., Plaintiff Paul Newell went to observe the police action being taken against the OWS participants.

899.    Approximately 2 blocks away from FKA Liberty Park on Broadway, Plaintiff encountered police barricades and police officers.  He was told that he could not go past the barricades, and he complied.

900.    As he backed away from the barricades in compliance with police orders, police

officers attacked him and detained him without any probable cause he was committing

any crime or otherwise not obeying police orders, lawful or otherwise.

901.    He was held in custody for approximately 6 hours.

902.    Defendant Police Officer had no reasonable expectation of successfully

prosecuting Plaintiff.

903.    Plaintiff was aware of his confinement, and did not consent to it.

904.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983,

The U.S. Constitution, New York State common law, and the New York State

Constitution.

905.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

FORTY-FOURTH CAUSE OF ACTION
VIOLATION OF PAUL NEWELL'S FOURTH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS
PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§ 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

906.    The above paragraphs and Appendix I below are here incorporated by reference.

907.    Defendants John Doe Officers, acting with malice, initiated a false prosecution

against Plaintiff Paul Newell and caused him to be prosecuted.

908.    The criminal proceedings were terminated favorably to Plaintiff.

909.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure, due

process of law, pursuant to the Fourth and Fourteenth Amendments to the United States

Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State

Constitution and tort law.

910.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

FORTY-FIFTH CAUSE OF ACTION
VIOLATION OF PAUL NEWELL'S FOURTH AMENDMENT RIGHT TO BE
FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)

911.    The above paragraphs and Appendix I below are here incorporated by reference.

912.    By aggressively grabbing Plaintiff Paul Newell, Defendant John Doe NYPD

officer made Plaintiff fear for his physical well-being and safety and placed him in

apprehension of immediate harmful and/or offensive touching.

913.    Defendants engaged in and subjected Plaintiff to immediate harmful and/or

offensive touching and battered him by forcing him to the ground and placing extremely

tight flexi-cuffs on his wrists for a lengthy period of time.

914.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in

any way resist arrest.

915.    Defendants used excessive and unnecessary force with Plaintiff in the course of

an unlawful arrest.

916.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights

and have conspired to deprive him of such rights and are liable to Plaintiff under common

law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York

State laws and Constitution.

917.    Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

FORTY-SIXTH CAUSE OF ACTION
(RESPONDEAT SUPERIOR)

918.    The above paragraphs and Appendix I below are here incorporated by reference.

919.    The Defendants' intentional tortious acts were undertaken within the scope of their employment by Defendant City of New York and the MTA in furtherance of the Defendant City of New York's interest.

920.    As a result of Defendants' tortious conduct in the course of their employment and in furtherance of the business of Defendant City of New York and MTA, Plaintiffs were damaged.

FORTY-SEVENTH CAUSE OF ACTION
VIOLATION OF CHARLES MEACHAM'S FOURTH AMENDMENT RIGHT TO
BE FREE FROM UNREASONABLE SEARCH AND SEIZURE -- FALSE
ARREST
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

921.    The above paragraphs and Appendix I below are here incorporated by reference.

922.    Defendant Deputy Inspector Tloczkowski, two (2) John Doe NYPD officers, Defendant Brookfield Properties and Defendant James Morrissey subjected Plaintiff Charles Meacham to false arrest and false imprisonment and deprivation of liberty without probable cause.

923.    Defendant Deputy Inspector Tloczkowski, the two (2) John Doe NYPD officers, Defendant Brookfield Properties and Defendant James Morrissey had no reasonable expectation of successfully prosecuting Plaintiff.

924.    Plaintiff was aware of his confinement, and did not consent to it.

925.    These Defendants have deprived Plaintiff of his civil, Constitutional and statutory

rights, and have conspired to deprive him of such rights in violation of 42 USC § 1983,

The U.S. Constitution, New York State common law, and the New York State

Constitution.

