Jeffrey L. Braun
jbraun@kramerlevin.com
Samantha Ford
sford@kramerlevin.com
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

*Attorneys for Defendant JP Morgan Chase & Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| NEW YORK CITY COUNCIL MEMBER YDANIS RODRIGUEZ, et al., | : | 12 Civ. 3389 (NRB) (RLE) |
| Plaintiffs, | : | |
| - against - | : | |
| DEPUTY INSPECTOR EDWARD WINSKI, et al., | : | |
| Defendants. | : | **DECLARATION** |
|  | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHAEL T. SILLERMAN declares under penalties of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of the law firm of Kramer Levin Naftalis & Frankel LLP, the attorneys in this action for defendant JP Morgan Chase & Co. ("JPMC"), and Co-Chair of the Kramer Levin firm's Land Use Department. I make this declaration in support of JPMC's motion to dismiss the First Amended Complaint in this action as to JPMC. The specific purpose of this declaration is to explain, and place before the Court materials relevant to, the history of the building and plaza on JPMC's property at One Chase Manhattan Plaza ("1CMP") in Lower Manhattan, and the legal status of the property.

A.      **My Credentials**

2.      I graduated from the Columbia University School of Law in 1976 as a Harlan Fiske Stone Scholar and was admitted to practice law in New York in 1977 and in the District of Columbia in 1981.  I entered the private practice of law in 1977.  After working in City government in 1981-82 as Executive Assistant to New York City Council President Carol Bellamy, I practiced land use and zoning law at Rosenman & Colin LLP from 1982 until 2002, when our Land Use Department moved to the Kramer Levin firm.  I have concentrated in the practice of New York City zoning and land use law at all times since 1982.

3.      I have represented numerous major developers and institutions (including commercial banks, hospitals, schools, museums and religious organizations) in the City's land use review processes.  I advise clients on all aspects of site development, including acquisition, air rights purchases, zoning, landmark considerations, environmental matters, tax abatements, economic development incentives and discretionary government land use approvals.  I am Chair of The Real Estate Board of New York's Landmarks Committee and Vice Chair of its Planning and Zoning Committee.  I have been recognized as a leading New York City land use practitioner in *Best Lawyers in America*, *Chambers USA*, *Legal 500 US*, *New York Super Lawyers*, *New York Magazine* and *Real Estate Weekly*.  In addition, based on the work of my colleagues and me, the Kramer Levin firm recently was named the 2013 *U.S. News-Best Lawyers* "Law Firm of the Year" in the field of "Land Use & Zoning Law."

B.      **The Complaint's Confusing and Erroneous Allegations About 1CMP**

4.      This action has been brought by several participants in and supporters of the Occupy Wall Street ("OWS") movement and a number of elected officials and professional or amateur journalists.  The complaint appears to be primarily concerned with alleged police

misconduct directed at participants in and observers of OWS activities. However, a secondary goal of the complaint is declaratory and injunctive relief to compel access by OWS members to four privately-owned spaces in Lower Manhattan's financial district – *i.e.*, (1) and (2) Zuccotti Park and the World Financial Center's Winter Garden, both allegedly owned by defendant Brookfield Office Properties, Inc., (3) the atrium at 100 William Street, allegedly owned by defendant Mitsui Fudosan America, Inc., and (4) the plaza at 1CMP, which is owned by JPMC.

        5.      The current complaint is fundamentally confusing insofar as it relates to 1CMP. Unlike the initial complaint in this action, the current complaint purports to distinguish to some degree between the status of 1CMP and the status of the other three properties. The current complaint thus alleges that "each" of the properties "*other than* [1CMP] is designated as 'publicly accessible open space' by the City of New York" (¶ 211) (emphasis added). Elsewhere, however, the current complaint also asserts that "the outdoor plaza space located at" 1CMP is "a publicly accessible open space" (¶ 263), and is one of the "publicly accessible open areas" (¶ 242) to which plaintiffs claim that they are entitled to have access. Still elsewhere, the current complaint alleges that Zuccotti Park, the Winter Garden and the atrium at 100 William Street – but *not* the plaza at 1CMP – "are 'privately owned public spaces' and are considered 'public plazas' within the rubric of" the New York City Zoning Resolution (¶ 219). The complaint goes on to make several additional allegations about the Zoning Resolution's requirements that "public plazas" be open to the public (*see* ¶¶ 219-39), without making clear whether these allegations are intended to refer to 1CMP, or only to the other properties at issue in this action.

        6.      Because of these allegations, it is not completely clear what plaintiffs' theory is as to 1CMP. The current complaint specifically alleges that, with respect to 1CMP,

JPMC "is the successor in interest to the original entity that bargained with the City of New York for various benefits and exemptions in the construction of same, including the de-mapping and removing [of] one block of public road in the process of building on the [1CMP] site" (¶ 32). Similarly, the current complaint also alleges that 1CMP "is a product of bargaining undertaken by Defendant City of New York's City Planning Commission, on behalf of the citizens of the City of New York with the private developers who developed [1CMP]," and that "[i]n return for said developers creating a plaza designated for public use and enjoyment, Defendant City allowed a zoning variance to build [1CMP]" (¶¶ 272-73). It appears from these allegations that plaintiffs' theory is that JPMC is obligated to keep the plaza at 1CMP open to the public under the terms of – or as a result of – the City approvals pursuant to which the building and plaza at 1CMP were constructed. With respect to the three other privately-owned properties at issue in this action (*i.e.*, Zuccotti Park, the Winter Garden and 100 William Street), each of which was constructed *after* 1CMP, plaintiffs' theory appears to be that provisions of the City's Zoning Resolution require that these properties are required to be kept open to the public. It is not clear whether plaintiffs claim that the plaza at 1CMP is subject to the same Zoning Resolution provisions, or whether, instead, the alleged obligation to keep the plaza open to the public is exclusively the result of the City approvals for the project, and is not required by provisions of the Zoning Resolution.

