UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
NEW YORK CITY COUNCIL MEMBER YDANIS  :
RODRIGUEZ, et al.,                   :
                                     :
            Plaintiffs,              :          12 Civ. 3389 (NRB) (RLE)
                                     :
        - against -                  :
                                     :
DEPUTY INSPECTOR EDWARD WINSKI, et al.,  :
                                     :          **ORAL ARGUMENT**
            Defendants.              :          **REQUESTED _____**
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW OF DEFENDANT JP MORGAN CHASE & CO. IN SUPPORT OF ITS MOTION TO DISMISS


Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York NY 10036
(212) 715-9100

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORIITES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF THE CASE ................................................................................................. 2

    A.    The Plaza at 1CMP ........................................................................................... 2

    B.    The Events Leading to This Action ................................................................. 3

    C.    The Complaint ................................................................................................... 5

ARGUMENT ............................................................................................................................ 6

THE DENIAL OF ACCESS TO THE PLAZA AT 1CMP HAS NOT VIOLATED
PLAINTIFFS' FIRST AMENDMENT RIGHTS TO FREEDOM OF SPEECH AND
ASSEMBLY ............................................................................................................................. 6

    A.    The Plaza at 1CMP Is Privately-Owned Property, and JPMC as Owner
           Is Under No Legal Obligation to Open It to the Public ......................................... 8

    B.    JPMC as Owner Has a Fundamental and Constitutionally Protected
           Right to Exclude Persons from the Plaza, and to Request and Receive
           Police Assistance in Enforcing This Right ......................................................... 17

    C.    A Private Owner's Voluntary Opening of Its Property to the Public Does
           Not Make the Property a Public Forum ............................................................. 19

    D.    The Allegations That JPMC Has Allowed Expressive Conduct by Others
           Are Irrelevant, Implausible and Deceptive ...................................................... 22

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adderley v. Florida,
    385 U.S. 39 (1966).............................................................................18

Amalgamated Food Empl. Union Local 590 v. Logan Valley Plaza, Inc.,
    391 U.S. 308 (1968)........................................................................20, 21

Anderson v. WROC-TV,
    109 Misc.2d 904 (Sup. Ct. Monroe Co. 1981)...................................19

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)......................................................................24, 25

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007).............................................................................24

Brentwood Academy v. Tenn. Secondary School Athletic Ass'n,
    531 U.S. 288 (2001).........................................................................6, 7

Central Hardware Co. v. N.L.R.B.,
    407 U.S. 539 (1972).......................................................................17, 21

Chambers v. Time Warner, Inc.,
    282 F.3d 147 (2d Cir. 2002)...........................................................10 n.4

Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace,
    Inc., 745 F.Supp. 65 (D. Mass. 1990)..........................................22 n.7

Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,
    473 U.S. 788 (1985)..............................................................................6

Crist v. Village of Larchmont,
    797 F.Supp. 309 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir. 1993)...................18

Downs v. Town of Guilderland,
    70 A.D.3d 1228 (3d Dep't), app. dsmssd., 15 N.Y.3d 742 (2010)............................22

Ginsberg v. Healey Car & Truck Leasing, Inc.,
    189 F.3d 268 (2d Cir. 1999)................................................................17

Hotel Empl. & Restaurant Empl. Union, Local 100 v. City of N.Y. Dep't of Parks
    & Recreation, 311 F.3d 534 (2d Cir. 2002)..........................6, 11, 22 n.7

*Hudgens v. N.L.R.B.*,
   424 U.S. 507 (1976)..................................................................................6, 21, 22

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*,
   515 U.S. 557 (1995)..........................................................................................18

*I. Mayer Pincus & Associates v. Oppenheimer & Co.*,
   936 F.2d 759 (2d Cir. 1991)........................................................................24 n.8

*Int'l Society for Krishna Consciousness, Inc. v. Reber*,
   454 F. Supp. 1385 (C.D. Cal. 1978) ..............................................................21

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979)..........................................................................................17

*Kalfus v. New York & Presbyterian Hospitals*,
   476 Fed. Appx. 877 (2d Cir. 2012).........................................................21, 22, 24 n.8

*Kirch v. Liberty Media Corp.*,
   449 F.3d 388 (2d Cir. 2006)..........................................................................8 n.3

*Kuna v. Illinois State Bd. of Elections*,
   821 F. Supp. 2d 1060 (S.D. Ill. 2011)...............................................................22

*Lauria v. Butera*,
   2010 WL 3909884 (N.D.N.Y. Sept. 29, 2010) ..............................................8 n.3

*Liwer v. Hair Anew*,
   2000 WL 223828 (S.D.N.Y. Feb. 25, 2000).....................................................17

*Lloyd Corp. v. Tanner*,
   407 U.S. 551 (1972)......................................................................18, 20, 21, 22

*Local 32B-32J, Service Empl. Int'l Union v. Port Authority*,
   462 F. Supp. 852 (S.D.N.Y. 1978) .................................................................21

*Loce v. Time Warner Entm't Advance/Newhouse P'ship*,
   191 F.3d 256 (2d Cir. 1999)............................................................................11

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982)....................................................................................17, 18

*Marsh v. Alabama*,
   326 U.S. 501 (1946).................................................................................19, 20, 21

*McCall v. Chesapeake Energy Corp.*,
   817 F. Supp. 2d 307 (S.D.N.Y. 2011)............................................................8 n.3

*Mitchell v. City of New Haven,*
   854 F. Supp. 2d 238 (D. Conn. 2012)................................................................22 n.7

*Moore v. Suffolk Co. Police Dep't,*
   151 Misc.2d 160 (Sup. Ct. Suffolk Co. 1991) .....................................................17

*Morton v. Salvation Army,*
   2005 WL 2234003 (S.D.N.Y. Sept. 12, 2005).....................................................12

*Nollan v. California Coastal Comm'n,*
   483 U.S. 825 (1987)......................................................................................17, 18

*Pani v. Blue Cross Blue Shield,*
   152 F.3d 67 (2d Cir. 1998).............................................................................10 n.4

*Rendell-Baker v. Kohn,*
   457 U.S. 830 (1982)..............................................................................................7

*Scott v. Harris,*
   550 U.S. 372 (2007)........................................................................................24 n.8

*SHAD Alliance v. Smith Haven Mall,*
   66 N.Y.2d 496 (1985) .........................................................................................21

*In re SINA Corp. Sec. Litig.,*
   2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006).................................................10 n.4

*Utah Gospel Mission v. Salt Lake City Corp.,* 316 F. Supp. 2d 1201 (D. Utah 2004) .................22

