UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
YDANIS RODRIGUEZ, et al.

            Plaintiffs,

      - against -

EDWARD WINSKI, et al.,

           Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

12 Civ. 3389 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Ydanis Rodriguez and 16 other named plaintiffs ("plaintiffs"), comprising a group of Occupy Wall Street protestors, elected officials, and journalists, bring this action against various institutional and individual defendants, pursuant to 42 U.S.C. § 1983.[1]  Plaintiffs assert 49 separate causes of action, including, *inter alia*, allegations of the violation of their federal First and Fourth Amendment rights, the violation of their New York State constitutional rights, conspiracy to violate their constitutional rights, and state tort law claims.

Pending before the Court are four motions to dismiss plaintiffs' First Amended Complaint brought by the following defendants:  (a) the Metropolitan Transportation Authority

---

[1]   Plaintiffs describe Occupy Wall Street as a "leaderless" movement without a formal institutional structure, consisting of "one big swarm of people."  Ex. L to Compl.  Accordingly, plaintiffs are a collection of named individuals, in addition to the National Press Photographers' Association; there is no "Occupy Wall Street" institutional entity acting as a party to this suit.

("MTA"), MTA Police Commissioner Michael Coan in his individual and official capacities, and MTA Police Lieutenant Omeeta Lakeram in her individual and official capacities (collectively, "MTA defendants"), (b) JP Morgan Chase & Co. ("JPMC"), owner of the plaza at One Chase Manhattan Plaza, (c) Mitsui Fudosan America, Inc. ("Mitsui"), owner of the atrium at 100 William Street, and (d) Brookfield Office Properties Inc., owner of Zuccotti Park and operator of the World Financial Center's Winter Garden ("Brookfield"), and James Morrissey, a Brookfield employee serving as General Manager of the World Financial Center (collectively, "Brookfield defendants"). The MTA defendants also move to sever plaintiffs' claims against them. For the reasons set forth below, the motions to dismiss brought by JPMC, Mitsui and the Brookfield defendants are granted; the motion to dismiss brought by the MTA defendants is granted in part, denied in part, and the MTA defendants' motion for severance is granted.

## BACKGROUND

### I.   Procedural History

Plaintiffs filed this lawsuit on April 30, 2012, and filed on October 16, 2012 their First Amended Complaint (hereinafter the "complaint"), which was joined by two new plaintiffs and brought against an expanded set of defendants. JPMC, Mitsui, the MTA defendants, and the Brookfield defendants moved to

dismiss on December 14, 2012.  Plaintiffs opposed on January 23, 2013, and the moving defendants filed their replies on February 12, 2013.  Oral argument was held in two sessions on August 7, 2013 and August 20, 2013.

## II.  Allegations in the Complaint

This case arises from events in New York City during the Occupy Wall Street protests regarding "the effects of income inequality on society."  Compl. ¶ 251.  Beginning in approximately September 2011, Occupy Wall Street ("OWS") protestors gathered or attempted to gather in a number of Manhattan locations, including certain relevant to the instant motions:  the plaza at One Chase Manhattan Plaza, the atrium at 100 William Street, the World Financial Center's Winter Garden, Zuccotti Park, and Grand Central Terminal.  Plaintiffs' 939-paragraph complaint alleges that, on a series of occasions, in violation of law, certain individual plaintiffs were either refused entry to certain properties or were forcibly removed from the properties and in some cases arrested.

### A.   Allegations Pertaining to Defendant JPMC

On September 17, 2011, OWS protestors, including individual plaintiffs Justin Wedes and Peter Dutro, marched to One Chase Manhattan Plaza ("1CMP"), but were unable to enter because the New York Police Department ("NYPD") had closed the space and cordoned it off with police barricades.  Compl. ¶¶ 263-64, 278.

3

Plaintiff Dutro was similarly barred from 1CMP when he and other OWS protestors attempted to enter on October 12, 2011. Compl. ¶¶ 283-84. Plaintiffs allege that at some time after October 12, 2011, a privately owned fence replaced the police barricades surrounding 1CMP, preventing OWS protestors from entering. Compl. ¶¶ 294-296, 303.

1CMP is a parcel of real property privately owned by JPMC. Compl. ¶ 32. The plaza is raised above street level and is accessible by several sets of staircases; it does not function as a part of the lower Manhattan street grid. *See* Decl. of Michael T. Sillerman, Ex. 1 at 17-22.

JPMC's predecessor Chase Manhattan Bank planned and received municipal approvals for the construction of 1CMP prior to the enactment of New York's 1961 Zoning Resolution. Sillerman Decl., Ex. 13. As part of the plan of construction, the City closed, de-mapped and conveyed to Chase Manhattan Bank a one-block section of Cedar Street. Sillerman Decl., Ex. 14-16. In turn, JPMC conveyed by indenture to the City "a permanent and perpetual easement . . . for street purposes" of property surrounding 1CMP, used to expand bordering streets and sidewalks. Sillerman Decl., Ex. 17. No easement or similar contractual provision burdens the plaza itself. *See* Aug. 7, 2013 Tr. at 14.

4

Because the City provided all requisite approvals for the design and construction of 1CMP before the promulgation of the 1961 Zoning Resolution, 1CMP was not designated as a "publicly accessible open space" pursuant to the 1961 ordinance. *See* Sillerman Decl., Ex. 14-18.  The complaint contains inconsistent allegations regarding whether 1CMP qualifies as a "publicly accessible open space." *Compare* Compl. ¶ 263 (alleging that 1CMP *is* a publicly accessible open space) *with* Compl. ¶ 211 (alleging that 1CMP is *not* a publicly accessible open space). Nevertheless, plaintiffs acknowledge in their opposition papers that "1CMP was not constructed under the provisions of the 1961 Zoning Resolution" that first introduced in New York the relevant zoning mechanism for creating privately owned publicly accessible open space.  Pls.' Opp'n to Def. JPMC's Mot. to Dismiss at 4.

