UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

THE NATIONAL PRESS PHOTOGRAPHERS
ASSOCIATION.

Index No. 12-CV-3389 (NRB)

Plaintiff,

**SECOND AMENDED
COMPLAINT**

-against-

**JURY TRIAL DEMANDED**

DEPUTY INSPECTOR EDWARD WINSKI, THE CITY
OF NEW YORK, MAYOR OF THE CITY OF NEW
YORK MICHAEL BLOOMBERG, NEW YORK POLICE
DEPARTMENT COMMISSIONER RAYMOND KELLY,
POLICE OFFICER ROBERT MATRISCIANI,
SERGEANT STEVEN CARO, POLICE OFFICER
MARGARET MONROE, POLICE OFFICER
FERNANDO TRINIDAD, DEPUTY INSPECTOR
FRANK TLOCZKOWSKI, LIEUTENANT DANIEL
ALBANO, JOHN AND JANE DOE NYPD OFFICERS
##1-100,

Defendants.

------------------------------------------------------------------------ X

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiff seeks relief for the violation of their

members' rights secured by 42 USC § 1983 and the First Amendment to the United States

Constitution, and the laws and Constitution of the State of New York and rules and

regulations of the City of New York.

2.      The claims in this action arise from Plaintiff's members' mistreatement during their

press coverage of protests and demonstrations ("Protected Activity") which occurred in

and around September of 2011 and continued in New York City.  In specific, Plaintiff

alleges Defendants interefered to prohibit Plaintiff's members' Protected Activity to

document police efforts to curtail demonstrators' First Amendment rights to assemble and engage in political protest. These protests, which began in 2011, were colloquially referred to as "Occupy Wall Street," which was a time of historic action surrounding social and economic inequality and the undue influence of corporations, and particularly the financial services sector, on government. Plaintiff alleges Defendants' mistreatement is continuous and ongoing and is employed when Defendants seek to cover up their efforts to deprive the public of their right to freely assemble and engage in important political protest of the day. Plaintiff alleges that the City of New York in concert with various private and public entities have employed Officers of the New York City Police Department ("NYPD") and others acting under color of state law, to intentionally and willfully deny Plaintiff's members their rights to engage in Protected Activity, purposefully obstructing Plaintiff and its members from carrying out their duties as members of the press most specifically when it involves efforts to cover police misconuct with regards to public protest.

3.     This unlawful conduct has been undertaken with the intention of obstructing, chilling, deterring and retaliating against Plaintiff and its members for engaging in Constitutionally-protected activities in violation of the laws and Constitution of the United States and the State of New York as well as New York City policies.

4.     Plaintiff seeks injunctive relief as well as special, compensatory and punitive monetary damages against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

**JURISDICTION**

5.      This action is brought pursuant to 28 USC §1331, 42 USC § 1983, and the First Amendment to the United States Constitution.   Pendent party jurisdiction and supplementary jurisdiction over Plaintiff's state law claims are asserted.

6.      Venue is laid within the United States District Court for the Southern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claims occurred within the boundaries of the Southern District of New York.

**INTRODUCTION**

7.      The First Amendment to the United States Constitution states: "Congress shall make no law [I.]  respecting an establishment of religion, or prohibiting the free exercise thereof; [II.] or abridging the freedom of speech, [III.] or of the press; [IV.] or the right of the people peaceably to assemble, [V.] and to petition the Government for a redress of grievances.

8.      Plaintiff's members, in their role as members of the press, many of whom were completing this work as part of their responsibilities for their job, but also as protected activity under the First Amendment of the United States Constitution, attempted to document demonstrations which occurred in and around September of 2011 and forward, which included coverage of the police using wrongful tactics to dissuade and punish those protestors through bad acts and misconduct. Defendants, including but not limited to Defendant City of New York and its police force, the NYPD, have acted to systematically curtail Plaintiff's members' Constitutionally-protected rights.

9.      This lawsuit seeks redress for these violations, including but not limited to ensuring

that Defendant City of New York ("City") and its agents follow the law as it relates to the Protected Activity in accordance with rights under the United States Constitution and New York City laws and NYPD policies without interference.

## PARTIES

10.     Plaintiff National Press Photographers Association ("NPPA") is a New York Corporation that has been awarded 501(c)(6) tax exempt status by the United States Internal Revenue Service, with a principal place of business in the city of Athens, County of Clarke, state of Georgia. Plaintiff NPPA is a professional organization dedicated to the advancement of visual journalism, its creation, practice, training, editing and distribution, in all news media and works to promote its role as a vital public service.  Plaintiff NPPA sues herein directly and on behalf of its approximately five thousand (5,000) active press photographer members, including Stephanie Keith and Robert Stolarik, on whose behalf NPPA has advocated with Defendant City of New York and agents of Defendant Mayor Michael Bloomberg and Defendant Police Commissioner Kelly throughout the course of the incidents described herein.