926.    Plaintiffs were damaged as a result of Defendants' unlawful conduct.


FORTY-EIGHTH CAUSE OF ACTION
VIOLATION OF CHARLES MEACHAM'S FOURTH AMENDMENT RIGHT TO
BE FREE OF UNREASONABLE SEARCHES AND SEIZURE – EXCESSIVE
FORCE
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICA, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 §
12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND ASSAULT AND
BATTERY CLAIMS)


927.    The above paragraphs and Appendix I below are here incorporated by reference.

928.    By aggressively grabbing Plaintiff Meacham, Deputy Inspector Tloczkowski and

the two (2) John Doe NYPD officers made Plaintiff fear for his physical well-being and

safety and placed him in apprehension of immediate harmful and/or offensive touching.

929.    Defendants engaged in and subjected Plaintiff to immediate harmful and/or

offensive touching and battered him by bodily seizing him and placing extremely tight

flexi-cuffs on his wrists for a lengthy period of time.

930.    Defendants engaged in these acts without the consent of Plaintiff Meacham or

valid legal justification.

931.    Plaintiff obeyed every police order, regardless of its lawfulness, and did not in

any way resist arrest.

932.    Defendants used excessive and unnecessary force with Plaintiff in the course of

an unlawful arrest.

933.    Defendants have deprived Plaintiff of his civil, Constitutional and statutory rights

and have conspired to deprive him of such rights and are liable to Plaintiff under common

law, the Fourth Amendment of the U.S. Constitution, 42 USC § 1983 and New York

State laws and Constitution.

934.    Plaintiff was damaged by Defendants' assault, battery and use of excessive force.

FORTY-NINTH CAUSE OF ACTION
VIOLATION OF CHARLES MEACHAM'S FOURTH AMENDMENT RIGHT TO
BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES–MALICIOUS
PROSECUTION
(FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
OF AMERICAN, CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1
§ 12, 42 USC § 1983 AND STATE CONSTITUTIONAL AND TORT LAW
CLAIMS)

935.    The above paragraphs and Appendix I below are here incorporated by reference.

936.    Deputy Inspector Tloczkowski, two (2) John Doe NYPD officers, Defendant

Brookfield Properties and Defendant James Morrissey, acting with malice, initiated a

false prosecution against Plaintiff Charles Meacham and caused him to be prosecuted.

937.    The criminal proceedings were terminated favorably to Plaintiff.

938.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil,

Constitutional and statutory rights to be free from unreasonable search and seizure, due

process of law, pursuant to the Fourth and Fourteenth Amendments to the United States

Constitution and are liable to Plaintiff under 42 U.S.C. §§ 1983 and the New York State

Constitution and tort law.

939.    Plaintiff was damaged as a result of Defendants' unlawful conduct.

WHEREFORE, the Plaintiffs will likely succeed on the merits and;

WHEREFORE, unlawful interference with Constitutional rights is *per se* irreparable harm; and

WHEREFORE, these causes of action are not moot as they are continuing to occur and they are "capable of repetition, yet evading review" Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975), Williams v. Ward, 845 F.2d 374, 380 n.6 (2d Cir. 1988)  People ex rel. Maxian on Behalf of Roundtree v. Brown, 164 A.D.2d 56, 58, (2d Dep't. 1990) aff'd, 77 N.Y.2d 422 (1991);

WHEREFORE, the NYPD history set forth in the attached appendix and incorporated herein indicate that appropriate oversight and monitoring is not in place at the present time;

WHEREFORE, other large municipalities, including Oakland[5] and Detroit[6], currently have an Independent Police Monitor authorized by a Federal Court that began by (i) initially auditing then present police practices and thereafter, (ii)  working with members of the police force and the the Department of Justice (Detroit) or Plaintiffs (Oakland) to create and/or ensure compliance with substantive and procedural requirements entered in a consent decree that would increase best police practices in those police departments; and (iii) on a quarterly basis report back to the Federal Court on compliance by the police department with  the 201 substantive and procedural requirements (Detroit) or 51 tasks (Oakland)[7].