7.     Contrary to the complaint's allegations, and as shown below in more detail, the property at 1CMP is <u>not</u> "publicly accessible open space," and JPMC is under no obligation to open the plaza at 1CMP to the public. Nothing in the City approvals for the project or in the Zoning Resolution is to the contrary. The building and plaza at 1CMP were built under approvals issued prior to the 1961 effective date of the City's current zoning ordinance; the

building does not include any zoning bonus received in exchange for construction of the plaza; and there is no restriction, requirement or condition that obligates the owner of 1CMP to open the plaza to the public.

8.      The City of New York agrees with this analysis.  In the answer that the Corporation Counsel's office interposed to the initial complaint in this action, the City affirmatively and repeatedly averred that "Chase Manhattan Plaza is a pre-1961 space that is not required by law to be open to the public" (¶¶ 193, 194, 195).

9.      This declaration demonstrates that the position of the City and JPMC is correct, and that plaintiffs' claims about 1CMP are unfounded.  This declaration first provides an overview of 1CMP and its history, as derived from an authoritative Landmarks Preservation Commission report.  This declaration then reviews historical materials about the City's zoning laws, which confirm that 1CMP was not approved or built under the current Zoning Resolution, which became effective in 1961.  Next, this declaration analyzes the relevant provisions of the Zoning Resolution, which confirm that the plaza at 1CMP is not subject to provisions requiring some plazas to be open to the public.  Finally, this declaration examines the approvals pursuant to which the building and plaza at 1CMP were built, and demonstrates that those approvals do not impose any legal obligation to open the plaza at 1CMP to the public.  Therefore, JPMC has the same rights typically enjoyed by other property owners to exclude the public from its plaza.

C.      **An Overview of 1CMP and Its History**

10.      The building and plaza at 1CMP were officially designated as a landmark by the New York City Landmarks Preservation Commission on June 24, 2008.  The landmark designation was supported by JPMC, civic groups and elected officials, and led to the issuance by the Commission on February 10, 2009 of a Designation Report (Exhibit 1 hereto).  The

Designation Report, which is 24 pages in length (including the Commission's findings and designation and several photographs), is an official New York City document. It provides an authoritative statement of the history and design of 1CMP.

11.     The Designation Report describes the property at 1CMP as "combin[ing] three main components: a 60-story tower, a 2-1/2 acre plaza, and a 6-story base, of which 5 stories are beneath grade" (at p. 4). It describes the tower as "positioned on part of the north block, leaving the rest of the site open" (*id.*), and points out that the plaza's "most conspicuous feature is Isamu Noguchi's 'Sunken Garden,'" a below-grade abstract composition on the southern part of the property, where it is visible from above in the plaza, and also from the below-grade bank branch underneath the plaza. This Sunken Garden, "like the Zen Gardens" in Kyoto, Japan, was "conceived for contemplation" (*id.* at 7-8). The Designation Report describes the building at 1CMP as having had a "significant … impact on the character of lower Manhattan," and as "one of the financial district's first buildings to boldly reflect the aesthetic and planning strategies of 20th century European modernism, often called the International Style" (*id.* at 2).

12.     According to the Designation Report, construction of the 1CMP complex "began in January 1957 and proceeded in two interconnected campaigns," with the office tower "completed in 1961 and the south plaza in 1964" (*id.* at 7). A skeleton Chase Manhattan Bank staff began occupancy of the building in 1960, but full occupancy by the bank "did not start until January 1961," and the building "was formally dedicated on March 17, 1961" (*id.*), which, as shown below, was nine months prior to the effective date of the City's 1961 Zoning Resolution.

**D.      The 1916 and 1961 Zoning Resolutions**

13.     Historical materials about New York City zoning law further confirm that 1CMP was not approved or built under the 1961 Zoning Resolution, but under the very different pre-1961 Zoning Resolution, which was enacted in 1916.  These materials also show that the concepts of "floor area," "floor area ratio" and "bonus" floor area referred to and relied upon in the current complaint in this action (at least with respect to the three private properties at issue other than 1CMP) were only introduced by the 1961 Zoning Resolution and did not exist in the law prior to that ordinance's enactment.  These materials also show that, in fact, 1CMP was one of a handful of Modernist buildings designed and built in the 1950's that actually inspired the 1961 Zoning Resolution's introduction of zoning incentives to encourage the design and development of tall buildings with plazas.