*Venetian Casino Resort, L.L.C. v. Local Joint Exec. Board of Las Vegas,*
   257 F.3d 937 (9th Cir. 2001) .........................................................................22 n.7

*Verizon Directories Corp. v. Yellow Book USA, Inc.,*
   309 F. Supp. 2d 401 (E.D.N.Y. 2004) ...........................................................24 n.8

*Zellner v. Summerlin,*
   494 F.3d 344 (2d Cir. 2007).........................................................................24 n.8

## STATUTES

42 U.S.C. § 1983.......................................................................................5, 7, 17

N.Y.C. Charter § 666 ............................................................................15 n.5

Zoning Resolution of 1916 ...........................................................................*passim*

Zoning Resolution of 1961 ...........................................................................*passim*

## OTHER AUTHORITIES

First Amendment, U.S. Constitution...................................................................... *passim*

Fourteenth Amendment, U.S. Constitution...............................................................7

Rule 12(b)(6), Fed. R. Civ. P. ...............................................................................1

Rule 12(b)(6)......................................................................................................24

## PRELIMINARY STATEMENT

Defendant JP Morgan Chase & Co. ("JPMC") respectfully submits this memorandum of law in support of its motion pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss this action as to it.  The pending first amended complaint is 150 pages long, with 950 numbered paragraphs, plus a 30-page appendix with 136 additional numbered paragraphs, plus 28 exhibits.  This complaint is overwhelmingly about alleged police misconduct, including allegations of wrongful arrest and excessive force, directed at participants in and observers of the Occupy Wall Street movement ("OWS").  However, the complaint also contains allegations directed at the private owners of four parcels of real property in Lower Manhattan – *i.e.*, (1) and (2) Zuccotti Park and the World Financial Center's Winter Garden, both owned by (or leased to) defendant Brookfield Office Properties, Inc., (3) 100 William Street, owned by defendant Mitsui Fudosan America, Inc., and (4) the plaza at One Chase Manhattan Plaza ("1CMP"), owned by JPMC.

Insofar as directed at JPMC, the complaint primarily is premised on two incidents, occurring, respectively, on September 17 and October 12, 2011, when some plaintiffs and other OWS participants allegedly were denied access to the plaza at 1CMP.  There is no allegation that any plaintiff was arrested or otherwise abused on either occasion.  Plaintiffs' sole grievance is that they were denied the ability to engage in expressive conduct at 1CMP.

The complaint fails to state a claim against JPMC, because 1CMP is privately-owned, and plaintiffs have no right, constitutional or otherwise, to have access to its plaza, let alone to commandeer the plaza for mass protest activities.  Plaintiffs suggest that this privately-owned plaza should be considered public, apparently on the basis of the approvals obtained by JPMC's predecessor from New York City agencies in 1956 to allow construction of the site's existing improvements.  There is no merit to this theory, because the relevant documents

demonstrate conclusively that these City approvals did not impose on the property owner any obligation to allow public access to the plaza.  As the City affirmed in its answer to the initial complaint in this action, "Chase Manhattan Plaza is a pre-1961 space that is not required by law to be open to the public" (¶¶ 193, 194, 195).

Furthermore, because 1CMP is private property, JPMC as its owner has the fundamental right, protected by the federal constitution, to exclude the public from the plaza. JPMC also is entitled to ask the New York City Police Department ("NYPD") for assistance in enforcing its rights as owner.  Finally, JPMC's alleged past practice of voluntarily allowing the public to use the plaza for passive recreation does not convert the plaza to public space or create a duty to keep it open or allow OWS participants to appropriate it to their own purposes.

## STATEMENT OF THE CASE

### A.    The Plaza at 1CMP

The property at 1CMP was developed by JPMC's predecessor, Chase Manhattan Bank.  It is improved with a 60-story office tower standing atop a six-story base, with five stories of the base underground.  The property also contains an adjoining two and one-half acre plaza. This plaza is higher than – and clearly delineated and separate from – the surrounding sidewalks, and is accessible from these sidewalks by several stairways.  The building and the plaza were designated landmarks by the City's Landmarks Preservation Commission in 2008.  Photographs of the site are annexed to the Commission's designation report (Exhibit 1), which calls the plaza the tower's "front yard" (*id.* at 7).[1]

The site consists of two blocks that were consolidated to form a single block when a segment of Cedar Street was closed and de-mapped by the City and conveyed to Chase Bank.

---

[1]      Unless otherwise indicated, citations to exhibits in this memorandum refer to exhibits to the declaration of Michael T. Sillerman, a zoning and land use expert who is a member of the law firm representing JPMC in this action.

The bank, which had long owned the south block, purchased the block immediately to the north in 1955 (*id.* at 6). Construction of the current improvements "began in January 1957 and proceeded in two interconnected campaigns," with the office tower completed and occupied in 1961, and the plaza completed in 1964 (*id.* at 7). The building and plaza were designated as a landmark due in part to the building's "significant ... impact on the character of lower Manhattan" as "one of the financial district's first buildings to boldly reflect the aesthetic and planning strategies of 20th century European modernism" (*id.* at 2).

On the present motion, JPMC does not dispute the complaint's assertion that, prior to the incidents here at issue, "persons would regularly gather and meet at [1CMP] to speak to one another [and] eat meals" (¶ 277) – *i.e.*, for passive recreation. However, as discussed below, the complaint's conclusory assertion that "the plaza has traditionally been used as a public space for public speech" (¶ 276) is not supported by factual allegations that make the claim plausible, and in any event is irrelevant to this case.

**B.    The Events Leading to This Action**

On September 17, 2011, the country's first OWS demonstration began in Lower Manhattan. The mass demonstration continued for about two months, during which protestors created a tent city in Zuccotti Park (FAC ¶ 67).[2]

The complaint alleges that, on September 17, OWS protestors were prevented from entering Wall Street, and then 1CMP, by NYPD officers and barricades (¶¶ 258-63). Accepting for purposes of this motion the complaint's assertion that JPMC acted "jointly with the NYPD and acquiesced" in a police decision to close the plaza at 1CMP on September 17 (¶¶ 572-74), there were legitimate reasons for doing so. As the complaint acknowledges, "the

---

[2]    Citations in this memorandum to "FAC" refer to paragraphs in the first amended complaint.