### B.  Allegations Pertaining to Defendant Mitsui

On the evening of January 1, 2012, certain OWS participants, including plaintiff Yonatan Miller, gathered in the atrium of 100 William Street.  Compl. ¶¶ 337, 342.  At some time thereafter, NYPD Deputy Inspector Edward Winski and other police officers arrived and instructed the OWS protestors to leave the atrium.  Compl. ¶¶ 343-44.  When challenged by OWS participants, Deputy Inspector Winski explained that Mitsui, the owner of 100 William Street, believed the area to be private

space.   Compl. ¶ 345-46.   Deputy Inspector Winski then allegedly threatened plaintiff Miller and other OWS participants with arrest if they did not depart the atrium, although no arrests are alleged to have occurred.   Compl. ¶¶ 349, 351.

Plaintiffs allege, without further specification as to who was involved or what conduct (if any) occurred, that "an employee of Mitsui invited and encouraged the police to take this action and/or did not prevent the NYPD from taking this action."   Compl. ¶ 357.   Plaintiffs characterize Mitsui's involvement, such as it was, as a "unilateral and sudden decision" in service of Mitsui's alleged "self-determined, spontaneous wish" to preclude OWS access to the 100 William Street atrium.   Compl. ¶¶ 362, 364.

The atrium of 100 William Street, owned by defendant Mitsui, is a "privately owned public space," colloquially known as "POPS."   Compl. ¶¶ 211, 338.   New York City governs the terms of public access to POPS via applicable Zoning Resolutions and the oversight of the City Council and the City Planning Commission.   Compl. ¶¶ 215-232.   A sign is posted in the atrium of 100 William Street, noting that the space is "required to be open to the public from 7 AM to Midnight."   Compl. ¶ 341.

### C.   Allegations Pertaining to Brookfield Defendants

Defendant Brookfield, a commercial real estate corporation, owns or operates two properties at issue in the instant case.

Like the Mitsui-owned atrium at 100 William Street, Zuccotti Park is a privately owned public space.[2]   Compl. ¶¶ 33, 219, 224, 312.   *See also* Brookfield Defs.' Mot. to Dismiss at 2. Brookfield also operates the Winter Garden, a glass atrium in the World Financial Center.[3]   Brookfield employs defendant James Morrissey as the General Manager of the World Financial Center, a position he held at all times relevant to this action.   Compl. ¶¶ 34, 133.

On or after September 17, 2011, certain individuals associated with the OWS movement entered Zuccotti Park, erected tents and began inhabiting the space.   Compl. ¶¶ 2, 75, 245. After approximately two months of occupation, on November 15, 2011, Mayor Michael Bloomberg directed the NYPD to evacuate Zuccotti Park, at which point the New York City Department of Sanitation and private vendors hired by Brookfield cleaned the park and performed repairs.   Compl. ¶¶ 313, 483, 625.   *See also*

---

[2]     Zuccotti Park was formerly known as Liberty Park.   Throughout their complaint, plaintiffs choose to use the park's former name in a self-described exercise of "iron[y]."   Compl. ¶ 25, n.3.   Eschewing irony in favor of clarity, this opinion uses the property's proper name.

[3]     Although plaintiffs allege that the Winter Garden is also a privately owned public space (Compl. ¶¶ 219, 338), Brookfield clarifies that it merely holds a ground lease, rather than ownership rights, to the Winter Garden. Brookfield Defs.' Mot. to Dismiss. at 5, n.2.   Brookfield's representation comports with a review of the applicable Zoning Regulations, indicating that New York's public-benefit corporation, the Battery Park City Authority, owns the Special Battery Park City District in which the Winter Garden is located. *See* New York City Zoning Resolution, art. VIII, ch. 4 (2013).   The Winter Garden is not listed among New York City's privately owned public spaces. *Privately Owned Public Space: Downtown Manhattan Community District 1*, NEW YORK CITY DEPARTMENT OF CITY PLANNING, http://www.nyc.gov/html/dcp/html/priv/mndist1.shtml#37 (last visited Sept. 26, 2013).

Brookfield Defs. Mot to Dismiss at 3.  According to plaintiffs'
allegations, Brookfield transferred all authority over Zuccotti
Park to the City and the NYPD, which then carried out the
eviction of the OWS protestors.  Compl. ¶¶ 235-37.

The complaint alleges that on November 15, 2011, plaintiff
Timothy Fitzgerald was arrested in Zuccotti Park, and plaintiff
Michael Rivas was beaten and arrested by NYPD officers as he
tried to enter Zuccotti Park.  Compl. ¶¶ 152, 486, 496.  Two
plaintiff City Council Members, Ydanis Rodriguez and Jumaane
Williams, and Democratic District Leader Paul Newell were
prevented by NYPD officers from entering Zuccotti Park on the
same day, and plaintiffs Rodriguez and Newell were arrested and
allegedly assaulted as they approached the park.  Compl. ¶¶ 53,
60-61, 65-68, 484-85, 550.  Members of the NYPD also barred
plaintiff Jeffery McClain from approaching Zuccotti Park.
Compl. ¶¶ 487-88.

The complaint also contains allegations related to OWS
protests at the Brookfield-operated Winter Garden.  Plaintiffs
allege that the Brookfield defendants entered into an agreement
with the NYPD to oust OWS participants from the Winter Garden on
December 12, 2011.  Compl. ¶ 606.  Members of the NYPD,
including Deputy Inspector Winski, allegedly arrested plaintiffs
Wedes, Knefel and Paul Sullivan without probable cause as they
were documenting protest activities in the Winter Garden, but

plaintiffs do not specify how, if at all, the Brookfield defendants were involved in conduct directed at Messrs. Wedes, Knefel and Sullivan. Compl. ¶ 153-156, 159.

Also on December 12, 2011, the NYPD arrested plaintiff photojournalist Charles Meacham in the Winter Garden. Compl. ¶¶ 99-119. Mr. Meacham was subsequently charged with criminal trespassing in the third degree, and these charges were later reduced and then dropped entirely. Compl. ¶¶ 125-142. Plaintiffs allege that defendant James Morrissey, manager of the World Financial Center property in which the Winter Garden was located, lied when he averred in the criminal complaint that he had personally instructed Mr. Meacham to leave the Winter Garden. Compl. ¶¶ 134-39. According to plaintiffs, Mr. Morrissey's allegedly false attestation occurred at the request of the NYPD, in an effort to chill the speech of OWS activists. Compl. ¶¶ 137-39. The Brookfield defendants, in turn, submit a more extensive video of the day's events, showing that Mr. Morrissey made several announcements requesting that OWS protesters vacate the premises. Flaum Decl., Ex. 7.