11.     Defendant The City of New York is a municipal corporation organized under the laws of the State of New York.  NYPD is an agency of the City of New York and its Commissioner and officers are employees and agents of the City of New York.

12.     Defendant Mayor Michael Bloomberg ("Mayor Bloomberg") was at all times here relevant the Mayor of the City of New York.  As such, Mayor Bloomberg was a policy maker with respect to the strategic deployment of police officers at political demonstrations beginning in and around November 2011 and the orders these police officers received

regarding how to handle members of the press covering demonstrations. Mayor Bloomberg is sued in his individual and official capacity as Mayor of the City of New York.

13.    Defendant New York Police Commissioner Raymond Kelly ("the Commissioner") was at all times here relevant the Commissioner of the New York City Police Department, and, as such, was a policy maker with respect to training, supervision, discipline and the strategic deployment of and orders to NYPD officers engaged in the suppression of press coverage of demonstrations beginning in and around November 2011.  The Commissioner is sued in his individual and official capacity as Commissioner of the NYPD.

14.    All other individual state actor Defendants (collectively, "officers" or "the officers") are employees of the NYPD, and are sued in their individual and official capacities.

I.    **MEMBERS OF THE PRESS HAVE BEEN DENIED A RIGHT OF ACCESS TO ASSEMBLE, OBSERVE, AND RECORD POLICE ACTIONS DURING DEMONSTRATIONS**

15.    "'[A] major purpose of [the First] Amendment [is] to protect the free discussion of governmental affairs'.... By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." New York Civil Liberties Union v. NY City Transit Auth., at 431; *quoting* Globe Newspaper v. Superior Court, 457 U.S. 596 at 604 (1982).

16.    Implicit in these protections of the First Amendment is the notion that, in order to have free discussion of governmental affairs, the press must have access to government affairs. Id.

17.    The First Amendment protects the rights to gather information about what public officials do and to record matters of public interest.  Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000);  Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir.1995).

18.    Yet, on November 15, 2011, when Defendants cleared protestors from Zuccotti Park, a place where significant political protest was occurring of national and international importance, Defendants barred the press, and even elected officials from observing their activities.  In fact, members of the press, and elected officials were kept at least two (2) blocks away from the protest for the purpose of barring their ability to engage in Protected Activity.

19.    By way of example, NYPD arrested and assaulted many members of the press, including members of the NPPA, to prevent them from covering or even observing the police action when Zuccotti Park was cleared.

20.    Prior and throughout this event, Plaintiff NPPA has struggled with Defendant City of New York to assure full promulgation of media guidelines to New York City police officers as well as compliance therewith.

21.    This struggle is reflected in an October 17, 2011 letter to NYPD Deputy Commissioner Paul Browne by NPPA general counsel Mickey Osterreicher, additionally signed by representatives of the Associated Press, Dow Jones & Company, Thomas Reuters and the New York Times, among others, noting the NYPD's lack of follow-up and follow-through with resolutions from an August 2011 meeting regarding police-media interactions, attached hereto as Exhibit A.

22.    Defendant City of New York issued no substantive response to NPPA's October 17, 2011 letter.

23.     Thereafter, NYPD conduct towards media journalists, including but not limited to NPPA members, continued to regularly diverge from stated NYPD policies for police-media interactions.

24.     These phenomena were exemplified on November 15, 2011, the date Defendants cleared all protestors from Zuccotti Park, which was a significantly newsworthy event, while barring press from Protected Activity.

25.     Some 26 journalists who tried to reach Zuccotti Park that night to report on the police action were prevented from reaching Zuccotti Park, some of whom were arrested by NYPD.  See "Appendix III: Index of Arrests of Journalists and Others Dcoumenting Occupy Wall Street" appendix to The Global Justice Clinic (NYU School of Law) and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice (Fordham Law School), Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street (2012) attached hereto as Exhibit B. See also weblog of Joshua Stearns, tracking journalist arrests at nationwide political events, accessed on April 29, 2012 from http://storify.com/jcstearns/tracking-journalist-arrests-during-the-occupy-prot attached hereto as Exhibit C.

26.     Many journalists from well-known mainstream media outlets complained of their treatment by NYPD on November 15, 2011, claiming that they were being prevented from performing their duties as professional journalists.  See November 21, 2011 Letter of New York Times Vice President and Assistant General Counsel George Freeman and twelve (12) others to NYPD Deputy Commissioner Paul J. Browne, attached hereto as Exhibit D.

27.     On November 21, 2011, Plaintiff NPPA joined in the letter authored by George Freeman, which additionally noted that since the meeting of August 2011 referenced

therein, the NYPD had only increased its targeting and restriction of journalists, noting specific instances of police abuse of journalists from on and after November 15, 2011, and requesting an immediate meeting with Deputy Commissioner Browne and Defendant Commissioner Kelly to address same.  Id.