---

[5] Oakland Police Department, (http://policeperformancesolutions.com/oakland.htm )
[6] Detroit Police Department (http://policeperformancesolutions.com/detroit.htm)
[7]  Additionally, after an extensive investigation by the Department of Justice, the Puerto Rico police department - the second largest police department in the United States - was found to have a systematic pattern and practice of (i) excessive force in violation of the Fourth Amendment; (ii) unreasonable force and other misconduct designed to suppress the exercise of protected First

Plaintiffs respectfully request that the court:

    (a) Issue a permanent injunction enjoining Defendants from forcibly preventing lawful entry into public spaces, and from forcibly removing citizens lawfully remaining in public spaces;

    (b) Issue a permanent injunction enjoining Defendants from preventing press access to policing activities in connection with public speech and assembly;

    (c) Issue a permanent injunction enjoining Defendants from retaining photographs and fingerprints (and all copies thereof) of arrestees who have received favorable dispositions in their criminal cases, and returning the photographs to the arrestees;

    (d) Issue an Accountability and Transparency Order that the NYPD appoint an agreed upon independent monitor[8] to:

        i.    Review all OWS arrests to determine:

            a.   What percentage of OWS arrestees processed as overnight arrests were eligible for Desk Appearance Tickets/Summons;

            b.   What percentage of OWS arrestees processed as overnight arrests were dismissed or resolved with an Adjournment in Contemplation of Dismissal;

---

Amendment rights; and (iv) unlawful searches and seizures in violation of the Fourth Amendment.
http://www.justice.gov/crt/about/spl/documents/prpd_exec_summ.pdf

[8] Currently there are at least two major American Cities, that have independent monitors auditing and oversight of  their Police Department, appointed and pursuant to federal litigation. Oakland Police Department, (See http://policeperformancesolutions.com/oakland.htm ) Detroit Police Department (http://policeperformancesolutions.com/detroit.htm), See also Cincinnati Police Department (2001) http://www.cincinnati-oh.gov/police/downloads/police_pdf5114.pdf.

      c.   What percentage of OWS arrestees were charged with one or all of the contempt of cop charges - 1 (disorderly conduct), 2 (obstruction of governmental administration) and/or 3 (resisting arrest);

ii.    Undertake an investigation into how a decision can be made by the NYPD to close public spaces, and how they occurred at:

      a.    100 William Street on 1/11/12;

      b.    FKA Liberty Park on 3/17/12;

      c.    Union Square on 3/21/12;

      d.    One Chase Manhattan Plaza, from 9/17/11 to present in varying forms;

iii.    Review all complaints filed with the IAB and audit such response by the IAB;

iv    Review all complaints forwarded by the CCRB and audit such responses by the NYPD to report on the findings.

v.    Review all stop and frisks and audit such documentation of the stop and frisks, and report on the findings;

vi.    Review all quota documentation and audit such documentation of the arrest quotas existence in the NYPD, and report on the findings;

(e) Issue an accountability and transparency order that the NYPD report on its hierarchial structure for all at Captain level or higher, and the structure for who the Commissioner reports to.

(f) Issue a Declaratory judgment declaring that the complained of conduct is

unlawful;

(g) Award money damages to Plaintiffs who have been damaged by the unlawful

and/or unconstitutional actions of Defendants;

(h) award attorney's fees pursuant to 42 USC §§ 1983 and 1988.

Dated:  October 10, 2012


Stoll, Glickman & Bellina, LLP          Stecklow Cohen & Thompson



_____~//s//~_____          _____~//s//~_____
Leo Glickman, Esq.                    Wylie M. Stecklow, Esq.
475 Atlantic Avenue, 3rd Floor        The Liberty & Justice For All Building
Brooklyn, NY 11217                    10 Spring Street – Suite 1
(718)852-3710                         New York, NY  10012
Fax: (718)852-3586                    (212) 566 8000
lglickman@stollglickman.com           Fax (212) 202 4952
                                      wylie@wylielaw.com


The Kurland Group

___~//s//~_____
Yetta G. Kurland, Esq.
350 Broadway, Suite 701
New York, N.Y.  10013
(212) 253 8911
Fax (212) 614 2532