14.     New York City's zoning ordinance is entitled "the Zoning Resolution of the City of New York" (ZR § 11-02).  Although amended on numerous occasions since its adoption, the current Zoning Resolution initially entered into effect "one year after the date of its approval by the Board of Estimate" (ZR § 11-70).  Copies of all current Zoning Resolution provisions cited in this declaration are assembled as Exhibit 2 hereto, and the entire current text is available on-line (*see* http://www.nyc.gov/html/dcp/html/zone/zonetext.shtml).  The Zoning Resolution was "adopted by the Board of Estimate on December 15, 1960, effective December 15, 1961" (*see* Exhibit 3 hereto).  The 1961 Zoning Resolution was developed from a study entitled *Zoning New York City:  A Proposal for a Zoning Resolution for the City of New York*, which was prepared by the architectural and planning firm of Voorhees, Walker, Smith & Smith

and is commonly referred to as the "Voorhees Report." The Voorhees Report had been commissioned by the City's Department of City Planning, and was published in 1958.[1]

      15.    The 1961 Zoning Resolution superseded the City's prior zoning ordinance, which had been enacted in 1916, largely in response to construction of the 42-story Equitable Building at 120 Broadway. In a 1982 report (*see* Exhibit 4 hereto), the City Planning Commission summarized the evolution of height and density restrictions in the City's zoning laws and, in doing so, described the fundamentally different approaches embodied in the 1916 and 1961 ordinances. With respect to the 1916 ordinance, this City Planning Commission report states that a 1913 report to the Board of Estimate "recommended enabling State legislation to restrict building heights in relation to street widths." The report continues:

> The canyon created by the Equitable Building at 120 Broadway, which rose straight up from the lot line, was an example of what would happen if heights were not controlled. A system of height controls was recommended which could vary in different districts depending on the character of existing development.

The report goes on to state that "[t]he 1916 Zoning Resolution, the first in the nation, established districts based on a set of relationships among building height and setback and street width." City Planning Commission report # N 820253 ZRM and N 820253 ZRM(A) (March 16, 1982, cal. # 1) (Exhibit 4 hereto), at p. 9.

---

[1]    The New York City Charter establishes the City Planning Commission as a body of 13 members, seven of whom (including the Chair) are appointed by the Mayor, and six of whom are appointed by other elected officials (§ 192, subd. a). The Commission is "responsible for the conduct of planning relating to the orderly growth, improvement and future development of the city" (§ 192, subd. d), and must review, hold public hearings on and approve amendments to the Zoning Resolution or the City's zoning map and numerous other City actions (§§ 197-a, 197-c, 200, 201, 202, 203). The Chair of the City Planning Commission simultaneously serves as Director of the Department of City Planning (§ 191, subd. a), an agency with the responsibility to "[p]rovide staff assistance to the city planning commission in all matters under its jurisdiction" (§ 191, subd. b).

16.     The same 1982 City Planning Commission report continues by explaining that "[t]he 1961 Zoning Resolution revised the height and setback regulations partly in reaction to the 'wedding cake' form of buildings constructed in accordance with the 1916 regulations." *Id.* The report continues with a description of the 1961 ordinance's change in approach:

> The 1961 Zoning Resolution introduced the concept of floor area ratio (FAR) as a limitation on building density. The 1916 height and setback regulations … provided unreliable control on density. The floor area ratio device was direct and reliable, and accommodated bonus provisions and transfer of development rights. The concept was subsequently used to secure public amenities on development sites, to help implement special district plans and to support the City's landmark preservation program.
>
> A major goal of the 1961 Zoning Resolution was to secure open space at street level. Bonus floor area was offered for a plaza, allowing a building in a FAR 15 district to reach a maximum FAR of 18.

*Id.*

17.     Similarly, the City's *Zoning Handbook*, a non-legal document published by the Department of City Planning as a guide for laymen and non-specialists, states that "when the 42-story Equitable Building was erected in Lower Manhattan, the need for controls on the height and form of all buildings became clear," and led to enactment of "[t]he groundbreaking Zoning Resolution of 1916," which "established height and setback controls" and "became a model for urban communities" throughout the country. *Zoning Handbook* 1 (2011 ed.). However, by the middle of the 20th century, "many of the underlying planning principles of the 1916 document no longer stood the test of time" (*id.* at 2):

> New theories were capturing the imaginations of planners. Le Corbusier's "tower-in-the-park" model was influencing urban designers of the time and the concept of incentive zoning – trading additional floor area for public amenities – began to take hold.

*Id.* Reflecting these new ideas, the Zoning Resolution of 1961 "introduced incentive zoning by adding a bonus of extra floor space to encourage developers of office buildings and apartment towers to incorporate plazas into their projects." *Id.* Excerpts from the City's *Zoning Handbook* are Exhibit 5 hereto. *See also* the Voorhees Report at 127 (under the proposed new zoning ordinance, "[i]n the central areas of the City … open plazas are encouraged by means of a floor area bonus") (Exhibit 6 hereto).