OWS actions were planned well in advance" (¶ 244).  Months before the protests began, a blog

in the on-line magazine *Adbusters* (*see* FAC Exhibit L) warned of the disruptive and extensive

nature of the planned protests.  For example, a July 13, 2011 blog entry stated that, "[o]n

September 17, we want to see 20,000 people flood into lower Manhattan, set up tents, peaceful

barricades and occupy Wall Street for a few months" (*id.* at 2).  On September 6, 2011, eleven

days before the protests began, the following entry was posted to the blog:

> Given today's intense anger against America's totally dysfunctional
> government, no one should be surprised if 90,000 arrive for Occupy Wall Street
> …. [R]eading [the protestors'] materials reveals a deeply frustrated, angry, fed up
> army of revolutionaries ….
>
> No, this is not a one-day rally.  Earlier talks of a "Day of Rage" and
> Million Man March have evolved.  They have new tactics.  Prepare for a long
> siege of the Wall Street/NYSE fortress that organizers say could last "months."

(*Id.* at 3.)

The complaint further alleges that, on October 12, OWS protestors returned to

1CMP to present JPMC's Chief Executive Officer with a "large symbolic check," but could not

enter the plaza because of NYPD barricades and officers (¶¶ 283-84).  The complaint also

alleges – "[u]pon information and belief," and without any factual specification – that "between"

September 17 and October 12, unidentified "people who were not OWS participants were not

prevented by NYPD from entering and remaining on [1CMP] to engage in speech and assembly

activities" (¶ 293).  In addition, at some point after October 12, JPMC allegedly replaced the

police barricades with a "high fence" (¶ 294), which has remained there "24 hours a day, seven

(7) days a week" (¶ 294).

Plaintiffs commenced this action on April 30, 2012.  They filed their amended

complaint after several defendants had written to the Court to request a pre-motion conference

for a motion to dismiss, and the Court had invited plaintiffs to amend their pleading.

C.    **The Complaint**

Plaintiffs are participants in OWS, elected officials and journalists who wish to observe OWS activities, and a journalists' professional organization.  There are 17 named defendants plus numerous "John Doe" defendants.  The current complaint contains 49 "causes of action," most alleging incidents of police misconduct.  The claims against the three private defendants (JPMC and two others) ask for declaratory and injunctive relief to compel access by OWS to these defendants' four spaces in the financial district (*see* FAC at p. 148, ¶ (a)).

While the lengthy complaint is confusing and opaque in its identification of which defendants are the targets of which "causes of action," the "causes of action" asserted against JPMC appear to be the following:

(a)    the first (¶¶ 534-38), which apparently accuses all defendants of having violated 42 U.S.C. § 1983 by violating unspecified federal constitutional rights of plaintiffs "under color of law";

(b)    the seventh (¶¶ 567-85), which accuses JPMC, the City, Mayor Bloomberg, the Police Commissioner and several NYPD officers of having jointly violated 42 U.S.C. § 1983 by denying plaintiffs access to the plaza at 1CMP on September 17 and October 12, and also thereafter, allegedly in violation of plaintiffs' rights of speech and assembly under the First Amendment to the federal constitution;

(c)    the tenth (¶¶ 596-600), which accuses JPMC and the City of a conspiracy to violate two of the plaintiffs' unspecified constitutional rights by denying them access to the plaza at 1CMP.

It is possible that plaintiffs also intend to include JPMC as a defendant in other "causes of action" that are directed against "defendants" in an undifferentiated way, particularly the eighth

(¶¶ 586-90) and the ninth (¶¶ 591-95).  However, any such additional claims are ineffective as to

JPMC for the same reasons that the claims that clearly are addressed to JPMC are ineffective.

## ARGUMENT

### THE DENIAL OF ACCESS TO THE PLAZA AT 1CMP HAS NOT VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHTS TO FREEDOM OF SPEECH AND ASSEMBLY

Where litigants claim that the government has wrongfully denied them access to

particular space in violation of their First Amendment rights to freedom of speech and assembly,

the courts typically examine the nature of the forum to determine where it fits on a spectrum that

is separated into three broad categories:  (1) a traditional public forum, which only may be closed

on the basis of reasonable, content-neutral time, place and manner restrictions; (2) a limited

public forum, which is open only to certain categories of speech; and (3) a nonpublic forum,

where the government may restrict speech entirely if the restrictions are viewpoint-neutral.  *See,

e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Hotel Empl.

& Restaurant Empl. Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d

534, 544-45 (2d Cir. 2002).

As a threshold matter, however, before any examination of the nature of the

forum, it must be established that the allegedly wrongful conduct amounted to state action,

because private parties are not normally subject to any constitutional requirement that they

refrain from violating the constitutional rights of other citizens.  Therefore, unless state action is

established, "the constitutional guarantee of free expression has no part to play," and the type of

forum is irrelevant.  *Hudgens v. N.L.R.B.*, 424 U.S. 507, 521 (1976).  There is no federal cause of

action against private parties for violations of constitutional rights unless their "seemingly

private behavior 'may be fairly treated as that of the State itself.'"  *Brentwood Academy v. Tenn.*

*Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001), quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349 (1974).  Under both the Fourteenth Amendment and 42 U.S.C. § 1983, "[t]he ultimate issue in determining whether" a viable claim lies against a private defendant is whether "the alleged infringement of federal rights" was "'fairly attributable to the State.'"  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982), quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

The Supreme Court has articulated numerous tests "to identify state actions and state actors."  *Brentwood Academy*, 531 U.S. at 294.  Here, the complaint uses the language of the New York Court of Appeals in *SHAD Alliance v. Smith Haven Mall*, 66 N.Y.2d 500 (1985):

> The factors to be considered in determining whether [state action] has been shown include:  "the source of authority for the private action; whether the State is so entwined with the regulation of the private conduct as to constitute State activity; whether there is meaningful State participation in the activity; and whether there has been a delegation of what has traditionally been a State function to a private person ....  As the test is not simply State involvement, but rather significant State involvement, satisfaction of one of these criteria may not necessarily be determinative to a finding of State action" ....

*Id.* at 505, quoting *Sharrock v. Dell Buick-Cadillac*, 45 N.Y.2d 152, 158 (1978).  Here, the complaint contains several conclusory assertions that are formulaic recitations of elements of various tests for state action.  For example, it alleges that the plaza's closure was "undertaken pursuant to an agreement between" the City and JPMC to impose "non-content neutral restrictions" (¶ 269), that JPMC's erection of a fence around the plaza is "a continuation of the policies, customs, and/or practices of" the City and the NYPD (¶ 296), that JPMC "has participated as a joint actor with the NYPD" and "is intertwined with the NYPD in the continuing practice of content-based restrictions on speech and assembly" (¶ 299), and that JPMC "acted jointly with the NYPD and acquiesced in" the NYPD's closure of 1CMP (¶ 573).