### D.  Allegations Pertaining to MTA Defendants

Plaintiffs' allegations against the MTA defendants are limited to claims arising out of the arrest of a single plaintiff, Justin Sullivan, in Grand Central Terminal on January 10, 2012. Compl. ¶¶ 161-173, 513-14, 866-95. While filming an

OWS protest at Grand Central Terminal, Mr. Sullivan was arrested by MTA police and members of the NYPD and allegedly treated with excessive force. Compl. ¶¶ 161-62, 866, 890-91. Plaintiffs allege that MTA Lieutenant Lakeram instructed other MTA officers to take Mr. Sullivan's cameras, which allegedly were never returned. Compl. ¶¶ 164, 168-69. After being held in custody for approximately 18 hours, Mr. Sullivan was released. Compl. ¶¶ 873-74. At some point thereafter, Mr. Sullivan returned to the police station at Grand Central Terminal to retrieve his camera and was then re-arrested by Lieutenant Lakeram and held for an additional 24 hours. Compl. ¶¶ 874-75. At oral argument, plaintiffs contended that Mr. Sullivan's re-arrest was retaliatory in nature, while the MTA defendants stated that Mr. Sullivan's previous release from custody had been mistaken and hence the re-arrest was a correction of the prior error. Aug. 20, 2013 Tr. at 39-40, 49. On September 4, 2012, Mr. Sullivan received an Adjournment in Contemplation of Dismissal on the unspecified charges relating to his arrest. Compl. ¶ 172.

With respect to individual defendant MTA Commissioner Michael Coan, plaintiffs do not allege that he was present or involved in Mr. Sullivan's arrest or detention. The complaint merely alleges that, as a 26-year veteran of the NYPD, Mr. Coan "would have had every opportunity to coordinate with NYPD in its

response to OWS generally and handling the press specifically in connection with OWS." Compl. ¶ 405.

## DISCUSSION

### I. Motion to Dismiss Standard

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Where a plaintiff has not "nudged [his] claims across the line from conceivable to plausible," dismissal is appropriate. *Id.* at 570. This pleading standard applies in "all civil actions." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). In applying these standards, we accept as true all factual allegations in the pleadings and draw all reasonable inferences in the non-moving party's favor. *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012).

### II. Analysis of Federal Claims Against Private Defendants

#### A.    § 1983 Claims Against Defendant JPMC

With regard to defendant JPMC, plaintiffs allege that their constitutional freedoms of expression, press, and assembly were violated when they were barred from entering 1CMP. The threshold question, then, must be whether the denial of access to 1CMP implicated First Amendment concerns.

11

It is axiomatic that the First Amendment protects the rights to speak, publish, and assemble against abridgement only by the government. U.S. CONST. amend. I. *See also Hudgens v. N.L.R.B.*, 424 U.S. 507, 513 (1976). Private actors are typically not subject to its constraints, and owners of private property are generally permitted to exclude strangers without First Amendment limitations. *See, e.g.*, *Kalfus v. New York & Presbyterian Hosp.*, 476 F. App'x 877, 879 (2d Cir. 2012) ("In the absence of any government nexus to the challenged action, however, the First Amendment does not prevent a property owner from restricting press access to private property." (citing *Hudgens*, 424 U.S. at 513–21)).

Here, the parties agree that 1CMP is private property owned by JPMC. Compl. ¶¶ 32, 211. Plaintiffs contend, however, that 1CMP has taken on the character and attendant obligations of public space via the original contractual covenants and conditions, its alleged traditional character as a public gathering place, and its incorporation of an area that formerly was a public sidewalk. Pls.' Opp'n to Def. JPMC Mot. to Dismiss at 2–17.

Although the contracts and implementing deeds between JPMC and New York City contain easements for expansions of the street and sidewalks surrounding 1CMP, they contain no easements on the plaza itself. Sillerman Decl., Ex. 17. *See also* Aug. 7, 2013

12

Tr. at 14.   This absence is legally significant, as New York's Statute of Frauds mandates that any interests in land be explicitly stated in writing.   N.Y. Gen. Oblig. Law § 5-703(1) ("An estate or interest in real property . . . cannot be created, granted, assigned, surrendered or declared, unless . . . by a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same."); *see also 2004 Bowery Partners, LLC v. E.G. West 37th LLC*, No. 113810/10, 2011 WL 2651792, at *4 (N.Y. Sup. Ct., June 30, 2011) ("[I]n order to satisfy the statute of frauds, there must be a writing subscribed by [defendant] setting forth the details of the transaction.").

The contractual appearance of the word "plaza" alone falls far short of the "plain and direct language evincing the grantor's intent" necessary to create a legally binding obligation for JPMC to open 1CMP to the public. *Willow Tex, Inc. v. Dimacopoulos*, 68 N.Y.2d 963, 965 (N.Y. 1986).   The dictionary definition on which plaintiffs themselves rely and from which they selectively quote indicates that "plaza" has a number of meanings, including a "public square" or a "market place."   Pls.' Opp'n to Def. JPMC's Mot. to Dismiss at 3; Decl. of Leo Glickman, Ex. A.   Other dictionary definitions of "plaza" confirm the word's multiplicity of meanings, including an "open square," "[a]n open place in a town," and "[a] large paved area

surrounded by or adjacent to shops and businesses, usually designed as a feature of a shopping complex." *See* Reply Decl. of Jeffrey Braun, Ex. B.   1CMP's municipal approval documents do not define the plaza's use value as the plaintiffs propose, but rather suggest that the City may have wanted the plaza for reasons of "light and air," passive recreation, or merely aesthetics.   *See* Sillerman Decl., Ex. 18 at 1008.   Plaintiffs' contentions notwithstanding, the word "plaza" is no surrogate for express language designating 1CMP a privately owned public space.