28.     As reported, members of the press could not get "anywhere near" Zuccotti Park on the night of the eviction, said journalist Andrew Katz. See Brian Stelter and Al Baker, "Reporters Say Police Denied Access to Protest Site," New York Times Media Decoder Blog, November 15, 2011, incorporated by reference herein and available online at http://mediadecoder.blogs.nytimes.com/2011/11/15/reporters-say-police-denied-access-to-protest-site/, last accessed 5/31/2019.

29.     NY1 reporter Lindsey Christ said that the aggressiveness with which the police handled reporters on the night of the eviction made it "the scariest 20 minutes" of her life. Id.

30.     NY1 reporter Lindsey Christ reported that a New York Post reporter was put in a choke hold by police officers on the night of the eviction.  Id.

31.     Despite the widely reported-upon and observed rough behavior employed by agents of Defendant City on the night of the eviction, NYPD Spokesperson Paul J. Browne carefully stated that "he saw 'nobody' who was manhandled."  Id.

32.     Indeed, the NYPD's use of force in general, and against journalists in particular is on-going and well-documented. See e.g.. Exhibit B.

33.     In response to police treatment of press on November 15, 2011, United States Congressman Jerrold Nadler, Ranking Member of the House Judiciary Subcommittee on the Constitution, and the representative of Lower Manhattan, wrote a letter, dated

December 6, 2011, to United States Attorney General Eric Holder, requesting that the Attorney General initiate an investigation into law enforcement activities surrounding demonstrations.  See December 6, 2011 letter of Congressman Jerrold Nadler, attached hereto as Exhibit E.

34.    In that December 6, 2011 letter, Congressman Nadler described Defendant Mayor Bloomberg's claim that reporters were prevented from approaching Zuccotti Park for their own protection as "hav[ing] little merit."  Congressman Nadler went on to point out that "[j]ournalists enter war zones to inform the American people about the status of those conflicts.  I think they can be trusted to assume the risks associated with covering a non-violent protest.  The actions of the NYPD to prevent the press from covering the protests and the [November 15, 2011] eviction [of protestors from Zuccotti Park] affect core First Amendment values, not just of the right of the press to report, but also the public's right to be informed on matters of great civic importance."  Id. at 3.

35.    Gabe Pressman, then-president of the The New York Press Club, which represents many of the most established media outlets and reporters in the City of New York, wrote a letter to Defendant New York City Police Commissioner Kelly, stating in part: "the brash manner in which officers ordered reporters off the streets [on the night of the eviction] and then made them back off until the actions of the police were almost invisible is outrageous."  See Gabe Pressman, "Open Letter to Mayor Bloomberg and Commissioner Kelly," November 15, 2011, incorporated by reference herein and available online at http://www.nypressclub.org/coalition.php, sub-tab "11/15/2011 – Open Letter to Mayor Bloomberg and Commissioner Kelly," last accessed 5/31/2019.

36.    Mayor Michael Bloomberg paradoxically claimed that the actions taken against

journalists on the night of the eviction were undertaken "to protect" said journalists.  See YouTube, "Bloomberg Defends Blocking Media from Zuccotti Park (via @capitalnewyork)", incorporated by reference herein and available online at http://www.youtube.com/watch?v=cOsujgv8Ueo, last accessed 5/31/2019.

37.     In response to the Press Club letter, Defendant Commissioner Kelly issued a well-publicized "directive" instructing NYPD officers to not unreasonably interfere with press coverage.  See "Update: NYPD to Remind Officers of Media's Rights at 10 Consecutive Roll Calls," available online at http://blogs.nppa.org/advocacy/2011/11/23/nypd-finest-message/, last accessed 5/31/2019.

38.     Nevertheless, the suppression of reporters and the right to freedom of the press and speech persisted thereafter, and continues to date.  See, e.g., February 1, 2012 Letter of New York Times Vice President and Assstant General Counsel George Freeman and ten (10) others to NYPD Deputy Commissioner Paul J. Browne, incorporated herein by reference and attached hereto as Exhibit F.

39.     Plaintiff NPPA has dedicated significant time and resources to assist its members who were arrested while attempting to document the wrongful eviction by Defendants of protesters from Zuccotti Park.

40.     Further, NPPA member and professional press photographer Robert Stolarik, was covering a demonstration on December 12, 2011 at the Winter Garden while protestors engaged in Constitutionally-protected speech and assembly activities.

41.     While he was photographing the unlawful arrests of multiple protestors, Mr. Stolarik was physically blocked by members of the NYPD from doing his job as a member of the press.

42.     Mr. Stolarik continued to try to perform his job, but members of the NYPD continued to try to block him from photographing these wrongful arrests. See video attached as Exhibit G, at timestamps 13:00-14:41.

43.     Plaintiff asserts that this is an example of the ways in which NYPD officers haved misused their police powers to bully and intimidate members of NPPA to discourage press coverage unfavorable to the City and deprive Plaintiff of Protected Activity.

44.     NPPA member and professional press photographer Stephanie Keith was arrested while covering a demonstration on the Brooklyn Bridge on October 1, 2011 for the Associated Press.