18.     An authoritative study of plazas and other open spaces in New York City was written by Professor Jerold S. Kayden of Harvard University under the auspices of the City's Department of City Planning and the Municipal Art Society of New York and published in 2000 (and is further discussed below).  Professor Kayden's study specifically identifies 1CMP (together with two Midtown landmarks, Lever House at 390 Park Avenue and the Seagram Building at 375 Park Avenue) as "notable exceptions" to the "wedding cake" or "ziggurat" form of buildings encouraged by the 1916 Zoning Resolution.  The Kayden study points out that these three buildings, all built in the 1950's, "would break the mold" of the 1916 Zoning Resolution and inspire the "entirely new approach to zoning" that is reflected in the 1961 Zoning Resolution.  Kayden, *Privately Owned Public Space: The New York City Experience* 9 (2000). Excerpts from Professor Kayden's book are Exhibit 7 hereto.

**E.     Statutory Analysis of the Public Access Requirement for Post-1961 Plazas**

19.     The relevant statutory provisions confirm that the plaza at 1CMP is not subject to any statutory requirement of public access.  The City's current Zoning Resolution contains incentives that encourage developers to construct tower-style buildings and plazas by providing floor area bonuses in exchange for plazas, but also require the resulting plazas to be

open to the public.  However, these zoning incentives only were introduced in 1961 and did not exist when the office tower and plaza at 1CMP were designed and approved.

20.     The City's Zoning Resolution requires that plazas built under the 1961 Zoning Resolution in exchange for floor area bonuses be kept open to the public at all times unless the City Planning Commission allows a plaza to be closed at night based upon a showing that satisfies enumerated criteria.  The precise requirements applicable to plazas vary somewhat, depending upon when the plaza was developed.  For plazas built since October 17, 2007, these requirements are found in Zoning Resolution § 37-727, which provides in relevant part that "[a]ll *public plazas* shall be accessible to the public at all times, except where the City Planning Commission has authorized a nighttime closing" in accordance with other provisions of the same section.[2]  The term "public plaza" is defined in Zoning Resolution § 12-10 (which is the general definitions section of the Zoning Resolution) as "an open area for public use provided in accordance with the requirements set forth in Section 37-70, inclusive."  ZR § 37-70 and the sections that immediately follow it were added to the Zoning Resolution effective October 17, 2007 (or, in the case of some provisions, later).  Therefore, a "public plaza" that is "provided in accordance with" § 37-70 necessarily is one that was approved *after* October 17, 2007.[3]

---

[2]     In this declaration, unless otherwise indicated, italicized words in quotations from the Zoning Resolution are italicized in the original.  The general definitions section of the Zoning Resolution, § 12-10, provides that "[w]ords in the text … of this Resolution which are *italicized* shall be interpreted in accordance with the provisions set forth in this Section."  In other words, terms that are defined in § 12-10 are italicized when they appear in other provisions of the Zoning Resolution.

[3]     ZR § 37-70 is entitled "PUBLIC PLAZAS."  Under the sometimes arcane conventions of Zoning Resolution terminology, the reference in ZR § 12-10 to "Section 37-70, inclusive," refers to § 37-70 through § 37-78.

21.     The Zoning Resolution also provides, in § 37-60, that the standards "for *plazas, residential plazas* and *urban plazas developed* prior to October 17, 2007, are located in APPENDIX E of this Resolution." Each of the terms "plaza," "residential plaza" and "urban plaza" has a different meaning that is distinct from the term "public plaza" but, like the term "public plaza," is defined in § 12-10 (*i.e.*, the general definitions section). These different definitions are linked to the dates when the relevant space was "developed." For example, a "plaza" is defined as "an open area for public use on a *zoning lot developed*, from December 15, 1961 to June 11, 1996, in accordance with the requirements set forth in APPENDIX E, Section E27-50 (PLAZA STANDARDS OF 1961), of this Resolution."[4] Similarly, the other plaza definitions also are delineated by dates, with both a "residential plaza" and an "urban plaza" limited by definition to "an open area for public use" developed during specified periods of time after 1961 (ZR § 12-10).[5]

---

[4]     Appendix E to the Zoning Resolution is entitled "Design Requirements for Plazas, Residential Plazas and Urban Plazas Developed Prior to October 17, 2007." Within Appendix E, § E27-50, which is the provision referred to in the definition of "plaza" in § 12-10, is entitled "PLAZA STANDARDS OF 1961." It establishes the minimum design criteria for a "plaza" – *i.e.*, "an open area for public use on a *zoning lot developed*, from December 15, 1961 to June 11, 1996, in accordance with the requirements set forth in APPENDIX E." It requires that a "plaza" must "be accessible to the public at all times" unless the City Planning Commission allows it to be closed at night in accordance with the criteria of former § 37-06, which now appear in § 37-727.

[5]     The current complaint in this action alleges that "[a] 'plaza' is defined in Art. 1, Ch. 3 § 33-11 of the Zoning Resolution as an 'open area accessible to the public at all times,'" and then refers to "attached Exhibit H" (¶ 215). Exhibit H to the complaint is a copy of old and superseded provisions of the Zoning Resolution. The current version of § 33-11 is entirely different from and unrelated to the version of § 33-11 annexed to the complaint. The current definition of "plaza" appears in § 12-10, is quoted above in the main text of this declaration (*see* ¶ 21) and is limited to open areas on zoning lots developed between December 15, 1961 and June 11, 1996.

22.     All of these definitions necessarily exclude 1CMP, because, as shown above, the property at 1CMP was developed pursuant to approvals granted before December 15, 1961.