None of these conclusory assertions is sufficient to render the closure of the privately-owned plaza at 1CMP an actionable violation by JPMC of plaintiffs' First Amendment rights. As shown below, (a) neither the City's zoning laws nor the terms of the City approvals for the office tower and plaza at 1CMP imposed upon the owner of the site an obligation to keep the plaza open to the public, (b) JPMC as owner of this private site has the right to exclude persons from the site, and to request police assistance in enforcing that right, (c) JPMC's alleged practice of opening the plaza to members of the public for passive recreational use does not create an obligation to keep the plaza open to the public or allow expressive activity on the plaza, and (d) the complaint's allegations that JPMC has discriminated in favor of other persons who have been allowed to use the site for expressive activity are grossly misleading and without legal effect. Therefore, the claims against JPMC are not viable and should be dismissed.[3]

A.    **The Plaza at 1CMP Is Privately-Owned Property, and JPMC**
        **as Owner Is Under No Legal Obligation to Open It to the Public**

The pending complaint acknowledges that 1CMP is privately-owned property. It thus expressly alleges that JPMC "is the property owner of" 1CMP and "the successor in interest to the original entity" that developed the site (¶ 32; *see also* ¶ 275 [1CMP "is privately owned"]). However, the crux of the complaint's claims against JPMC is the notion that JPMC is nevertheless under a legal duty to keep the plaza at 1CMP open to the public, in consequence of

---

[3]    The complaint's conclusory assertion of a "conspiracy" between JPMC and the City (*see* ¶ 600) is similarly unavailing. There is no independent tort of conspiracy under either federal or New York law, and "a claim of civil conspiracy must be dismissed if the underlying torts are also dismissed." *McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307, 321 (S.D.N.Y. 2011). *See also, e.g.*, *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006); *Lauria v. Butera*, 2010 WL 3909884, at *6 (N.D.N.Y. Sept. 29, 2010). Because the exclusion of plaintiffs from the plaza at 1CMP did not violate their First Amendment rights, their conspiracy claim fails as a matter of law.

which, supposedly, plaintiffs and other OWS members enjoy the right, allegedly protected by the First Amendment, to engage in expressive conduct in the plaza.

Unlike the initial complaint in this action, the pending complaint is ambiguous as to the basis for JPMC's alleged duty to keep the plaza open to the public.  In their initial complaint, plaintiffs lumped 1CMP together with the three other private parcels at issue in the case.  The initial complaint thus asserted that all four properties were developed under the City's current zoning ordinance, *i.e.*, the Zoning Resolution that became effective on December 15, 1961 (¶ 194), and that, "[i]n return for ... creating a plaza designated for public use and enjoyment," the City allowed the office tower at 1CMP to exceed "the generally-applicable floor to area ratio limit" that otherwise would apply (¶ 193).  Therefore, according to the initial complaint, the plaza at 1CMP was subject to a statutory requirement in the 1961 Zoning Resolution that plazas built in exchange for floor area bonuses obtained pursuant to the 1961 Zoning Resolution be open to the public at all times, unless the City Planning Commission authorized their closure at night.

In fact, 1CMP was <u>not</u> developed under the 1961 Zoning Resolution, but under the very different prior ordinance, the Zoning Resolution of 1916 (*see* Sillerman Decl. ¶¶ 7, 8, 12-18, 23).  Therefore, the pending complaint takes a different approach.  It alleges that 1CMP "is the product of bargaining undertaken by [the] City Planning Commission ... with the private developers who developed" 1CMP, and that "[i]n return for said developers creating a plaza designated for public use and enjoyment, Defendant City allowed a zoning variance to build" 1CMP (¶¶ 272-73).  It appears from these allegations that plaintiffs' theory now is that JPMC is obligated to keep the plaza at 1CMP open to the public under the terms of – or as a result of – the City approvals pursuant to which the building and plaza at 1CMP were constructed.  It is not

clear whether plaintiffs' theory is that the plaza at 1CMP therefore is subject to the same Zoning

Resolution provisions governing plazas as the other three properties involved in this action, or

whether, instead, the alleged obligation to keep the plaza open to the public is exclusively the

result of the City approvals for the project and is not required by the Zoning Resolution.

   Relevant historical materials and scholarly commentary are presented by the

accompanying Sillerman declaration.[4]  These documents establish that the building and plaza at

1CMP were approved by the City agencies in 1956, five years before the effective date of the

1961 Zoning Resolution.  The office tower and plaza at 1CMP were pioneering examples of

European Modernist architecture, known as the "International Style."  As such, the building and

plaza were of considerable importance in the history of New York City architecture.  They

diverged dramatically from the "ziggurat" or "wedding cake" buildings encouraged by the 1916

Zoning Resolution and, together with two contemporaneous International Style buildings in

Midtown (Lever House and the Seagram Building, both on Park Avenue), were so highly

acclaimed that they inspired fundamental changes in City zoning policies that were introduced

by the 1961 Zoning Resolution.  Specifically, the 1961 Zoning Resolution introduced the

concepts of "floor area" and "floor area ratio" as mechanisms for regulating the bulk of

buildings, and established incentives in the form of floor area bonuses to encourage tower-style

buildings with adjoining plazas.  None of these concepts existed in the 1916 Zoning Resolution.

   Plazas built under the 1961 Zoning Resolution in exchange for floor area bonuses

– *i.e.*, larger buildings – are required to be open to the public at all times, unless the City

---

[4]  On this motion, the Court may consider documents referred to in the complaint, such as the City approvals for the building and plaza at 1CMP, even though those documents are not attached to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  The Court also may consider public records. *See, e.g., Pani v. Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998). *See also In re SINA Corp. Sec. Litig.*, 2006 WL 2742048, at *7 n. 11 (S.D.N.Y. Sept. 26, 2006).

Planning Commission allows their closure at night (Sillerman Decl. ¶¶ 20-21).  However, by the plain terms of the Zoning Resolution, these requirements do not apply to the plaza at 1CMP, because it was not built under the 1961 Zoning Resolution and was not built in exchange for a floor area bonus, a concept that did not exist in New York City law when the building and plaza at 1CMP were designed and approved (*id.* at ¶¶ 13, 16-21).