Further, plaintiffs' assertions that 1CMP shares certain characteristics with public parks are irrelevant and unavailing. Indisputably, 1CMP is not a public park, and indeed has been privately owned since its initial development, irrespective of the fact that, "[b]efore September 17, 2011, persons would regularly gather and meet at One Chase Manhattan Plaza, to speak to one another, eat meals" and engage in other passive recreation.   Compl. ¶ 277.   The Supreme Court has rejected the notion that privately owned space "lose[s] its private character merely because the public is generally invited to use it for designated purposes." *Lloyd Corp. v Tanner*, 407 U.S. 551, 569 (1972).   Indeed, the Court has expressly retracted its erstwhile amenability to applying First Amendment protections to privately owned space.   *See Hudgens v. N.L.R.B.*, 424 U.S. 507, 518 (1976)

("[W]e make clear now, if it was not clear before, that the rationale of *Logan Valley* [applying First Amendment protections to a private shopping mall] did not survive the Court's decision in the *Lloyd* case.")

Finally, while at one time Cedar Street and its adjoined sidewalks ran through the space that is now 1CMP, the incorporation of a former public sidewalk does not suffice to transform 1CMP into a traditional public forum.  Compl. ¶ 274.  What was once a traditional public forum ceased to be so when the City of New York de-mapped and sold, without retention of servitude, a portion of the street and sidewalk to JPMC, which in turn conspicuously changed its objective characteristics by absorbing the property into a raised plaza distinct from the former street grid.  Sillerman Decl., Ex. 1.  *See also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699 (1992) (Kennedy, J., concurring) ("In some sense the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use.").

Plaintiffs cite precedent finding that privately owned streets and sidewalks can in some cases be subject to First Amendment protections; however, the circumstances here are factually dissimilar.  For instance, the plaza itself at 1CMP is burdened by no government-held servitude, unlike the properties

at issue in *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114 (10th Cir. 2002); *Venetian Casino Resort, L.L.C. v. Local Joint Executive Bd. of Las Vegas*, 257 F.3d 937 (9th Cir. 2001); and *Citizens To End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass. 1990). 1CMP is also separate and distinct from Lower Manhattan's street grid and is visually distinguishable as a privately owned space. *Compare Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1255-58 (10th Cir. 2005) (holding that private property was no longer subject to the First Amendment after the city sold its easement to the private property owner and the property was differentiated from the surrounding sidewalks by signage and landscaping features) *with First Unitarian Church of Salt Lake City v. Salt Lake City Corp.,* 308 F.3d 1114, 1122-28 (10th Cir. 2002) (previously holding that the very same private property over which the city then held an easement and which functioned as a pedestrian thoroughfare as part of the city's transportation grid was subject to First Amendment protections). As this review makes clear, the factors articulated by courts to support application of the First Amendment to private property do not apply here.

Accordingly, because 1CMP is privately owned and because the space has not been dedicated to public use, "the constitutional guarantee of free expression has no part to

16

play," and plaintiffs cannot state a claim against defendant JPMC. *Hudgens*, 424 U.S. at 521.

## B.   § 1983 Claims Against Mitsui and the Brookfield Defendants

Plaintiffs also allege violations of their constitutional rights to speech, press, and assembly by Mitsui and the Brookfield defendants during separate confrontations between police and OWS participants at Zuccotti Park, the Winter Garden, and the 100 William Street atrium.

### 1.   Legal Standard for State Action

For plaintiffs to prevail in a 42 U.S.C. § 1983 claim against private defendants Mitsui, Brookfield and James Morrissey, they must establish that Mitsui and the Brookfield defendants acted under color of law.  Because the purpose of § 1983 is to deter or, alternatively, provide redress for constitutional violations perpetrated by state actors, "a plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Tancredi v. Metro. Life Ins*. Co., 316 F.3d 308, 312 (2d Cir. 2003)) (internal quotation marks omitted).  A private actor can undertake "state action" only where the "challenged action of a private party is fairly

attributable to the state." *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010) (citations omitted).

Admittedly, as has been noted, Supreme Court cases on the issue of what precisely constitutes state action "have not been a model of consistency." *United States v. Stein*, 541 F.3d 130, 147 (2d Cir. 2008) (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting)). Nonetheless, state action generally can be attributed to a private entity where

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski*, 546 F.3d at 257 (citing *Brentwood Acad. v Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

Plaintiffs do not allege in their complaint, nor do they argue in their opposition papers, that Mitsui, Brookfield or Mr. Morrissey acted pursuant to the state's compulsion or coercive power. Plaintiffs' arguments instead effectively focus on the second and third standards set forth in *Sybalski*; that is, that Mitsui and the Brookfield defendants are to be considered state actors because they engaged in joint action

with the NYPD to evict OWS activists and because they are stewards of privately owned public spaces.

        **2.   Joint Action Test**

"The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, No. 05 Civ. 7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999). However, a private party's "provision of background information to a police officer does not by itself make [the private owner] a joint participant in state action under Section 1983." *Ginsberg*, 189 F.3d at 272. *See also Liwer v. Hair Anew*, No. 99 Civ. 11117 (SAS), 2000 WL 223828, at *2 (S.D.N.Y. Feb. 25, 2000) ("Where a private person merely seeks the assistance of the police to quell a disturbance, the private party is not 'jointly engaged' in the police officer's conduct so as to render it a state actor under § 1983." (citing *Ginsberg*, 189 F.3d at 272)). In considering joint action claims, courts must assess whether the police independently evaluated the situation. Where "a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct so as to render

it a state actor under Section 1983." *Ginsberg*, 189 F.3d at 272.

In support of their allegations that Mitsui and the Brookfield defendants, respectively, undertook joint action with the NYPD, plaintiffs rely heavily on allegations that Mitsui and Brookfield called upon police to remove OWS participants from Zuccotti Park, the Winter Garden, and the atrium at 100 William Street. Compl. ¶¶ 235-39, 356-57, 360, 398, 602-08. With respect to Mitsui, however, the complaint does not make clear whether any Mitsui associate in fact communicated with police. Plaintiffs allege merely that "an employee of Mitsui invited and encouraged the police to take this action and/or did not prevent the NYPD from taking this action." Compl. ¶ 357.