45.     Ms. Keith was carrying sophisticated photography equipment with her on October 1, 2011 for the purpose of taking photographs for licensing and sale to major news outlets and the photographs taken prior to Ms. Keith's arrest appeared in major press outlets.

46.     Ms. Keith did not have NYPD-granted press credentials but she violated no police order, and yet members of the NYPD arrested her while she was covering the demonstration.

47.     Thereafter, on September 15, 2012, Plaintiff's member Ms. Keith was covering a different demonstration, when she alleges she was approached without warning or apparent justification by NYPD Lieutenant Albano, who proceeded to grab Ms. Keith by the arm, push her about her upper body, shove her and yell at her incoherently, causing her pain, discomfort, fear and distress.

48.     On information and belief, despite numerous complaints and lawsuits brought against him for acts of battery and wrongful arrests, Lieutenant Albano was and remains a member of the NYPD's legal bureau, which is, *inter alia*, responsible for providing legal

guidance to the NYPD.

49.      NPPA has dedicated significant time, money, and resources towards advocating for its members' rights and getting criminal charges against its members dismissed after its members were arrested by the NYPD for doing nothing more than performing the responsibilities of their jobs.

50.      Plaintiff asserts that when it is politically expedient, such mistreatment and abuses by Defendants continue in New York City, which has required yet another Finest Message regarding members of the press by Defendant NYPD, which was issued most recently on September 14, 2018.  See Exhibit H.

51.      Plaintiff alleges that false arrests and other unlawful conduct also has a chilling affect on the ability of NPPA's members to perform their job duties and from being able to act in their official capacities as members of the press.

52.      Upon information and belief, because of this mistreatment and violation of their rights, many NPPA members working for established media outlets are afraid to assert or enforce their rights in court because of the threat it poses to their careers.

53.      Plaintiff NPPA seeks damages as well as injunctive and equitable relief to curtail the constitutionally violative conduct, policies and practices of Defendant City of New York and its agents described herein as they affect Plaintiff NPPA and its membership, including but not limited to their members' ability to perform their professional duties.


## II.      DEFENDANTS' FAILURES TO MAKE MEANINGFUL EFFORT TO EXERT OVERSIGHT OVER THE NYPD

54.      Plaintiff's members' work also plays a vital role in the public safety.  On September 19, 2011, a peaceful demonstration resulted in NYPD Deputy Inspector Winski arresting a

participant for alleged disorderly conduct and resisting arrest.

55.     NYPD spokesperson Paul Browne alleged in an e-mailed statement that this individual was arrested "for jumping a police barrier and resisting arrest."  See Laura Marcinek, "Wall Street Areas Blocked as Police Arrest Seven in Protest," Bloomberg News, September 19, 2011, incorporated by reference herein and available online at http://www.bloomberg.com/news/2011-09-18/wall-street-occupied-by-a-few-hundred-people-as-protesters-ranks-dwindle.html, last accessed 5/31/2019.

56.     However, a NY Times City Room Blog with photographs showed precisely the opposite –Deputy Inspector Winski tried to pull a protestor over a barrier, and then Winski jumped over the barrier to grab the protestor.  See Colin Moynihan, "Wall Street Protests Continue, With at Least 6 Arrested", New York Times City Room Blog, September 19, 2011, incorporated by reference herein and available online at http://cityroom.blogs.nytimes.com/2011/09/19/wall-street-protests-continue-with-at-least-5-arrested/, last accessed 5/31/2019.

57.     Subsequently, Spokesperson Paul Browne stated that 'he had gotten his facts scrambled." Dwyer, J. "A Spray Like A Punch in the Face" N.Y. Times, 9/27/2011, available online at http://www.nytimes.com/2011/09/28/nyregion/a-burst-of-pepper-spray-like-a-punch-in-the-face.html and incorporated by reference herein, last accessed 5/31/2019.

58.     On information and belief, the above-referred incidents explain the reason why Defendants are motivated to violate Plaintiff's members' right to Protected Activity and block coverage of their activity.  In the absence of proper oversight and accountability, these problems will continue to occur.

59. While the claims in this action originated in 2011, they continue to plague the NYPD, and while the NYPD's stated policies might be sufficient on their face to properly ensure Plaintiff's members' ability to engage in Protected Activity, Plaintiff alleges the problem exists in that individual police offiers, the NYPD or the City at large ignore these policies when they wish to hide from the public more serious misteps by the NYPD. That is, Plaintiff asserts these divergences from NYPD policy are not motivated by appropriate need such as public safety, or justifiable necessity, but rather are used by Defendants to cover up other bad acts that they seek to avoid accountability for such as illegal arrests, police abuse, physical attacks on protestors, curtailing or chilling political protest, or other constitutional rights of citizens, or improperly ejecting members of the public from public space.

60. On information and belief, the NYPD's continuing practice of violating its own policy (including but not limited to NYPD Patrol Guide Procedure 212-49 and related Finest Messages) and combating meaningful efforts towards internal police oversight continue to injure Plaintiff and its members and is excaserbated by the custom and practice of NYPD officers' "blue wall of silence" and refusal to take seriously this issue.