23.     In this connection, the fact that the plaza at 1CMP was completed after the 1961 Zoning Resolution's December 15, 1961 effective date has no relevance.  When the 1961 Zoning Resolution was enacted, it contained comprehensive transition provisions.  Specifically, it provided that construction pursuant to a lawful permit issued "before the effective date of this resolution" could be "continued after the effective date," except that, if this construction had "not been completed, and a certificate of occupancy issued … , within two years after the effective date of this resolution," the permit would "automatically lapse and the right to continue construction shall terminate" unless the City's Board of Standards and Appeals (the "BSA") extended the two-year deadline.  See former ZR § 11-321 (Exhibit 8 hereto).[6]  In the case of 1CMP, a temporary Certificate of Occupancy dated October 10, 1961 (Exhibit 9 hereto), is the last Certificate of Occupancy issued before the effective date of the 1961 Zoning Resolution.  This certificate establishes that the cellar, five subcellar floors and at least 30 additional floors of the building at 1CMP had been completed prior to the 1961 Zoning Resolution's effective date.  In addition, the BSA thereafter extended until December 15, 1965 the deadline by which the plaza at 1CMP could be completed pursuant to the approvals and permits that previously had been issued under the 1916 Zoning Resolution (BSA Cal. No. 3337BZY) (Exhibit 10 hereto).[7]

---

[6]     The transitional provisions of the 1961 Zoning Resolution governing the continuing effectiveness of permits and other approvals issued prior to the ordinance's effective date are moot now and no longer appear in the Zoning Resolution, but the relevant provisions from 1961 are collected in Exhibit 8 hereto.

[7]     Even if the plaza at 1CMP (as distinct from the building) were to be deemed to have been developed after December 15, 1961, it is not situated on a zoning lot that was developed "in

24.     The distinct types of "plazas" defined in ZR § 12-10 and described above in turn are collectively defined in § 12-10 as "publicly accessible open areas."[8]  This statutory term may be the basis of the erroneous allegation in the complaint in this action that the plaza at 1CMP "is a publicly accessible open space" (¶ 263) and is one of the City's "publicly accessible open areas" (¶ 242).  However, the term "publicly accessible open space" does not appear in the Zoning Resolution.  As shown above, moreover, the plaza at 1CMP does not fall within the definitions in the Zoning Resolution of any of the specific types of "plazas" that collectively constitute "publicly accessible open areas" as defined in § 12-10.

25.     The various types of "plazas" that are defined in the Zoning Resolution, together with other types of open spaces that also are defined in the Zoning Resolution and are intended to be accessible to the public (*e.g.*, "arcades" and "covered pedestrian spaces"), have come to be known collectively as "privately owned public spaces" or "POPS."  This term does not appear in the Zoning Resolution, but it has entered into widely accepted use and is defined by the Department of City Planning on its website as "an amenity provided, constructed and maintained by a property owner/developer for public use in exchange for additional floor area" (http://www.nyc.gov/html/dcp/html/zone/zh_ztools_pops.shtml).  This same website entry explains that, "[s]ince 1961, the Zoning Resolution has permitted different types of POPS," and that "[o]ver the years, the requirements of POPS have been refined, providing greater design quality and more comfortable elements to meet the needs of the public."  The website entry

---

accordance with the requirements set forth in APPENDIX E, Section E27-50 (PLAZA STANDARDS OF 1961)," of the 1961 Zoning Resolution.  Therefore, it cannot be a "plaza" within the meaning of ZR § 12-10, and is not subject to the requirement in § E27-50 that it be "accessible to the public at all times" unless closed at night pursuant to City Planning Commission permission.

[8]     ZR § 12-10 thus provides that "[a] 'publicly accessible open area' is an open area for public use on a *zoning lot developed* in accordance with the requirements of a *plaza, residential plaza, urban plaza* or *public plaza.*"

further explains that, "[i]n 2007, all previous design regulations for outdoor POPS were updated and consolidated" in order to "facilitate the design and construction of unique outdoor spaces that ... result in an inviting, attractive and well used public space."

26.     These 2007 Zoning Resolution amendments adopting "updated and consolidated" requirements for outdoor POPS followed the publication in 2000 of Professor Kayden's book, *Privately Owned Public Space: The New York City Experience*, referred to above (*see* ¶ 18). With the support of the Department of City Planning and the Municipal Art Society, Professor Kayden systematically surveyed the open spaces that had been built pursuant to the 1961 Zoning Resolution to assess how well these existing spaces served the public, and also to evaluate the adequacy of the Zoning Resolution's design requirements for those spaces and the City's enforcement of those requirements. Significantly, Professor Kayden's survey of all of the City's urban spaces constituting a POPS catalogued and described 44 separate properties containing POPS (*see* Exhibit 7 hereto, at 74-104) in "Downtown" Manhattan, corresponding for the most part to the Manhattan blocks below Canal Street (*see* map at p. 74). This survey conspicuously does <u>not</u> include in its enumeration the plaza at 1CMP, which, as discussed above, was not built pursuant to the 1961 Zoning Resolution and is not a POPS.