The pending complaint alleges that:  (1) 1CMP "is a product of bargaining undertaken by [the] City Planning Commission … with the private developers who developed" 1CMP (¶ 272); (2) "[i]n return for said developers creating a plaza designated for public use and enjoyment, [the] City allowed a zoning variance to build" 1CMP (¶ 273); (3) "[i]n building [1CMP], authorization was sought and granted to de-map a portion of Cedar Street to join two parcels of land upon which [1CMP] was built" (¶ 274); and (4) 1CMP therefore "exists as a creation of a consummated bargain between a private actor and government" and "has its genesis in a combined effort between government and a private actor" (¶ 275).  There is a kernel of truth in these allegations, because, in order to develop 1CMP, Chase Bank did obtain a zoning variance from the City and did persuade the City to de-map a block-long segment of Cedar Street and convey it to the bank.

Nevertheless, the mere fact that 1CMP was developed on the basis of discretionary governmental approvals does not make JPMC a state actor for purposes of constitutional analysis; otherwise, every privately owned building developed with discretionary zoning approvals could be the basis of a state action claim against its owner.  The idea is unsustainable, because government authorization of, or acquiescence in, a private entity's actions does not in itself establish state action.  *Hotel Emps. & Rest. Emps. Union*, 311 F.3d at  543-44, citing *Brentwood Academy*, 531 U.S. at 288.  *See also Loce v. Time Warner Entm't*

*Advance/Newhouse P'ship*, 191 F.3d 256, 266 (2d Cir. 1999). Similarly, the fact that a private entity "provides a function that benefits the state" does not convert it into a state actor. *Morton v. Salvation Army*, 2005 WL 2234003, at *3 (S.D.N.Y. Sept. 12, 2005) (the Salvation Army did not become a *de facto* part of the criminal justice system by accepting parolees).

It is therefore essential to examine the actual terms of the two City approvals at issue – *i.e.*, (1) the closing, de-mapping and conveyance to the bank of a block-long segment of Cedar Street, and (2) the issuance of a zoning variance allowing minor deviations from the 1916 Zoning Resolution's requirements. These approvals were the results of separate public review processes that were conducted simultaneously in 1956. On their faces, these approvals conclusively refute plaintiffs' contention that they created an obligation on the part of the owner to keep the plaza at 1CMP open to the public:

1. <u>The street de-mapping</u>. In 1955, when Chase Bank decided to build its new headquarters building in the financial district, Lower Manhattan's irregular street grid and small blocks did not allow construction of a large International Style office tower (Sillerman Decl. ¶¶ 31-32). The City therefore was persuaded to close, de-map and convey to the bank the block-long portion of Cedar Street between Nassau and William Streets, which created a large block bounded by Nassau, Pine, William and Liberty Streets (Exhibit 1, at p. 4). In exchange, the bank agreed to convey to the City easements over strips of land around the perimeter of the 1CMP site to allow the City to widen the surrounding streets and sidewalks (Exhibits 13, 14).

An alteration map (Exhibit 12) depicts the closing of Cedar Street and the creation of easements for widened streets and sidewalks around the site's perimeter. The proposed alteration was submitted to the Board of Estimate and, on April 26, 1956, referred to the City Planning Commission, which held a public hearing on June 6, 1956, and voted to recommend

approval to the Board of Estimate (*see* Exhibit 13, at pp. 7654-55).  Similar recommendations were made by the Manhattan Borough President and the Comptroller (*id.* at 7655-57).  Nothing in the record of these proceedings indicates that the plaza that was to be part of the project would be subject to any legal requirement that it be open to the public.  To the contrary, the supporting communication to the Board of Estimate from Robert Moses on behalf of the City Planning Commission urged approval of the proposal for reasons unrelated to the plaza – *i.e.*, the over-all revitalization of the financial district and the alleviation of traffic congestion (*id.* at 7654).

A written agreement dated October 5, 1956 (Exhibit 14), thereafter was prepared to memorialize the City's commitment to convey the de-mapped portion of Cedar Street to the bank, and the bank's commitment to convey easements around the perimeter of the site to the City for the street and sidewalk widenings.  This agreement obligated the bank (a) to "construct a new head office building not exceeding the size and height and substantially in the location shown on Exhibit D hereto annexed together with a plaza as shown on said Exhibit D," (b) to "complete the construction of said new office building on or prior to March 1, 1962 subject, however, to delays" outside its control, (c) "at its expense and at no cost to the City," to "cause to be demolished all buildings and structures within the areas in which it is granting the City a permanent and perpetual easement for street purposes," and (d) "at its own expense," to "cause the surface of said areas … to be graded, curbed, paved and sidewalks constructed, including the paving of the entire width of the roadways of the streets … and including the installation of necessary catch basins, drainage facilities and other City facilities" (¶ 8).  The agreement further provided that, "except for the new head office building to be constructed by" the bank, "no building and no structure or improvement other than balustrades, railings, statuary and similar structures or improvements, including trees and landscaping, above a plane six feet above the

highest level of the grade of the highest sidewalk," would "be erected or maintained within [the] area" of the plaza (¶ 15). However, the agreement contained no easement or other provision requiring that this plaza be, or remain, open to the public.

On October 25, 1956, the Board of Estimate adopted resolutions (Exhibit 15) approving the de-mapping and conveyance of the portion of Cedar Street, the acceptance of the easements from the bank, and the City's entry into the agreement with the bank. Nothing in these resolutions required the plaza at 1CMP to be open to the public.

By deed dated January 24, 1957 (Exhibit 16), the City conveyed to the bank the de-mapped portion of Cedar Street. This deed reiterated the restriction in the October 5, 1956 agreement against construction of buildings or other structures in the area of the plaza (*see* ¶ FOURTH, at p. 6), but contained no requirement that the plaza be open to the public. By a subsequent deed (Exhibit 17), the bank conveyed to the City "a permanent and perpetual easement for street purposes" to the portions of the site required for the street and sidewalk widenings. Nothing in this deed referred or otherwise related to the plaza at 1CMP.

2.    <u>Modification of lot coverage and setback requirements</u>. Enactment of the 1916 Zoning Resolution was largely a response to the Equitable Building at 120 Broadway, which rises along its site's property lines, without setbacks, for over 40 stories, and therefore creates a canyon that allows little light to reach adjoining sidewalks and neighboring buildings. As a reaction to this design, the 1916 Zoning Resolution required setbacks from property lines at various heights, with additional setbacks at greater heights, all of which encouraged the construction of buildings in the "wedding cake" or "ziggurat" configurations that are common in buildings constructed before 1961. However, there was "one significant exception" to this requirement of setbacks. Jerold S. Kayden, *Privately Owned Public Space: The New York City*

*Experience* at 8 (2000) (*see* Exhibit 7).  Specifically, "[f]or portions of the building that covered no more than 25 percent of the lot area and that were set back from the street line by a minimum distance, there would be no height limit whatsoever," and "the building could rise to the moon." *Id.* at 8-9.  While seldom used, this "25 percent tower coverage" provision allowed skyscrapers like the Chrysler Building and the Empire State Building.  *Id.* at 9.