In any event, summoning police or requesting that police take action to disperse OWS protestors simply does not suffice to constitute joint action or to convert the private party into a state actor. *See Forbes*, 2008 WL 3539936, at *9 (quoting *Liwer*, 2000 WL 223828, at *2). Indeed, even if a private party provides false information to police, as plaintiffs allege that defendant James Morrissey did in the criminal complaint, such provision alone does not constitute joint action actionable

under § 1983.[4]   *See Young v. Suffolk Cnty*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010) (citing *Ginsberg*, 189 F.3d at 272).

The evictions from Brookfield and Mitsui properties in no way involved the type of improper abdication of decision-making authority from police to a private party that would give rise to an inference of joint action.   Rather, the police were engaged in active evaluation and decision-making throughout the duration of the OWS protests.   For instance, plaintiffs allege that an NYPD spokesman informed the press that even before protests began on September 17, "the plans for the [OWS] meeting and protest were 'well known publicly.'"  Compl. ¶ 271.   By the time of the evictions at issue, the movement's scope and media coverage had only grown, as did police monitoring thereof.   *See* Compl. ¶ 78 (alleging increased police observation and restriction of OWS participants between August 2011 and November 2011).   According to the complaint, police "targeted" OWS participants and OWS-affiliated journalists for arrest, rather than merely deferring to the judgment of others.   Compl. ¶¶ 147-48, 158, 397, 501, 556, 563.

With regard to the specific evictions, the complaint alleges—and plaintiffs' video exhibit to the complaint confirms—

---

[4]    As noted *supra*, plaintiffs' allegation that Mr. Morrissey purposefully provided false information in his attestation founders in light of a more complete video cut of that day's events, which plainly shows Mr. Morrissey asking OWS protestors to depart, as he truthfully averred in the criminal complaint.  *See* Flaum Decl. Ex. 7.

that in each case police observed the protests firsthand, interacted with the protestors, and formed an independent judgment, without merely relying on that of the property owners. *See* Exhibit G to Compl. Regarding police conduct at Zuccotti Park, plaintiffs allege that the eviction was "carefully planned by the City and the Police Commissioner," and that "each aspect of the Zuccotti Park operation went according to the City's plan." Compl. ¶ 625. Regarding the arrest of plaintiff Charles Meacham at the Winter Garden, plaintiffs allege that members of the NYPD instructed Mr. Meacham to leave and then arrested him, without apparent input from any Brookfield associate, including Mr. Morrissey. Compl. ¶¶ 106-115. Regarding the 100 William Street eviction, plaintiffs argue that NYPD Deputy Inspector Winski had "essentially unfettered discretion" and "carte blanche . . . to address this 'problem' as he pleased." Pls.' Opp. to Def. Mitsui's Mot. to Dismiss at 18, 20.

Together, these allegations demonstrate that police responding to protest sites reached independent decisions as to what action, if any, to take and how. Plaintiffs simply cannot show the substitution of private judgment for police judgment necessary to constitute joint action. Instead, plaintiffs explicitly plead the very opposite as to defendant Brookfield, which allegedly "actually transferr[ed] discretion and authority to [the] NYPD to order OWS participants off of publicly

accessible open areas." Compl. ¶ 398. See also *id.* ¶¶ 234-37, 320. In sum, plaintiffs' allegations cannot support an inference of joint action with the City or the police against Mitsui or the Brookfield defendants.

### 3. Public Function Test

Plaintiffs' alternative argument—that defendants Mitsui and Brookfield are state actors under the "public function" test—would require that the private defendants perform a function that is "traditionally the exclusive prerogative of the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974). Plaintiffs allege that, by operating a space akin to a public park, Mitsui and the Brookfield defendants satisfy this standard. Pls.' Opp'n to Def. Mitsui's Mot. to Dismiss at 10-17; Pls.' Opp'n to Brookfield Defs.' Mot. to Dismiss at 2-5. This argument is without merit.

Plaintiffs rely heavily on the public function test set out in *Evans v. Newton*, holding that the owner of a former public park, which had been transferred to private ownership in order to introduce racial segregation, constituted a state actor. 382 U.S 296, 299 (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."). In *Evans*, the City of Macon continued to maintain and control the

former public park, which saw virtually no change of circumstances as it passed from public to private ownership beyond a substitution of trustees. *Id.* at 301. The Court reasoned that "[i]f the municipality remains entwined in the management or control of the park, it remains subject to the restraints of the Fourteenth Amendment . . . ." *Id*.

The facts of the instant case, however, are dissimilar and distinguishable. Here, plaintiffs do not allege that the City is involved in any way in controlling or maintaining Zuccotti Park, the Winter Garden, or the atrium at 100 William Street, in contrast to the park in *Evans*.

Further, subsequent decisions have confined *Evans* to its facts. In *Flagg Bros., Inc. v. Brooks*, for instance, the Court characterized the *Evans* holding as "a finding of ordinary state action under extraordinary circumstances" and expressed "doubt" that *Evans* intended to establish a rule whereby operation of a park becomes an exclusively public function. 436 U.S. 149, 159 n.8. *See also Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1255 (10th Cir. 2005) ("*Evans* has since been limited to the unique facts involved."). Although courts have identified other public functions, such as operating a company town, holding primary elections and neutering animals on an exclusive basis, subsequent cases have declined to hold that operating a park open to the public is, in itself, a public

function.  *Compare Marsh v. Alabama*, 326 U.S. 501, 506-08 (1946)
(operation of a company town constituted a public function) *and*
*Terry v. Adams*, 345 U.S. 461, 469-70 (1953) (primary elections
constituted state action) *and Fabrikant v. French*, 691 F.3d 193,
210-11 (2d Cir. 2012) (SPCA animal control activities
constituted a public function) *with Forbes v. City of New York*,
No. 05 Civ. 7331 (NRB), 2008 WL 3539936, at *8 (S.D.N.Y. Aug.
12, 2008) (no public function found in operating a publicly-
owned but privately-licensed park, where the City had no
oversight duties and received no financial benefit from park
activities or speech restrictions).