61. Instead, Plaintiff asserts that Defendants continue to deny Plaintiff's members' Protected Activity during protests while violating their own policies for political expedience. This activity is alleged on both a Department wide basis, but also by individual Officers in the NYPD who engage in this practice on a case by case basis.

62. As of the last report on PMU released by Defendant City's Commission to Combat Police Corruption ("CCPC") in 2006, incorporated by reference herein, only fourteen (14) officers comprised the totality of the PMU, and were nominally tasked with monitoring the

performance of any of the approximately forty thousand (40,000) members of the NYPD who may be set down for performance monitoring.

63.    On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same also enables police officers to include false inormation in accusatory instruments and under oath, further compounding the problem.

64.    On information and belief, the NYPD's continuing custom or practice of covering up police misconduct rather than meaningfully addressing same, in conjunction with the NYPD's policy of quantitative enforcement "performance goals," actually encourages police officers to include misinformation in accusatory instruments and under oath because officers are forced to operate in a system which penalizes an absence of enforcement activity, even when no cause for enforcement activity exists, while at the same time enabling officers to make misrepresentations and commit acts of misconduct against civilians, including members of the press, without employment consequences.

65.    On information and belief, taken together these practices, policies and customs engender improper incentives for officers to commit acts of misconduct against civilians including Plaintiff's members without consequences, and without hope of this changing, and allows the City and the NYPD to ignore its own policies out of political expediency while letting individual NYPD Officers to act improperly without accountability.

## EQUITABLE RELIEF

66.    Injunctive relief is appropriate in this case because firstly, the Plaintiff has shown that its members' Constitutional rights have been violated. Lewis v. Casey, 518 U.S. 343 (1996).

67.     Secondly, Plaintiff has shown that, in light of the continuous and ongoing nature of the Constitutional violations at issue, said violations are highly likely to recur.

68.     Where a Plaintiff's right to free speech has been infringed in the past, the chilling effect of future speech is a sufficient continuing injury to obtain injunctive relief.  Secretary of State of MD. V. Joseph H. Munson Co., Inc., 467 U.S. 947 at 956-957 (1984).

69.     Where an individual officer's misconduct is officially authorized it is likely to recur, and therefore injunctive relief is appropriate.  City of Los Angeles v. Lyons, 461 U.S. 95 at 106.  See also Illinois Migrant Council v. Pilliod, 540 F.2d 1062, 1067 (7th Cir. 1976).

70.     Plaintiff has standing, and injunctive relief is granted where they "allege a pattern of localized, intentional misconduct aimed at a particular set of identifiable individuals, those individuals satisfied the requirement that they show an imminent threat of injury." Nat'l Council of La Raza v. Gonzales, 468 F. Supp. 2d 429, 442 (E.D.N.Y. 2007).

71.     For example, the court upheld standing and the availability of injunctive relief where a plaintiff who had been falsely arrested in high drug areas feared further future injury because of the pattern of conduct exhibited by police and because the arrests took place in targeted geographical zones, i.e. high drug areas.  Roe v. City of New York, 151 F.Supp. 2d 495 (S.D.N.Y. 2001).  See also Zepeda v. U.S.I.N.S., 753 F.2d 719 (9th Cir. 1983); Illinois Migrant Council v. Pilliod, 540 F.2d 1062 (7th Cir. 1976); National Congress of Puerto Rican Rights v. City of New York 191 F.R.D. 52 (S.D.N.Y. 1999).

72.     Plaintiff here has demonstrated that their members' Constitutional rights have been violated repeatedly.

73.     Plaintiff NPPA is entitled to relief and has standing to participate in this lawsuit. Plaintiff NPPA has demonstrated that its members have been targeted as members of the press by Defendants and Defendants' agents.  Plaintiff NPPA and its members are chilled from engaging in future activity protected by the First Amendment.  Finally, upon information and belief, the conduct described herein was authorized by Defendants.

74.     Each of these factors, along with past injury, demonstrate the high likelihood that injury to Plaintiff and other members of the press are likely to recur; and further, that Plaintiff's members' exercise of their First Amendment rights have been chilled by the likelihood that the injury will recur.

75.     Therefore, Plaintiff are entitled to injunctive relief.

### FIRST CAUSE OF ACTION
### VIOLATION OF CONSTITUTIONAL RIGHTS
### (UNITED STATES CONSTITUTION AND 42 USC § 1983)

76.     Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

77.     The above-referred acts by Defendants were undertaken under color of law.

78.     The above-referred acts by Defendants were undertaken in the exercise of Defendants' official duties.

79.     The above-referred acts by Defendants violated the Constitutional rights of Plaintiff's members including Plaintiff's members' right to engage in Protected Activity.