27.     The same is true of a report (Exhibit 11 hereto) entitled *Privately Owned Public Spaces (POPS) in Community District 1*, which was prepared in 2012 under the direction of Professor Michael Levine of Pace University for Manhattan Community Planning Board No. 1, the local advisory board whose area of responsibility includes the 1CMP site. This 2012 report identifies the POPS sites within Community Board No. 1's planning district. Both of the maps that appear in this report do <u>not</u> include the 1CMP site – *i.e.*, the block bounded by Liberty, Nassau, Pine and William Streets – among the 30 sites in the Community Board No. 1 district

- 15 -

that were surveyed for the report.  This omission further confirms that the plaza at 1CMP is not a POPS.

**F.    The Alleged Pre-1961 "Bargain" With the City**

28.    The preceding analysis demonstrates that the plaza at 1CMP is not a POPS, was built under the 1916 Zoning Resolution and not the 1961 Zoning Resolution, and therefore is not subject to the current Zoning Resolution provisions requiring that post-1961 plazas be kept open to the public in the absence of permission from the City Planning Commission allowing night-time closing.  Simply put, the plaza at 1CMP was not built pursuant to the 1961 Zoning Resolution and was not built in exchange for a floor area bonus in accordance with the zoning incentives that were introduced to New York City zoning law by the 1961 Zoning Resolution.

29.    The current complaint nevertheless asserts that the building and plaza at 1CMP were constructed pursuant to "bargaining" between JPMC's predecessor-in-interest as owner of the site and City agencies (*see* ¶¶ 32, 272-73), and that the bargain that allegedly was struck with the City allegedly obligates JPMC to open the plaza at 1CMP to the public.  There is no merit to this contention, which is premised on fundamentally erroneous misconceptions about the City approvals that allowed development at 1CMP.

30.    The documents from the public records that relate to the approval of 1CMP demonstrate that there was <u>no</u> pre-1961 "bargain" with the City that obligates JPMC to keep the plaza at 1CMP open to the public.  These documents demonstrate that in fact JPMC is not under any legal duty at all to open the plaza to the public.

31.    JPMC's office tower at 1CMP was the first modern high-rise office tower built in the financial district after World War II.  The financial district's small and irregularly

shaped blocks are relics of Dutch New Amsterdam, and are not conducive to a modern office tower.  Furthermore, the technical requirements of the 1916 Zoning Resolution, which require setbacks so as to prevent a repetition of the Equitable Building, were inconsistent with tower-style buildings.  Therefore, the design and construction of the building and plaza at 1CMP required JPMC's predecessor, Chase Manhattan Bank, to obtain two forms of relief from the City – *i.e.*, (1) the closing, de-mapping and conveyance to the bank of a segment of Cedar Street to enlarge the bank's site, and (2) a zoning variance allowing minor deviations from the 1916 Zoning Resolution's requirements for setbacks and lot coverage.  These two approvals were obtained pursuant to public review processes that were pursued in a generally simultaneous manner during 1956, and are indicative of the importance that the City's leadership attached to the creation of a modern office tower at the 1CMP site as stimulus for a badly needed revitalization of the financial district as a whole.  The two City actions and the relevant documentation are described in detail in the succeeding paragraphs of this declaration.

      32.    <u>The street de-mapping</u>.  As indicated above, Lower Manhattan's irregular street grid and small blocks are not conducive to the construction of a large International Style office tower.  To allow construction of the 1CMP building and plaza, the City agreed to close, de-map and convey to Chase Manhattan Bank the block-long portion of Cedar Street between Nassau and William Streets, thereby creating a large block bounded by Nassau, Pine, William and Liberty Streets.  In exchange, the bank agreed to convey to the City easements over strips of land around the perimeter of the 1CMP site sufficient to allow the City to widen the surrounding streets and adjoining sidewalks.  The street de-mapping, closure and conveyance for 1CMP was the first of a number of such street closures that the City effectuated over the years to allow the development of modern office towers in Lower Manhattan.

33.     To effectuate this action, an alteration map dated April 16, 1956 (Exhibit 12 hereto), was created.  This map depicts the closing of Cedar Street between Nassau and William Streets and the creation of easements for widened sidewalks around most of the site's perimeter.  The proposed alteration was submitted to the Board of Estimate and, on April 26, 1956, referred to the City Planning Commission, which held a public hearing on the proposal on June 6, 1956, and voted to recommend approval of the proposal to the Board of Estimate (*see* Exhibit 13 hereto, at pp. 7654-55).  Similar recommendations were made by the Manhattan Borough President and the City's Comptroller (*see* Exhibit 13, at 7655-57).  Nothing in the record of these proceedings indicates that the plaza that was to be part of this project would be subject to any legal requirement that it be open to the public on a perpetual basis.  To the contrary, the supporting communication to the Board of Estimate from Robert Moses on behalf of the City Planning Commission urged approval of the proposal on a basis unrelated to the plaza – *i.e.*, the over-all revitalization and redevelopment of the financial district, and the alleviation of traffic congestion:

> There has been growing concern as to the future of the financial district in the face of increasing traffic problems and efforts of other communities to entice commerce and industry from New York City.  The decision of Chase Manhattan Bank to maintain its central office here has anchored the financial district in its present location and will encourage others to follow suit in the reconstruction, rehabilitation and expansion of the area.  Evidences of this have already appeared in the announcements of new buildings and modernization of existing ones near the project site.
>
> This is a bold and farsighted move on the part of the Chase Bank and it deserves the full and complete support of the City.  The offer as outlined in the memorandum of understanding is fair and equitable, will provide an improvement leading to rehabilitation of surrounding areas, provides substantial relief of traffic through construction of off-street parking facilities and widening existing streets, and will be carried out without cost or expense to the City.