The new office tower at 1CMP would not strictly comply with these requirements of the 1916 Zoning Resolution, because (a) the proposed tower's location on the site caused the building to encroach slightly into required setback areas on two sides (while providing setbacks greatly in excess of those required on its other sides), and (b) the tower's footprint would occupy 27.3% of the area of the lot, which slightly exceeded the 25% maximum lot coverage allowed for towers.  Therefore, Chase Bank needed to apply to the City's Board of Standards and Appeals (the "BSA") for a variance allowing these minor non-compliances with the Zoning Resolution.[5]

The bank filed its variance application with the BSA (No. 347-56-BZ) on May 4, 1956 (*see* Exhibit 18).  The BSA held a public hearing on May 29, 1956, and on June 12, 1956, unanimously granted the application.  In its resolution of approval, the BSA recited that the new building would "only occupy 27.3% of the entire plot, leaving 72.7% for a plaza, which will afford light and air and room for relaxation for the applicant's employees and for others in the area," and further recited that, "in foregoing the erection of the building to the street line as permitted by the zoning resolution, the owner has left approximately 72.7% of his [*sic*] entire plot ... for the benefit and welfare of the area to provide open space and light and air" (Exhibit 18, at 1008).  The BSA's resolution also referred to "the unique circumstances and the great

---

[5]    The BSA is empowered pursuant to City Charter § 666, subd. 6, to grant variances from zoning requirements where the applicant makes a showing of hardship resulting from economic considerations or practical difficulties in complying with zoning requirements.

benefit to the surrounding area and the overwhelming consents of owners in the area and the absence of objections" (*id.*).

However, the BSA did not make the variance contingent or conditional upon an obligation on the part of the bank to open the plaza to the public, let alone to keep it open on a perpetual basis. To the contrary, the BSA approved the variance subject to the bank's compliance with a list of other enumerated conditions (*id.* at 1009), all of which were intended to ensure that the project would otherwise comply with applicable laws and that the City and the bank would perform their contractual obligations to exchange the segment of Cedar Street for easements over the site's perimeter to allow the street and sidewalk widenings.

The premise of the complaint that the plaza at 1CMP is part of a "bargain" with the City pursuant to which the owner is required to keep the plaza open to the public is, thus, simply incorrect. The documentation regarding the closure, de-mapping and conveyance of Cedar Street makes clear that the consideration given to the City by the bank did not include a commitment to open the plaza to the public. Similarly, the BSA's resolution granting the variance imposes no obligation on the owner regarding public access to the plaza.

A 2000 study by a Harvard professor of New York City's privately-owned plazas provides the explanation for the absence of any requirement that the plaza at 1CMP be open to the public. It indicates that as of 1956, the idea of imposing upon a private property owner an obligation to allow public access to its property as a condition to the grant of a benefit by the City had not been devised. Instead, plazas were seen as providing more light and air to a site's surrounding streets and neighboring buildings. According to this study, "[t]he idea" of linking plazas, incentives and a requirement of public access "first appeared in" a 1958 study that was the precursor to the 1961 Zoning Resolution. Kayden, *supra*, at 11. In short, when the

improvements at 1CMP were designed and approved, the concept at the heart of plaintiffs'
claims against JPMC – *i.e.*, the imposition upon a private property owner, in exchange for a
concession by the City, of an obligation to keep a privately-owned plaza open to the public – had
not yet been devised, and was not part of the City's zoning laws or public policies.

**B.     JPMC as Owner Has a Fundamental and Constitutionally
         Protected Right to Exclude Persons from the Plaza, and to
         <u>Request and Receive Police Assistance in Enforcing This Right</u>**

         The "power to exclude has traditionally been considered one of the most treasured
strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV
Corp.*, 458 U.S. 419, 435 (1982). *See also Kaiser Aetna v. United States*, 444 U.S. 164, 179-80
(1979); *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987). This right protects a
property owner's legitimate "expectation that he will be relatively undisturbed … in the
possession of his property." *Loretto*, 458 U.S. at 436.

         Furthermore, the owner of private property may invoke its right to exclude
without becoming a state actor. *Central Hardware Co. v. N.L.R.B.,* 407 U.S. 539, 547 (1972)
(no First Amendment violation by shopping mall owner where a union organizer was arrested at
the owner's request after violating the mall's no solicitation rule). Therefore, "[w]here a private
person merely seeks the assistance of the police to quell a disturbance, the private party is not
'jointly engaged' in the police officer's conduct so as to render it a state actor under § 1983."
*Liwer v. Hair Anew*, 2000 WL 223828, at *2 (S.D.N.Y. Feb. 25, 2000), quoted in *Forbes v. City
of New York*, 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008). *See also Ginsberg v. Healey
Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir. 1999) (a "private party" is not a state
actor "whenever it legitimately calls for official assistance or protection"); *Moore v. Suffolk Co.
Police Dep't*, 151 Misc.2d 160, 162 (Sup. Ct. Suffolk Co. 1991) ("the enforcement of a private

property owner's right to exclude demonstrators by Suffolk County police officers, who do so at the request of the private property owner, does not constitute State action").[6]

Because a property owner "suffers a special kind of injury when a *stranger* directly invades and occupies [his] property," *Loretto*, 458 U.S. at 436 (emphasis in original), an owner is entitled to prevent such entry even if the intrusion would "achiev[e] an important public benefit or ha[ve] only minimal economic impact on the owner." *Nollan*, 483 U.S. at 831-32. It is irrelevant, therefore, that plaintiffs' activities allegedly would foster public discourse on important issues. *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995); *SHAD Alliance*, 66 N.Y.2d at 506. It is equally irrelevant that plaintiffs allegedly had "no suitable alternative channel for the protest" that they attempted to stage by presenting a symbolic check to JPMC's CEO (FAC ¶ 291). An alleged lack of public spaces in Lower Manhattan does not require a private owner like JPMC to "bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Nollan*, 483 U.S. at 836 n. 4. The Supreme Court has "never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 568 (1972). *See also Adderley v. Florida*, 385 U.S. 39, 47-48 (1966) (those who want to "propagandize protests or views" do not have "a constitutional right to do so whenever and however and wherever they please"). A property owner therefore is free to close its property to expressive conduct that is "'… incompatible with the intended use of the property …'" by the owner. *Crist v. Village of Larchmont,* 797 F. Supp. 309, 313-14 (S.D.N.Y. 1992), *aff'd*, 9 F.3d 1537 (2d Cir. 1993),

---

[6]     Because of JPMC's right to request police assistance to exclude OWS participants from the plaza, the complaint's assertion that JPMC made a large donation of goods, services and money to the New York Police Foundation (FAC ¶¶ 401-02) is completely irrelevant.

quoting *Gannett Satellite Inf. Net., Inc. v. Metrop. Transp. Authority*, 745 F.2d 767, 773 (2d Cir.