Because plaintiffs fail to allege state action by Mitsui
and the Brookfield defendants via public function, joint action
or an alternative standard, they do not state a claim against
these defendants under § 1983.  Having thus failed to establish
state action or individual liability, plaintiffs also cannot
state a claim against Mitsui or Brookfield for vicarious
liability.[5]  *See, e.g.*, *City of Los Angeles v. Heller*, 475 U.S.

---

[5]     The minimally alleged conduct by Brookfield and Mitsui does not
constitute grounds for vicarious liability for further reasons.  Even
assuming *arguendo* that plaintiffs had been able to properly show that these
private entities acted under color of law, "[p]rivate employers are not
[vicariously] liable under § 1983 for the constitutional torts of their
employees," absent allegations of conduct pursuant to an official policy.
*Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 452 (S.D.N.Y. 2012) (quoting *Rojas
v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990)).
        Plaintiffs attempt to overcome this impediment by arguing in opposition
papers that the private defendants can be held liable for failing to train
their employees properly.  Pls.' Opp'n to Def. Mitsui's Mot. to Dismiss at
15-17.  Parenthetically, a failure to train theory—considered "most tenuous"

796, 798-99 (1986) (per curiam) (finding no municipal liability for a § 1983 violation where a jury verdict found that the municipal employee inflicted no constitutional injury on the plaintiff); *Curley v. Village of* Suffern, 268 F.3d 65, 71-72 (2d Cir. 2001) (applying the *Heller* analysis to hold that where "the jury found no deprivation of rights in the first instance" by defendant employees, "no cause of action may be maintained against the village [employer]").

### III. Analysis of Federal Claims Against MTA Defendants

#### A.   § 1983 Claims Against the MTA Defendants by Plaintiff Justin Sullivan

While the complaint is not a model of clarity, the primary claims against the MTA defendants appear to be for alleged violations of individual plaintiff Justin Sullivan's First and Fourth Amendment rights, arising from Mr. Sullivan's arrest by MTA Police on January 10, 2012 in Grand Central Terminal, though Mr. Sullivan is not explicitly named in the paragraphs setting forth the First Amendment claims.[6]  *See* Compl. ¶¶ 586-95, 865-95.

---

by the Supreme Court—would require plaintiffs to show a Brookfield or Mitsui "custom or policy" characterized by "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," a dubious proposition at best.  *Connick v. Thompson*, 131 S. Ct 1350, 1359 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (2011).  More to the point, however, the complaint itself contains no allegations of improper training against Mitsui or Brookfield.

[6]   Although plaintiff's counsel contended in oral argument that they also intended to assert the complaint's 13th cause of action against the MTA defendants (Aug. 20, 2013 Tr. at 32), the language of that cause of action references neither the MTA nor Mr. Sullivan.  Compl. ¶¶ 616-21.  Further, the complaint contains no allegations elsewhere against the MTA regarding the activity complained of in that cause of action—*i.e.*, refusing to return or destroy photographs of arrested parties who received favorable terminations

Plaintiff Sullivan advances these claims against the MTA, MTA Police Commissioner Michael Coan in his individual and official capacities, and MTA Police Lieutenant Omeeta Lakeram in her individual and official capacities.

### 1.  Claims against the MTA

Municipal employers generally "are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 131 S. Ct 1350, 1359 (2011). "[T]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). To make the requisite showing, plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."

---

of criminal charges. *Id.* Hence, to the extent it was intended to apply to the MTA, plaintiff has not properly pleaded the 13th cause of action against MTA defendants.

Even if plaintiffs had alleged sufficient facts against the MTA defendants, the right of arrestees to have police photographs returned or destroyed pursuant to New York Crim. Pro. L. § 160.50 is purely statutory in nature and does not implicate constitutional concerns. *New York v. Patterson*, 587 N.E.2d 255, 256 (N.Y. 1991) ("A defendant has no inherent or constitutional right to the return of photographs, fingerprints or other indicia of arrest where charges are dismissed."); *see also New York v. Anderson*, 411 N.Y.S.2d 830, 833 (N.Y. Sup. Ct. 1978) (same). Accordingly, the violation of New York Crim. Pro. L. § 160.50 does not provide grounds for a § 1983 claim. *See, e.g., Grandal v. City of New York*, 966 F. Supp 197, 202-203 (S.D.N.Y. 1997) (dismissing § 1983 claims predicated upon a violation of New York Crim. Pro. L. § 160.50 for failure to allege a constitutional violation).

*Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997).  If the practice giving rise to a plaintiff's claims is an unwritten "custom" rather than an official "policy," plaintiff must show that the "relevant practice is so widespread as to have the force of law."  *Brown*, 520 U.S. at 404 (citations omitted).

Plaintiff Justin Sullivan has failed to allege the requisite MTA custom or policy that caused the violation he allegedly suffered.  The complaint's factual pleadings regarding the MTA are limited to the incident on January 10, 2012 concluding in Mr. Sullivan's arrest, which does not in itself suggest a widespread custom with force of law.  *See id.*  Plaintiff's claims against the MTA pursuant to § 1983 are insufficiently pled as a matter of law.

### 2.   Claims against MTA Commissioner Coan

Plaintiff asserts claims against MTA Police Commissioner Coan in both his official and individual capacities.  The official-capacity claims are "to be treated as a suit against the entity . . . not a suit against the official personally." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted).  For plaintiff's official-capacity claims against Commissioner Coan to survive, an MTA wrongful "'policy or custom' must have played a part in the violation of federal law." *Id.* (quoting

*Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)).  Because plaintiff has not adequately alleged an MTA policy or custom responsible for Mr. Sullivan's alleged injuries, this claim fails as a matter of law.