80.     Plaintiff NPPA and its members were injured as a result of Defendants' acts.

**SECOND CAUSE OF ACTION**
**VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS**
**PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM**
**OBSERVING AND RECORDING POLICE ACTIONS AGAINST PROTESTERS**
**(FIRST AMENDMENT OF THE CONSTITUTION OF THE**
**UNITED STATES OF AMERICA AND 42 USC § 1983)**

81.     Plaintiff repeats and reiterates each and every allegation set forth above with the

same force and effect as if more fully set forth at length herein.

82.     Members of NPPA, including but not limited to Stephanie Keith and Robert

Stolarik, have been prevented by NYPD officers from observing, recording and reporting

on protest activities and police response to said activities.

83.     Members of the Plaintiff, including the above referenced, and other members of NPPA,

were forcibly removed, stopped from engageing in Protected Activity, sometimes arrested by

NYPD officers from the scene of police actions against protesters for no lawful purpose.

84.     In addition, Plaintiff alleges members of the press are targeted by police officers

for arrest and harassment to deter them from recording and observing police activity,

specifically police efforts to chill political protest.

85.     Furthermore, the unlawful interference with Proteced Activity and prevention of

coverage by NPPA members of police activities in connection with demonstrations, and

other political activity, violates the rights of Plaintiff's members.

86.     As a result of Defendants' conduct, NPPA has been harmed financially as it has

dedicated significant resources towards supporting and defending its members.

87.     Defendants have deprived the above and other members of Plaintiff of their civil,

Constitutional and statutory rights and have conspired to deprive them of such rights and

are liable to Plaintiff under 42 USC § 1983.

88.    As a result, Plaintiff NPPA and its members have been injured.

### THIRD CAUSE OF ACTION
### VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF PRESS
### PUBLIC SPEECH BY PREVENTING PRESS MEMBERS FROM
### OBSERVING AND RECORDING POLICE ACTIONS AGAINST PROTESTERS
### (ARTICLE 1 § 8 OF THE CONSTITUTION OF THE STATE OF NEW YORK,
### STATE CONSTITUTIONAL TORT)

89.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

90.    Members of the NPPA, including but not limited to Stephanie Keith and Robert Stolarik, have been prevented by NYPD officers from observing, recording and reporting on demonstrations and police response to said activities and otherwise engaging in Protected Activity.

91.    Members of Plaintiff, including the above referenced, and other, members of NPPA, were forcibly removed, stopped from engaging in Protected Activity, and sometimes arrested by NYPD officers from the scene of police actions against protesters for no lawful purpose.

92.    In addition, members of the press are targeted by police officers for arrest and harassment to deter them from recording and observing police activity.

93.    Furthermore, the deliberate and unlawful interference with and prevention of reporting about police activities in connection with demonstrations, and other political activity, violates the rights Plaintiff's members from being free of unlawful and unnecessary infringement of their free speech rights.

94.    As a result of Defendants' conduct, NPPA has been harmed financially as it has dedicated significant resources towards supporting and defending its members.

95.     Defendants have deprived the above and other members of Plaintiff of their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to Plaintiff under the State Constitution.

96.     As a result, Plaintiff NPPA and its members have been injured.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF RIGHT TO FREE SPEECH AND FREE ASSEMBLY IN**
**PUBLIC SPACES**
**(FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED**
**STATES OF AMERICA, AND, 42 U.S.C. § 1983,)**

97.     Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

98.     Members of Plaintiff, including but not limited to Stephanie Keith and Robert Stolarik, have attempted to enter and/or remain in publicly accessible open areas in accordance with each area's published rules.

99.     They were prevented from entering and/or forced to leave and/or arrested for being in a publicly accessible open area by Defendants and precluded from engageing in Protected Activity.

100.    As a result of Defendants' conduct, NPPA has been harmed financially as it has dedicated significant resources towards supporting and defending its members.

101.    Defendants have deprived the above and other members of Plaintiff of their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to Plaintiff under 42 USC § 1983, New York State common law, and the New York State Constitution.

102.    As a result, Plaintiff NPPA and its members have been injured.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF RIGHT TO FREE SPEECH AND**
**FREE ASSEMBLY IN PUBLIC SPACES**
**(ARTICLE 1 § 8 OF THE CONSTITUTION OF THE**
**STATE OF NEW YORK, STATE CONSTITUTIONAL TORT)**

103.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

104.    Members of Plaintiff, including but not limited to Stephanie Keith and Robert Stolarik, attempted to enter and/or remain in publicly accessible open areas in accordance with each area's published rules.

105.    They were prevented from entering and/or forced to leave and/or arrested for being in a publicly accessible open area by Defendants and/or otherwise precluded from engaging in Protected Activity.

106.    As a result of Defendants' conduct, NPPA has been harmed financially as it has dedicated significant resources towards supporting and defending its members.

107.    Defendants have deprived the above and other members of Plaintiff their civil, Constitutional and statutory rights and have conspired to deprive them of such rights and are liable to Plaintiff under 42 USC § 1983, New York State common law, and the New York State Constitution.