(Exhibit 13 hereto, at 7654.)

- 18 -

34.     A written agreement dated October 5, 1956 (Exhibit 14 hereto), thereafter was prepared by the City and Chase Manhattan Bank and executed by the bank.  This extensive agreement (recorded at Liber 4985, page 218) memorialized the City's commitment to convey the de-mapped portion of Cedar Street to the bank, and the bank's commitment to convey to the City easements for space around the perimeter of the site to allow the widening of Nassau, Liberty, William and Pine Streets.  This agreement described these property transfers in detail and included forms of the respective deeds.  It also obligated the bank (a) to "construct a new head office building not exceeding the size and height and substantially in the location shown on Exhibit D hereto annexed together with a plaza as shown on said Exhibit D," (b) to "complete the construction of said new office building on or prior to March 1, 1962 subject, however, to delays" resulting from events outside its control, (c) "upon completion of the said new office building and plaza" and "at its expense and at no cost to the City," to "cause to be demolished all buildings and structures within the areas in which it is granting the City a permanent and perpetual easement for street purposes," and (d) "at its own expense," to "cause the surface of said areas ... to be graded, curbed, paved and sidewalks constructed, including the paving of the entire width of the roadways of the streets ... and including the installation of necessary catch basins, drainage facilities and other City facilities" (¶ 8).  The agreement further provided that, "except for the new head office building to be constructed by" the bank, "no building and no structure or improvement other than balustrades, railings, statuary and similar structures or improvements, including trees and landscaping, above a plane six feet above the highest level of the grade of the highest sidewalk," would "be erected or maintained within [the] area" of the plaza (¶ 15).  However, the agreement contained <u>no</u> requirement that the plaza at 1CMP be, or remain, open to the public.

35.     On October 25, 1956, the Board of Estimate adopted resolutions (Exhibit 15 hereto) approving the de-mapping and conveyance of the portion of Cedar Street, the acceptance of the easements from the bank, and the City's entry into the agreement with the bank.  Nothing in these resolutions required the plaza at 1CMP to be open to the public.

36.     By deed dated January 24, 1957 (Exhibit 16 hereto) (recorded at Liber 4992, page 43), the City conveyed to the bank the land of the de-mapped portion of Cedar Street. This deed reiterated the restriction in the October 5, 1956 agreement against the construction of buildings or other structures in the area of the plaza (*see* ¶ FOURTH, at p. 6), but contained no requirement that the plaza be or remain open to the public.  By subsequent deed (Exhibit 17 hereto) (recorded at Reel 189, page 9), the bank conveyed to the City "a permanent and perpetual easement for street purposes" to the portions of the site required for the street and sidewalk widenings.  Nothing in this deed referred or otherwise related to the plaza at 1CMP.

37.     Lot coverage and setback requirements.  As indicated above, a principal purpose of the 1916 Zoning Resolution was to avoid buildings like the Equitable Building at 120 Broadway, which rises along its site's property lines, without setbacks, for virtually the building's entire 42 stories in height.  To achieve this objective, the 1916 Zoning Resolution required setbacks from property lines at various heights, with additional setbacks at greater heights, all of which served to encourage the construction of buildings in the "wedding cake" or "ziggurat" configurations that are common in buildings constructed before 1961.  However, as Professor Kayden points out in his book, there was "one significant exception" to this requirement of setbacks. *Privately Owned Public Space* at 8.  Specifically, "[f]or portions of the building that covered no more than 25 percent of the lot area and that were set back from the street line by a minimum distance, there would be no height limit whatsoever," and "the building

could rise to the moon." *Id.* at 8-9.  While seldom used in view of practical limitations, this "25 percent tower coverage" provision allowed the construction of skyscrapers like the Chrysler Building and the Empire State Building. *Id.* at 9.

      38.    The design and placement of the new office tower at 1CMP would not strictly comply with these setback and lot coverage requirements of the 1916 Zoning Resolution, because (a) the proposed tower's location on the site caused the building to encroach slightly into required setback areas on two sides (while providing setbacks greatly in excess of those required by the 1916 Zoning Resolution on its other sides), and (b) the tower's footprint would occupy 27.3% of the area of the lot, which exceeded by 2.3% the 25% maximum lot coverage allowed by the 1916 Zoning Resolution for tower-style buildings.  Therefore, it was necessary for Chase Manhattan Bank to apply to the City's Board of Standards and Appeals (the "BSA") for a variance that would allow these minor non-compliances with the Zoning Resolution.  The BSA was and is empowered pursuant to § 666, subd. 6, of the City Charter to grant variances from strict compliance with zoning requirements where the applicant makes a showing of hardship resulting from economic considerations or practical difficulties in complying with applicable zoning requirements.