1984). *See also Anderson v. WROC-TV*, 109 Misc.2d 904, 910 (Sup. Ct. Monroe Co. 1981) (the

First Amendment has never been construed as a "license to trespass … or … intrude").

**C.    A Private Owner's Voluntary Opening of Its Property to the Public
        Does Not Make the Property a Public Forum**

      The pending complaint alleges that the plaza at 1CMP is "a publicly accessible

open space" (¶ 263); that prior to the commencement of OWS activities on September 17, 2011,

"persons would regularly gather and meet" there "to speak to one another, eat meals, and engage

in substantially all of the activities that are commonly undertaken in public spaces" (¶ 277); and

that 1CMP "is a public space that is open 24 hours a day, 7 days a week" (¶ 280).  The complaint

further alleges that the exclusion from 1CMP "of OWS activists," including two of the named

plaintiffs, "is a violation of their rights pursuant to the First and Fourteenth amendments ...

according to the principles enunciated in *Marsh v. Alabama*, 326 U.S. 501 (1946)" (¶ 308).  This

invocation of *Marsh* appears to be an assertion that the plaza at 1CMP has been generally open

to the public, and therefore should be treated as the functional equivalent of publicly-owned

space that only can be closed to expressive conduct on the basis of reasonable, content-neutral

time, place and manner restrictions.  This proposition is without merit, because an owner who

invites the public onto its property for limited purposes does not become obligated to allow the

public to engage in expressive conduct on its property.  *Marsh* is not to the contrary.

      *Marsh* involved an Alabama company town, where all land, including the streets

and sidewalks, were owned by a private corporation.  A Jehovah's Witness tried to distribute

literature on the town's business block, was arrested and was convicted of criminal trespass.  The

Supreme Court reversed the conviction, holding that the private ownership of the premises where

the relevant events had occurred "is not sufficient to justify the State's permitting a corporation

to govern a community of citizens so as to restrict their fundamental liberties" by preventing the distribution of religious literature.  326 U.S. at 509.

Subsequently, in *Amalgamated Food Empl. Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968), the Court applied *Marsh* to a privately-owned shopping mall, holding that it was "clearly the functional equivalent of the business district ... in *Marsh*." 391 U.S. at 318.  Significantly, however, the author of the Court's majority opinion in *Marsh*, Justice Black, issued a forceful dissent.  He wrote that "*Marsh* was never intended to apply to this kind of situation," but instead "dealt with the very special situation of a company-owned town" that "had all the attributes of a town and was exactly like any other town in Alabama." *Id.* at 330-31. Justice Black continued:

> The question is, Under what circumstances can private property be treated as though it were public?  The answer that *Marsh* gives is when that property has taken on *all the attributes* of a town, *i.e.*, "residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated."

*Id.* at 332 (emphasis added).  Justice Black's dissent eventually became the law.

In *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972), Vietnam War opponents claimed that a privately-owned shopping mall's prohibition against hand-billing violated their First Amendment rights.  The Court rejected their claim.  The shopping mall contained an auditorium that was available to civic and charitable organizations and even presidential candidates; the American Legion sold poppies in the mall to help disabled veterans; and the Salvation Army and Volunteers for America solicited Christmas donations there.  Nevertheless, the Court concluded that the mall had not lost "its private character merely because the public is generally invited to use it for designated purposes." 407 U.S. at 569.  There had "been no such dedication of [the] privately owned and operated shopping center to public use as to entitle respondents to exercise

therein the asserted First Amendment rights." *Id.* at 570. *See also Central Hardware Co. v. N.L.R.B.*, 407 U.S. 539 (1972) (the First Amendment did not give union representatives the right to solicit members in their employer's privately-owned parking lot).

Four years later, in *Hudgens v. N.L.R.B.*, 424 U.S. 507 (1976), the Court decided that union members did not have a First Amendment right to picket a store in a privately-owned shopping mall. In doing so, the Court acknowledged that its decision in *Lloyd* had created confusion as to the continuing validity of *Logan Valley*. 424 U.S. at 518. Therefore, after quoting at length from Justice Black's dissent in *Logan Valley* (in which he had distinguished *Logan Valley* from *Marsh*), the Court stated that "we make clear now, if it was not clear before, that the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case." *Id.*

The evolution of the Supreme Court's position in these cases makes clear that a private owner's invitation to the public to enter upon its property does not create a duty on the part of the owner to allow conduct that, if conducted on public property, would be protected by the First Amendment. *Marsh* is only a very narrow exception, applicable to the special situation of a company town. Lower court decisions are to similar effect. *See, e.g., Kalfus v. New York & Presbyterian Hospitals*, 476 Fed. Appx. 877 (2d Cir. 2012) (no right of photojournalist to linger on hospital steps); *Local 32B-32J, Service Empl. Int'l Union v. Port Authority*, 462 F. Supp. 852 (S.D.N.Y. 1978) (no right to picket on private land outside airport terminal); *Int'l Society for Krishna Consciousness, Inc. v. Reber*, 454 F. Supp. 1385 (C.D. Cal. 1978) (no right to distribute religious literature on private extension of public street).