For plaintiff to successfully state a claim against Commissioner Coan in his individual capacity, by contrast, plaintiff "must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (citation omitted).  Additionally, in the Second Circuit, "[i]t is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

The complaint evinces a total absence of any factual allegations that might establish Commissioner Coan's personal involvement in the alleged violations.  Plaintiff merely alleges that, given his 26-year tenure with the NYPD before joining the MTA Police, Commissioner Coan "would have had every opportunity to coordinate with NYPD in its response to OWS . . . ."  Compl. ¶ 405.  This conclusory speculation, which does not even rise to

the level of factual allegation, is baldly insufficient to state a claim against Commissioner Coan in an individual capacity.

### 3. Claims Against Lieutenant Lakeram

For the same reasons applicable to plaintiff's official-capacity claims against Commissioner Coan, *supra* Section III.A.2, plaintiff fails to state a claim against Lieutenant Lakeram in her official capacity.

Plaintiff Sullivan also asserts claims against Lieutenant Lakeram in an individual capacity, relating to abridgement of Mr. Sullivan's First and Fourth Amendment rights. With regard to his First Amendment claim, "[t]o prevail on [a] free speech claim, plaintiff must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citation omitted).

Applying this standard, plaintiff Sullivan successfully pleads allegations sufficient to state a claim under § 1983 for violation of his First Amendment rights. His participation in and documentation of the January 2012 OWS protest at Grand Central invoked associative and expressive interests protected by the First Amendment. Plaintiff plausibly pleads that his expressive activity motivated or substantially caused the NYPD

to conduct his arrest.    Compl. ¶¶ 162, 513.    Further, Mr. Sullivan includes as an exhibit to his complaint a video that, while not entirely clear, does not undermine his contention. Ex. G to Compl.

Finally, Mr. Sullivan plausibly pleads that Lieutenant Lakeram's conduct chilled his exercise of his First Amendment rights, notwithstanding Mr. Sullivan's allegation that he "intends to participate in Constitutionally protected protest activities in New York City *in the future*."    Compl. ¶ 17 (emphasis added).    Defendants argue in motion papers that, by stating his intent to protest in the future, Mr. Sullivan undermined his allegations that the arrest effectively chilled his exercise of speech rights.    *See* MTA Defs.' Mot. to Dismiss at 14-15; MTA Defs.' Reply at 5-6.    The precedent raised by defendants on this point is inapposite, because in those cases the retaliatory action occurred separately from the speech at issue, calling into question whether First Amendment chilling occurred.    *See, e.g.*, *Rosendale v. Brusie*, No. 07-CV-8149 (CS), 2009 WL 778418 (S.D.N.Y. Mar. 25, 2009); *Sloup v. Loeffler*, No. 05-CV-1766 (JFB), 2008 WL 3978208 (E.D.N.Y. Aug. 21, 2008).

Here, by contrast, defendant Lakeram arrested Mr. Sullivan during his participation in a protest.    Hence, Mr. Sullivan's expressive activity was not merely chilled, but was rather completely frustrated for the period of his arrest.    While, to

31

be sure, "governmental action which falls short of a direct prohibition on speech may violate the First Amendment by chilling the free exercise of speech," here Mr. Sullivan alleges the more axiomatic "direct prohibition," thereby fulfilling the requirement to allege that his speech rights were infringed. *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992). Plaintiff's First Amendment claim against defendant Lakeram thus survives.

In addition to the First Amendment claims, plaintiff also asserts several Fourth Amendment-related claims against the MTA defendants for false arrest, excessive force, and malicious prosecution.[7] Compl. ¶¶ 865-95. The MTA defendants did not move to dismiss plaintiff's false arrest claim, therefore that claim survives. *See* Aug. 20, 2013 Tr. at 51-52. Plaintiff did not contest the motion to dismiss the malicious prosecution claim and conceded that claim at oral argument. Aug. 20, 2013 Tr. at 29-31. Remaining to be decided is plaintiff's claim for excessive force, and a related state law assault and battery claim. Compl. ¶¶ 889-895. However, the Court need not inquire into its merits, because plaintiff makes no factual allegations relevant to excessive force against Lieutenant Lakeram or the MTA. Compl. ¶¶ 889-895. Plaintiff merely alleges that "Defendant John Doe NYPD officer . . . forc[ed] him to the

---

[7]     As discussed *supra*, plaintiff has failed to state a claim against the MTA and defendant Coan pursuant to § 1983 for constitutional violations, leaving only plaintiff's § 1983 claims against defendant Lakeram in her individual capacity to be addressed.

ground and wall multiple times, placing extremely tight flexi-cuffs on his wrists for a lengthy period of time." Compl. ¶¶ 890-91. Accordingly, to the extent that it is necessary to do so, the excessive force claim and the related state law assault and battery claim are dismissed as against the MTA and defendant Lakeram.[8]

## IV.  Conspiracy Claims Against Private Defendants and MTA Defendants

Plaintiffs' conspiracy claims against both the private defendants and the MTA defendants are so underdeveloped that it is unclear whether they are intended under federal or state law. In any event, to properly plead a conspiracy pursuant to § 1983, plaintiffs must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).[9]  Further, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to

---

[8]    Any arguable *respondeat superior* claim against the MTA defendants arising out of the intentional torts allegedly committed by its officers is also dismissed. Compl. ¶¶ 918-20. *See also* Pls.' Opp'n to MTA Defs.' Mot. to Dismiss at 16. Since plaintiff directs his assault and battery claim against an unnamed NYPD officer and does not otherwise allege intentional torts by MTA personnel, plaintiff does not state a claim against the MTA defendants.
[9]    See *Concepcion v. City of New York*, No. 05 Civ. 8501 (RJS), 2008 WL 2020363, at *4-5 (S.D.N.Y. May 7, 2008) for discussion of the *Ciambriello* standard's continued application, pursuant to Supreme Court and Circuit precedent.

deprive the plaintiff of his constitutional rights are properly
dismissed; diffuse and expansive allegations are insufficient,
unless amplified by specific instances of misconduct." *Id.* at
325 (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d
Cir. 1993)).

With regard to defendant JPMC, as discussed *supra* Section
II.A, the exclusion of plaintiffs from 1CMP implicated no First
Amendment concerns.  Thus, even assuming it had been pled with
sufficient specificity, the alleged agreement between defendant
City of New York and defendant JPMC to exclude outsiders from
JPMC property would not have been in violation of law.