108.    As a result, Plaintiff NPPA and its members have been injured.

**SIXTH CAUSE OF ACTION**
**MUNICIPAL AND SUPERVISORY LIABILITY**
**(THE CITY OF NEW YORK, MAYOR BLOOMBERG**
**AND COMMISSIONER KELLY UNDER 42 USC § 1983 AND MONELL V.**
**CITY OF NEW YORK DEPARTMENT OF SOCIAL SERVICES, 436 U.S. 658**
**(1978))**

109.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

110.    The City and the Commissioner are liable for the damages suffered by Plaintiff as a result of the conduct of their employees, agents, and servants.

111.    The City and the Commissioner knew or should have known of their employees', agents', or servants' propensity to engage in the illegal and wrongful acts detailed above.

112.    The aforesaid events were pre-planned by the City and the Police Commissioner. For example, The Commissioner and the Mayor of the City of New York, Michael Bloomberg, have both said that each aspect of the Zuccotti Park operation went according to the City's plan.

113.    The aforementioned actions are occurring in an open and notorious manner. Furthermore, much of the aforementioned activities have been carried out by police supervisors and presumably at the direction of the City and the Commissioner.  If the City and Commissioner are not directing such actions, they are tacitly accepting and encouraging such conduct.

114.    Similarly, the forcible removal of members of the press from public spaces and the prevention of members of the press to observe and record police activities and otherwise engage in Protected Activity has been widely reported on and happens in the presence of and at the direction of supervising officers.  The New York Press Club was loudly critical of the actions taken against members of the press, and they were acknowledged publicly by Commissioner Kelly.  There is therefore evidence that the City and Commissioner have notice of such actions and yet, the City, Commissioner and their supervisors either direct such actions or tacitly accept and encourage them by not preventing officers from engaging in such conduct and disciplining them.

115.    The City and the Commissioner have been aware for some time (from lawsuits,

notices of claim and complaints filed with the Civilian Complaint Review Board) that many of their police officers are insufficiently trained on the observations necessary to support arrests and prosecutions. The City and the Commissioner are further aware, from the same sources, that NYPD officers had been complained of engaging in such bad acts. Further, upon information and belief, the City and the Commissioner have failed to discipline officers for not reporting fellow officers' misconduct that they have observed, and fail to discipline officers for making false statements to disciplinary agencies. Upon information and belief, the City is aware that all of the aforementioned has resulted in violations of citizens' and specifically Plaintiff's members' Constitutional rights. Despite such notice, the City and the Commissioner, have failed to take corrective action. This failure and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

116.    The City and the Commissioner have failed to take the steps to discipline, train, supervise or otherwise correct the improper, illegal conduct of the individual Defendants in this and in similar cases involving misconduct or take steps to change Department-wide breaches from policy.

117.    The above described policies and customs demonstrated a deliberate indifference on the part of policymakers of the City and the Commissioner to the Constitutional rights of persons within New York City, and were the cause of the violations of the rights of Plaintiff and its members here alleged.

118.    Defendants have damaged Plaintiff and its members by their failure to properly train, supervise, discipline, review, remove, or correct the illegal and improper acts of their employees, agents or servants in this and in similar cases involving police misconduct.

119.    Plaintiff NPPA and its members have been damaged as a result of the wrongful,

grossly negligent and illegal acts of the City and the Commissioner.

### SEVENTH CAUSE OF ACTION
### RETALIATION FOR FIRST AMENDMENT PROTECTED
### EXPRESSION/EXPRESSIVE ASSOCIATION AGAINST INDIVIDUALS
### OBSERVING, RECORDING AND COMMENTING UPON POLICE
### ACTIONS
### (FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED
### STATES OF AMERICA, ARTICLE 1 § 12 OF THE CONSTITUTION OF THE
### STATE OF NEW YORK, 42 USC § 1983 AND STATE CONSTITUTIONAL
### TORT)

120.    Plaintiff repeats and reiterates each and every allegation set forth above with the

same force and effect as if more fully set forth at length herein.

121.    In many of the incidents detailed above and throughout the course of Occupy Wall

Street, numerous members of NPPA have been subjected to adverse actions including but

not limited to arrest, assault, battery and malicious prosecution for observing, recording,

reporting on and/or commenting upon police conduct, or have been stopped from engaging

in Protected Activity.

122.    The aforesaid actions and other like actions were undertaken by the NYPD for no

proper purpose.

123.    The aforesaid actions and other like actions undertaken by the NYPD against

members of NPPA were causally connected to the First Amendment protected activities of

the aforesaid members of Plaintiff NPPA.

124.    Defendants took adverse action against the aforesaid membrs of Plaintiff NPPA

and other persons similarly situated in deliberate efforts to chill the First Amendment

protected expression of persons observing, recording, and/or commenting upon police

actions undertaken in the course of various protests and demonstrations.

24

125.    Upon information and belief, officers of the NYPD have retaliated against Plaintiffs' members in order to deter those individuals from recording and disseminating instances of police misconduct.

126.    Upon information and belief, officers and ranking officers of the NYPD are aware of the First Amendment rights of members of Plaintiff.

127.    Upon information and belief, officers and ranking officers of the NYPD have willfully acted to deter individuals from documenting police actions in order to increase their capacities to use improper force, false arrests and malicious prosecutions to deter participation in protest activity.

128.    As a result of Defendants' conduct, NPPA has been harmed financially as it has dedicated significant resources towards supporting and defending its members.

## EIGHTH CAUSE OF ACTION
## RESPONDEAT SUPERIOR

129.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

130.    The Defendants' intentional tortious acts were undertaken within the scope of their employment by Defendant City of New York in furtherance of the Defendant City of New York's interest.

131.    As a result of Defendants' tortious conduct in the course of their employment and in furtherance of the business of Defendant City of New York, Plaintiff NPPA and its members were damaged.

**WHEREFORE**, the Plaintiff will likely succeed on the merits and;

**WHEREFORE**, unlawful interference with Constitutional rights is *per se* irreparable harm; and

**WHEREFORE**, these causes of action are not moot as they are continuing to occur and they are "capable of repetition, yet evading review" Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975), Williams v. Ward, 845 F.2d 374, 380 n.6 (2d Cir. 1988) People ex rel. Maxian on Behalf of Roundtree v. Brown, 164 A.D.2d 56, 58, (2d Dep't. 1990) aff'd, 77 N.Y.2d 422 (1991);

**WHEREFORE**, other large municipalities, including Oakland[1] and Detroit[2], currently have an Independent Police Monitor authorized by a Federal Court as a result of similar problems that began by (i) initially auditing then present police practices and thereafter, (ii) working with members of the police force and the the Department of Justice (Detroit) or Plaintiff (Oakland) to create and/or ensure compliance with substantive and procedural requirements entered in a consent decree that would increase best police practices in those police departments; and (iii) on a quarterly basis report back to the Federal Court on compliance by the police department with the 201 substantive and procedural requirements (Detroit) or 51 tasks (Oakland)[3].

---

[1] Oakland Police Department, (http://policeperformancesolutions.com/oakland.htm )

[2] Detroit Police Department (http://policeperformancesolutions.com/detroit.htm)

[3] Additionally, after an extensive investigation by the Department of Justice, the Puerto Rico police department - the second largest police department in the United States - was found to have a systematic pattern and practice of (i) excessive force in violation of the Fourth Amendment; (ii) unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and (iv) unlawful searches and seizures in violation of the Fourth Amendment. http://www.justice.gov/crt/about/spl/documents/prpd_exec_summ.pdf

**PLAINTIFF RESPECTFULLY REQUESTS** that the court:

(a) Issue a permanent injunction enjoining Defendants from forcibly preventing lawful entry into public spaces, and from forcibly removing citizens lawfully remaining in public spaces;

(b) Issue a permanent injunction enjoining Defendants from improperly preventing press access to policing activities in connection with public speech and assembly;

(c) Direct Defendants to implement training for all members of the NYPD regarding police-press relations and to require discipline when press policies are violated;

(d) Issue an Accountability and Transparency Order that the NYPD appoint an agreed upon independent monitor[4] to:

    i. Review all denials of press credentials by Defendants from 2010 to present;

    ii. Undertake an investigation into how a decision is made by the NYPD to issue press credentials and address press access;

    iii. Undertake an investigation into how a decision is made by the NYPD to close public spaces, and how they occurred at:

        a. 100 William Street on 1/11/12;

        b. Zuccotti Park on 11/15/11 and 3/17/12;

        c. Union Square on 3/21/12;

---

[4] Currently there are at least two major American Cities, that have independent monitors auditing and oversight of their Police Department, appointed and pursuant to federal litigation. Oakland Police Department, (See http://policeperformancesolutions.com/oakland.htm ) Detroit Police Department (http://policeperformancesolutions.com/detroit.htm), See also Cincinnati Police Department (2001) http://www.cincinnati-oh.gov/police/downloads/police_pdf5114.pdf.

> d. One Chase Manhattan Plaza, from 9/17/11 to present in varying forms;

> iv. Review all complaints filed with the IAB related to this activity and audit such response by the IAB;

> v. Review all complaints forwarded by the CCRB related to this activity and audit such responses by the NYPD to report on the findings.

(e) Issue an accountability and transparency order that the NYPD report on its hierarchial structure for all at Captain level or higher, and the structure for who the Commissioner reports to with regards to press and Protected Activity.

(f) Issue a Declaratory judgment declaring that the complained of conduct is unlawful;

(g) Award money damages to Plaintiff NPPA who has been damaged by the unlawful and/or unconstitutional actions of Defendants;

(h) award attorney's fees pursuant to 42 USC §§ 1983 and 1988.

Dated:  May 31, 2019

The Kurland Group

$\sim$//s//$\sim$
Yetta G. Kurland, Esq.
85 Broad Street, 28th Floor
New York, N.Y. 10004
Telephone: (212) 253-6911
kurland@kurlandgroup.com