      39.    The bank filed the necessary application with the BSA (No. 347-56-BZ) on May 4, 1956 (*see* Exhibit 18 hereto).  The BSA held a public hearing on the application on May 29, 1956.  On June 12, 1956, the BSA voted unanimously to grant the application.  In its resolution approving the variance, the BSA recited that the new building would "only occupy 27.3% of the entire plot, leaving 72.7% for a plaza, which will afford light and air and room for relaxation for the applicant's employees and for others in the area," and further recited that, "in foregoing the erection of the building to the street line as permitted by the zoning resolution, the

owner has left approximately 72.7% of his [*sic*] entire plot … for the benefit and welfare of the area to provide open space and light and air" (Exhibit 18, at 1008). The BSA's resolution also supported its decision to grant the variance by reference to "the unique circumstances and the great benefit to the surrounding area and the overwhelming consents of owners in the area and the absence of objections" (*id.*). However, the BSA did not make its approval of the variance contingent or conditional upon an obligation on the part of the bank to open the plaza to the public, let alone to keep it open to the public on a perpetual basis. To the contrary, the BSA approved the variance subject to the bank's compliance with a list of other enumerated conditions – *i.e.*, (1) that the new building would comply with all applicable "laws, rules and regulations" not modified by the variance, (2) that "the building shall not be further increased in height or area"; (3) that "the necessary amendment to the city map, the closing of Cedar street and the conveyance by the City of such portion of Cedar street as lies within the plot in question and the granting of a surface easement to the City for such portions of the plot surrounding the building" as were needed for street and sidewalk widenings "shall be completed prior to the issuance of any certificate of occupancy"; and (4) that "all permits shall be obtained and all work completed" in accordance with the Zoning Resolution (*id.* at 1009).

       40.     Significantly, while the BSA's resolution recognized the plaza at 1CMP as an amenity that would provide "light and air," "open space" and even "room for relaxation," nothing in the BSA's resolution, or in any of the foregoing documents relating to the closure, de-mapping and conveyance of Cedar Street, was contingent or conditioned upon a commitment to keep the plaza open to the public. Nothing in the BSA's resolution or any of the other documents imposed an obligation on Chase Manhattan Bank or its successors to open the plaza to the public at all. Furthermore, the premise of the current complaint in this action that the plaza

at 1CMP is part of a "bargain" with the City pursuant to which the owner is obligated to keep the plaza open to the public is simply incorrect.  The documentation regarding the closure, de-mapping and conveyance of Cedar Street makes clear that the consideration given to the City by the bank was spelled out in these governing documents and did not include any commitment to keep the plaza open to the public.  Similarly, the BSA's resolution granting the variance that was requested by the bank makes clear that (1) while the plaza provided part of the justification for the BSA's decision to grant relief, the office tower that the bank was allowed to build was not bigger or more spacious than what otherwise would have been allowed by the 1916 Zoning Resolution, but instead was believed to be a better design in terms of practicality and aesthetic appearance, and (2) no commitments or obligations to open the plaza to the public were imposed upon the bank by the City or the BSA as a condition to the grant of the variance.

      41.     Professor Kayden's book provides the explanation for the omission from the City's approvals of any requirement that the plaza at 1CMP be open to the public.  It indicates that as of 1956, when these arrangements were approved by the relevant City bodies, the idea of imposing upon a private property owner an obligation to allow public access to its property in exchange for the grant of a benefit by the City had not been devised.  Instead, the advantages or benefits that construction of plazas was seen to bring was the provision of more light and air to a site's surrounding streets and neighboring buildings.  According to Professor Kayden, "[t]he idea" of linking plazas, incentives and a requirement of public access "first appeared in" the Voorhees Report of 1958, which was the precursor to the 1961 Zoning Resolution.  *Privately Owned Public Space* at 11.  Even then, Professor Kayden writes, "the Voorhees Report's commentary … was remarkably terse, delivered in two sentences."  *Id.*  After quoting from the Voorhees Report itself, Professor Kayden's discussion mentions that, "to tout

the advantages of plazas," the report "also relied on a photograph of the Seagram Building," which was built in 1955-58 and had been designed by the world-renowned architects Ludwig Mies van der Rohe and Philip Johnson. *Id.* Professor Kayden then provides a telling anecdote about the Seagram Building's plaza and its celebrated architects' views about the plaza's purpose:

> Indeed, the concept of "usable" open space, as distinct from space meant to bring more "light and air" to the street level, was never elaborated [in the Voorhees Report]. Although the Seagram plaza has roughly 600 linear feet of ledge and step space, Philip Johnson is said to recall that "when Mies van der Rohe saw people sitting on the ledges, he was quite surprised. He had never dreamt they would."

*Id.* In short, at the time that the building and plaza at 1CMP were designed and approved, the concept at the heart of plaintiffs' claims against JPMC – *i.e.*, that the City might impose upon a private property owner, in exchange for a concession by the City, an obligation or commitment to keep a privately-owned plaza open to the public – had not yet been devised, and was not yet part of the City's zoning laws or public policies.

## G.    Conclusion

42.    The relevant historical materials and Zoning Resolution provisions establish conclusively that there is no legal basis for plaintiffs' claims in this lawsuit that JPMC is under some form of legal obligation to maintain the plaza at 1CMP as space that is accessible to the public.

43.    I declare under penalties of perjury that the foregoing is true and correct. Executed on December 12, 2012.

_____
Michael T. Sillerman