Significantly, moreover, New York's highest court has reached the same conclusion, holding that the state's constitution does not create greater rights than the First Amendment does to engage in expressive conduct in a privately-owned shopping mall. *SHAD*

*Alliance v. Smith Haven Mall*, 66 N.Y.2d 496 (1985).  *See also Downs v. Town of Guilderland*,

70 A.D.3d 1228, 1231-32 (3d Dep't), *app. dsmssd.*, 15 N.Y.3d 742 (2010).[7]

**D.     The Allegations That JPMC Has Allowed Expressive Conduct**
**by Others Are Irrelevant, Implausible and Deceptive**

      The complaint seeks to avoid dismissal on the basis of cases like *Hudgens* and

*SHAD Alliance* by asserting that JPMC has been selective on a content-driven basis in whom it

allows to use the plaza.  It is settled law, however, that private property does not "lose its private

character merely because the public is generally invited to use it for designated purposes." *Lloyd*

*Corp.*, 407 U.S. at 569.  *See also Kalfus*, 476 Fed. Appx. at 879-80.  Therefore, there is no basis

for requiring a private owner to be content-neutral in allowing some expression on its premises

but not allowing other expressive conduct.  *See Kuna v. Illinois State Bd. of Elections*, 821 F.

Supp. 2d 1060, 1070 (S.D. Ill. 2011); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp.

2d 1201, 1224, 1231 (D. Utah 2004).

      Nevertheless, assuming for argument's sake that JPMC, as a private owner, would

be obligated to allow OWS participants to demonstrate in the plaza if it allowed other expressive

activity, these allegations do not save the complaint.  Specifically, the complaint alleges that,

"[i]n the generations since its construction, [1CMP] has traditionally been used as a public space

---

[7]    The exclusively private nature of the ownership and management of 1CMP distinguishes it from other properties that courts have held – or assumed without deciding – should be treated as some form of public forum. *See, e.g., Hotel Empl. & Restaurant Empl. Union, Local 100*, 311 F.3d at 543 (Josie Robertson Plaza at Lincoln Center was managed by a private not-for-profit licensee but was owned by the City of New York); *Venetian Casino Resort, L.L.C. v. Local Joint Exec. Board of Las Vegas*, 257 F.3d 937 (9th Cir. 2001) (sidewalk was owned by a hotel but subject to a recorded servitude obligating the hotel to dedicate the sidewalk to public use); *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass. 1990) (streets around Faneuil Hall were leased to a private owner but were owned by the City of Boston and subject to an easement for public passage). *See also Mitchell v. City of New Haven*, 854 F. Supp. 2d 238 (D. Conn. 2012), involving OWS activity on the New Haven Green, which the parties agreed was public in nature, because the Green historically is undivided common land of the New Haven community, and the non-profit committee that owns it is a self-perpetuating 19th century creation whose members – all prominent citizens – view themselves as "stewards of the Green and advisors to the City." *Id.* at 243.

for public speech" (¶ 276), and – "[u]pon information and belief" – that "between" September 17 and October 12, 2011, "people who were not OWS participants were not prevented by NYPD from entering and remaining on [1CMP] to engage in speech and assembly activities" (¶ 293).

The only factual support in the entire complaint for these conclusory assertions is the following allegation:

> For example, in 2009, it [*i.e.*, the plaza] was the site of a group demonstrating against home disclosures – NACA – that was undisturbed by police or by private security.

(FAC ¶ 276.)  The complaint does not identify what "NACA" is, but the characterization of the demonstration as being "against home disclosures" suggests that the demonstration was against some form of bank regulation, and therefore was supported by JPMC.

This impression that the complaint fosters is completely false.  "NACA" is the Neighborhood Assistance Corp. of America, which, as its website makes clear (*see* www.naca.com), provides mortgage assistance, counseling and advocacy to actual and prospective home owners of modest means.  A NACA-organized demonstration at 1CMP took place on December 14, 2009, and was not "against home <u>dis</u>closures," but against home <u>fore</u>closures.  Thus, contrary to the impression that the complaint fosters, it was not a demonstration that JPMC would be expected to support or approve.  A contemporaneous account of the incident makes clear that the implication that JPMC favored this demonstration, and that it "was undisturbed by police or by private security," is simply not true.  An article on AOL's *Daily Finance* news website contains the following account of NACA's demonstration at 1CMP, based on statements by NACA's own Chief Executive Officer:

> A brief altercation at the headquarters occurred when Chase employees tried to lock the building's revolving doors, effectively barring the protesters from the building, says Bruce Marks, CEO of NACA. Approximately 700 NACA representatives gathered in the building's

lobby, Marks says, while as many as 400 more waited outside, until New York Police Department officers arrived and asked the protesters to leave.

Bruce Watson, *Chase Backlash: 1,000 Homeowners Protest at Bank's Manhattan HQ*, http://www.dailyfinance.com/2009/12/14/chase-protests-1-000-homeowner-protest-at-banks-manhattan-head (Dec. 14, 2009).  YouTube videos posted by NACA protestors are consistent with this account.  *See, e.g.*, http://www.youtube.com/watch?v=h_paM02g8MU.[8]

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is *plausible on its face*."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added).  "A claim has facial plausibility" only if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

In *Twombly*, the Court ruled that allegations of an unlawful agreement between competitors were not supported by sufficient allegations of specific facts to allow a plausible inference that the competitors' parallel conduct resulted from an agreement in restraint of trade rather than from each competitor's "natural, unilateral" assessment of its own best interests.  *Id.* at 566.  Similarly in *Iqbal*, the Court ruled that the complaint contained insufficient factual allegations to render plausible a claim by a Pakistani national that his detention after the

---

[8]   It is well-established that, on summary judgment, a court may rely upon video recordings and other documentary evidence that "utterly discredit[s]" a party's account of events.  *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  *See also, e.g., Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007); *Kalfus*, 476 Fed. Appx. at 880-81.  Judge Weinstein has ruled that video recordings also may be relied upon on motions to dismiss.  *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 404 (E.D.N.Y. 2004).  *See also, generally, I. Mayer Pincus & Associates v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) ("We therefore decline to close our eyes [and] create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference").

September 11, 2001 terrorist attacks was the result of racial, religious or national origin discrimination, as opposed to a "legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks ...." 556 U.S. at 682.

Here, the same principles apply to the complaint's allegation about the NACA demonstration. A demonstration occurred, but nothing in the complaint renders plausible the inference that plaintiffs want to draw – *i.e.*, that the demonstration was allowed by JPMC, and that JPMC therefore has practiced contest-based discrimination as to who may or may not engage in expressive conduct at 1CMP. The claim is not plausible and should be rejected.

## CONCLUSION

Plaintiffs do not have a right to access to the plaza at 1CMP, and the denial of access did not violate any plaintiff's rights. Therefore, the complaint does not allege a claim against JPMC for which relief can be granted, and the action should be dismissed as to JPMC.

Dated: New York, NY
      December 14, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Defendant JP Morgan Chase & Co.*

By: _____ /s/ Jeffrey L. Braun _____
            Jeffrey L. Braun
            Samantha Ford

1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100