The conspiracy analysis as to Mitsui and the Brookfield
defendants is very similar to our initial discussion, *supra*
Section II.B.2, finding no actionable joint action between
private defendants and the NYPD.  *See Ciambriello*, 292 F.3d at
324 (noting the similarity between analysis of joint action and
conspiracy claims under § 1983).  *See also Fisk v. Letterman*,
401 F. Supp. 2d 362, 375-78 (evaluating joint action and
conspiracy claims concurrently).  As noted, a private party is
not liable under § 1983 for "subsequent, independent actions of
a police officer whenever [the party] legitimately calls for
official assistance or protection." *Ginsberg v. Healey Car &
Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999).

Further, plaintiffs' conspiracy allegations against Mitsui and the Brookfield defendants are no more specific than those dismissed as insufficient in similar cases involving arrests at the 2008 Republic National Convention. In *Concepcion v. City of New York*, for example, allegations that an RNC official had repeatedly met and collaborated with city officials to devise a master strategy for managing protestors, some of whom were arrested during the Convention, were found insufficient to survive a motion to dismiss. No. 05 Civ. 8501 (RJS), 2008 WL 2020363 at *5-10 (S.D.N.Y. May 7, 2008) (holding that allegations that RNC official Norcross had discussed a security strategy with City officials "does not support a plausible claim that Norcross or the RNC reached an *agreement* with any other individual or entity, let alone an agreement to violate plaintiff's civil rights.").

Here, plaintiffs allege even less. Against defendants Brookfield and Mitsui, the complaint merely recites the elements of a conspiracy claim and makes conclusory assertions. Compl. ¶¶ 602-15. With regard to Mitsui, plaintiffs undermine their allegations of a prearranged, bilateral conspiracy by alleging that Mitsui came to a "unilateral and sudden decision" emanating from a "self-determined, spontaneous wish" to rid 100 William Street of OWS protestors. Compl. ¶¶ 362, 364.

As against Brookfield employee James Morrissey, Plaintiffs present only one specific factual allegation: that Mr. Morrissey "falsely averred" in a criminal complaint to requesting that an OWS participant leave the Winter Garden. Compl. ¶ 607. As noted earlier, however, a more complete video of the day's events substantiates Mr. Morrissey's account. *See* Flaum Decl. Ex. 7. Nevertheless, even assuming that Mr. Morrissey had deliberately provided false information to police, such provision alone is not sufficient to form the basis of a conspiracy claim. *See Vazquez v. Combs*, No. 04 Civ. 4189 (GEL), 2004 WL 2404224 at *4 (S.D.N.Y. Oct. 22, 2004) ("[M]erely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation."). Plaintiffs' allegations against Mitsui, Brookfield and Mr. Morrissey simply do not support a plausible conspiracy claim.

Plaintiff Justin Sullivan likewise fails to plead sufficient facts to state a claim for conspiracy against the MTA defendants. Instead, the complaint merely makes conclusory allegations of a conspiratorial agreement and attempts to generate suspicion, without more, about MTA Commissioner Coan's prior employment with the NYPD years prior. Compl. ¶ 404-06.

Mr. Sullivan's January 2012 arrest in Grand Central Terminal is the only incident alleged involving conduct by both the MTA and the NYPD.   However, neither the complaint nor the video exhibit to the complaint makes a showing that the NYPD and MTA Police formed an unlawful conspiracy to abridge Mr. Sullivan's constitutional rights.   Compl. ¶¶ 161-66, 513-14, 866-95; Ex. G to Compl.

## V.   State Claims against Private Defendants and MTA Defendants

In addition to the claims discussed *supra*, plaintiffs also assert concomitant state claims against both the private defendants and the MTA defendants, arising from the same alleged conduct and implicating state constitutional rights, as well as, with regard to defendant Brookfield, an apparent assault and battery claim.   "It is well settled that where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."   *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006). Because we have dismissed the § 1983 claims against JPMC, Mitsui and the Brookfield defendants, we will refrain from exercising pendent jurisdiction over the related state claims.   By contrast, since plaintiff's § 1983 claims against defendant Lakeram invoking violation of the First Amendment and false arrest survives, declining pendent jurisdiction with respect to

related state claims against the MTA defendants would be premature.

**VI.   Severance**

In addition to moving for dismissal, the MTA defendants simultaneously moved to sever Justin Sullivan's claims against the MTA, defendant Coan, and defendant Lakeram.   Pursuant to Federal Rule of Civil Procedure 21 and governing case law, "[t]he decision whether to grant a severance motion is committed to the sound discretion of the trial court."   *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1082 (2d Cir. 1988). The following factors are relevant to the determination of severance:   "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims."   *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 214 F.R.D. 152, 154-55 (S.D.N.Y. 2003).

With these factors in mind, we find that severance of the remaining claims against the MTA defendants is appropriate.   Of the many allegations in plaintiffs' prolix complaint, only a small percentage concerns the MTA defendants, even before this

opinion.   More importantly, plaintiffs' allegations against the MTA defendants are limited to a single incident involving a single plaintiff, Justin Sullivan, who does not assert claims against any of the non-MTA defendants.   The occurrences giving rise to Mr. Sullivan's claims against the MTA are independent of plaintiffs' many unrelated allegations involving separate parties and spanning a much longer time period.   Given the infirmity of plaintiffs' conspiracy allegations, discussed *supra* Section IV, there remains no unifying scheme linking Mr. Sullivan's January 2012 arrest with the other incidents alleged. *See id.* at 155-56 (granting severance where conspiracy claim was insufficient).   The balance of factors here weighs in favor of severance.

## CONCLUSION

For the foregoing reasons, we grant the motions to dismiss brought by JPMC, Mitsui and the Brookfield defendants.  We grant in part and deny in part the motion to dismiss brought by the MTA defendants.  We further grant the MTA defendants' motion for severance.  This resolves Docket Nos. 41, 44, 48, and 51.

Dated:    New York, New York
          September 26, 2013

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE